# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# BEAUMONT DIVISION

|  |  |  |
|---|---|---|
| BARTHOLOMEW GRANGER, | § | |
| | § | |
| Petitioner | § | |
| | § | |
| v. | § | No. 1:17-cv-00291-RC |
| | § | |
| LORIE DAVIS, | § | **THIS IS A CAPITAL CASE** |
| Director, Texas Department of | § | |
| Criminal Justice, Correctional | § | |
| Institutions Division, | § | |
| | § | |
| Respondent. | § | |

---

# PETITION FOR WRIT OF HABEAS CORPUS
# BY A PRISONER IN STATE CUSTODY
# PURSUANT TO 28 U.S.C. § 2254 *et seq.*

PETER WALKER
Tex. Bar No. 24075445
CLAUDIA VAN WYK
Pa. Bar No. 95130
Federal Community Defender for the
Eastern District of Pennsylvania
Suite 545 West, The Curtis Center
601 Walnut Street
Philadelphia, PA 19106
(215) 928-0520
peter_walker@fd.org
claudia_vanwyk@fd.org

May 11, 2018

## PRELIMINARY STATEMENT

Petitioner, Bartholomew Granger, submits his claims for relief, supporting facts, and a limited number of references to principles of law necessary to contextualize the claims. Mr. Granger wishes to brief the points of law supporting his claims in a Memorandum of Law and respectfully requests that this Court permit him to do so at a later date.

The appendix to this Petition will be cited as A___. The Reporter's Record will be cited as ___ RR ___. The Clerk's Record will be cited as CR ___. The Supplement to the Clerk's Record will be cited as ___ Supp. CR ___.

The opinion of the Texas Court of Criminal Appeals denying relief on Mr. Granger's direct appeal appears in the Appendix and at *Granger v. State*, No. AP-77,017, 2015 WL 1875907 (Tex. Crim. App. April 22, 2015) (A___). The order of the Texas Court of Criminal Appeals denying habeas relief appears in the Appendix and at *Ex parte Granger*, No. WR-83,135-01, 2017 WL 3379285 (Tex. Crim. App. May 17, 2017), *cert. denied sub nom. Granger v. Texas*, 138 S. Ct. 470, 470 (2017) (A___).

# TABLE OF CONTENTS

PRELIMINARY STATEMENT...................................................................................................i

TABLE OF AUTHORITIES...............................................................................................xiv

INTRODUCTION....................................................................................................................1

STATEMENT ABOUT EXHAUSTION AND PROCEDURAL DEFAULT.........................2

EXCEPTIONS TO PROCEDURAL DEFAULT ..................................................................2

STANDARD OF REVIEW UNDER THE AEDPA ..............................................................3

    A. General Standards ........................................................................................................3

    B. Because the Last Reasoned State Court Opinion Was Adopted Nearly Verbatim
       from Respondent's Proposed Order, AEDPA Deference Should Not Apply to
       Those Claims that Were Adjudicated on the Merits in State Habeas Proceedings. ............4

STANDARDS RELATING TO INEFFECTIVE ASSISTANCE OF COUNSEL ......................6

REQUEST FOR AN EVIDENTIARY HEARING...............................................................7

STATEMENT OF THE CASE ...............................................................................................8

    A. Procedural History ........................................................................................................8

    B. The Preparation for Trial .............................................................................................9

    C. The Trial Testimony....................................................................................................13

        1. The Guilt-Innocence Phase ...............................................................................13

        2. The Penalty Phase................................................................................................16

    D. The Evidence That Could Have Been Introduced At Trial...................................22

CLAIMS FOR RELIEF .........................................................................................................25

  I.    TRIAL COUNSEL'S CONFLICTING LOYALTIES ACTUALLY AFFECTED
       THEIR PERFORMANCE AT BOTH PHASES OF TRIAL, AND THE
       CUMULATIVE EFFECT OF THEIR DEFICIENT PERFORMANCE
       PREJUDICED THE DEFENSE AT BOTH PHASES OF TRIAL, DEPRIVING
       MR. GRANGER OF HIS SIXTH AMENDMENT RIGHTS ...............................25

  II.   TRIAL COUNSEL'S PERFORMANCE DURING VOIR DIRE DEPRIVED
       PETTITIONER OF THE EFFECTIVE ASSISTANCE OF COUNSEL ...............28

    A. Counsel Provided Ineffective Assistance by Failing to Remove Biased and
       Misinformed Jurors, Failing to Determine that Jurors Were Able to Consider and
       Give Effect to Mitigating Evidence, and Failing to Determine that Jurors Were
       Able to Consider a Life Sentence.................................................................................28

        1. Trial Counsel Allowed the Seating of Three Jurors Who Had Experienced
           Violence Similar to the Kinds at Issue in the Trial.........................................29

        2. Counsel Allowed the Seating of a Juror Who Was Not Life Qualified.......................35

        3. Counsel Allowed the Seating of a Juror Who Was Not Prepared to Accept
           Psychological Evidence.......................................................................................39

4.   Counsel Failed to Object to or Clarify the Prosecutor's Mischaracterization of Mitigation, Resulting in the Seating of Jurors whose Fitness to Consider Mitigating Evidence was Unknown ..................................................40

5.   Counsel Failed to Exhaust Peremptory Challenges........................................45

B.   Counsel's Deficiency Was Presumptively Prejudicial and, in Any Case, Prejudiced the Defense ..................................................................................................................46

C.   Any Procedural Default Is Excused ..........................................................................46

III.   TRIAL COUNSEL'S FAILURE TO RAISE AN EQUAL PROTECTION CHALLENGE TO THE PROSECUTOR'S RACIALLY DISPROPORTIONATE EXERCISE OF PEREMPTORY CHALLENGES DEPRIVED MR. GRANGER OF THE EFFECTIVE ASSISTANCE OF COUNSEL..................................47

A.   *Batson v. Kentucky* and Its Progeny Prohibit the Exclusion of Even a Single Potential Juror on the Basis of Race..........................................................................48

B.   Trial Counsel Were Ineffective for Failing to Object Contemporaneously to the Pattern of Disproportionate Strikes ........................................................................49

C.   State Habeas Counsel's Failure to Raise Trial Counsel's Ineffectiveness Excuses Any Default of the *Batson* Ineffectiveness Claim ..................................................51

IV.   TRIAL COUNSEL'S EMPLOYMENT OF THE COURT'S COMPETENCY EXPERT AS AN EXPERT FOR THE PENALTY-PHASE DEFENSE DEPRIVED MR. GRANGER OF DUE PROCESS OF LAW, AND COUNSEL'S FAILURE TO OBTAIN AN INDEPENDENT EXPERT, OR TO CONSULT WITH AND PREPARE HIS APPOINTED EXPERT BEFORE PRESENTING HIS TESTIMONY, DEPRIVED MR. GRANGER OF THE EFFECTIVE ASSISTANCE OF COUNSEL ..................................................................................51

A.   Dr. Gripon's Involvement in the Case.....................................................................52

B.   The Conversion of the Court's Expert Psychiatrist into a Defense Expert Violated Mr. Granger's Right to Due Process of Law..........................................................54

C.   Trial Counsel Ineffectively Sought the Appointment of an Expert Who Had Conflicting Loyalties, and Then Employed That Expert Ineffectively .......................56

D.   Any Procedural Default Is Excused ..........................................................................58

V.   TRIAL COUNSEL WERE INEFFECTIVE FOR HIRING AS THEIR LEAD INVESTIGATOR THE FATHER OF A WITNESS FOR THE PROSECUTION..........59

VI.   TRIAL COUNSEL'S FAILURE TO INVESTIGATE, PREPARE, AND PRESENT READILY AVALABLE, POWERFUL MENTAL HEALTH EVIDENCE DEPRIVED MR. GRANGER OF THE EFFECTIVE ASSISTANCE OF COUNSEL..................................................................................63

A.   Counsel Failed to Adequately Investigate, Develop, and Present Evidence of Petitioner's Mental Health..........................................................................................64

B.   Counsel's Failures Prejudiced Petitioner..................................................................65

1.   Petitioner suffers from diffuse organic brain damage................................66

2.   Petitioner is a Mentally Ill Trauma Survivor................................................67

    C. Any Procedural Default Is Excused ........................................................................69

VII. TRIAL COUNSEL FAILED TO INVESTIGATE, DEVELOP, AND PRESENT
    COMPELLING MITIGATING EVIDENCE OF MR. GRANGER'S
    BACKGROUND ......................................................................................................70

    A. The Story of Violence, Instability, and Neglect that Could Have Been Presented
        to the Jury ............................................................................................................70

        1. Domestic Violence and Extreme Instability .................................................70

        2. Neglect and Poor Parenting ...........................................................................72

        3. Poor Performance in School ..........................................................................73

        4. Murder of Samantha Granger and Growing Distrust ....................................73

        5. Vallire's Strange Behavior and Undiagnosed, Untreated Mental Illness ....74

    B. Counsel's Investigation and Presentation of Mitigating Evidence Were Deficient..........75

    C. Counsel's Failures Prejudiced Petitioner....................................................................77

    D. The State-Court Opinion ...........................................................................................80

VIII. PETITIONER WAS DENIED HIS SIXTH AMENDMENT RIGHT TO
    EFFECTIVE ASSISTANCE OF COUNSEL AT THE PENALTY PHASE OF
    TRIAL AS A RESULT OF COUNSEL'S FAILURE TO ADEQUATELY
    INVESTIGATE AND PREPARE WITNESSES AND THROUGH
    PRESENTATION OF OVERTLY HARMFUL EVIDENCE....................................81

    A. Counsel's Deficient Performance During the State's Presentation of Its Penalty
        Phase Case ..........................................................................................................82

    B. Counsel Presented Harmful Evidence ......................................................................84

        1. Reverend James McAbee.............................................................................84

        2. Ulyssess Granger, Sr.....................................................................................85

        3. Fellow Inmates ..............................................................................................85

        4. Petitioner's Mother—Vallire Ozene ............................................................88

    C. Counsel's Inept Closing Argument............................................................................89

    D. Petitioner Was Prejudiced as a Result of Counsel's Harmful Acts and Omissions..........91

    E. State Habeas Counsel Ineffectiveness .......................................................................92

IX. TRIAL COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT
    SAMANTHA JACKSON'S DIARY OR OTHER AVAILABLE DOCUMENTARY
    EVIDENCE, TO REBUT HER CLAIM THAT HER FATHER SEXUALLY
    MISTREATED HER, DEPRIVED MR. GRANGER OF THE EFFECTIVE
    ASSISTANCE OF COUNSEL AT THE PENALTY PHASE ................................92

    A. Counsel Failed to Discover or Use the Diary ...........................................................93

    B. Counsel's Failure to Investigate the State's Case for Death Was Deficient .....................94

    C. Counsel's Failure to Investigate and Present the Diary Prejudiced the Defense at
        the Penalty Phase.................................................................................................95

    1.  The Diary Does Not Say or Suggest that Mr. Granger Sexually Abused His Daughter ..................................................................................................96

    2.  Ms. Jackson Refers to Mr. Granger As Her "Mother and Dad and[] Friend" ...........96

    3.  Counsel's Deficiency Deprived Mr. Granger of Valuable Rebuttal and Mitigation Evidence ...............................................................................97

  D.  Because The State Court's Ruling Rested on an Unreasonable Determination of the Facts and No Conclusions of Law, This Court's Review Is De Novo........................97

X.   PETITIONER'S RIGHT TO DUE PROCESS WAS INFRINGED BY IMPROPER PROSECUTORIAL ARGUMENT AT PENALTY-PHASE SUMMATION, AND HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL WAS INFRINGED BY THE FAILURE OF TRIAL COUNSEL TO OBJECT ...................... 100

XI.  PETITIONER WAS DENIED HIS SIXTH AMENDMENT RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL AND A FAIR TRIAL AS A RESULT OF TRIAL COUNSEL'S FAILURE TO INVESTIGATE, PREPARE, AND PRESENT A COHERENT GUILT PHASE DEFENSE; COUNSEL'S INTRODUCTION OF OVERTLY HARMFUL EVIDENCE; AND COUNSEL'S FAILURE TO OBJECT TO IRRELEVANT AND OVERLY PREJUDICIAL EVIDENCE AND ARGUMENT ........................................................................ 102

  A.  Counsel's Chosen Guilt-Phase Defense Was Not a Defense to Murder and Only Prejudiced the Jury Against Petitioner ................................................................ 104

  B.  Counsel's Introduction of Otherwise Inadmissible Bad Acts Through Petitioner's Own Testimony was Deficient Performance................................................................ 106

  C.  Counsel's Failure to Object to Cross-examination of Petitioner Regarding Irrelevant, Highly Prejudicial Prison Phone Calls Was Deficient Performance.............. 108

  D.  Counsel's Failure to Adequately Investigate and Prepare Lyndon Granger, Which Resulted in the Admission of More Damaging Than Helpful Evidence, Was Deficient Performance................................................................................................ 110

  E.  Counsel's Failure to Object to the Prosecutor's Improper Closing Argument Was Deficient Performance................................................................................................ 111

  F.  Petitioner Suffered Prejudice as a Result of Counsel's Combined Failures.................... 114

  G.  State Habeas Counsel Ineffectiveness ................................................................ 115

XII.  PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL AND A FAIR TRIAL AND SENTENCING AS A RESULT OF COUNSEL'S HANDLING OF THE BALLSITICS EVIDENCE, INCLUDING PRESENTATION OF HARMFUL EXPERT TESTIMONY AND FAILURE TO OBJECT TO THE STATE'S PRESENTATION OF FALSE TESTIMONY AND OVERSTATED CLOSING ARGUMENT. .................................................................................. 115

    A.  Relevant Facts ........................................................................................... 115

    B.  Deficient Performance ............................................................................... 119

        1.  Counsel Failed to Highlight Helpful Evidence and Elicited Very Damaging Evidence .................................................................................. 119

        2.  Counsel Failed to Prepare Dr. Grossberg to Testify ................................ 120

        3.  Counsel Failed to Object to the Prosecutor's Overstatement in Summation ......... 121

    C.  Prejudice .................................................................................................. 122

    D.  State Habeas Counsel Ineffectiveness ........................................................ 123

    E.  The Prosecutor Knowingly Presented False Testimony .............................. 123

XIII. PETITIONER'S RIGHT TO DUE PROCESS WAS INFRINGED WHEN THE PROSECUTOR CALLED HIM A "MURDERING SON OF A BITCH" DURING GUILT-PHASE CROSS-EXAMINATION, AND HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL WAS INFRINGED BY THE FAILURE OF TRIAL COUNSEL TO OBJECT OR SEEK A MISTRIAL ..................... 123

XIV. BECAUSE BARTHOLOMEW GRANGER'S BRAIN DAMAGE AND PSYCHOSIS—DEFECTS BEYOND HIS CONTROL—ARE MORALLY INDISTINGUISHABLE FROM INTELLECTUAL DISABILITY, HE IS CATEGORICALLY INELIGIBLE FOR THE DEATH PENALTY, AND HIS COUNSEL WERE INEFFECTIVE FOR FAILING TO MAKE THAT CLAIM. ....... 127

XV.  PETITIONER'S DEATH SENTENCE IS INCONSISTENT WITH THE EVOLVING STANDARDS OF DECENCY THAT MARK THE PROGRESS OF A MATURING SOCIETY ................................................................................. 130

XVI. THE PRESENTATION OF EVIDENCE OF "EXTRANEOUS" CONDUCT VIOLATES THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS ............................................................................................ 133

XVII. THE JURY'S DETERMINATION OF SPECIAL ISSUE ONE LACKED THE GUIDED DISCRETION REQUIRED BY THE EIGHTH AND FOURTEENTH AMENDMENTS, BECAUSE THE TERMS OF THE QUESTION ARE VAGUE AND UNDEFINED, AND THE USE OF "PROBABILITY" UNDERMINES THE STATE'S BURDEN OF PROOF .......................................................................... 135

    A.  The "First Special Issue" is Unconstitutionally Vague, and Fails to Provide the Constitutionally Required Guided Discretion to the Sentencing Jury .............................. 135

    B.  The State-Court Opinion ........................................................................... 136

XVIII. PETITIONER'S RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WERE VIOLATED BECAUSE THE TRIAL COURT DID NOT INSTRUCT THE JURY THAT A VOTE FOR LIFE BY ONE JUROR WOULD RESULT IN A LIFE SENTENCE ................................................................................................................... 136

    A. The Trial Court Instructed the Jury that Ten Votes Were Required for a Life Sentence, but Did Not Inform the Jury a Vote for Life by One Juror Would Result in a Life Sentence .................................................................................................. 136

    B. The State-Court Opinion .................................................................................. 139

XIX. THE TRIAL COURT'S INSTRUCTIONS AND THE PROSECUTOR'S ARGUMENTS LIMITED THE JURY'S ABILITY TO GIVE EFFECT TO MITIGATING EVIDENCE, IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS ................................................................................ 140

XX. THE TRIAL COURT ERRED IN FAILING TO INSTRUCT THE JURY THAT MITIGATING CIRCUMSTANCES DO NOT NEED TO BE PROVEN BEYOND A REASONABLE DOUBT, VIOLATING PETITIONER'S EIGHTH AND FOURTEENTH AMENDMENT RIGHTS; TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO MOVE FOR A PROPER INSTRUCTION OR OBJECT TO THE INSTRUCTION AS GIVEN .......................................................... 143

PRAYER FOR RELIEF ................................................................................................... 147

# INDEX TO APPENDIX

**VOLUME I**

Pleadings & Orders

1.  March 29, 2012 - Indictment ............................................................ A0001

2.  August 2, 2012 - Indictment ............................................................ A0002

3.  April 30, 2013 - Verdict Form .......................................................... A0003

4.  May 7, 2013 - Charge of the Court on Punishment ........................... A0004

5.  April 22, 2015 - Court of Criminal Appeals of Texas Direct Appeal ............ A0010

6.  October 19, 2016 - Applicant's Findings of Fact and Conclusions of Law .................. A0029

7.  October 19, 2016 - State's Proposed Findings of Fact and Conclusions of Law .......... A0124

8.  October 28, 2016 - Order Adopting State's Proposed Findings of Fact and Conclusions of Law ........................................................ A0141

9.  May 17, 2017 - Court of Criminal Appeals of Texas Application for Writ of Habeas Corpus ............................................................ A0142

10. May 7, 2012 - Order for Examination Regarding Competency ...................... A0154

11. August 31, 2012 - Order on Interim Mitigation Specialist Funding Motion.................. A0157

12. September 6, 2012 - Defendant's Ex Parte Motion #2 to Provide Funds for Investigation Expert Assistance ................................................ A0158

13. January 11, 2013 - Funding Motion for Medical Expert .................................... A0162

14. February 11, 2013 - Order on Funding Motion for Medical Expert ............................. A0169

15. February 18, 2013 - Funding Motion for Mental Health Expert ...................... A0170

16. February 20, 2013 - Order on Funding Motion for Mental Health Expert .................. A0175

17. March 4, 2013 - Index of Motions.................................................... A0176

18. March 13, 2013 - Notice of Experts.................................................. A0180

19. May 7, 2013 - Judgment of Conviction by Jury .................................................. A0182

20. October 29, 2014 - Notice of Filing of State Habeas Petition ............................................. A0185

21. February 23, 2015 - Order on Application for Writ of Habeas Corpus ........................... A0186

22. March 2, 2015 Order Denying Applicant's Motion to Reconsider Order Denying
    Request for Evidentiary Hearing ...................................................................................... A0187

23. February 24, 2016 - Court of Criminal Appeals of Texas Order of Remand to
    Trial Court ........................................................................................................................ A0186

24. March 17, 2016 - Order Striking Post-Application Pleadings ........................................ A0194

25. March 17, 2016 - Order Appointing Criminal District Attorney Pro Team .................. A0195

26. March 17, 2016 - Order Vacating Findings of Fact and Conclusions of Law ............... A0196

27. October 19, 2016 - Office of Capital and Forensic Writs Evidentiary Hearing
    Demand .............................................................................................................................. A0197

## VOLUME II

Declarations & Expert Reports

28. May 5, 2018 - Report of Dr. Daniel A. Martell, Ph.D., ABPP ........................................ A0227

29. May 8, 2018 - Report of Richard G. Dudley, Jr., M.D .................................................... A0249

30. Declaration of Stacie Brown ............................................................................................ A0266

31. Addendum / Exhibits to Declaration of Stacie Brown ..................................................... A0308

32. July 17, 2012 - Competency Evaluation Report by Edward B. Gripon, M.D ................ A0311

33. March 1, 2013 - Mental Health Evaluation Notes by Edward B. Gripon, M.D ............ A0318

34. March 23, 2013 - Mental Health Evaluation Notes by Edward B. Gripon, M.D ......... A0322

35. Undated - Report of Findings by M.K. Hamza, Ph.D, PA ............................................. A0324

36. May 1, 2013 - Competency Evaluation Report by Victor R. Scarano, M.D., J.D. ........ A0346

37. October 24, 2014 - Affidavit of Vallire Ozene .................................................................. A0354

38. September 8, 2016 - Affidavit of James R. Makin ............................................................ A0355

39. January 27, 2015 - Affidavit of C. Haden Cribbs, Jr. ...................................................... A0360

40. May 10, 2018 - Declaration of Dr. Lee Ann Grossberg .................................... A0363

41. April 9, 2018 - Declaration of Derek Verhagen ................................................ A0365

42. May 7, 2018 - Declaration of Edward Gripon .................................................. A0367

43. October 24, 2014 - Affidavit of Shemerial Sewell ........................................... A0370

44. May 7, 2018 - Declaration of Norma Villanueva ............................................ A0372

45. May 8, 2018 - Declaration of Rife Kimler, Esq. .............................................. A0377

46. May 10, 2018 - Declaration of M.K. Hamza, Ph.D., P.A. ............................... A0378

47. Dr. Norma Villanueva Mitigation Report ........................................................ A0385

48. October 24, 2014 - Affidavit of Norma Villanueva ......................................... A0458

## VOLUME III

Juror Materials

49. Natalie Beard Juror Questionnaire ................................................................. A0463

50. Natalie Beard Voir Dire ................................................................................. A0467

51. Billie Gillas Juror Questionnaire .................................................................... A0491

52. Billie Gillas Voir Dire .................................................................................... A0495

53. Angela Junemann Juror Questionnaire ........................................................... A0527

54. Angela Juneman Voir Dire ............................................................................. A0531

55. Mariah Korin Questionnaire ........................................................................... A0561

56. Mariah Korin Voir Dire .................................................................................. A0565

57. Lynn Rivera Juror Questionnaire .................................................................... A0588

58. Lynn Rivera Voir Dire .................................................................................... A0592

59. Feleneice Shanks Juror Questionnaire ............................................................ A0634

60. Feleneice Shanks Voir Dire ............................................................................ A0637

61. Juror Spread Sheet .......................................................................................... A0675

62. Granger Judge's Juror List ................................................................................................. A0676

**<u>VOLUME IV</u>**

<u>Transcript Excerpts</u>

63. 5 RR 31 ................................................................................................. A0720

64. 3 RR 138-45, 177-87  (Sexual Assault Trial)........................................................ A0722

65. 23 RR 172-91 (Rife Kimler Testimony) ............................................................. A0769

66. 20 RR 185-91 ................................................................................................. A0792

67. 23 RR 39-40 ................................................................................................. A0799

68. 27 RR 50-51, 55-57 ....................................................................................... A0801

69. 29 RR 8 ......................................................................................................... A0802

70. 29 RR 25-26, 28-31, 39-41 ............................................................................ A0807

<u>Discovery & Law Enforcement</u>

71. March 18, 2013 – Prosecution Witness List........................................................ A0816

72. March 23, 2012 – Beaumont Police Department Report, F. C. Coffin III .................... A0820

73. March 15, 2012 – Beaumont Police Department Report, T.D. Spikes........................... A0822

74. March 15, 2012 – Beaumont Police Department Report, F.C. Coffin III ...................... A0825

75. March 19, 2012 – Warrant and Affidavit........................................................... A0827

76. March 19, 2012 – Warrant Inventory and Return............................................... A0829

77. March 23, 2012 – Jefferson County Sheriff's Office Report, Kevin B. Lovett ............. A0832

78. March 27, 2012 – Jefferson County Sheriff's Office Report, Chad Kolander .............. A0835

79. June 22, 2012 – Harris County Sheriff's Office Report, Robert D. Baldwin ................. A0841

80. August 31, 2012 – Order Authorizing Funding for Mitigation Specialist Norma
    Villanueva ..................................................................................................... A0846

81. February 1, 2013 –Letter  Forwarding Jefferson County Regional Crime Lab Report
    Dated December 19, 2012, and Harris County Sheriff's Office Forensic Lab
    Examination Dated October 1, 2012 ................................................................... A0847

82. April 22, 2013 – Subpoena of Edward Gripon, M.D. ................................................ A0862

83. Jefferson County List of Recovered Evidence ................................................. A0863

84. Jefferson County Lab Submission Form ........................................................ A0868

Counsel File Materials

85. September 6, 2012 –Receipt Note, Villanueva Appointment Motion and CV, Notebook Entitled "State's Discovery" .............................................. A0871

86. October 12, 2012 – James Makin Interim Voucher ......................................... A0872

87. October 25, 2012 – Coffin Interview Report, Bartholomew Granger ........................... A0873

88. October 29, 2012 – Vazquez Interim Voucher ................................................ A0874

89. January 14, 2013 – Coffin Interview Report, Bartholomew Granger ............................. A0875

90. February 5, 2013 – Coffin Billing ........................................................ A0879

91. February 5, 2013 – Coffin Billing ........................................................ A0882

92. January 9, 2013 – Villanueva Billing ..................................................... A0889

93. February 14, 2013 – Letter, James R. Makin to M.K. Hamza .................................. A0894

94. February 14, 2013 – Letter, James R. Makin to M.K. Hamza .................................. A0895

95. March 4, 2013 – Letter, James R. Makin to M.K. Hamza .................................... A0896

96. March 4, 2013 – Letter, James R. Makin to M.K. Hamza .................................... A0898

97. March 5, 2013 – Letter, James R. Makin to Edward Gripon .................................. A0900

98. March 5, 2013 – Letter, James R. Makin to Edward Gripon .................................. A0902

99. March 20, 2013 – Coffin Interview Report, Daron and Derrick Hayes ......................... A0904

100.     March 26, 2013 – Email, Georgia to Julia, Witness List............................... A0906

<u>Miscellaneous</u>

101. Court's Charge and Verdict Sheet ................................................................. A0909

102. Court's Exhibit 2 – Defendant's Hand Written Sign ................................... A0915

103. Jury Charge on Special Issue .......................................................................... A0916

104. Samantha Granger's Diary ............................................................................. A0918

105. State Habeas Petition Exhibit 24, Excerpt, Samantha Granger School Records .... A0948

# TABLE OF AUTHORITIES

## Federal Cases

*Adams v. Quarterman*, 324 F. App'x 340 (5th Cir. 2009) ............................................................ 75

*Allen v. Stephens*, 805 F.3d 617 (5th Cir. 2015) ....................................................................... 6

*Anderson v. City of Bessemer*, 470 U.S. 564 (1985) ........................................................ 5, 54, 57

*Andres v. United States*, 333 U.S. 740 (1948) ..................................................................... 139

*Andrews v. Collins*, 21 F.3d 612 (5th Cir. 1994) .................................................................... 49

*Atkins v. Virginia*, 536 U.S. 304 (2002) ................................................................... 127, 130

*Banks v. Dretke*, 540 U.S. 668 (2004) ................................................................................. 7

*Batson v. Kentucky*, 476 U.S. 79 (1986) ............................................................. 47, 48, 49, 141

*Battenfield v. Gibson*, 236 F.3d 1215 (10th Cir. 2001) .............................................................. 94

*Beets v. Scott*, 65 F.3d 1252 (5th Cir. 1995) ........................................................... 26, 59, 120

*Berger v. United States*, 295 U.S. 78 (1935) ............................................. 113, 124, 126-127

*Biagas v. Valentine*, 265 F. App'x 166 (5th Cir. 2008) ........................................... 38, 46, 50

*Boyde v. California*, 494 U.S. 370 (1990) ................................................................... 139, 143

*Boyle v. Million*, 201 F.3d 711 (6th Cir. 2000) ...................................................................... 125

*Brecht v. Abrahamson*, 507 U.S. 619 (1993) ................................................................. *passim*

*Brumfield v. Cain*, 135 S. Ct. 2269 (2015) ....................................................... 4, 131, 131-132

*Caldwell v. Mississippi*, 472 U.S. 320 (1985) ............................................................... 113, 139

*Canales v. Stephens*, 765 F.3d 551 (5th Cir. 2014) ................................................................ 3

*Carty v. Thaler*, 583 F.3d 244 (5th Cir. 2009) ...................................................................... 3

*Chamberlin v. Fisher*, 885 F.3d 832 (5th Cir. 2018) ............................................................. 50

*Chambers v. Mississippi*, 410 U.S. 284 (1973) ..................................................................... 84

*Cone v. Bell*, 556 U.S. 449 (2009) ............................................................................. 3, 132

*Cuyler v. Sullivan*, 446 U.S. 335 (1980) .............................................................. 25, 26, 136

*Davis v. Alaska*, 415 U.S. 308 (1974) .......................................................... 84, 85, 86, 89

*Dodson v. Stephens*, 611 F. App'x 168 (5th Cir. 2015) ........................................................... 6

*Donnelly v. DeChristoforo*, 416 U.S. 637 (1974) ....................................................... 101, 124-125

*Drain v. Woods*, 902 F. Supp. 2d 1006 (E.D. Mich. 2012) ...................................................... 50

*Eddings v. Oklahoma*, 455 U.S. 104 (1982) ................................................................. 41, 142

*Escamilla v. Stephens*, 602 F. App'x 939 (5th Cir. 2015) ......................................................... 6

*Farkus v. Delo*, 33 F.3d 933 (8th Cir. 1994) ........................................................................ 7

*Floyd v. Meachum*, 907 F.2d 347 (2d Cir. 1990) .................................................................. 113

*Foust v. Hook*, 655 F.3d 524 (6th Cir. 2011) ...................................................................... 78

*Furman v. Georgia*, 408 U.S. 238 (1972) ............................................................... 131

*Glenn v. Tate*, 71 F.3d 1204 (6th Cir. 1995) ......................................................... 66

*Granger v. Texas*, 138 S. Ct. 470 (2017) ...................................................... 102, 126

*Gray v. Branker*, 529 F.3d 220 (4th Cir. 2008) ............................................. 75, 78

*Green v. Thaler*, 699 F.3d 404 (5th Cir. 2012) .................................................... 5

*Gregg v. Georgia*, 428 U.S. 153 (1976) ....................................................... 101, 132

*Guy v. Cockrell*, 343 F.3d 348 (5th Cir. 2003) ............................................... 62-63

*Harding v Sternes*, 380 F.3d 1034 (7th Cir. 2004) .......................................... 106

*Harrington v. Richter*, 562 U.S. 86 (2011) ............................................................ 4

*Hinton v. Alabama*, 134 S. Ct. 1081 (2014) ....................................... 6, 57, 104

*J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994) ........................................ 48

*Jackson v. Virginia*, 443 U.S. 307 (1979) ............................................................. 5

*Jefferson v. Upton*, 560 U.S. 284 (2010) ............................................................. 5

*Jenkins v. Anderson*, 447 U.S. 231 (1980) ......................................................... 7

*Johnson v. Bagley*, 544 F.3d 592 (6th Cir. 2008) ........................................... 78

*Johnson v. Mitchell*, 585 F.3d 923 (6th Cir. 2009) ........................................ 78

*Jones v. Johnson*, 171 F.3d 270 (5th Cir. 1999) .............................................. 49

*Jones v. United States*, 527 U.S. 373 (1999) ................................................... 140

*Kyles v. Whitley*, 514 U.S. 419 ............................................................... 126, 132

*Lewis v. Dretke*, 355 F.3d 364 (5th Cir. 2003)..................................... 76, 78, 79

*Lockett v. Ohio*, 438 U.S. 586 (1978) ............................................. 139, 141, 146

*Martinez v. Ryan*, 566 U.S. 1 (2012) ......................................................... *passim*

*McWilliams v. Dunn*, 137 S. Ct. 1790 (2017) ..................................... 54, 55, 56

*Mickens v. Taylor*, 535 U.S. 162 (2002) ............................................................ 25

*Miller-El v. Cockrell*, 537 U.S. 332 (2003) ................................................... 4, 48

*Mills v. Maryland*, 486 U.S. 367 (1988) ................................................. 138, 141

*Mitcham v. Davis*, 103 F. Supp. 3d 1091 (N.D. Cal. 2015) ......................... 50

*Moore v. Johnson*, 194 F.3d 586 (5th Cir. 1999) ........................................... 77

*Morgan v. Illinois*, 504 U.S. 719 (1992) ............................................ 28, 29, 35, 36

*Mu'Min v. Virginia*, 500 U.S. 415 (1991) ........................................................ 29

*Napue v. Illinois*, 360 U.S. 264 (1959) ............................................................ 123

*Nelson v. Quarterman*, 472 F.3d 287 (5th Cir. 2006) ................................ 39, 40

*Park v. Dugger*, 498 U.S. 308 (1991) ............................................................... 41

*Payne v. Tennesee*, 501 U.S. 808 (1991) ......................................................... 112

*Penry v. Lynaugh*, 492 U.S. 302 (1989) ..................................... 39, 40-41, 144

*Porter v. McCollum*, 558 U.S. 30 (2009) ............................................................... *passim*

*Powers v. Ohio*, 499 U.S. 400 (1991) ................................................................ 48

*Reed v. Quarterman*, 555 F.3d 364 (5th Cir. 2009) .............................................. 48, 49

*Rhoades v. Davis*, 852 F.3d 422 (5th Cir. 2017)................................................... 49

*Richards v. Quarterman*, 566 F.3d 553 (5th Cir. 2009) ........................................ 46, 92

*Richey v. Bradshaw*, 498 F.3d 344 (6th Cir. 2007) .............................................. 56, 64

*Rickman v Bell*, 131 F. 3d 1150 (6th Cir. 1997) ................................................... 91

*Riddle v. Cockrell*, 288 F.3d 713 (5th Cir. 2002) ................................................ 101, 126

*Ring v. Arizona*, 536 U.S. 584 (2002) .............................................................. *passim*

*Rompilla v. Beard*, 545 U.S. 374 (2005) ............................................................ *passim*

*Ruiz v. Stephens*, 728 F.3d 416 (5th Cir. 2013) .................................................. 6, 92

*Sanchez v. Davis*, 2018 WL 1954096 (5th Cir. 2018) ............................................ 77

*Sandoval v. Calderon*, 241 F.3d 765 (9th Cir. 2000) ............................................ 100

*Schlup v. Delo*, 513 U.S. 298 (1995) ............................................................... 7, 56

*Schriro v. Landrigan*, 550 U.S. 465 (2007) ........................................................ 7, 39, 41

*Scott v. Hubert,* 610 F. App'x 433 (5th Cir. 2015) .............................................. 50

*Sears v. Upton*, 561 U.S. 945 (2010) .............................................................. 6, 66-67

*Simmons v. South Carolina*, 512 U.S. 154 (1994) ................................................ 139-140

*Snyder v. Louisiana*, 552 U.S. 472 (2008)......................................................... 49

*Strauder v. West Virginia*, 100 U.S. 303 (1879) ................................................. 48

*Strickland v. Washington*, 466 U.S. 668 (1984) .................................................. *passim*

*Summit v. Blackburn*, 795 F.2d 1237 (5th Cir. 1986) ........................................... 94, 96

*Swain v. Alabama*, 380 U.S. 202 (1965) ........................................................... 48, 139

*Tennard v. Dretke*, 542 U.S. 274 (2004) .......................................................... 41, 69, 141

*Townsend v. Sain*, 372 U.S. 293 (1963) ........................................................... 7

*Trevino v. Thaler*, 569 U.S. 413 (2013) ........................................................... *passim*

*Treviño v. Davis*, 861 F.3d 545 (5th Cir. 2017) .................................................. 100

*Trop v. Dulles*, 356 U.S. 86 (1958) ................................................................ 132

*United States v. Agurs*, 427 U.S. 97 (1976) ...................................................... 123

*United States v. Carpenter*, 769 F.2d 258 (5th Cir. 1985) ..................................... 59-60, 62

*United States v. Diaz Carreon*, 915 F.2d 951 (5th Cir. 1990) ................................. 101, 124

*United States v. Drummond*, 481 F.2d 62 (2d Cir.1973) ........................................ 111-112

*United States v. El Paso Nat. Gas Co.*, 376 U.S. 651 (1964) .................................. 5

*United States v. Infante*, 404 F.3d 376 (5th Cir. 2005) ........................................ 25-26

*United States v. Mendoza*, 522 F.3d 482 (5th Cir. 2008) ....................................... 113

*United States v. Murrah*, 888 F.2d 24 (5th Cir. 1989) .................................................................... 125

*United States v. Swanson*, 943 F.2d 1070 (9th Cir. 1991) .............................................................. 91

*United States v. Vasquez*, 298 F.3d 354 (5th Cir. 2002) ........................................................ 59, 120

*United States v. Wolf*, 787 F.2d 1094 (7th Cir. 1986) .................................................................. 110

*Virgil v. Dretke*, 446 F.3d 598 (5th Cir. 2006) ...................................................................... *passim*

*Wainwright v. Witt*, 469 U.S. 412 (1985) ..................................................................................... 41

*Walbey v. Quarterman*, 309 F. App'x 795 (5th Cir. 2009) ...................................................... *passim*

*Ward v. Dretke*, 420 F.3d 479 (5th Cir. 2005) ..................................................................... 101, 126

*White v. Thaler*, 610 F.3d 890 (5th Cir. 2010) ............................................................................. 92

*Wiggins v. Smith*, 539 U.S. 510 (2003) ................................................................................. *passim*

*Wilkerson v. Collins*, 950 F.2d 1054 (5th Cir. 1992) .............................................................. 49, 50

*Williams v. Allen*, 542 F.3d 1326 (11th Cir. 2008) ................................................................. 75, 78

*Williams v. Taylor*, 529 U.S. 362 (2000) ............................................................................... *passim*

*Wood v. Georgia*, 450 U.S. 261 (1981) ......................................................................................... 25

*Yoney v. Collins*, 985 F.2d 222 (5th Cir. 1993) ........................................................................... 55

## Federal Statutes

28 U.S.C. § 2254 ............................................................................................................................ 1

28 U.S.C. § 2254(b)(1)(A) ............................................................................................................. 2

28 U.S.C. § 2254(d)(2) .................................................................................................. 4, 80, 100

28 U.S.C. § 2254(e)(2) ................................................................................................................. 7

## State Cases

*Armstrong v. State*, 897 S.W.2d 361 (Tex. Crim. App. 1995) ............................................... 29, 57

*Batiste v. State*, 888 S.W.2d 9 (Tex. Crim. App. 1994) ............................................................... 49

*Berry v. State*, 233 S.W. 3d 847 (Tex. Crim. App. 2007) ......................................................... 136

*Corcoran v. State*, 774 N.E.2d 495 (Ind. 2002) ............................................................... 129, 130

*DeFreece v. State*, 848 S.W.2d 150 (Tex. Crim. App. 1993) ....................................................... 57

*Dinkins v. State*, 894 S.W.2d 330 (Tex. Crim. App. 1995) ......................................................... 29

*East v. State*, 702 S.W.2d 606 (Tex. Cr. App. 1985) ............................................................ 83-84

*Ex parte Carter*, 521 S.W.3d 344 (Tex. Crim. App. 2017) ...................................................... 133

*Hadden v. State*, 829 S.W.2d 838 (1992) ............................................................................... 107,

*Kinnamon v. State*, 791 S.W.2d 84 (Tex. Crim. App. 1990) .................................................. 82, 83

*Martinez v. State*, 327 S.W. 3d 727 (Tex. Crim. App. 2010) ................................................... 136

*Motilla v. State*, 78 S.W.3d 352 (Tex. Crim. App. 2002) ........................................................ 125

*People v. LaValle*, 817 N.E.2d 341 (N.Y. 2004) ..................................................................... 140

*Pope v. State*, 207 S.W.2d 352 (Tex. Crim. App. 2006) ............................................................ 57

*State v. Davis*, 61 P.3d 701 (2003) ......................................................................................... 112

*State v. Garza*, 143 S.W.3d 144 (Tex. App. 2004).................................................................... 29

*State v. Graves*, 668 N.W.2d 860 (Iowa 2003) ....................................................................... 112

*State v. Ketterer*, 855 N.E.2d 48 (Ohio 2006) ....................................................................... 130

*State v. Scott*, 748 N.E.2d 11 (Ohio 2001) ............................................................................ 130

*Walker v. State*, 195 S.W.3d 250 (Tex. Crim. App. 2006) ........................................................ 29

*Williams v. State*, 803 A.2d 927 (Del. 2002) ......................................................................... 112

*Wilson v. State*, 938 S.W.2d 57 (Tex. Crim. App. 1996) .......................................................... 125

## State Statutes

Tex. Code Crim. Proc. art. 37.071 ................................................................................. 101, 137

Tex. Code Crim. Proc. art. 37.071 § 2(b)(1) ............................................................................. *passim*

Tex. Code. Crim. Proc. Art 37.071, 2(e)(1) ........................................................................ 43, 146

Tex. Penal Code Ann. § 19.03(a)(2) ....................................................................................... 105

Tex. Stat. Ann. Art. 11.071, Sec. 9 ........................................................................................ 100

## Other

*Criminal Procedure Unconstitutional on Its Face, 2 Supp. CR 295-303, and a Motion to Hold Unconstitutional Tex. Code Crim. Proc. Art. 37.*071 Sec. 2(e) ........................................................................ 146

Tex. R. Evid. 404(b) .............................................................................................................. 107

Tex. R. Evid. 705 ........................................................................................................ 117, 118, 119

U.S. Const. amends. VI, XIV ............................................................................................. *passim*

*Virginia to Capital Defendants With Severe Mental Illness*, 70 Brook. L. Rev. 995 & nn.86-103 (2005)(collecting references) ................................................................................................ 130

**INTRODUCTION**

Bartholomew Granger is a brain-damaged, mentally ill man who stood trial for capital murder in 2013, represented by attorneys whose compromised loyalty and lack of meaningful preparation subjected him to a fundamentally unfair trial. They hired a psychiatrist who was the court's competency expert, and an investigator who was the recently retired chief of police and whose son (also a police officer) was a prosecution witness. In a trial involving allegations of childhood sexual assault and the shooting of an elderly woman, they allowed the seating of three jurors who were survivors of childhood sexual violence or had close ties to an elderly murder victim. Their guilt-phase presentation disproved their chosen defense, and their penalty-phase presentation was no better. Counsel elicited overtly harmful testimony from their own witnesses (including a prison pastor's testimony that Mr. Granger deserved a death sentence) and made no objection to prosecution name-calling and other misconduct.

Mr. Granger is floridly mentally ill, as demonstrated by his numerous outbursts during the court proceedings. The trial court twice ordered him evaluated to determine his competency. Nevertheless, trial counsel ignored testing showing brain damage and never even told their psychiatrist about it. They never developed, or ignored, readily available evidence of numerous, medically documented head injuries throughout Petitioner's life; a long history of trauma, auditory hallucinations, delusional thinking, and extreme mood swings; and a family history of mental illness. They never presented the psychologist who had conducted the testing or the mitigation specialist who had developed some of the available background evidence. Instead, they called their psychiatrist to the stand, without preparation, to testify only about future dangerousness. The psychiatrist gave a damaging opinion.

Counsel's deficient performance and disloyalty deprived Mr. Granger of a fair trial. For the reasons below, this Court should grant habeas relief.

**STATEMENT ABOUT EXHAUSTION AND PROCEDURAL DEFAULT**

Federal habeas petitioners generally must exhaust state court remedies. 28 U.S.C. § 2254(b)(1)(A). Each of Mr. Granger's claims either is exhausted or falls within an exception to the exhaustion requirement. No claims are procedurally barred. Where the state court deemed any claim procedurally barred, either: (1) it was mistaken; (2) it was not an adequate and independent state ground; and/or (3) there is cause and prejudice and/or a miscarriage of justice. Because procedural default and non-exhaustion are affirmative defenses that Respondents must assert and can waive, Mr. Granger reserves his right to reply to any such arguments.

**EXCEPTIONS TO PROCEDURAL DEFAULT**

Procedural-default doctrine imposes a bar on federal review of claims that "a state court declined to hear because the prisoner failed to abide by a state procedural rule." *Martinez v. Ryan*, 566 U.S. 1, 9 (2012). This bar does not apply, however, unless "the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed." *Id.* (citations omitted). Furthermore, the default is overcome by showing "cause" and "prejudice," or miscarriage of justice. *Id.* (citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)).

Postconviction counsel's ineffective assistance can constitute "cause" to overcome a default. In *Martinez*, the Court held that when an initial-review collateral proceeding is the first time a petitioner can raise a claim for ineffective assistance of trial counsel, state habeas counsel's ineffective assistance could supply "cause" for the default of the trial-ineffectiveness claim. 132 S. Ct. at 1320. This rule applies to Texas. *Trevino v. Thaler*, 569 U.S. 413, 429 (2013).

To establish cause under *Martinez*, the Fifth Circuit requires a showing that (1) state habeas counsel's performance at an initial-review collateral proceeding was deficient as defined in *Strickland v. Washington*, 466 U.S. 668, 693 (1984), and (2) an ineffective-assistance-of-trial-counsel

claim that state habeas counsel failed to raise has "some merit." *Canales v. Stephens*, 765 F.3d 551, 567-68 (5th Cir. 2014). Petitioner makes these showings in several claims below. In addition, Petitioner must demonstrate prejudice, which "requires a showing that there is 'a reasonable probability that, but for [trial] counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 568 (quoting *Strickland,* 466 U.S. at 694) (alteration in original). The meritorious claims of trial ineffectiveness outlined in this pleading prove actual prejudice.

## STANDARD OF REVIEW UNDER THE AEDPA

### A.    General Standards

This Court reviews the state-court decisions under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). For claims or parts of claims that received a state-court "adjudicat[ion] on the merits," 28 U.S.C. § 2254(d) bars relief unless the state-court decision is "contrary to" or "an unreasonable application of" clearly established Supreme Court law, or involves an "unreasonable determination of the facts." *See Williams v. Taylor*, 529 U.S. 362, 412 (2000).

AEDPA's § 2254(d) does not apply where the state-court ruling fails either: (1) to address the petitioner's actual federal; or (2) to address the merits of the federal. Where those requirements are not met, habeas review is de novo. *See Cone v. Bell*, 556 U.S. 449, 472 (2009); *accord Porter v. McCollum*, 558 U.S. 30, 39 (2009); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (citing *Wiggins v. Smith*, 539 U.S. 510, 534 (2003)); *Carty v. Thaler*, 583 F.3d 244, 253 (5th Cir. 2009). Similarly, if a state court decides only part of a federal claim (for example, only the prejudice prong of an ineffective-assistance claim), only that part of the claim addressed by the state court receives AEDPA review. *See Porter*, 558 U.S. at 39 (per curiam); *Rompilla*, 545 U.S. at 390; *Wiggins*, 539 U.S. at 534.

Where § 2254(d) does apply, it requires three separate inquires. A reviewing court must determine, first, whether the state-court adjudication was "contrary to" clearly established federal law; second, if it was not, whether the adjudication was an objectively unreasonable application of clearly

established federal law; and third, in addition, whether the adjudication was based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(2); *Harrington v. Richter*, 562 U.S. 86, 100-01 (2011).

"A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases." *Williams*, 529 U.S. at 405. A state-court ruling is also "contrary to" clearly established federal law where it "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Id.* at 412-13. Under the "'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

A court may grant relief under § 2254(d)(2) where a state-court decision resulted from an unreasonable determination of the facts, meaning that the factual determination is "objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 332, 340 (2003). A state-court decision may likewise be unreasonable under § 2254(d)(2) where the state court decides the matter without holding an evidentiary hearing or granting the defendant the resources necessary to litigate the claim. *See Brumfield v. Cain*, 135 S. Ct. 2269, 2273 (2015).

**B.** **Because the Last Reasoned State Court Opinion Was Adopted Nearly Verbatim from Respondent's Proposed Order, AEDPA Deference Should Not Apply to Those Claims that Were Adjudicated on the Merits in State habeas Proceedings.**

Much of Mr. Granger's federal habeas petition was raised and adjudicated in his amended state habeas petition. Because the state court's order denying these claims was a largely verbatim adoption of a lengthy proposed order written by Respondent's attorneys, Petitioner submits that this Court should exercise de novo review over these claims and should not defer to the state court's purported factual findings. Deferring to an order drafted by a party-opponent is not required by

AEDPA and is inconsistent with due process.

Mr. Granger acknowledges that the Fifth Circuit has declined to extend less AEDPA deference to state-court factual findings where those findings are verbatim adoptions of proposed orders written by the State. The Fifth Circuit has recognized that the Supreme Court has "not considered the lawfulness" of such whole-cloth adoptions, and has therefore declined to provide any less deference. *See Green v. Thaler*, 699 F.3d 404, 416 (5th Cir. 2012). The Supreme Court, however, has at least questioned whether such a practice is proper. *See Jefferson v. Upton*, 560 U.S. 284, 293-94 (2010) (vacating denial of habeas petition in pre-AEDPA case and remanding for district court to determine whether presumption of correctness applied to factual findings in state court order adopted verbatim from proposed order authored by Respondent's attorneys where court solicited the proposed order ex parte and gave petitioner no opportunity to criticize proposed findings or submit his own proposed order).

Although it appears that the Texas state habeas courts have made a practice of denying relief by adopting Respondent's proposed orders,[1] a practice is not legitimate merely because it is repeated. In non-habeas cases, the United States Supreme Court has criticized the adoption of a party's proposed order as a court's reasoned opinion on multiple occasions. *See Anderson v. City of Bessemer*, 470 U.S. 564, 572 (1985); *United States v. El Paso Nat. Gas Co.*, 376 U.S. 651, 657 n.4 (1964).

These concerns are still more pronounced in a state court's adjudication of a capital habeas case. Our legal system has long accorded more—not less—protection to the rights of criminal defendants. *See, e.g., Jackson v. Virginia*, 443 U.S. 307, 315 (1979) (discussing the heightened beyond-reasonable-doubt standard). Procedural and substantive safeguards must be more robust in capital cases. *See, e.g., Ring v. Arizona*, 536 U.S. 584, 605-06 (2002).

---

[1] Tex. Defender Serv., *Lethal Indifference: The Fatal Combination of Incompetent Attorneys and Unaccountable Courts in Texas Death Penalty Appeals* 54 (2002), http://texasdefender.org/wp-content/uploads/Lethal-Indiff_web.pdf.

Mr. Granger recognizes that circuit precedent suggests that this Court should defer even to a state habeas court's order that parroted Respondent's proposed order, but contends that the precedent is erroneous. A state-court decision concerning the constitutional rights of a capital defendant should not receive deference when it adopts an order written unilaterally by his adversary.

**STANDARDS RELATING TO INEFFECTIVE ASSISTANCE OF COUNSEL**

Under *Strickland v. Washington*, 466 U.S. 668 (1984), a petitioner seeking to establish the ineffective assistance of trial counsel must show: (1) that counsel's performance was deficient because it fell below "an objective standard of reasonableness," *id.* at 688; and (2) that the deficient performance prejudiced the defense because there is a reasonable probability that, but for counsel's errors, the factfinder would have had a reasonable doubt with respect to the defendant's guilt or the appropriate punishment, *id.* at 695; *see also Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014) (prejudice exists because of reasonable probability that new evidence would lead jury to have reasonable doubt about defendant's guilt); *Sears v. Upton*, 561 U.S. 945, 955-56 (2010); *Porter*, 558 U.S. at 32; *Rompilla*, 545 U.S. at 390; *Wiggins*, 539 U.S. at 538; *Williams*, 529 U.S. at 398.

In assessing prejudice, a reviewing court considers the effects of more than one deficiency cumulatively. *Dodson v. Stephens*, 611 F. App'x 168, 178-79 (5th Cir. 2015) (unpublished) (assuming that cumulative prejudice analysis is required and collecting cases).

In assessing prejudice at the penalty phase of a capital case, a reviewing court must decide if there is a reasonable probability that, but for counsel's deficient performance, at least one juror would have voted for life. *See Wiggins*, 539 U.S. at 537; *Escamilla v. Stephens*, 602 F. App'x 939, 941-42 (5th Cir. 2015); *Ruiz v. Stephens*, 728 F.3d 416, 424 (5th Cir. 2013).

A federal habeas petitioner who challenges state habeas counsel's representation must meet the *Strickland* standard as to that counsel's performance. *See Allen v. Stephens*, 805 F.3d 617, 626 (5th Cir. 2015).

## REQUEST FOR AN EVIDENTIARY HEARING

As a general rule, an evidentiary hearing is appropriate when the facts alleged in the habeas petition, if true, would entitle the petitioner to relief and there is a material dispute about those facts. *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007); *Townsend v. Sain*, 372 U.S. 293, 312-19 (1963), *over-ruled in part on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1, 5 (1992). When evaluating a habeas petitioner's proffer, the court accepts the factual allegations as true and views the factual assertions in the light most favorable to the petitioner. *Id.* at 312. Evidentiary "hearings are particularly important in capital cases . . . , where the 'irremediable' penalty demands factfinding at a 'heightened standard of reliability.'" *Farkus v. Delo*, 33 F.3d 933, 939 n.6 (8th Cir. 1994) (quoting *Ford v. Wainwright*, 477 U.S. 399, 411 (1986)); *cf. Banks v. Dretke*, 540 U.S. 668, 675 (2004) ("[T]hrough discovery and an evidentiary hearing . . . in a federal habeas corpus proceeding, . . . long-suppressed evidence came to light" and death sentence was vacated).

To the extent this Court believes that any of Petitioner's claims may be procedurally defaulted, this Court should grant a hearing so that Petitioner can show cause and prejudice and/or a fundamental miscarriage of justice to overcome any default. *See, e.g., Trevino v. Thaler*, 569 US 413, 428 (2013) (ineffective assistance of state postconviction counsel can establish cause for procedural default); *Schlup v. Delo*, 513 U.S. 298, 332 (1995) (remanding to district court to determine whether to hold hearing on fundamental miscarriage of justice); *Jenkins v. Anderson*, 447 U.S. 231, 234 n. l (1980) (application of cause and prejudice may require district-court fact finding).

The state courts refused to allow—and/or predecessor counsel failed to pursue—factual development of some of the claims set forth in the petition and this memorandum. The Supreme Court explained in *Williams* that "28 U.S.C. § 2254(e)(2) works against a hearing only when the petitioner 'failed to develop the factual basis of a claim in State court proceedings.'" *Williams*, 529 U.S. at 430. Here, § 2254(e)(2) does not apply because Mr. Granger did *not* "fail[] to develop the factual ba-

sis" of his claims in state court, or his failure must be excused because it resulted from his counsel's ineffectiveness. Under such circumstances, a federal hearing is appropriate.

## STATEMENT OF THE CASE

### A. Procedural History

Jefferson County Indictment No. 12-013804 charged Bartholomew Granger with felony murder on March 14, 2012. A0001. The defense requested a change of venue from Jefferson County to Galveston County, which the state did not oppose because the county courthouse was the scene of the crime. The district judge, the Honorable Bob Wortham, granted the motion. 2.1 RR 4-5. A new indictment, filed on August 2, 2012, charged Mr. Granger with intentional murder on a transferred-intent theory, alleging that he had intended to kill Claudia Jackson and, in the course of committing retaliation against her, had killed Minnie Ray Sebolt with a deadly weapon. A0002.

Jury selection ran from April 2 to April 17, 2013. 7 RR 1; 17 RR 49. The testimonial portion of the trial began on April 22. 18 RR 1. On April 30, the jury found Mr. Granger guilty as charged. 24 RR 61; A0003. Following a penalty hearing, the jury sentenced him to death on May 7, 2013. 29 RR 45; A0004; A0005.

On April 22, 2015, the Court of Criminal Appeals affirmed Mr. Granger's conviction and sentence. A0010. Meanwhile, on October 29, 2014, he had filed a petition for writ of habeas corpus before the Honorable W. Kent Walston, Presiding Judge, in the Jefferson County District Court. A0185. In the interim, Judge Wortham, the trial judge, had been elected the Jefferson County District Attorney. After the district attorney had responded and Judge Walston had signed the State's proposed findings, the Court of Criminal Appeals accepted the parties' agreement to vacate the findings and the filings and remand for further proceedings because of the appearance of impropriety. The district attorney's office recused itself. A0188. On remand, the circuit court vacated its previous order, struck the previously filed pleadings, and appointed Thomas Roebuck as prosecutor pro tem-

pore. A0194-96. Mr. Roebuck filed an amended response, which was nearly identical to the one the district attorney's office had filed. After he submitted proposed findings of fact and conclusions of law, along with affidavits by trial counsel Makin and Cribbs, the court adopted his findings verbatim on October 28, 2016. A0355. The Court of Criminal Appeals affirmed that order on May 17, 2017. A0142.

On July 17, 2017, this Court appointed the Federal Community Defender Office for the Eastern District of Pennsylvania to represent Mr. Granger on a petition for writ of habeas corpus, and set a due date of May 17, 2018. ECF Nos. 3, 4. The Court granted his motion to proceed in forma pauperis on December 6, 2017. ECF No. 8.

### B. The Preparation for Trial

At Mr. Granger's arraignment on April 27, 2012, his assigned counsel, Haden "Sonny" Cribbs, expressed concerns about his mental health. 2 RR 1-2. At his request, the judge appointed Dr. Edward Gripon as the court's expert to evaluate Mr. Granger's competency. 2 RR 11. He appointed James Makin as co-counsel on August 24, 2012, and assigned Joel Vazquez, Esq., to assist Makin and Cribbs on September 26. A0872; A0874.

Mr. Granger was arraigned on the new indictment on August 24, 2012. The judge, having received Dr. Gripon's report, found him competent and set a trial date in April. 3 RR 7, 12. In a foretaste of things to come, Mr. Granger punctuated the short proceeding with several outbursts expressing a variety of grievances. 3 RR 7, 13.

In the ensuing months, counsel subpoenaed or otherwise sought various records. *See, e.g.*, 4 RR 2-7. Counsel also filed numerous motions, but all of them addressed abstract legal questions unrelated to Mr. Granger's case. *See* 5 RR 5-45; 2 Supp. CR 109-11. A0176. Counsel moved for the appointment of an investigator, a mitigation specialist, and several experts, but, as discussed in detail below, used little or none of their work product at trial.

**Dr. Norma Villanueva**: Norma Villanueva was appointed as Mr. Granger's mitigation specialist on August 31, 2012. A0157(Makin Box 9 of 13 (1), p. 30/204). Dr. Villanueva was able to make only two trips to east Texas, interviewing several family members and holding only three face-to-face meetings with the defense team. A0372. She quickly suspected that Vallire Ozene, Mr. Granger's mother, was mentally ill, and advised trial counsel. A0374. Dr. Villanueva was not asked to gather records relating to Mr. Granger's life. *Id.* Instead, investigator Frank Coffin, Jr., collected the records and provided them to her. He also accompanied her during several interviews with Mr. Granger's family members. A0372-73.

Dr. Villanueva identified several mitigation themes, including the heavy toll the sexual assault allegations took on Mr. Granger and the instability and neglect he experienced as a child, largely as a result of poverty and the extreme domestic violence and physical abuse his mother suffered from before his birth and throughout his childhood. A0373; A0386-92; A0434. Mr. Makin did not ask her to prepare a final mitigation report until after the guilty verdict. She was not called to testify. A0374-75.

**Dr. M.K. Hamza**: Although Mr. Makin obtained an ex parte order authorizing the retention of neuropsychologist M.K. Hamza on September 27, 2012 (JM 1863), he did not arrange for Dr. Hamza to test Mr. Granger, or for any other mental health evaluations, until almost the eve of trial. Between December 2012 and March 2013, Mr. Granger repeatedly told Dr. Villanueva and defense investigator Frank Coffin, Jr., that he sometimes heard voices, described his thoughts on angels and demons, and often lost all emotional control during visits. [12/2/12 (JM 11610); 1/14/13 (JM 11946), 3/1/13 (JM 11513), 3/5/13 (JM 11637)]. Mr. Makin took no steps to have Mr. Granger evaluated until mid-February, 2013.

On February 15, 2013, Dr. Villanueva wrote to Mr. Makin advising him that she had recently learned that Mr. Granger had attended special education classes and had not, as the team previously

believed, actually obtained a valid GED degree. She stressed that an evaluation by a psychologist was "crucial," and asked that they continue the trial date two months so that she could complete her investigation. A0374. Counsel never sought a continuance, but finally arranged two expert evaluations. Dr. Hamza conducted testing in February and March, 2013. A0335. He administered three neuropsychological tests, all of which indicated impaired brain functioning: in frontal lobe functioning (WCST-64 test), attention, mental speed, and mental control (Stroop test), and memory and visual-motor organization (RCFT test). A0336.

Dr. Hamza found "readily apparent" cognitive and mental health deficits. Mr. Granger's history of head injuries and his presentation, along with the test results, strongly suggested significant frontal lobe brain damage. His mood was labile, and he was anxious, defensive, and argumentative about the testing, much of which he found extremely difficult. He was extremely paranoid. Dr. Hamza told Mr. Makin that Mr. Granger had significant neuropsychological deficits and could benefit from further testing, but Mr. Makin did not want him to do anything further. He asked Dr. Hamza to prepare a report based solely on the testing he had already performed. A0378. Mr. Makin never requested further neuropsychological testing and did not call Dr. Hamza as a witness at trial.

**Dr. Edward Gripon**: Dr. Gripon began his association with Mr. Granger's case as the court's competency expert. 2 RR 12; A0311. He concluded that Mr. Granger had no delusions, the voices he reported hearing were not hallucinations, he could control his behavior, and he was competent. A0315-16.

Almost a year later, even though Dr. Gripon had already reached adverse conclusions about Mr. Granger's mental condition on the court's behalf, Mr. Makin secured his appointment as a mental health expert for the defense. A0175; A0170. Dr. Gripon made two evaluative visits to Mr. Granger, who told him he was hearing voices and taking psychoactive medication. The doctor again concluded that Mr. Granger was not psychotic and adhered to essentially the same diagnosis: inter-

mittent explosive disorder, and "Axis II issues" with paranoia and schizoid features. A0318; A0322. Dr. Gripon never learned about Dr. Hamza's neuropsychological testing. A0367. Mr. Makin listed him as a witness and subpoenaed him to appear for trial, but never met with him to prepare for his trial testimony. A0180; A0862.

**Other Experts:** Mr. Makin retained Kathy Snyder, a nurse who obtained and reviewed medical records for the team. A0162. She did not testify, and the only medical records the defense introduced were presented without explanation during Mr. Granger's penalty-phase testimony. 28 RR 31, 49, 51. Mr. Makin also retained Dr. Lee Ann Grossberg, a forensic pathologist, who reviewed the autopsy report and video and surveillance videos of the incident. A0169. Dr. Grossberg did testify, but did not meet with counsel beforehand.

**Frank Coffin, Jr.:** Trial counsel hired Frank Coffin, Jr., who six months before the courthouse shooting was the Chief of the Beaumont Police Department and previously supervised the Special Crimes Unit that investigated the sexual assault allegations against Petitioner, as their lead investigator. *See* About Frank Coffin, http://www.frankcoffininvestigations.com/about/ (last visited May 6, 2018). Frank, Jr.,'s son, Frank Coffin III, was an active detective with the Beaumont Police Department and a witness for the prosecution who filed a report, A0820, and would later testify, A0792-98, about his perception that Petitioner was a volatile, dangerous person.

Frank Coffin, Jr., directed the guilt-phase and penalty-phase investigations, presumably knowing that his son was a key participant in the opposing investigation who believed that Petitioner was a dangerous character and doubtless wanted to see Petitioner convicted and punished. Frank Coffin, Jr.,'s initial job was to conduct guilt-phase investigation, and he prepared many reports that trial counsel gave to experts. *E.g.*, A0875-81; A0894; A0896-97; A0900-01.

Later on, he did also work on the mitigation investigation. *E.g.*, A0904-08. He served as the "intermediary" between Dr. Villanueva and trial counsel. Trial counsel and Coffin, Jr., then treated

Petitioner and his family as if they were in fact dangerous characters: trial counsel feared the Granger family and made Coffin, Jr., accompany Dr. Villanueva to family interviews, and Coffin, Jr., carried a gun into an interview on at least one occasion. A0372-73. Coffin, Jr., was the mitigation gatekeeper, and the person who eventually broke the news to Dr. Villanueva that her proposed mitigation themes had been rejected. A0458.

## C. The Trial Testimony

### 1. The Guilt-innocence Phase

At the guilt-innocence phase of trial, the State's case against Petitioner consisted of testimony from the judge overseeing Mr. Granger's trial at the time of the shooting, numerous eyewitnesses, various police officers who responded to the scene and collected evidence, an employee of attorney Rife Kilmer who spoke with Petitioner on the phone the night before the shooting, four people who were held hostage by Mr. Granger at a nearby business called RCI, and the medical examiner who conducted the autopsy of Ms. Sebolt. The State also presented numerous maps of the area and the scene of the shooting, video footage of the parking lot and the courthouse entrance, the semiautomatic rifle recovered from RCI when Petitioner was arrested, and an apparent suicide note recovered from Petitioner's briefcase.

Judge John Stevens testified that Petitioner was on trial for a felony offense and that his daughter and her mother had testified against him in that case. He did not describe the nature of the offense. 18 RR 29-32. Rife Kimler's secretary testified that Petitioner called his office the night before the shooting upset about how the trial was going, wanting a change of venue, and then stating he would "take care of it tomorrow." 18 RR 43-46.

The eyewitnesses presented by the State gave somewhat conflicting accounts, but all agreed that Petitioner fired in the direction of Samantha Granger, Claudia Jackson, and Rebecca Richard, ran back to his truck, and then ran Samantha over with the truck. Many of these witnesses also testi-

fied that a passer-by, Minnie Sebolt, was shot and killed at the door of the courthouse during the shooting. 19 RR 7-24 (William Anderson); 19 RR 37-53 (Sheriff's Deputy Anthony Barker); 19 RR 59-73 (Sheriff's Deputy Donald Hayes); 19 RR 77-87 (Vicki Hollingsworth); 19 RR 106-18 (Rebecca Richard); 19 RR 140-50 (Officer John Poole); 19 RR 156-63 (Detective Tomora Hamilton); 19 RR 167-79 (Officer James Robichaux); 20 RR 5-16 (Attorney David Dies); 20 RR 23-39 (Attorney Troy Soileau); 20 RR 45-62 (Claudia Jackson); 20 RR 66-75 (Samantha Jackson). Many of the witnesses testified that they saw numerous police officers and court personnel also firing their weapons, mainly in response to Petitioner having fired and mainly at his truck as he pulled off. *See, e.g.*, 19 RR 161-64 (Police Chief Jim Singletary); 19 RR 70-71 (Sheriff's Deputy Donald Hayes).

The video footage showed Petitioner arriving in the parking lot across from the courthouse at around 7:30 a.m. and later getting out of his truck when Samantha, Claudia, and Rebecca left their cars and headed towards the courthouse. Although the video footage did not capture Mr. Granger firing his weapon, it did capture Ms. Sebolt falling to the ground as she attempted to enter the revolving door that led to the courthouse, and it also captured Petitioner's truck running over Samantha. 18 RR 135-42 (State's Ex. 72A, clips from the video played for the jury).

The medical examiner testified that Ms. Sebolt was shot twice, once in her right knee and once in her left thigh. The fatal bullet entered her thigh from the front, went through her femoral vein, and exited out the back. 21 RR 23-29. Since both bullets were through and through, it was impossible to determine the caliber of the bullet that killed her. 21 RR 21-23. Testimony of law enforcement officers established that all the bullet fragments and bullet jacket fragments recovered near the courthouse were identified as coming from Petitioner's Beretta, numerous shell casings near the courthouse came from law enforcement weapons, ten shell casings in the street came from Petitioner's weapon, and other ballistics evidence (the nature and location of which was not elicited) was unidentifiable. 21 RR 74-78 (Brandy Henley); 21 RR 86-91, 95 (Robert Baldwin). The firearm exam-

iner's testimony that all bullet and bullet jacket fragments recovered near the courthouse could be traced to Petitioner's weapon was inaccurate, but went uncorrected by counsel.

Witnesses at RCI and at the hospital where Petitioner was taken after he was arrested testified to numerous incriminating statements Petitioner made about the shooting and his intentions when he started firing, including "I tried to shoot my daughter, ex-wife and ex-girlfriend," "I wanted to kill them, if I killed anyone else I'm sorry," "How much can a man take," "they set me up," and "they treat me like a killer, I will act like one." 20 RR 175-76 (Officer Michael Custer); 20 RR 117-18 (Melvin Bond); 20 RR 186-89 (Frank Coffin III); 20 RR 199 (Stuart Hanley).

Petitioner testified that he fired at his daughter Samantha and ran her over with his truck, with the intent to harm her, but denied firing in the direction of Claudia or killing Ms. Sebolt. He maintained that the police firing at him were responsible for her death. 23 RR 29-34. Given Petitioner's testimony, the only contested issue at the guilt phase of trial, other than the propriety of a capital prosecution under the theory of transferred intent, was whether or not Petitioner's bullet(s) caused Ms. Sebolt's fatal injuries.

The defense presented a total of eight guilt-phase witnesses. Seven of them testified mainly about the underlying sexual assault charges that Petitioner was on trial for at the time of the shooting. *See* 23 RR 20-22 (Mr. Granger's testimony about the sexual assault charges he and his brothers faced); 23 RR 88, 98-100 (Lyndon Granger's testimony about the sexual assault charges he and his brothers faced); 23 RR 111-12 (Bartholomew Granger, Jr.,'s testimony that he never saw any improper sexual activity); 23 RR at 128-31 (Vallire Ozene's testimony that sexual assault allegations were lies); 23 RR at 193-98 (Ulysses Granger's testimony about false accusations of rape against him, Petitioner, and Lyndon in Houston and Jefferson Counties); 23 RR at 173-75 (Attorney Rife Kimler's testimony confirming that Petitioner was on trial for the sexual assault of Samantha, that Claudia had testified the day before, and that he planned to cross-examine Samantha that day); 23 RR at

122-26 (Shemerial Sewell's testimony that her friend Samantha was gullible and easily led and never disclosed any sexual abuse). Until these defense witnesses testified, the nature of the charges Petitioner faced had been kept from the jury.

Petitioner's direct testimony, in addition to extensively describing the sexual assault charges, included substantial coverage of additional prior bad acts and propensity for violence that had not emerged in the State's case in chief. *See, e.g.*, 23 RR 9-12 (Petitioner and Lyndon rap under the names Ice Man and Cyanide and Dr. Jekyll and Mr. Hyde); 23 RR 15-16 (Claudia called the police, alleging he was abusive and tried to cut her with a knife). Still more irrelevant and prejudicial information emerged in the cross-examination of Mr. Granger and his brother Lyndon. *See* 23 RR 49-62 (cross of Petitioner with irrelevant and damaging prison phone calls, despite favorable ruling on motion in limine); 23 RR 104-05 (cross of Lyndon about his purported admission to fellow inmate that he sexually assaulted Samantha).

The final defense witness, forensic pathologist Dr. Lee Ann Grossberg, testified about Ms. Sebolt's injuries and concluded that the bullets that killed her must have come from the street, where Petitioner was located. 23 RR 164-65. This was the first time any witness testified as to the location of the shooter who fired the shots that killed Ms. Sebolt. *See* 24 RR 20 (counsel's closing argument that due to the chaos of the situation it was unclear who fired the fatal bullet); 23 RR 155 (Dr. Grossberg states her opinion at hearing before she testified).

## 2. The Penalty Phase

As the jury entered the courtroom for the start of the penalty phase on May 1, Mr. Granger had an outburst, apparently focused on the sexual assault trial:

> THE DEFENDANT: I can't do this. I don't care what they are. I'm gonna tell the truth. I can't do this. I was lied on. They didn't give me the opportunity.

25 RR 4. The judge excused the jury, and Mr. Cribbs asked him to appoint a psychiatrist to determine his client's competence to go forward. The judge was reluctant and, echoing Dr. Gripon's

evaluation a year earlier, indicated that he thought Mr. Granger could control himself "when he wants to." 25 RR 5. The judge attempted to address Mr. Granger directly, but a rambling tirade promptly began, touching on a scrambled set of topics and individuals: Mr. Granger's belief that people were "lying on me," his innocence of the sexual assault charges, his opposition to trial in Galveston where they had built the jail "on the backs of black men," his sexual impotence, the responsibility of the police for "kill[ing] the old lady," the persecution of his brother by the authorities, and the closed minds of the members of the nearly all-white jury. 25 RR 8-20. Judge Wortham had Mr. Granger escorted from the courtroom briefly, and then attempted to resume on the record, but Mr. Granger promptly hurled insults at prosecutor Shettle. 25 RR 21. Mr. Makin reiterated that he believed Mr. Granger had suffered a breakdown and could no longer communicate with counsel. Mr. Granger interrupted:

> THE DEFENDANT: I'm controlling myself. I'm fine. He don't know what he talking about. Let's proceed. Let's move forward. Give me liberty or give me death. I want death. (Yelling) Give me fucking death. I want it. I rather be dead.

25 RR 21. After one further unproductive exchange with Mr. Granger, the judge dismissed the jurors for the day and appointed Dr. Vincent Scarano to do a competency assessment. 25 RR 25. Dr. Scarano issued a report the next day, concluding that Mr. Granger could control himself and was only seeking attention. A0346. The judge found him competent, and trial resumed. 26 RR 5-9. Mr. Granger apologized to the judge, the City of Galveston, and Ms. Sebolt's family, 26 RR 8, but his emotional dyscontrol surfaced repeatedly throughout the penalty trial.

The state's case for death involved evidence of Mr. Granger's jail infractions for outbursts and unfulfilled threats, testimony by his daughter and former wife describing his alleged sexual assaults, and excerpts of phone calls he had made from the county jail.

The jurors heard from several county jail employees about verbal insults, threats, one instance of physically resisting detention, and a hearsay account of a purported escape plan. They testi-

fied that Mr. Granger cursed at a female disciplinary officer (C.T. Turner: 26 RR 19; Bryan Jones: 26 RR 74), physically resisted while officers removed him to a detention cell for screaming and kicking the door of his regular cell (Richard Gutierrez: 26 RR 43; David Leday: 26 RR 44), tauntingly cursed at a nurse (Marissa Jarell: 26 RR 57), and repeatedly insulted and taunted an African-American officer (Laquintin Wilson: 26 RR 66).

Samantha Jackson testified that, beginning when she was about twelve, her father engaged in acts of sexual conduct that culminated in sexual intercourse when she was fourteen or fifteen. 26 RR 87-96. She recalled that she had kept a diary during that time. 26 RR 99. In 2009, when she was about seventeen, her mother, Claudia Jackson, invited her to come visit for the summer and Samantha decided to stay with her. When Samantha broke this news to her father, he threatened her. 26 RR 97-99. She claimed that her father was abusive and controlling and also abused her brother, Bartholomew, Jr. 26 RR 100-02.

Mr. Granger's ex-wife, Rebecca Richard, described an incident in about 2003, when Mr. Granger asked her to take Samantha to the doctor because Samantha had dried off with a towel he had used to ejaculate and he was afraid she was pregnant. Samantha was not pregnant. When Ms. Richard inquired, Samantha denied that anyone had ever touched her inappropriately. 26 RR 122-24.

The State's case ended with a series of excerpts from tapes of phone calls by Mr. Granger, from the jail, to his mother and other family members. Attorney Makin's objection that the excerpts were incomplete was overruled. As part of the defense case, Mr. Makin played numerous calls in full. 26 RR 126-34.

In the defense case, every witness but one—who said almost nothing at all—contributed harmful information about Mr. Granger. The witnesses either described bad acts or opinions, or contested Mr. Granger's guilt of the sexual assault or murder.

Psychiatrist Edward Gripon focused entirely on the question of future danger and not on

mitigating factors. Although Dr. Gripon had spoken with Mr. Makin generally before trial, he did not meet with him to prepare his testimony. As the doctor arrived in court, prosecutor Shettle spoke to him for five minutes in the hallway, but Mr. Makin did not. A0367.

On direct examination, Dr. Gripon indicated that the opinion he had formed the year before as the court's competency expert had not changed. 27 RR 16. During phone calls Mr. Granger had made to his family from jail, his mood varied from "reasonable emotional control" to quite agitated and upset. Dr. Gripon recognized that "many of his thoughts or ideas are certainly not ones I would subscribe to as reasonable, logical, or sometimes coherent." He nevertheless insisted, as he had in the competency evaluation for the court, that he saw no evidence of psychosis. 27 RR 16. He found that Mr. Granger had a "paranoid personality," a diagnosis that fell on Axis II,[2] but indicated that this was not a mental illness. 27 RR 19. As a jail inmate, Mr. Granger may have made threats but was "mostly a lot of talk," and he could control his behavior when he wanted to, despite his struggles to do so during the competency evaluation. 27 RR 20-21.

During cross-examination, Mr. Shettle mentioned a previous conversation in which Dr. Gripon had promised to send him a copy of any report he sent to the defense. 27 RR 22. Gripon did not send a report to Mr. Makin, and so Mr. Shettle did not receive one either. Asked if trial counsel had met with him about his findings "so that they knew what you were gonna testify to today," Dr. Gripon responded, "Not specifically, no." 27 RR 22; A0367.

Dr. Gripon portrayed Mr. Granger as a dangerous person. He acknowledged that the murder "clearly tells you under certain circumstances what he's capable of." He would not feel comfortable seeing Mr. Granger with a loaded weapon. Because Mr. Granger had an intermittent explosive disorder, he was potentially dangerous. 27 RR 25-28. In Dr. Gripon's view, Mr. Granger suffered

---

[2] See Am. Psychiatric Ass'n, Diagnostic and Statistical Manual-5 649 (2013); Am. Psychiatric Ass'n, Diagnostic and Statistical Manual IV-TR 690 (2000).

from an "almost uncontrolled level of internalized anger," and when he elected not to control that anger, "he can be very dangerous." 27 RR 30.

Wanda Hayes, Mr. Granger's cousin, did not provide any family background information except to inform the jury that he had "clowned around with my boys a lot" when they were younger. She testified that she did not think he deserved to die. 27 RR 49-53. Five other witnesses—Mr. Granger's mother and father, a prison chaplain, and two fellow jail inmates—each provided harmful information and no background information. *See* Claim VIII.

Mr. Granger, testifying against the advice of counsel, 28 RR 8, was the only witness to provide an overview of his background and history. He touched on his parents' marriage and divorce, his mother's abusive relationships, his attendance in special education classes, his sister Samantha's murder, and his failure to return to school after his sister's death. 28 RR 14-27. He had a variety of jobs and suffered a number of accidental injuries, and as a result needed surgery and medication for the pain. At the time of the phone calls played for the jury, he was also receiving medications in jail that affected his mood. 28 RR 27-49. He insisted that he would rather receive the death penalty than life in prison. 28 RR 45.

Mr. Granger's response to the stress of cross-examination was argumentative and intemperate. At one point it climaxed in a rambling tirade and his removal from the courtroom. 28 RR 52-64. The examination continued after a break, but culminated in another tirade. 28 RR 64-72. It ended:

> THE DEFENDANT: Say "Hello" to the bad guy. Give me liberty or give me death. That's what I want.

28 RR 72.

In summation, both Mr. Makin and Mr. Cribbs focused primarily, but not exclusively, on the issue of future danger. 29 RR 13, 19. Mr. Makin began by arguing that his client should have been shot in the parking lot of the Jefferson County Courthouse: "Any man, any veteran, any woman with a gun in that parking lot on that day would have taken it out and shot Mr. Granger." 29 RR 13-

14. On future danger, he told the jury that, in fourteen months at the jail, despite "all these horrible words and rants," he had inflicted "not one little injury." His client was a "blowhard, a big mouth." 29 RR 15. For mitigation, he relied exclusively on Mr. Granger's phone calls with his mother: "All those phone calls and language are probably the most inappropriate, bigoted, vulgar, profane, sick collection of misconceptions, fantasies, unconnected thoughts and words that any of us have ever heard"; Mr. Granger "stands on [his mother's] shoulders." 29 RR 15-17. He told the jurors that, although Mr. Granger was not insane or mentally ill, he was "not like us," and should be "removed from normal society. He should be locked up, and handled by professionals." 29 RR 18. He concluded by advising the jury that he and his co-counsel were "kind of on the life side[.]" 29 RR 19.

Mr. Cribbs argued that "part of the problem was the environment he was raised in," that none of the defense witnesses had "testified on his behalf," but even Cain was only banished for killing Abel. 29 RR 20-21. He asked the jurors to vote for life "even though he doesn't want it." 29 RR 22.

As prosecutor Knauth argued that Mr. Granger was dangerous and thanked the professionals who had kept him under control at the jail, Mr. Granger repeatedly laughed and interjected comments. 29 RR 25, 28. Prosecutor Shettle's summation provoked him further. He hooted derisively at Mr. Shettle's argument that he had shown no remorse, and contradicted his assertion that the prosecution had proven that he had molested his daughter. 29 RR 31-32. He called Mr. Shettle a liar and exclaimed that one of the inmate witnesses was a "jailhouse snitch." While Mr. Shettle continued the argument, Mr. Granger wrote on a pad that he displayed to the jury, "DEATH." The judge ordered him removed from the courtroom. Mr. Shettle maintained that the defense had not produced any evidence to mitigate Mr. Granger's culpability. No sooner had Mr. Shettle mocked Dr. Gripon's testimony that Mr. Granger tended to lose his temper ("This is mitigation evidence that he wanted you to hear?"), and insisted that Mr. Granger was in control of his defense, than those in the

courtroom could hear loud noises from the holding cell. 29 RR 33-40, 42; A0915.

For the verdict, the judge had Mr. Granger returned to the courtroom, where he made more intemperate remarks before the jurors entered. 29 RR 43-44. The jurors answered the first special question "Yes" and the second special question "No," and the judge advised Mr. Granger that he would impose a sentence of death. 29 RR 44-49. As the victim's daughter prepared to give a statement about the loss of her mother, Mr. Granger loudly insisted that he had not killed her. The judge ordered him restrained and gagged while the daughter continued her statement. 29 RR 49-55.

As discussed below, the jury made its decision in ignorance of readily available evidence that could have explained and mitigated this behavior.

### D. The Evidence That Could Have Been Introduced At Trial

**Social History:** Petitioner was born into a family that was unstable and violent. He continually experienced domestic violence starting while he was still in utero, as his biological father would beat his mother, Vallire Sapp Ozene; his birth itself was troubled. His childhood involved abuse, parental neglect, trauma, domestic violence, poverty, transience, and instability. He lacked a stable dwelling or a steady parental figure. He experienced sickness and injury many times as a child, but oftentimes these went untreated. His mother beat him, as she acknowledged to school officials, but she ignored his academic problems. School records show he was in special education classes, but his mother did not attend a single IEP planning meeting. When he was a teenager, his older sister, with whom he was very close, was murdered; the crime was never solved. A0266.

Petitioner, his brother, and his mother all exhibit bizarre behavior and thought patterns, including fixations on death, angels, the devil, and the supernatural generally. As children, Petitioner and his siblings were taught by their mother to hate and look down upon African Americans. This yielded intense, internalized self-hatred because they claim to be of mixed race and appear to be light-skinned African Americans. In his late teenage years, Petitioner, along with his mother and

brother Lyndon Brook Granger, began using, and eventually abusing, prescription medications. This only worsened their cloistered family lifestyle and the paranoid mistrust they harbored against anyone outside the family circle.

Petitioner's unusually close relationship with his mother and brother Lyndon, both of whom suffered from undiagnosed and untreated mental health problems, affected his life in every way. And Petitioner had mental health issues of his own: depression, anxiety, mood swings, auditory hallucinations, and the effects of major head injuries. These mental health problems grew more acute under pressure. But, apart from a single visit to a psychiatrist as a young adult, Petitioner received no mental health treatment. A0266.

**Evidence of Brain Impairment:** Trial counsel had available, but did not use, test results and opinion testimony by Dr. Hamza. Mr. Granger had markedly impaired scores on three neuropsychological tests designed specifically to detect brain damage and impaired brain functioning A0379-80. Dr. Hamza found that Mr. Granger was one of the most impaired individuals he had ever encountered. He regarded his testing as incomplete and told Mr. Makin that further testing was necessary. If called to testify, even on the basis of the testing he had already administered, he could have told the jury that Mr. Granger is a profoundly mentally ill man who suffered from significant cognitive deficits that made it impossible for him to handle the intense pressures of his two trials, think rationally, or control his impulses. A0382-84.

Further neuropsychological testing would have underscored the extent and significance of Mr. Granger's brain damage and impairment. Neuropsychologist Daniel A. Martell, Ph.D., administered an extensive battery of tests—thirty-one tests overall—to Mr. Granger on March 19 and 20, 2018. This included a set of free-standing and embedded measures of effort. Mr. Granger's performance indicated that the testing reflected a reliable and valid indication of his neuropsychological functioning and ability. A0230-31; A0239.

Dr. Martell's battery included the same three tests administered by Dr. Hamza, and Mr. Granger obtained scores at comparable levels of impairment in all three. This indicates that his impairments are longstanding and stable over time. A0246. Although Dr. Martell would have advised trial counsel that additional neuropsychological testing was indicated, if counsel had asked him testify on the basis of those three tests, he "would have been able to describe the clear deficits reflected in the test data." A0247.

Dr. Martell's testing yielded additional evidence of impaired brain function in various dimensions, including memory, academic functioning (with scores that were consistent with a learning disability), executive functions (including impulse control, perseveration, abstract reasoning, learning from feedback, and divided attention and multitasking), and motor functioning. A0240-45. Mr. Granger's sentencing jurors never learned this information.

**Psychiatric Evidence:** Trial counsel never learned what mitigating evidence an informed and prepared psychiatrist could have provided. Psychiatrist Richard G. Dudley, Jr., M.D., conducted psychiatric examinations of Mr. Granger on March 12, March 13, and April 24, 2018. The collateral information he reviewed included Stacie Brown's social history report (which provided extensive information on the functioning of the Granger family) and Dr. Martell's report on neuropsychological testing. He also conducted psychiatric interviews of Mr. Granger's mother, Vallire Ozene; his brother Lyndon; his brother Ulysses and Ulysses's wife Debbie; and his niece, Nicole, and her husband, Patrick. A0250.

He found that Mr. Granger suffered from the effects of childhood trauma and had severe instability related to attachment and self-worth. He experienced severe psychiatric difficulties in mood regulation, impulsivity, depression, and substance abuse, and experienced delusions and hallucinations. He developed a major psychiatric disorder best described as Schizoaffective Disorder, Bipolar Type. A0251; A0254-55; A0260; A0261; A0263-65. Because trial counsel asked Dr. Gripon to

give an opinion only on future dangerousness, the jurors never heard any expert testimony to mitigate Mr. Granger's offense.

## CLAIMS FOR RELIEF

**I.  TRIAL COUNSEL'S CONFLICTING LOYALTIES ACTUALLY AFFECTED THEIR PERFORMANCE AT BOTH PHASES OF TRIAL, AND THE CUMULATIVE EFFECT OF THEIR DEFICIENT PERFORMANCE PREJUDICED THE DEFENSE AT BOTH PHASES OF TRIAL, DEPRIVING MR. GRANGER OF HIS SIXTH AMENDMENT RIGHTS**

The shootings at the Jefferson County Courthouse affected the entire courthouse community. Bullets shattered the front entrance, an innocent woman died in the revolving doors, dozens of bystanders dove for cover, and dozens of sheriff's officers and police officers put themselves in harm's way to stop the attack. Judges, attorneys, and courthouse personnel became fact witnesses to a homicide. Mr. Granger's attorneys were longtime members of the courthouse community, with deep ties to the local bar and law enforcement. For these and other reasons, they represented him with deeply divided loyalties that actually affected their representation, *see Cuyler v. Sullivan*, 446 U.S. 335, 349-50 (1980), and, cumulatively, undermined the fairness of both phases of his trial. *See Strickland*, 466 U.S. 668, 693 (1984). Counsel's disloyalty and deficient performance throughout their representation deprived Mr. Granger of his Sixth Amendment rights to conflict-free counsel and effective counsel. U.S. Const. amends. VI, XIV.

The Sixth Amendment guarantee of effective assistance of counsel includes the right to counsel's undivided loyalty. *Wood v. Georgia*, 450 U.S. 261, 271-72 (1981). When conflicting interests burden an attorney's representation, "the likelihood that the verdict is unreliable is so high that a case-by-case inquiry is unnecessary." *Mickens v. Taylor*, 535 U.S. 162, 166 (2002). Therefore, to obtain relief on a conflict-of-interest claim, a defendant need not demonstrate prejudice if she shows that "an actual conflict of interest adversely affected [the] lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 349-50 (1980); *accord Mickens*, 535 U.S. at 168 (citing *Sullivan*); *United States v. Infante*, 404

F.3d 376, 391 (5th Cir. 2005).

While the Supreme Court has not yet decided whether the *Cuyler* standard extends beyond multiple concurrent representation to include conflicts between an attorney's personal interest and the client's best interests, the Fifth Circuit has held that it does not. *See Beets v. Scott*, 65 F.3d 1252, 1278 (5th Cir. 1995). Whatever standard applies, the result should be the same in Mr. Granger's case. Not only did counsel's divided loyalty actually affect their performance, *see Cuyler*, 446 U.S. at 349-50, but there is a reasonable probability that, but for their numerous deficiencies at both phases of trial, the outcomes of both phases would have been different. *See Strickland*, 466 U.S. at 693.

The compromised loyalty of Mr. Makin, Mr. Cribbs, and Mr. Vazquez affected their work for Mr. Granger from the beginning of their representation. They retained an investigator whose son was one of the State's witnesses and who, as the recently retired Chief of the Beaumont Police, was the former boss of many of the others. They secured the appointment of a psychiatrist who had already served as the court's competency expert, and had formed the opinion that Mr. Granger was not psychotic and could control his behavior. *See* Claims IV and V.

In a case where their client faced allegations that he had sexually abused his daughter, killed an elderly woman, and taken hostages, all three counsel allowed the seating of two jurors who had been victims of childhood sexual abuse and/or hostage-taking, and a third who had been close to an elderly woman who was murdered. See Claim II. They did not object when the prosecution selected a jury of eleven white jurors and one black juror who would automatically vote for death. *See* Claim III. And, over and over, either through lack of preparation or indifference to their client's welfare, they called witnesses who gave extremely harmful testimony, sometimes elicited by the defense on direct examination. Specifically, they presented a ballistics expert who was the only witness to opine that the bullets that killed the victim came from the location their client was firing from, contradicting Mr. Granger's testimony and their chosen defense. They also elicited testimony from seven dif-

ferent witnesses that the "felony" Mr. Granger was on trial for at the time of the shooting was the sexual assault of his daughter, an irrelevant and prejudicial fact the jury had not previously known. Finally, despite having won pretrial motions precluding the admission of certain prior bad acts and impeachment evidence, they failed to object to the State's admission of this exact type of evidence on cross-examination of Mr. Granger and his brother Lyndon. Had counsel objected, this prejudicial evidence would never have been heard by the jury. *See* Claims XI and XII. These deficiencies demonstrate that counsel's divided loyalties actually affected their representation in preparation for and during the guilt phase. Furthermore, their deficiencies prejudiced the defense because there is a reasonable probability that, but for the cumulative effect of these errors in preparation and presentation and the other deficiencies set forth in this petition, the jury would have found Mr. Granger not guilty or, at least, that one or more jurors would have voted for a life sentence.

For the penalty phase, although part of counsel's strategy was to establish mitigation through Mr. Granger's background and abnormal functioning, they curtailed their mitigation specialist's investigation, ignored their psychologist's advice that Mr. Granger had brain damage, and relied only on Mr. Granger himself, rather than lay and expert witnesses, to describe his background and functioning. *See* Claims VI and VII. They called their already conflicted psychiatrist as a witness without telling him that testing revealed Mr. Granger's brain damage, information that would have caused the psychiatrist to reassess his opinions. Even worse, they did not prepare him to testify and focused his testimony on the question of future danger without first learning that he would say Mr. Granger was indeed dangerous. *See* Claim IV. Almost every other penalty-phase witness they called, including the pastor who testified that he believed Mr. Granger deserved the death penalty, gave dramatically damaging testimony. *See* Claim VIII. In closing argument, neither defense counsel explicitly asked the jury to impose life and Mr. Cribbs actually pondered how he could ask the jury to do anything other than impose death. These deficiencies demonstrate that counsel's divided loyalties actually af-

fected their penalty-phase representation. Furthermore, there is a reasonable probability that, but for the cumulative effect of all these deficiencies and all those set forth in this petition, at least one juror would have voted to spare Mr. Granger's life.

For all these reasons, as well as those set forth elsewhere in this petition, this Court should grant Mr. Granger habeas relief from his conviction and death sentence.

## II. TRIAL COUNSEL'S PERFORMANCE DURING VOIR DIRE DEPRIVED PETITIONER OF THE EFFECTIVE ASSISTANCE OF COUNSEL

Mr. Granger's trial counsel allowed biased jurors, misinformed jurors, and unqualified jurors to be seated, deliberate, convict, and impose sentence on their client. Counsel did not challenge jurors who disclosed that they had suffered or witnessed childhood sexual assault, had been close to an elderly murder victim, or expressed uncertainty about the ability to serve objectively. *See* 14 RR 154. Counsel failed to challenge jurors who were unfit to serve as sentencers because they could not consider relevant mitigating evidence, *see* 13 RR 203-4; 12 RR 25, and failed to ensure that seated jurors were life qualified. *See* 12 RR 34-35. Counsel did not object to or correct the prosecution's mischaracterizations of mitigating evidence. *See, e.g.*, 8 RR 148. Despite the presence on the panel of several unqualified and unfavorable jurors and of others whose fitness was unclear because of inaccurate or incomplete questioning, counsel did not exhaust their peremptory challenges. Their deficiencies in jury selection deprived Mr. Granger of the effective assistance of counsel. U.S. Const. amends. VI, XIV; *Strickland v. Washington*, 466 U.S. 668, 693 (1984).

### A. Counsel Provided Ineffective Assistance by Failing to Remove Biased and Misinformed Jurors, Failing to Determine that Jurors Were Able to Consider and Give Effect to Mitigating Evidence, and Failing to Determine that Jurors Were Able to Consider a Life Sentence

An adequate voir dire is essential to protect a defendant's right to an impartial jury. *See Morgan v. Illinois*, 504 U.S. 719, 728-29 (1992). The process of voir dire "is designed to ensure, to the fullest extent possible, that an intelligent, alert, disinterested, impartial and truthful jury will perform

the duty assigned to it." *Armstrong v. State*, 897 S.W.2d 361, 363 (Tex. Crim. App. 1995). The importance of the voir dire process is further heightened in capital cases. *Morgan*, 504 U.S. at 730; *Mu'Min v. Virginia*, 500 U.S. 415 (1991).

As this process is fundamental to ensuring the constitutional rights of criminal defendants, "voir dire is an integral part of defense counsel's role in providing adequate legal assistance." *Dinkins v. State*, 894 S.W.2d 330, 344 (Tex. Crim. App. 1995). Mr. Granger's counsel failed in this vital duty. "Given the fundamental nature of the impartial jury and the consistent line of Supreme Court precedent enforcing it," this Court "must conclude that 'the result of [Petitioner's trial] is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.'" *Virgil v. Dretke*, 446 F.3d 598, 613 (5th Cir. 2006) (counsel ineffective in failing to remove two biased jurors).

### 1. Trial counsel allowed the seating of three jurors who had experienced violence similar to the kinds at issue in the trial

In order to ensure an impartial jury, defense counsel "must be diligent in eliciting pertinent information from prospective jurors during voir dire in an effort to uncover potential prejudice or bias [and] has an obligation to ask questions calculated to bring out information that might indicate a juror's ability to be impartial." *Walker v. State*, 195 S.W.3d 250, 256 (Tex. Crim. App. 2006). Where a prospective juror's responses suggest bias, counsel has a duty to follow up and to exercise cause and peremptory challenges intelligently. *Id.* at 257; *see also State v. Garza*, 143 S.W.3d 144 (Tex. App. 2004) (aggravated sexual assault case in which counsel found ineffective for failing to challenge juror for cause or use peremptory strike when juror admitted that he would be biased because family member had been victim of sexual assault). As explained in *Virgil*, 446 F.3d at 611-14, a petitioner is prejudiced not only by trial counsel's failure to remove jurors whose testimony indicates bias, but also by counsel's failure to engage in questioning sufficient to dispel the appearance of bias. Given "the fundamental nature of the impartial jury," the presence of a biased juror

renders the results of a trial "unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Id* at 613. In such cases, "[t]he process-failure . . . stems as much from the unknown as from the known." *Id.* In *Virgil*, the conviction was overturned in part because "[n]o effort was made to explore the depth or intensity of either [juror's] bias toward [petitioner], in particular, or criminal defendants, in general." *Id.*

Mr. Granger's counsel failed to ask appropriate questions of, and then challenge, three women, Billie Rae Gillas, Lynn Rivera, and Natalie Beard. All three described personal experiences with acts of violence similar to the ones at issue in the trial, and Ms. Gillas expressed deep uncertainty about her ability to sentence Mr. Granger without bias. Counsel's questioning about the jurors' experiences was shallow or non-existent; counsel failed to ask Ms. Gillas any questions at all. Counsel never attempted to remove these jurors for cause, never exercised peremptory challenges against them, and let peremptory challenges go unused at the end of jury selection.

### a.    Billie Rae Gillas

Billie Rae Gillas reported "child molestation by stepfather" on Question 30 of her juror questionnaire, A0493, giving her an extremely personal connection to Mr. Granger's alleged motive and the underlying allegations from Mr. Granger's sexual assault trial—a focus of the defense presentation at the guilt phase and the State's presentation at the penalty phase. Prosecutor Knauth brought up this personal connection in his questioning of Ms. Gillas, and she explained that it would influence her judgment in Mr. Granger's case.

> Q. And you—you had indicated that you—there was child molestation by your step-father.
>
> A. Correct.
>
> Q. There may or may not be allegations of that come up in a trial. That may come up in a trial.
>
> A. Uh-huh.

> Q. If it does come up in this trial, will your—what occurred with you, will it affect you in any way whatsoever?
>
> A. Well, of course, it would affect me.
>
> Q. But would it affect your decisions as to whether or not to find the defendant guilty or—and how to answer the questions?
>
> A. It will certainly have some bearing. It will have bearing because I will have personal knowledge of how that could affect an individual.

14 RR 136-37. Mr. Knauth attempted to rehabilitate the juror, coaxing her to change her answers.

Ms. Gillas explained her inability to predict the impact of her experiences:

> A. I'm just saying that, you know, we talk—the question was put to us, "If you find in this manner," saying you go to a point—that you have to determine whether or not there are mitigating factors and process whether you choose life or death, for instance.
>
> Q. Right.
>
> A. That those factors are going to be based on judgment, and that's a personal judgment 'cause it means something different to each individual.
>
> Q. Okay. Well, I agree with that. What—I guess what I'm more focused on is would your prior life experiences with your stepfather cause an emotional response which would make you make a decision on guilt or innocence or the answers to the questions based upon your emotions and not upon the facts that were presented to you?
>
> A. Not likely.
>
> Q. Okay. You need to be able to say it would not or it would. We need to know, because we need you to be able to take the oath and, like you told me, you would follow the oath. And, so, that's what we need to hear from you. If you cannot, that's fine; but right now's the time we need to know.
>
> A. I'd guess I don't know.

14 RR 138-39. Prosecutor Knauth then left this emotional topic and ran through the procedure of the trial. Although Ms. Gillas later said that she could answer depending on the evidence, 14 RR 152, she never backed off the obvious: that the abuse she had suffered would affect her as a juror.

Despite the fraught exchange between Mr. Knauth and Ms. Gillas, defense attorney Cribbs not only failed to follow up on this issue, but declined to ask any questions of Ms. Gillas at all. 14

RR 154. The defense did not challenge her for cause or exercise a peremptory challenge to remove her. Counsel had no valid strategic reason to leave a childhood sexual abuse survivor to sit in judgment on a client whose trial would spotlight charges of childhood sexual abuse.

### b. Lynn Rivera

Lynn Rivera disclosed on her questionnaire that she had witnessed her friend's sexual assault while they were hitchhiking together when they were twelve years old. She herself was also held hostage during the sexual assault. On another occasion, she was the victim of an armed robbery at a restaurant, during which she was forced to put money in a bag while other victims were locked in a freezer. JM01115. Thus, she not only had personal exposure and trauma from the sexual assault of a young girl, but also had twice had direct exposure to hostage-taking, another aspect of the trial testimony here. The prosecution questioned her about both incidents:

> Q. And you said you had two incidents. You said: Witnessed a rape as a teenager. Could you tell me about that.
>
> A. I was a stupid 12-year-old. I went hitchhiking with two other friends. We lied to each of the parents. We wanted to go to [the] beach. It was in South Carolina. The car pulled over to pick us up and instinct told me not to get in the car, and I did anyway. It was two doors. We were kidnapped, robbed. I and one of the girls was held in the back seat at gunpoint, and the girl in the front was being raped. The— I got away. They were pushing my friend down. I'm not sure how exactly. I kept trying to get out of the car. And they found her the next morning wandering around, naturally had been raped.

15 RR 136. The prosecutor went on to ask about the robbery:

> Q. Again, you also said the second instance where you were—you were involved— you were a victim in an armed robbery?
>
> A. I was the assistant manager at Domino's Pizza in Monterey, California, near Fort Ord; and armed robbers came in one night. They locked everybody in the freezer but me, and I had to give 'em the money. Later find out it was a guy we had fired a few days before that and his brother, and they were prosecuted.

15 RR 137. While Ms. Rivera claimed that her experiences would not affect her, 15 RR 137, these were not minor criminal episodes but major traumatic events. They echoed the kinds of traumas the

State sought to establish through the trial testimony. Mr. Cribbs, however, failed to follow up with Ms. Rivera about this in any way, and allowed her to be seated without challenging her for cause or using a peremptory strike. He and his co-counsel had no valid reason for these failures.

### c.     Natalie Beard

Finally, Natalie Beard's personal and emotional connection to a recently murdered elderly woman should have raised concerns about her ability to be objective as a juror at Mr. Granger's trial for the murder of elderly Minnie Sebolt. Ms. Beard indicated in question 30 on her questionnaire that "I was very interested in a criminal case that involved my friend[']s grandmother being murdered." A0465. Mr. Cribbs raised the issue in his voir dire questioning of Ms. Beard, but failed to act upon her disclosure of potential bias, instead working to ensure that she would be seated on the jury despite her obvious emotional distress about a similar case.

Q. Okay. 'Cause you said something about you have—very interested in a criminal case that involved your friend's grandmother being murdered.

A. (Nodding).

Q. Would that affect you in any way, the fact that it was a friend of yours and his grandmother was murdered?

A. (Crying) Sorry. It was recent.

Q. Ma'am?

A. It was a recent case. Sorry (crying).

Q. Okay.

(Pause)

Q. (BY MR. CRIBBS) Well, I think the evidence is probably gonna show that there was an elderly lady by the name of Minnie Sebolt was killed in this case.

A. Okay.

Q. And the fact that this was your friend's grandmother, are you able to set that completely out of your mind where you will not consider that if you are chosen on this jury?

A. I think so. It was—the way it was done was just very malicious.

Q. How long ago was that?

A. The actual—as far as the actual incident or when they closed the—

Q. The incident.

A. Oh, it was like a year and a half ago.

Q. Okay. So, it's fairly fresh?

A. Yes, sir.

Q. Has that person been tried or convicted or—

A. The case has been closed now. It just closed recently.

Q. Okay. It has closed?

A. Yes.

Q. All right. Well, that fact won't affect you if you happen to be chosen as a juror in this case, would it?

A. I think it makes me more aware of the court system; but I don't think it will affect me as far as being one-sided, if that's what you're asking me.

Q. All right. Well, you can understand where we're coming from when we ask—

A. Yes, sir—

Q. —if that would—

A. Most definitely.

Q. —because surely you can't hardly put somebody on the witness—I mean on the jury box that's thinking about something else and relates it to this offense, 'cause you gotta be clearheaded and mind on this offense alone when it takes place. Okay?

A. Yes, sir.

10 RR 56-58. The fact that Ms. Beard broke down crying while Mr. Cribbs questioned her about this case, coupled with her statements that the murder was "very malicious," had only recently closed, and remained "fairly fresh" in her mind, demonstrated her unfitness as a juror, or at least justified the use of a peremptory challenge. However, Mr. Cribbs failed to pursue additional question and al-

lowed her to be seated on the jury, where she would eventually condemn his client to death for a crime similar to the one that made her weep during voir dire. No valid strategy justifies counsel's failures.

Trial counsel's blindness to the blatant unfitness of these three jurors was deficient.

### 2. Counsel allowed the seating of a juror who was not life qualified

Seated juror Feleanice Shanks gave questionnaire responses suggesting that she would automatically vote for death in the event of a conviction, and her voir dire responses never demonstrated any willingness to consider a life sentence. In order to serve in Texas, a capital juror must be willing to consider imposing a life sentence on the basis of the mitigating evidence even after finding the defendant guilty of capital murder and answering the "future danger" question affirmatively. *See* Tex. Code Crim. Proc. art. 37.071, § 2(b)(1). The Due Process Clause likewise prohibits any juror who would automatically vote for the death penalty without regard for the mitigating evidence to serve as a sentencer in a capital trial. *See Morgan*, 504 U.S. at 721. Ms. Shanks did not meet these requirements. Trial counsel's failure to challenge her for cause, or even to exercise a peremptory challenge to remove her, deprived Mr. Granger of the effective assistance of counsel.

In her questionnaire, Ms. Shanks answered "Yes" to the question, "Do you believe in the death penalty?" In the space provided to "explain why or why not," she wrote, "The reason I believe in the death penalty is because those victims deserved the right to live just like the defendant wants to live." This answer suggested that she would automatically choose death. A0634.

Despite thirty-seven pages of voir dire questioning that continued for over forty minutes, Ms. Shanks never stated clearly that she could vote for life in an appropriate case, and trial counsel never asked her for an answer one way or the other. 12 RR 7-43; *see* 12 RR 40.

The prosecutor, Mr. Knauth, began by questioning Ms. Shanks about her questionnaire:

Q. Okay. All right. You had indicated that you do believe in the death penalty.

A. Yes.

Q. And you said: The reason I believe in the death penalty is because those victims deserve the right to—I believe level [sic]—just like the—live—I'm sorry—to live just like the defendant wants to live. Is that—is that how you felt when you filled out this questionnaire?

A. Yes.

Q. Okay. And how long or why do you—do you believe in the death penalty?

A. For the reasons that I've stated.

Q. Okay.

12 RR 10-11. Mr. Knauth elicited Ms. Shanks's agreement that "in most murder cases the death penalty's not available," *id.* at 11, but did not ask her if she could consider both options. Instead, he explained the jury's role at the guilt phase and its obligation to answer the first special question about future danger. *Id.* at 12-18. Finally, he asked her to read the second question and provided a description of mitigating evidence as "something favorable to the defendant." Then he asked her if she could determine if the "favorable outweighs the bad." She indicated that she could. *Id.* at 18-21.

Attorney Vazquez returned to her questionnaire responses:

Q. I'm reading what you wrote under: Do you believe in the death penalty? Yes. Please explain. The reason I believe in the death penalty is because those victims deserve the right to live just like the defendant wants to live. Tell me what you meant. I mean, I know what you meant here; but can you expound a little bit?

A. (No response).

Q. Just take your time. Just tell me what you think about it.

A. When the—when the D.A. was speaking of—on the 2nd when we were in the jury room stating that what had transpired and, then, the defendant—defense attorney stated that—was looking for the defendant to—that he would—if he got life, he would be—he would spend the rest of his life in there, in prison. But that was just my take on it. The victims, they're—they were innocent. They're not here anymore to think about that.

Q. You're saying the victim or victims is not here anymore to think about that?

A. Yeah, the victim.

12 RR 25-26. These responses reiterated the same absolutist point of view as the questionnaire: the innocent victims were no longer alive, and so Ms. Shanks believed in the death penalty for the defendant. Her testimony gave no indication that she could be open to a life sentence.

Mr. Vazquez went on to elicit Ms. Shanks's understanding of the meaning of the second special question, but again Ms. Shanks never said she could answer that question "yes."

Q. Whether, taking into consideration all the evidence, including the circumstances of the offense—means everything you've heard, right?

A. Yes.

Q. Everything you've heard at the trial thus far. The defendant's character, background, and personal moral culpability—what does that mean to you?

A. (No response).

Q. I heard you and Mr. Knauth say maybe his blameworthiness, how blameworthy you think the defendant is. Can you think of anything else you might call it?

A. (No response).

Q. Personal moral culpability.

A. (Reviewing).

Q. It's vague and hard to define. I've never—you know, I don't know—people have different—

A. Uh-huh.

Q. —different definitions of it, what they feel. And if there is sufficient mitigating circumstance—circumstance or circumstances. What do you think sufficient mitigating circumstance or circumstances are?

A. (No response).

Q. Take a guess. It's fine to guess.

A. (No response).

Q. Just that term there, "sufficient mitigating circumstances."

A. (No response).

Q. I've heard people say, Miss Shanks, there's something you've heard about the

background or the defendant's character, or something that makes you think he doesn't deserve to die, that life in prison without parole would be enough. If one person finds sufficient mitigating circumstances, there's something, something—I've heard it called something that favors him, something that makes someone want to not make the punishment death, something causing sympathy or compassion or empathy—I don't—you know, I don't know. If one person has that, though, that person can save his life. He'll spend the rest of it in prison, but he won't be facing a death penalty. Can you follow that, that law?

A. (No response).

Q. Or what do you think about that law?

A. (Reviewing) You're asking if it's—if it's found that—looking at the defendant's character?

Q. One thing is character, background, whatever it is you've learned about him throughout the trial, throughout both phases of the trial.

A. (No response).

12 RR 34-35. Despite extended questioning, Ms. Shanks did not state that she would be able to vote for a life sentence based on mitigating evidence, and Mr. Vazquez never made sure that she answered that question. Indeed, when she did not initially respond to his question whether she could "follow that law," he changed the question, asking her only what she "thought about" it. She did not respond to that question either.

An attorney is ineffective for failing to challenge a biased juror who then sits on the jury. *See Virgil*, 446 F.3d at 612-14 (seating of biased juror is structural error and therefore establishes *Strickland* prejudice); *Biagas v. Valentine*, 265 F. App'x 166 (5th Cir. 2008) (following *Virgil* and finding state court's rejection of prejudice argument unreasonably applied clearly established federal law). Despite the evidence of Ms. Shanks's inability to fulfill her duties, trial counsel, without any valid strategic reason, neither moved to strike her for cause nor used any of their available peremptory strikes to remove her. Their failure to do so was deficient.

### 3. Counsel allowed the seating of a juror who was not prepared to accept psychological evidence

It is not enough to allow a defendant to present mitigating evidence in a capital trial; the sentencer must be able to give weight to such evidence in making the sentencing decision. *See Penry v. Lynaugh*, 492 U.S. 302, 319 (1989); *see also Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246, 260 (2007). "The Constitution requires a court to determine whether the special issues *as applied* enable the sentencer to give *full* consideration and *full* effect to the capital defendant's mitigating evidence." *Nelson v. Quarterman*, 472 F.3d 287, 298 (5th Cir. 2006) (emphasis in original).

Despite this duty of meaningful consideration, a seated juror, Mariah Korin, made statements during voir dire and in her juror questionnaire indicating her inability to take psychological evidence into account, stating that psychological and psychiatric testimony "isn't evidence." 13 RR 203.

Defense counsel Vazquez noticed Mariah Korin's troubling views on her juror questionnaire, but allowed his questioning to be quickly derailed by prosecutor Shettle and did not adequately pursue the issue or move to strike Ms. Korin for cause.

> Q. I see where you answered about the psychiatric and psychological testimony: It's interesting to know the information but—from a professional, but it isn't evidence. Why did you write that?
>
> A. (No response).
>
> Q. What is it that makes you think it's not evidence if—if you hear it from the witness stand?
>
> A. Well, it's not like—they weren't inside his head type of thing. It's not—they can't—I don't know.
>
> Q. No, they're not inside his head but it could be—you could hear from some experts from the State, from the defense, about psychology or psychiatry and they would be—if you hear from them, they're deemed experts and the judge decides if that evidence is admissible.
>
> MR. SHETTLE: Your Honor, I'm gonna object to this. The term "deemed experts," I don't believe that is the status of Texas law at present. Nobody is deemed an ex-

pert.

MR. VAZQUEZ: Let me—I'll rephrase, your Honor.

13 RR 203-4. Ms. Korin's questionnaire clearly indicated that she would be unable to fully consider psychological testimony as, in her words, "it isn't evidence." A0563. Rather than move to have her struck for cause, Mr. Vazquez fumbled to address this clear statement of Ms. Korin's inability to serve as a juror. After a few unsuccessful attempts to rephrase, Mr. Vazquez concluded the line of questioning with,

> Q. If you hear what is considered expert testimony and it's admissible evidence and the jurors hear it, it is something you—to be on the jury, it is something you would have to consider. You wouldn't have to believe all of it. You wouldn't have to—it's just something you'd have to consider, all 12 of you. Can you do that?
>
> A. Yes.

13 RR 205. By qualifying the question and giving the juror permission not to believe the mitigating evidence, Mr. Vazquez prevented her from giving a meaningful response as to whether she could give the full consideration that the law mandates. *See Nelson v. Quarterman*, 472 F.3d 287, 297 (5th Cir. 2006). Mr. Vazquez failed not only to fully explore Ms. Korin's beliefs and seek her removal for cause, but he and co-counsel failed to remove her with a peremptory strike, although numerous strikes went unused. Because no reasonable strategy could support the decision to leave her on the jury, that decision was deficient.

### 4. Counsel failed to object to or clarify the prosecutor's mischaracterization of mitigation, resulting in the seating of jurors whose fitness to consider mitigating evidence was unknown

Throughout voir dire, the prosecution repeatedly misinformed jurors about the definition and extent of mitigating evidence, narrowly describing such evidence as "favorable" information about the defendant, rather than acknowledging the full range of information that the jurors must consider. *See, e.g., Porter v McCollum*, 558 U.S. 30, 38 (2009) (counsel ineffective in failing to present

mitigating evidence of defendant's mental difficulties and abusive childhood); *Penry v. Lynaugh*, 492 U.S. 302, 340 (1989) (reversing on grounds that Texas special issues unconstitutionally precluded jury from full consideration of evidence of childhood abuse and mental retardation); *Park v. Dugger*, 498 U.S. 308, 314 (1991) (error to refuse to consider evidence of "a difficult childhood, including an abusive, alcoholic father"); *see also Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982) (overturning capital sentence because sentencer did not give weight to "evidence of a turbulent family history, of beatings by a harsh father, and of severe emotional disturbance"). Trial counsel never objected to these mischaracterizations.

Counsel also unreasonably failed to object to prosecution statements indicating that only mitigating evidence connected to the crime itself could be considered, and by not following up or clarifying the correct, broader definition of relevant mitigating evidence. *See Tennard v. Dretke*, 542 U.S. 274, 287 (2004) (explaining that there is no requirement of a nexus between relevant mitigating evidence and the crime committed).

"[T]he Eighth Amendment requires that the jury be able to consider and give effect to a capital defendant's mitigating evidence." *Tennard*, 542 U.S. at 285 (citing *Boyde v. California*, 494 U.S. 370, 377-78 (1990) (internal citations omitted)). Giving effect to such evidence entails actual consideration of relevant information by the sentencer. *See Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246 (2007) ("[S]entencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual . . . .").

A juror who is unwilling to consider all relevant mitigating evidence is unqualified to serve because his or her views "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainright v. Witt*, 469 U.S. 412, 424 (1985). Defense counsel's failure to object to the prosecution's mischaracterizations of the law allowed mis-

informed jurors to rely on faulty standards in responding to the questions of counsel for both sides, and prevented trial counsel from ensuring Mr. Granger would be judged by a life-qualified and unbiased jury. As discussed below, these deficiencies emerged in the questioning of multiple jurors who were seated at the trial and convicted and sentenced Mr. Granger to death. Counsel had no reasonable strategic basis for not clarifying the scope of the mitigating evidence the jurors must consider.

### a.    April Vanderslice

In his voir dire of seated juror April Vanderslice, prosecutor Knauth repeatedly misrepresented mitigation as "[s]omething that is favorable to the defendant that seems to lessen the evil that he may or may not have done," and as "something good." 8 RR 149. Mr. Knauth further obfuscated the meaning of mitigation with an explanation that "[t]o some people a bad childhood may be mitigating. To some others, it may be not mitigating. It may be aggravating. It depends." 8 RR 148. The defense team did not object to Mr. Knauth's mischaracterizations, and further failed to explain, or to ask the court to explain, what constitutes mitigation under capital sentencing law.

### b.    Angela Junemann

Seated juror Angela Junemann explained in her questionnaire that she believed in the death penalty, "if the individual proves to be a threat to society with no potential value to society." A0527. Rather than inform her how her beliefs deviated from the law, Mr. Knauth reinforced her misunderstanding, stating that her view, "[s]trangely enough, it's—almost tracks what the law is." 9 RR 68. Mr. Knauth never explained that mitigating evidence does not need to prove someone's value to society in order to serve as mitigation, and Mr. Granger's lawyers did not object to this misinformation. Mr. Makin, the defense attorney responsible for Ms. Junemann's voir dire, in fact further reinforced this incorrect definition in his own questioning, stating that her answer on the questionnaire was so good that, "you kind of wonder, well, why didn't the legislature just say that in those easy terms rather than go through that thing." 9 RR 86.

Mr. Knauth further misled Ms. Junemann by stating that, when sentencing the defendant, "you take into consideration all of the evidence, including the circumstances of the offense itself— the circumstances of the offense itself, it—that may in itself be enough." 9 RR 82. To base a death sentence solely on the circumstances of the offense is a clear violation of Texas law, which requires consideration of mitigating factors. *See* Tex. Code. Crim. Proc. Art 37.071, 2(e)(1). While Mr. Makin went over the sentencing process with Ms. Junemann, he never sought to clarify that the jurors could not base their decision entirely on the circumstances of the crime.

### c.     Brad Loser

During the voir dire of seated juror Brad Loser, Mr. Knauth defined mitigating evidence as something "that's favorable to the defendant," 14 RR 184, and emphasized this limited definition by framing the sentencing question as, "is there a sufficient *favorable* circumstance or circumstances to warrant for the defendant to get life instead of death?" 14 RR 184. Mr. Granger's trial counsel made no objection to either of the prosecutor's inaccurate framings.

When attorney Vazquez had his own opportunity to question Mr. Loser, he did not clarify what counted as mitigating evidence, or ask further questions to determine if Mr. Knauth's limited definition had affected Mr. Loser's understanding. Because of this, Mr. Vazquez allowed Mr. Loser to answer questions on an inaccurate basis, to the obvious detriment of counsel's ability to exercise cause and peremptory challenges.

### d.     Jolynn Hamilton

The defense again failed to correct the prosecution's limitations on the scope of mitigating evidence in the voir dire of seated juror Jolynn Hamilton. While describing the penalty phase of the sentencing, prosecutor Shettle explained:

> Q: You look at everything, and you decide if there's something good enough in that defendant to warrant a life sentence rather than a death sentence. And if you can't find sufficient good, then you answer this question "no"; and he gets the death penalty. If you—and what you decide is sufficiently good is up to Ms. Hamilton.

A. Uh-huh.

Q. Okay. And you may find good in him, but does it outweigh the bad? This is a balancing question.

A. Right.

8 RR 179-80. Prosecutor Shettle's repeated framing of mitigation as something "sufficiently good" violated *Eddings*'s mandate that jurors consider all relevant mitigation evidence, such as evidence of mental illness, that, while not "good" or "favorable," may explain the behavior of the defendant or otherwise provide a basis for a sentence of life imprisonment. While attorney Makin did discuss mitigation with Ms. Hamilton in his questioning of her, his explanation was far from comprehensive. Makin explained that mitigation "[c]ould be he was a Boy Scout. Could be bad homelife (sic). Could be good cook. Could be bad cook. Whatever—I mean, and those are just wild examples. Can mean anything you want it to be." 8 RR 187.

### e.    Gavin O'Neil

Seated juror Gavin O'Neil's voir dire left him misinformed about the role of mitigating evidence as well. Discussing Mr. O'Neil's answers to the juror questionnaire, Mr. Knauth said,

Q. You had indicated you believe in the death penalty, and you said: Some crimes are so terrible as to require the ultimate penalty. And you still feel that way?

A. Yes, sir.

Q. Okay. The law agrees with you on that. There are some crimes and some criminal defendants that are so terrible or so bad that the death penalty is an appropriate punishment, and that's what the law entails. We're gonna go through that process. I would suggest to you that it's not decided by you just hear what's happened and you just say, "That person deserves life," or, "That person deserves death." It's decided by how you answer certain questions. Does that make sense to you?

A. Yes, sir.

13 RR 15. Although Mr. Knauth introduced the general structure of Texas's death penalty sentencing law in addressing the "certain questions," he also suggested that the sentence can be entirely determined by the crime, which can be "so terrible or so bad that the death penalty is an appropriate

punishment." Appropriate capital sentencing must be determined by more than just the conditions of the crime, and thus Knauth's explanation misled the juror. Mr. Makin did not object to this, and further reinforced prosecutor Knauth's incorrect definition of mitigation:

> Q. What does "mitigating" mean to you?
>
> A. Is there some circumstance that is presented that would make you consider—a circumstance that is worth consideration in deciding whether to answer this question "yes" or "no."
>
> Q. Okay. Yes. And—and—I'll try to say it a different way. What I've heard other jurors say or what I've been told it is "mitigating" is something that lessens the bad that you've heard, something that is favorable to the defendant.

13 RR 22. This definition again contradicted constitutional and statutory definitions. Mr. Makin made matters worse by telling O'Neil, "You've said a wonderful explanation of mitigation. Are there some circumstance or circumstances that you would take into consideration; and that's what this is asking you to do, look at everything." 13 RR 30. Makin did not clarify that information that is not necessarily favorable to the defendant, such as a history of trauma or mental health problems, would be relevant mitigating evidence.

Counsel's failure to ensure adequate life qualification of the jurors before exercising peremptory challenges was deficient.

### 5. Counsel Failed to Exhaust Peremptory Challenges

Bartholomew Granger stood trial for his life, charged with the shooting death of an elderly woman in the course of attempting to kill the daughter who had accused him of childhood sexual assault. The seated jurors at his trial included a woman who had experienced childhood sexual abuse, another woman who was abducted with and saw a friend raped at age twelve, and a third who had a personal connection to a recently murdered elderly woman. They included a fourth juror who was not qualified to vote for life and a fifth who would not consider mental health evidence. Nevertheless, counsel exhausted only twelve of their allotted fifteen peremptory challenges. Even if counsel

had failed, through the timely objections that reasonable counsel would have lodged, to secure the dismissal of these unfavorable jurors for cause, they could have removed at least three of them with their remaining peremptory challenges. Nevertheless, counsel allowed all five of these jurors to sit.

Counsel's failure to exercise all of their allotted peremptory challenges when confronted with this collection of unfavorable jurors was deficient. *See Virgil*, 446 F.3d at 610 (counsel deficient for not using either cause or peremptory challenges against two unfavorable jurors).

### B.     Counsel's Deficiency Was Presumptively Prejudicial and, in Any Case, Prejudiced the Defense

The deficient performance of Mr. Granger's attorneys and resulting seating of unfit and unfavorable jurors created a reasonable probability that Mr. Granger was not convicted or sentenced by an impartial jury. As the Fifth Circuit has recognized, an attorney's failure to challenge a biased juror who then sits on the jury is prejudicial. *See Virgil v. Dretke*, 446 F.3d at 612-14 (5th Cir. 2006) (seating of biased juror is structural error and therefore establishes *Strickland* prejudice); *Biagas v. Valentine*, 265 F. App'x 166 (5th Cir. 2008) (following *Virgil* and finding state court's rejection of prejudice argument unreasonably applied clearly established federal law).

Alternatively, there is a reasonable probability that, but for the presence of these jurors on Mr. Granger's panel, along with an unknown number whose fitness to serve was unclear because of misleading questioning, the outcome of the trial would have been different. Alone and in combination with the other instances of deficient performance set forth in this petition, counsel's deficiencies prejudiced the defense at both phases of trial. *See Richards v. Quarterman*, 566 F.3d 553 (5th Cir. 2009) ("We will address each aspect of Davis's performance the district court found deficient before considering whether Richards was cumulatively prejudiced thereby.").

### C.     Any Procedural Default Is Excused

For the reasons above, Mr. Granger's ineffective-assistance claim is substantial. Yet state habeas counsel failed to raise any jury-related ineffective-assistance claim, although no strategic basis

could justify the failure. State habeas counsel's ineffectiveness therefore excuses any default, alone and in combination with other instances of their deficiency set forth in this petition. *See Trevino v. Thaler*, 569 U.S. 413, 428 (2013); *Martinez v. Ryan*, 566 U.S. 1, 17 (2012).

### III. TRIAL COUNSEL'S FAILURE TO RAISE AN EQUAL PROTECTION CHALLENGE TO THE PROSECUTOR'S RACIALLY DISPROPORTIONATE EXERCISE OF PEREMPTORY CHALLENGES DEPRIVED MR. GRANGER OF THE EFFECTIVE ASSISTANCE OF COUNSEL

Mr. Granger's attorneys failed to protect him from the prosecutors' discriminatory and disproportionate exercise of their peremptory challenges. *See Batson v. Kentucky*, 476 U.S. 79, 100 (1986). The court allowed the parties to conduct individual voir dire and questioned sixty-one jurors. Forty-nine of those questioned were white, seven were black, four were Hispanic, and one was Asian-American.[3] *See* 7-17 RR. The court allowed each party fifteen peremptory challenges for the jury and one additional challenge for the alternates. 17 RR 45. The prosecution used fourteen peremptory challenges on the seated jurors and one on an alternate, or fifteen overall. 17 RR 57-59.

The prosecutors used a disproportionate number of challenges on black jurors, measured by their strike rate and their exclusion rate. They had a strike rate of 57% (4/7) for the black jurors, but only about 20% (10/49) for the white jurors, and 50% (2/4) for the Hispanic jurors. The exclusion rate was also skewed: the prosecutors used 27% (4/15) of their challenges on black jurors, although black jurors represented less than 15% (9/61) of those questioned.

The only black citizen who passed through voir dire to sit on the jury favored the death penalty so strongly that the court should have excused her for cause. *See infra* Claim II. An otherwise all-white jury convicted Mr. Granger of capital murder and sentenced him to death. Nevertheless, his attorneys never challenged the State's exercise of its peremptory challenges, depriving Mr. Granger

---

[3] The Judge's List generated on the first day of questioning, April 2, 2013, reflects the names, genders, and races of the questioned jurors, along with other demographic information. A0676-A0719 The jurors' races, compiled from that list, appear in a chart in the Appendix at A0675.

of the effective assistance of counsel. U.S. Const. amends. VI, XIV.

**A.    *Batson v. Kentucky* and Its Progeny Prohibit the Exclusion of Even a Single Potential Juror on the Basis of Race**

The Equal Protection Clause forbids a prosecutor to strike any potential juror on the basis of race. *Batson*, 476 U.S. at 100; *Swain v. Alabama*, 380 U.S. 202, 203-04 (1965); *Strauder v. West Virginia*, 100 U.S. 303, 312 (1879). This rule protects several vital interests. Clearly, a defendant has "the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria." *Batson*, 476 U.S. at 85–86. Likewise, potential jurors have an equal protection right—enforceable by the defendant—"to jury selection procedures that are free from state-sponsored group stereotypes rooted in, and reflective of, historical prejudice." *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 128 (1994). As the Supreme Court has explained:

> The very fact that [members of a particular race] are singled out and expressly denied . . . all right to participate in the administration of the law, as jurors, because of their color, though they are citizens, and may be in other respects fully qualified, is practically a brand upon them, affixed by the law, an assertion of their inferiority, and a stimulant to that race prejudice which is an impediment to securing to individuals of the race that equal justice which the law aims to secure to all others.

*Powers v. Ohio*, 499 U.S. 400, 408 (1991) (quoting *Strauder*, 100 U.S. at 308). Finally, "the very integrity of the courts is jeopardized when a prosecutor's discrimination invites cynicism respecting the jury's neutrality and undermines public confidence in adjudication." *Miller-El v. Dretke*, 545 U.S. 231, 238 (2005) (*Miller-El II*) (internal citations omitted).

*Batson* sets forth a three-part test for analyzing claims of discrimination in jury selection. First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race. Second, the prosecution must offer a race-neutral basis for striking the juror in question. Third, in light of the parties' submissions, the court must determine whether the defendant has shown purposeful discrimination. *Batson*, 476 U.S. at 96-97; *see also Miller-El v. Cockrell*, 537 U.S. 322, 328-29 (2003) (*Miller-El I*); *Reed v. Quarterman*, 555 F.3d 364, 368 (5th Cir. 2009).

Once a *Batson* challenge reaches the third step, "a defendant may rely on 'all relevant circumstances' to raise an inference of purposeful discrimination." *Batson*, 476 U.S. at 96-97; *see also Miller El-II*, 545 U.S. at 240-66 (providing a list of non-exhaustive yet illustrative factors useful in "ferreting out" the discriminatory pretext of peremptory strikes). One relevant factor is whether the prosecutor employed disparate questioning during the voir dire of black and non-black jurors. *See Miller-El II*, 545 U.S. at 255 ("The next body of evidence that the State was trying to avoid black jurors is the contrasting voir dire questions posed respectively to black and nonblack panel members."); *Rhoades v. Davis*, 852 F.3d 422, 435 (5th Cir. 2017) (finding a "substantial showing of constitutional violation" in connection with the striking of a black venire member based on, inter alia, evidence that the prosecutor "questioned her more extensively than the previous, white jurors"). Additionally, courts will consider "broader patterns of practice" that may confirm the inference of intentional discrimination. *Miller-El II*, 545 U.S. at 253. For example, courts often look to the proportion of qualified minority venire members peremptorily struck by the government in a given jury selection. *See, e.g., id.* at 240 (observing that "prosecutors used their peremptory strikes to exclude 91% of the eligible African-American venire members" and that "[h]appenstance is unlikely to produce this disparity").

If the defendant establishes even a single juror was excluded on the basis of race, a new trial is warranted. *See Batson*, 476 U.S. at 100; *Snyder v. La.,* 552 U.S. 472 (2008); *Reed*, 555 F.3d at 381 n.12.

### B.     Trial Counsel Were Ineffective for Failing to Object Contemporaneously to the Pattern of Disproportionate Strikes

Trial counsel knew, or should have known, the importance of a contemporaneous objection to *Batson* error. Without one, a litigant procedurally defaults the claim under state law. *See Jones v. Johnson*, 171 F.3d 270, 278 (5th Cir. 1999); *Batiste v. State*, 888 S.W.2d 9, 17 n.5 (Tex. Crim. App. 1994). Counsel also knew, or should have known, of Fifth Circuit precedent holding that a contemporaneous objection is a constitutionally required element. *See Andrews v. Collins*, 21 F.3d 612, 621 (5th Cir. 1994); *Wilkerson v. Collins*, 950 F.2d 1054, 1062-63 (5th Cir. 1992). "The inquiry is essentially

one of fact, dependent on credibility, and the passage of time would diminish the prosecutor's re-construction of his reasons for striking a venireperson and the judge's evaluation of the juror." *Id.* at 1063; *see Chamberlin v. Fisher*, 885 F.3d 832, 838-39 (5th Cir. 2018) (rejecting challenge to trial court's failure to conduct comparative juror analysis on *Batson* claim, in part, because trial counsel never sought one).

An attorney's failure to make a *Batson* claim, when confronted with a prima facie case of discriminatory exercise of peremptory challenges, is deficient. *See Drain v. Woods*, 902 F. Supp. 2d 1006, 1025 (E.D. Mich. 2012) ("Counsel's passivity in light of an obvious pattern of strikes against minority prospective jurors fell below an objective standard of reasonableness and amounted to deficient performance."), *aff'd*, 595 F. App'x 558 (6th Cir. 2014); *see also Mitcham v. Davis*, 103 F. Supp. 3d 1091 (N.D. Cal. 2015) (counsel deficient in capital murder case for failing to object in 1984 trial to state's peremptory strikes of all black jurors on basis of state pre-*Batson* authority). As the Fifth Circuit has recognized, an attorney's failure to challenge a biased juror who then sits on the jury is prejudicial. *See Virgil v. Dretke*, 446 F.3d 598, 612-14 (5th Cir. 2006); *Biagas v. Valentine*, 265 F. App'x 166 (5th Cir. 2008). The same principle applies to an attorney's failure to make a meritorious *Batson* challenge. *See Drain*, 595 F. App'x at 583 (*Batson* error structural, and failure to make meritorious *Batson* challenge prejudicial). *But see Scott v. Hubert* 610 F. App'x 433, 435 (5th Cir. 2015) (considering, but not deciding, whether failure to raise meritorious *Batson* claim is presumptively prejudicial).

Mr. Granger's trial attorneys said nothing as the prosecutors used their peremptory challenges systematically to remove all black jurors from the panel except for one pro-death penalty woman. The different treatment of black and non-black jurors was dramatic, and would have established a prima facie case. *See Miller-El II*, 545 U.S. at 240. Because trial counsel did nothing, the prosecutor had no opportunity to explain any race-neutral reasons for the challenges and the court had no opportunity to engage in comparative analysis or consider other relevant evidence to determine if

discrimination had been proven. Mr. Granger can establish at a hearing that a *Batson* objection would have been successful and that his counsel were therefore ineffective. This Court should accordingly grant a hearing (which Mr. Granger will seek by separate motion) and, ultimately, relief on this claim.

    **C.**     **State Habeas Counsel's Failure to Raise Trial Counsel's Ineffectiveness Excuses Any Default of the *Batson* Ineffectiveness Claim**

For the reasons above, Mr. Granger's ineffective-assistance claim is substantial. Yet state habeas counsel failed to raise any *Batson*-related ineffective-assistance claim, although no strategic basis could justify the failure to raise it. State habeas counsel's ineffectiveness, alone and in combination with the other instances of their ineffectiveness set forth in this petition, therefore excuses any default. *See Trevino v. Thaler*, 569 U.S. 413, 428 (2013); *Martinez v. Ryan*, 566 U.S. 1, 17 (2012).

    **IV.**     **TRIAL COUNSEL'S EMPLOYMENT OF THE COURT'S COMPETENCY EXPERT AS AN EXPERT FOR THE PENALTY-PHASE DEFENSE DEPRIVED MR. GRANGER OF DUE PROCESS OF LAW, AND COUNSEL'S FAILURE TO OBTAIN AN INDEPENDENT EXPERT, OR TO CONSULT WITH AND PREPARE HIS APPOINTED EXPERT BEFORE PRESENTING HIS TESTIMONY, DEPRIVED MR. GRANGER OF THE EFFECTIVE ASSISTANCE OF COUNSEL**

Trial counsel James Makin[4] waited for almost a year after Mr. Granger's arrest and then, less than two months before trial, arranged to have Mr. Granger evaluated by a psychiatrist. He chose Dr. Edward Gripon, the same expert the court had previously appointed to assess Mr. Granger's competency, who had already formed the opinion that Mr. Granger was not psychotic or delusional and could control his behavior. Mr. Makin then called Dr. Gripon as a penalty-phase witness without meeting with him to prepare his testimony. Counsel never learned about valuable mental health mitigating evidence that an independent expert could have helped to develop, and never even learned that Dr. Gripon would give damaging testimony on the future dangerousness question.

---

[4] Because attorney Makin handled Dr. Gripon's retention and presented his testimony at the penalty phase, this claim focuses on Mr. Makin's conduct. All three of Mr. Granger's counsel, however, were responsible for his representation.

Counsel's presentation of Dr. Gripon violated both Mr. Granger's right to due process of law and his right to the effective assistance of counsel. U.S. Const. amends. VI, XIV.

## A.  Dr. Gripon's Involvement in the Case

Dr. Gripon first consulted on Mr. Granger's case as the court's expert. On April 27, 2012, Judge Wortham ordered him to conduct a competency evaluation under Article 46B of the Texas Code of Criminal Procedure. 2 RR 12; A0154-55. After visiting Mr. Granger on May 8 and June 1, 2012, and reviewing only his jail record and limited information about his current charges, Dr. Gripon found that he was competent to stand trial. A0311; A0317; A0367. Mr. Granger told him that he had suffered from anxiety, depression, and memory problems and had received treatment from a psychiatrist. He was receiving anti-depressant medication from the prison. A0314.

Although Dr. Gripon took note of Mr. Granger's "unique" and "unusual" ideas regarding angels, demons, and possession, he found that Mr. Granger's "thought process was specifically free of hallucinations, illusions, or delusions." He viewed Mr. Granger as an "angry individual" who was "quite explosive," with "a rather paranoid flavor to some of his thinking," but thought Mr. Granger had a rational and factual understanding of his legal difficulties, an ability to communicate with his attorney, and "the ability to conduct himself in an appropriate manner." A0317. Dr. Gripon diagnosed Mr. Granger as suffering from Intermittent Explosive Disorder and a mixed personality disorder with "mild paranoia and antisocial features." A0316.

Even though Dr. Gripon had already concluded (as the court's expert) that Mr. Granger had no delusions and could control his behavior, Mr. Makin filed an ex parte motion for funding to retain Dr. Gripon as a mental health expert on February 18, 2013. A0170. Apparently working from a fill-in-the-blanks form, counsel provided a minimal explanation for the psychiatrist's expected role, noting that "mental health will be a significant factor" because "the State is seeking the death penalty" and "the requested expert will assist the defense" by determining "the psychology of . . . Mr.

Granger, and mitigation." A0172. The Court granted the motion on February 20. A0175.

Dr. Gripon visited Mr. Granger at the Jefferson County Jail twice as a defense expert, on March 1 and March 23, 2013. He never sent Mr. Makin a report, but his file contains two "signed"[5] documents in which he recounted the evaluations and made diagnoses. It also contains two memos memorializing his further impressions about the case. He never learned about Dr. Hamza's report. A0367.

The first document describes an evaluation visit on March 1, 2013. A0318. Mr. Granger arrived "angry and agitated," and told Dr. Gripon that he was taking psychoactive medication. Mr. Granger described his history of depression and family stress, and also spent "significant time" discussing "Seth Israel," "some voice/alter ego that he 'hears and takes direction from.'" A0318. Dr. Gripon observed Mr. Granger's "substantial level" of paranoia or suspicion and his preoccupation with demons, angels, and "shadow people." A0319; A0320. The doctor "wonder[ed] about" a retrospective diagnosis of "MDD with psychosis." A0319. Mr. Granger obsessively recounted the story of his daughter's accusations of sexual assault and the ensuing prosecution. A0319-20. Dr. Gripon thought that his "unusual perception/preoccupation" was limited to the "area of explaining his legal difficulties." A0320. The doctor essentially adhered to the original diagnoses he had reached in his competency evaluation for the court: intermittent explosive disorder, and "Axis II issues" with paranoia and schizoid features. A0321 (2013 opinion); *see also* A0316 (2012 competency report).

At a second evaluative visit held on March 23, 2013, Dr. Gripon speculated that Mr. Granger "continued to internalize his anger" over the sexual assault charges to the point where he "lost it" at the time of the murder. Despite Mr. Granger's "idiosyncratic and rather bizarre beliefs," Dr. Gripon concluded that he was "not psychotic." Nevertheless he was impaired:

---

[5] Each document includes a typed indication that it is "signed" by Dr. Gripon, but neither bears a manuscript signature.

In conclusion, Bartholomew Granger represents a mood disorder, disorder of impulse control and perceptual issues all of which is superimposed on some personality features that are less than adequate.

In combination, this creates an individual with a number of mental health issues/defects.

A0322-23.

Mr. Makin listed Dr. Gripon as a witness for trial on March 13, and, on April 22, subpoenaed him to appear for trial. A0380-81; A0862. Neither Mr. Makin nor the other defense attorneys met with him to prepare for his trial testimony.

### B. The Conversion of the Court's Expert Psychiatrist into a Defense Expert Violated Mr. Granger's Right to Due Process of Law

Dr. Gripon had formed opinions about Mr. Granger as the court's expert, and showed divided loyalty before and during his testimony at trial. He could not provide Mr. Granger and his counsel the type of evaluation, consultation, or testimony that due process requires. In *Ake v. Oklahoma*, 470 U.S. 68, 71 (1985), the trial court denied a defense request for a psychiatrist to evaluate Ake's sanity for trial. Although trial counsel elicited testimony from the psychiatrists who had evaluated Ake for competency, no expert gave an opinion on sanity or presented any penalty-phase mitigating evidence. *Id.* at 72. The Supreme Court held that the state had deprived Ake of due process:

> [W]hen a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in *evaluation, preparation, and presentation* of the defense.

*Id.* at 83 (emphasis added); *see id.* at 76. In the same vein, at the penalty phase, where the state attempted to prove Ake's future dangerousness, "due process requires access to a psychiatric examination on relevant issues, to the testimony of the psychiatrist, and to assistance in preparation at the sentencing phase." *Id.* at 84.

*McWilliams v. Dunn*, 137 S. Ct. 1790, 1794 (2017), applied the law that *Ake* clearly established. McWilliams, like Ake, was found competent after a court-ordered competency evaluation. *Id.* At the

portion of the sentencing held before a jury, defense counsel attempted to show McWilliams's impairment through testimony from his client and his mother. The state responded by calling the doctors who had found him competent, and the jury recommended the death sentence. *Id.* at 1795. Before the judicial sentencing hearing, at counsel's request, the court ordered an expert employed by the state to conduct neurological and neuropsychological testing. However, the court denied counsel expert assistance to interpret the neuropsychologist's report and related records, and sentenced McWilliams to death. *Id.* at 1795-97.

The Supreme Court held that the state had denied McWilliams due process. Regardless of whether a defendant is entitled to an expert "retained specifically for the defense," *Ake* entitled him to more than he received:

> Neither Dr. Goff [the state neuropsychologist] nor any other expert helped the defense evaluate Goff's report or McWilliams' extensive medical records and translate these data into a legal strategy. Neither Dr. Goff nor any other expert helped the defense prepare and present arguments that might, for example, have explained that McWilliams' purported malingering was not necessarily inconsistent with mental illness . . . . Neither Dr. Goff nor any other expert helped the defense prepare direct or cross-examination of any witnesses, or testified at the judicial sentencing hearing himself.

*Id.* at 1800-01. Alabama's provision of mental health assistance was contrary to, or unreasonably applied, *Ake*, because it "fell so dramatically short of what *Ake* requires." *Id.* at 1801 (citing 28 U.S.C. § 2254(d)(1)); *see also Yoney v. Collins*, 985 F.2d 222, 227 (5th Cir. 1993) (indigent defendant has general right to expert assistance to develop evidence if there is a reasonable probability it would assist defense and prevent "fundamentally unfair trial").

As in *McWilliams*, the assistance the State provided to Mr. Granger fell "dramatically short of what *Ake* requires." By the time the court appointed Dr. Gripon as a defense expert in 2013, he had already evaluated Mr. Granger for the court in 2012, and decided that he did not suffer from "hallucinations, illusions, or delusions" and had adequate behavior controls. A0317. In 2013, he adhered to essentially the same conclusions, disregarding Mr. Granger's descriptions of "some voice/alter

ego that he 'hears and takes direction from,'" labile behavior, and extreme suspicion. A0318. The doctor made plans to share his report with the prosecutor without consulting with defense counsel. He went straight to the witness stand without spending any time preparing with defense counsel, and he gave highly damaging testimony on cross-examination. He demonstrated divided loyalty and provided no assistance in evaluation, preparation, or presentation of the defense.

Dr. Gripon's appointment had a substantial and injurious effect on the defense. *See McWilliams*, 137 S. Ct. at 1801; *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). His previous opinion predisposed him to discount evidence of psychosis and impaired brain functioning that emerged in his later interviews with Mr. Granger. He never consulted with counsel about the evidence of psychosis he himself uncovered. He never saw Dr. Hamza's report and thus was unable to consult with counsel about the evidence of brain damage it contained. As explained in Claim VI below, independent experts could have presented voluminous evidence of psychosis, brain damage, and other mitigating impairments. At the very least, this Court must find itself in equipoise on the question whether Dr. Gripon's non-independence injured Mr. Granger's defense. *See O'Neal v. McAninch,* 513 U.S. 432, 436 (1995). This Court must accordingly grant relief on this ground, alone and in combination with the other claims in this petition.

### C.     Trial Counsel Ineffectively Sought the Appointment of an Expert Who Had Conflicting Loyalties, and Then Employed That Expert Ineffectively

It is not sufficient for counsel merely to retain an expert and present his or her testimony. Effective counsel must adequately prepare and present expert witnesses. *See Walbey,* 309 F. App'x at 803 (counsel ineffective for inadequately preparing mental health expert to testify and failed to rehabilitate expert when State elicited possible aggravating diagnosis); *Richey v. Bradshaw,* 498 F.3d 344, 362-63 (6th Cir. 2007) (counsel retained expert shortly before trial, did not explore or test basis for expert's opinion, and thus failed to take requisite reasonable steps to present favorable expert testimony).

Mr. Granger's counsel fell far short of this standard. First, counsel did not ensure that their client received the *defense* expert assistance to which he was entitled. An attorney who fails to learn and apply the relevant law concerning a client's entitlement to expert assistance is deficient. *See Hinton v. Alabama*, 134 S. Ct. 1081, 1088 (2014) (trial counsel's ignorance of state law providing available funding to replace inadequate expert was deficient performance). Mr. Granger's counsel therefore should have known what type of expert assistance due process required. *See Ake*, 470 U.S. at 83; *see also Rey v. State*, 897 S.W.2d 333, 341-43 (Tex. Crim. App. 1995) (defendant who makes threshold showing entitled to more than expert to testify; also entitled to "technical" assistance from expert); *DeFreece v. State*, 848 S.W.2d 150, 160 (Tex. Crim. App. 1993) (defendant who makes threshold showing entitled to expert who can provide guidance in evaluating strength of defense; "neutral" court expert cannot perform this function).

Instead, Mr. Granger's counsel employed an expert whose independence was compromised before his retention. Dr. Gripon had already decided, as the court's expert, that Mr. Granger was not only competent but free of delusions and hallucinations, and able to control his behavior. It was unreasonable for counsel to expect that Dr. Gripon could discard his prior opinions and approach his evaluation as a defense expert with an open mind to the presence of major impairments or mental illness. Counsel was deficient in not seeking the appointment of an independent expert.

More significantly, counsel failed to secure, even from Dr. Gripon, the basic level of assistance the Constitution requires. Counsel should have consulted Dr. Gripon to help evaluate and prepare, not just to present, his defense. *Ake*, 470 U.S. at 83. Instead, when the doctor took the witness stand, he and counsel faced each other in mutual ignorance—counsel of the doctor's opinions and the doctor of counsel's strategy. Mr. Makin never obtained or reviewed either of the evaluation documents that Dr. Gripon had prepared, and listed him as a witness before the doctor had even made his second evaluation visit. Counsel should have known that, once he had designated Dr.

Gripon as a witness, opposing counsel could seek information from or about him. *See Pope v. State*, 207 S.W.2d 352, 360 (Tex. Crim. App. 2006) ("[O]nce a party designates a particular person as an expert that he may use as a witness at trial . . . the opposing party, whether the State or the defendant, may seek further information from or about him for use at trial."). Counsel was deficient in not even obtaining Dr. Gripon's account of his evaluations before exposing the information to the State.

Counsel's reckless non-preparation for Dr. Gripon's testimony went even further. Mr. Makin did not send him Dr. Hamza's report, did not discuss Mr. Granger's potential brain damage or his descriptions of hearing voices, and called him to the witness stand completely unprepared. He never consulted with him about whether and how to present Dr. Gripon's mental health diagnoses in mitigation. On the stand, Mr. Makin elicited testimony vaguely relevant to future dangerousness without learning—because he did not prepare the doctor beforehand—that the doctor would testify that, in his opinion, Mr. Granger presented a risk of future violence.

Mr. Makin's inadequate consultation with and preparation of his expert witness prejudiced Mr. Granger's defense. There is a reasonable probability that, if counsel had retained an independent expert unwedded to the conclusion that there was nothing wrong with Mr. Granger, or if counsel had at least consulted with Dr. Gripon about the availability of mitigating mental health diagnoses, or if counsel had at the very least learned beforehand that Dr. Gripon would give a harmful opinion on future dangerousness, the outcome of trial would have been different. Instead, the jury was left to conclude that the defense's own expert believed Mr. Granger was a very dangerous man. There is a reasonable probability that, but for counsel's deficiency, alone and in combination with the other deficiencies in this pleading, the outcome of Mr. Granger's penalty trial would have been different. This Court should therefore grant habeas relief on this ground.

### D.  Any Procedural Default Is Excused

For the reasons above, both Mr. Granger's ineffective-assistance claim and the related due

process claim are substantial. Yet state habeas counsel, without any strategic basis, failed to raise any claim related to Dr. Gripon. State habeas counsel's ineffectiveness, alone and in combination with other instances of their ineffectiveness set forth in this petition, therefore excuses any default. *See Trevino v. Thaler*, 569 U.S. 413, 428 (2013); *Martinez v. Ryan*, 566 U.S. 1, 17 (2012).

## V. TRIAL COUNSEL WERE INEFFECTIVE FOR HIRING AS THEIR LEAD IN-VESTIGATOR THE FATHER OF A WITNESS FOR THE PROSECUTION

"Representation of a criminal defendant entails certain basic duties. Counsel's function is to assist the defendant, and hence counsel owes the client a duty of loyalty, a duty to avoid conflicts of interest." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). Here, trial counsel hired as their lead in-vestigator Frank Coffin, Jr., a former law enforcement officer whose son, Frank Coffin III, also a law enforcement officer, was involved in the State's investigation and testified for the State at trial. Moreover, less than six months before the courthouse shooting, Frank Coffin, Jr., had retired from his position as Chief of Police of Beaumont, where he had earlier "[i]mplemented the Sex Crimes Unit of the Special Crimes Division," "[s]pecialized in the investigation of sexual offenses as well as crimes against children for over ten (10) years," and was the "[s]upervisor of the Special Crimes Unit which investigated . . . crimes against children[] as well as all sexual offenses"—the very unit that would have investigated the sex crimes Petitioner's daughter accused him of committing. About Frank Coffin, http://www.frankcoffininvestigations.com/about/ (last visited May 6, 2018).

Trial counsel failed—through laziness, inability to perceive how their agent's loyalty deviated from their client's interest, or some other basic deficiency—to find and hire an investigator who was not related, by both blood and profession, to a key State's witness. This was deficient. *Beets v. Scott*, 65 F.3d 1258, 1296 (5th Cir. 1995) ("A lawyer's duty of loyalty may . . . be compromised when his own interests diverge from his client's interests."); *see also United States v. Vasquez*, 298 F.3d 354, 360 (5th Cir. 2002) ("Generally, an attorney owes a duty of loyalty to his client which requires the attor-

ney to place his client's interest ahead of his own interests."); *Beets*, 65 F.3d at 1270 ("Where the obligation to a single client is concerned, the duties of loyalty and competence are intertwined."); *United States v. Carpenter*, 769 F.2d 258, 263 (5th Cir. 1985) ("A conflict exists when defense counsel places himself in a position conducive to divided loyalties.").

Petitioner was prejudiced by this deficiency insofar as Frank Coffin, Jr., directed the guilt-phase and penalty-phase investigations, presumably knowing that his son was a key component of the opposing investigation who believed that Petitioner was a dangerous character and doubtless wanted to see Petitioner convicted and punished—in direct contravention of Frank Coffin, Jr.,'s and trial counsel's ethically and constitutionally required interests.

The day after the courthouse shooting, witness for the prosecution Detective Frank Coffin III filed a Beaumont Police Department Case Supplemental Report—later turned over to trial counsel in discovery—that contained the following:

> At approximately 1355 hrs while I was standing near the door I could hear Granger talking to a St. Elizabeth nurse, later identified as Angela Dillahunty. Dillahunty asked Granger about his injuries. Granger began to speak in a loud voice to nurse Dillahunty telling her that he was "set up" referring to the charge that he had been accused of and that he was in court for. Granger then stated "treat like a killer act like a killer". Granger also said "good to go to jail for something worth it". Granger was talking about running his daughter over and that his ex-wife was scared and that she ran away. Granger thought it was funny that the ex-wife ran away from her child when she was scared. Granger then made mention that he would take a bullet for one of his kids. Granger stated his intentions were to kill Claudia, Rebecca, and Judge Stevens. All of these statements Granger made to nurse Dillahunty while we were standing in the room.

A0820-21. Det. Coffin at trial testified substantially in conformance with his written report, with some added detail. He said that Petitioner "started making statements. He was talking loud. I was outside the room; but when I heard him speak, I moved inside" because "it wasn't clear at that time what was happening, if he was trying to hurt anybody or— we were still in reactive mode, and we just wanted to make sure that—that everything was okay in the—in the emergency room," and he wanted to make sure the nurse in the room with Petitioner was "safe." A0792. He said that the

"treat like a killer act like a killer" statement was made in "kind of a vindictive tone—or maybe not that but just as a matter of fact." A0793. He said Petitioner did not sound remorseful. A0793-94. He added that Petitioner did not "appear to understand . . . the irony or the inconsistency . . . that he's the one who put the bullet in his daughter." A0794. He said that Petitioner "said that Judge Stevens deserved to die." A0795. He said that about thirty minutes later, "[w]e did have to restrain him further during his outburst for the safety of the other officers and the other nurses that were there." A0796-97. He went on, "I remember he was so belligerent to the point that a— I believe he was a nurse practitioner, Jason Babcock, had to come in and medically sedate him so he could not fight us [medical personnel and police officers] anymore." A0797. On cross-examination, Det. Coffin affirmed, "He was never to the point where he didn't know what he was saying." A0798.

Trial counsel moved for the appointment of Frank Coffin, Jr., on September 6, 2012, A0158-60, and the court granted the motion that day, A0161—the same day trial counsel handed over to him a notebook of "State's Discovery," A0871, which presumably contained his son's report. Frank Coffin, Jr.,'s initial job was not to conduct any mitigation investigation but was "focused more on points that may be of use with regard to general information and follow up as well as the sexual assault aspect." A0873. His job was to conduct guilt-phase investigation, and he prepared many reports. *E.g.*, A0875-84.

Later on, he did also work on the mitigation investigation. *E.g.*, A0904-08. He served as the "intermediary" between mitigation specialist Norma Villanueva and trial counsel. A0458. Dr. Villanueva

> could tell early on in the investigation that the attorneys and Mr. Coffin feared the Granger family. Mr. Makin often portrayed the Grangers as being very dangerous. He even insisted that Mr. Coffin accompany me whenever I interviewed the family and other witnesses. Mr. Coffin's presence during the interviews made me uncomfortable because he was the former chief of police of the Beaumont Police Department and he carried a concealed handgun and brought it into at least one of our home-based interviews. . . . Despite the defense team's apparent fear of the Grangers, I did not find them to be violent.

A0459. Coffin, Jr., functioned as the mitigation gatekeeper: trial counsel's "approach to the investigation required that all records relevant to the case be requested and collected by Mr. Coffin first, and then forwarded to me." A0460. When Dr. Villanueva expressed to trial counsel that she wished to conduct further investigation into "potential intellectual deficits and learning disabilities," trial counsel said that Coffin, Jr., was already "working on that part of the mitigation investigation." *Id.* On February 14, March 4, and March 5, 2013, trial counsel sent Mr. Coffin's notes and reports on the discovery provided by the district attorney's office to Drs. Hamza and Gripon. A0894-A0903. Mr. Coffin thus exerted influence over these experts. After the trial, at which Dr. Villanueva was not called to testify, "Mr. Coffin explained that my proposed mitigation themes had not been used." A0461.

In sum, trial counsel hired as lead investigator someone they knew or should have known was the father of a law enforcement witness for the prosecution who reported that Petitioner was a dangerous person. Furthermore, Coffin, Jr., until shortly before Mr. Granger's indictment, had supervised and worked side by side with many of the state's other law enforcement witnesses as the Chief of Police. Trial counsel and Coffin, Jr., treated Petitioner and his family as if they were in fact dangerous characters: trial counsel feared the Granger family and made Coffin, Jr., accompany Dr. Villanueva to family interviews, and Coffin, Jr., carried a gun into an interview on at least one occasion. A0459. Dr. Villanueva, the actual mitigation specialist, was hamstrung by trial counsel's choice to allow Coffin, Jr., to oversee her work, screen the documents sent her way, serve as counsel–mitigation specialist liaison, and eventually take over parts of the mitigation investigation—even though he was not the true mitigation expert. Dr. Villanueva felt that his presence made witnesses uncomfortable and thwarted her ability to build rapport with Petitioner's family members. *Id.* After Coffin, Jr., overtook the mitigation-expert role, Dr. Villanueva's mitigation themes were not used. It is thus reasonably probable that a different mitigation case would have been developed and present-

ed had the de facto mitigation specialist not been closely related to, and presumably influenced by, his strong ties to the state's law enforcement witnesses, including his son. In turn, it is reasonably probable that had trial counsel used an investigator without compromised loyalty, the jury would not have sentenced Petitioner to death. *See Guy v. Cockrell*, 343 F.3d 348, 349 (5th Cir. 2003) (alleged conflict of legal team's investigator may result in ineffective assistance of counsel).

Trial counsel were thus ineffective in hiring Frank Coffin, Jr., as their lead investigator. U.S. Const. amends. VI & XIV; *Strickland*, 466 U.S. at 693. The deficiency of hiring him as their lead investigator prejudiced Petitioner at both guilt and penalty phases, both alone and cumulatively with other deficiencies. *Strickland*, 466 U.S. at 694 (prejudice assessed from combined effect of "counsel's unprofessional errors"). State habeas counsel were ineffective for failing to raise this meritorious ineffective-assistance claim, and their ineffectiveness excuses any procedural default. *Trevino v. Thaler*, 569 U.S. 413, 429 (2013). State habeas counsel's deficiency in failing to raise this meritorious claim prejudiced Petitioner both alone and cumulatively with other deficiencies. *Martinez v. Ryan*, 566 U.S. 1, 14 (2012) (discussing necessity of a habeas court's hearing substantial ineffective-assistance-of-counsel claims otherwise defaulted by attorney "errors" in initial-review collateral proceeding).

## VI.   TRIAL COUNSEL'S FAILURE TO INVESTIGATE, PREPARE, AND PRESENT READILY AVALABLE, POWERFUL MENTAL HEALTH EVIDENCE DEPRIVED MR. GRANGER OF THE EFFECTIVE ASSISTANCE OF COUNSEL

Trial counsel retained a psychologist whose testing showed that Mr. Granger suffers from brain damage. They disregarded the expert's advice to follow up, and decided not to use him without ever discussing his results. Then they called their appointed psychiatrist to the stand without telling him about the neuropsychological testing and without meeting with him to prepare his testimony. As a result, the jury never learned that Mr. Granger is a brain-damaged, mentally ill man who became psychotic around the time of the crime. Counsel's failure to prepare and present readily available mental health evidence deprived Mr. Granger of the effective assistance of counsel.

### A. Counsel Failed to Adequately Investigate, Develop, and Present Evidence of Petitioner's Mental Health

The Supreme Court has repeatedly found trial counsel ineffective for failing to uncover or present mitigating mental health evidence. *See, e.g.*, *Rompilla*, 545 U.S. at 391 (adequate investigation would have disclosed mental health mitigation); *Wiggins*, 539 U.S. at 535 (adequate investigation would have uncovered petitioner's "diminished mental capacities"); *Williams*, 529 U.S. at 396 (constitutionally adequate investigation would have disclosed that petitioner was "borderline mentally retarded"). "In assessing the reasonableness of an attorney's investigation . . . a Court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further. *Wiggins*, 539 U.S. at 527.

Here, the red flags indicating the need for further investigation regarding whether Mr. Granger suffers brain damage were overwhelming.

Dr. Hamza administered three neuropsychological tests, all of which indicated impaired brain functioning. Dr. Hamza found that Mr. Granger had "readily apparent" cognitive and mental health deficits. Mr. Granger's history of head injuries, his presentation, and the test results strongly suggested significant frontal lobe brain damage. A0382. Dr. Hamza told Mr. Makin that Mr. Granger had significant neuropsychological deficits and limited intellectual capacity, but additional testing was necessary. A0382-83. However, trial counsel refused to conduct any further investigation into the issue of brain damage. Instead, Makin asked Dr. Hamza to prepare a report based on the testing he had already performed. *Id.* Dr. Hamza completed this report and trial counsel asked Dr. Hamza to prepare to testify at trial. However, trial counsel never had any other substantive discussions with Dr. Hamza regarding his conclusions and did not call him as a witness.

Counsel had no reasonable basis for deciding not to call Dr. Hamza to testify without discussing his test results. The report contained powerful mitigating evidence, including a discussion of Mr. Granger's impaired brain functioning. A0336. However, after receiving the report, trial counsel

failed to consult with Dr. Hamza. Without such a consultation, counsel could not have made an informed decision as to whether to present him. *Richey v. Bradshaw*, 498 F.3d 344, 362-63 (6th Cir. 2007).

Moreover, trial counsel were ineffective in their consultation with Dr. Gripon. *Walbey*, 309 F. App'x at 803 (counsel ineffective when for failing to adequately prepare mental health expert to testify.) As discussed in Claim IV, trial counsel never met with Dr. Gripon to prepare him to testify. More important, counsel never gave Dr. Hamza's test results and report to Dr. Gripon and never told him that the testing showed brain damage. Dr. Gripon was therefore unable to take brain impairment into consideration when forming his conclusions. Mr. Granger's impaired scores would have caused Dr. Gripon to "take[] a closer look" at his conclusions, including his conclusion that Mr. Granger could control his behavior, and would have led him to recommend further testing. A0368. More generally, counsel failed to consult with Dr. Gripon about mitigating mental health evidence that he could provide, including his assessment of symptoms like hearing voices, paranoia, and emotional lability, and never engaged him in discussion of the influence of his upbringing and his family's impaired functioning. In fact, as he took the witness stand, Dr. Gripon was uncertain what points Mr. Makin sought to make through his testimony. A0368-69.

### B. Counsel's Failures Prejudiced Petitioner

As a result of trial counsel's deficient performance, the only testimony regarding Mr. Granger's mental health the jury heard was that of Dr. Gripon, who testified that Mr. Granger was not psychotic or delusional and could control his behavior. Mr. Makin elicited Dr. Gripon's views on future dangerousness but did not ask him to provide opinions relevant to mitigation. 27 RR 16, 20-21. The picture of Mr. Granger's mental health was so skewed and incomplete that in their closing arguments even trial counsel themselves affirmatively argued that Mr. Granger was not mentally ill. 29 RR 18. In contrast, a reasonable investigation into Mr. Granger's mental health would have

revealed evidence of brain damage, psychosis, and other mitigating impairments. But for counsel's failure to develop and present this evidence, "there is a reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 537.

### 1. Petitioner suffers from diffuse organic brain damage

Further neuropsychological testing, which Dr. Hamza recommended to trial counsel, would have underscored the extent and severity of Mr. Granger's brain damage and impairment. Neuropsychologist Daniel A. Martell, Ph.D., administered an extensive battery of tests to Mr. Granger on March 19 and 20, 2018. The testing provided objective evidence of neuropsychological impairments that could have been presented at trial as mitigating evidence:

> Mr. Granger exhibits several neuropsychological abnormalities most consistent with diffuse organic brain damage. Primary among these are deficits in his frontal lobe/executive control abilities including evidence of:
>
> - deficits in self-monitoring and behavioral impulse control,
> - problems adapting to changing problem situations,
> - impaired problem-solving and abstract reasoning,
> - diminished cognitive flexibility,
> - impaired semantic fluency, and
> - supramodal perseveration.

A0244-45. Mr. Granger's neuropsychological strengths and weaknesses helped to explain his behavior, both at the time of the offense and in court:

> Mr. Granger's pattern of neuropsychological deficits, and his frontal lobe impairments in particular, have implications for his capacity to organize and control his behavior. Those underlying brain impairments can then interact synergistically with an acute bipolar psychotic episode to produce behavior that is both irrational and impulsive.

A0247.

Had trial counsel conducted a reasonable investigation/presentation into the issue of brain damage, as their own expert had recommended, they would have been able to present this powerful mitigating evidence that the jury never heard. Organic brain damage is a highly mitigating condition.

Jurors are "likely to react sympathetically when their attention is drawn to organic brain problems." *Glenn v. Tate*, 71 F.3d 1204, 1211 (6th Cir. 1995). Accordingly, counsel's deficient failure to develop and present evidence of organic brain damage has frequently been found prejudicial. *See, e.g., Sears*, 561 U.S. at 949 (trial counsel ineffective for failing to present evidence of defendants brain damage and frontal lobe impairments); *Porter*, 558 U.S. at 41-43 (finding prejudice from failure to present evidence or brain abnormality and cognitive defects); *Rompilla*, 545 U.S. at 392-93 (failure to present evidence of organic brain damage linked to fetal alcohol exposure); *Williams*, 529 U.S. at 370, 398 (failure to present evidence that defendant "might have mental impairments organic in origin").

Even without the additional testing he recommended, Dr. Hamza could have provided similar testimony that Mr. Granger suffers from impaired brain function. Dr. Hamza's report indicates that Mr. Granger had markedly impaired scores on three neuropsychological tests designed specifically to detect brain damage and impaired brain functioning. Dr. Hamza also reported that Mr. Granger was one of the most impaired individuals he had ever encountered. A0382. His report contained a wealth of mitigating mental health evidence that could have caused at least one juror to vote for a life sentence.

### 2.    Petitioner is a Mentally Ill Trauma Survivor

As set forth in Claim VII, Mr. Granger suffered an extremely traumatic, unstable upbringing in the home of a mother who was abused by male partners and was mentally ill. He himself developed mental illness related to trauma exposure, attachment, mood regulation, impulsivity, delusions, and substance abuse. However, trial counsel never learned what mitigating evidence an informed and well prepared psychiatrist could have provided. Psychiatrist Richard G. Dudley, Jr., M.D., conducted psychiatric examinations of Mr. Granger on March 12, March 13, and April 24, 2018.

Dr. Dudley found that Mr. Granger suffered an extremely difficult childhood and adolescence, resulting in "trauma-related psychiatric difficulties, characterized by anxiety, difficulty sleep-

ing, hypervigilance, emotional withdrawal and depression." A0262. He also found "instability around attachment, instability with regard to his own sense of self-worth; difficulty regulating his mood; and impulsivity, with difficulty making sound/reasonable decisions." A0263. He noted that individuals with this pattern of instability "are vulnerable to severe decompensation when under stress." A0263. The modeling Mr. Granger received from his mother—who herself exhibited emotional lability, pressured speech, loosened associations, and grandiosity in her psychiatric interview and was alternately controlling and demeaning to her children—further complicated his development. A0260; A0263. Mr. Granger's brother Lyndon exhibited many of the same symptoms as his mother, and Ulysses was also very labile. A0260-61. Bartholomew Granger had a history of hearing voices and, as an adult, a history of prescription drug abuse. A0254-55; A0259.

Mr. Granger also suffered from "long-standing intellectual and/or other cognitive difficulties." These were apparent in his extremely concrete thinking and impaired capacity for high-level decision-making during his evaluation, as well as his history of repeated exposure to trauma, head injury, and heavy use of drugs, along with his poor educational performance and history of emotional dyscontrol. This combination of symptoms and history called for neuropsychological testing. A0263.

Dr. Dudley's opinion is that, as a young adult, Mr. Granger became psychotic:

It is the opinion of this psychiatrist, to within a reasonable degree of medical certainty that as Mr. Granger moved into his late adolescent and early adult years, he began to evidence a major psychiatric disorder characterized by clinically significant swings in his mood (from depression with suicidal ideation, to a hostile/angry form of mania, and possibly even to mixed states of depression and mania) coupled with psychosis. In formal diagnostic terms (based on the *Diagnostic and Statistical Manual of Mental Disorders*), it is the opinion of this psychiatrist that this major psychiatric disorder is best described as Schizoaffective Disorder, Bipolar Type. It is among the list of major psychiatric disorders that he was genetically at increased risk of developing. In addition, Mr. Granger became dependent on opiate pain medication; as a result . . . he was high and numb virtually all of the time; however, in that intoxicated state, he was better able to cope with and manage all of his above described psychiatric difficulties.

A0264.

Dr. Dudley concluded that, at the time of the shootings, the stresses Mr. Granger was enduring were superimposed on his combination of impairments until his depression, mania, and psychosis became "all the more florid. . . . Mr. Granger was suffering from all these mental health difficulties at the same time, and as a result, his mental state had severely deteriorated and his judgment was severely impaired." A0264-65.

Both Dr. Martell and Dr. Hamza could have provided similar opinions regarding Mr. Granger's mental state at the time of the offense. *See* A0247 (Mr. Granger's "underlying brain impairments can then interact synergistically with an acute bipolar psychotic episode to produce behavior that is both irrational and impulsive."); A0383-84 ("Ultimately, Mr. Granger was under extreme mental, emotional and financial pressure at the time of this crime. He had a personality structure and brain impairments that did not afford him the capacity to handle the immense pressure in a constructive way. Nor did he have the ability to think rationally and control his impulses. As a result of all this, Mr. Granger suffered a significant psychotic break.").

Evidence regarding Mr. Granger's deteriorated mental state and severely impaired judgment at the time of the offense would have been particularly powerful, as it would have been mitigating independent of any nexus to the commission of the offense, *see Tennard v. Dretke*, 542 U.S. 274, 287 (2004), but also would have reduced Mr. Granger's moral culpability by demonstrating his severely impaired judgment at the time of the offense. There is a reasonable probability that, but for counsel's deficiency respecting this evidence, alone and in combination with the other deficiencies in this petition, at least one juror would have voted for life.

## C.     Any Procedural Default Is Excused

For the reasons above, Mr. Granger's ineffective-assistance claim is substantial. Yet state habeas counsel, without any strategic basis, failed to raise any claim related to trial counsel's failure to adequately investigate, prepare, and present evidence of Mr. Granger's mental health. State habeas

counsel's ineffectiveness, alone and in combination with other instances of their ineffectiveness set forth in this petition, therefore excuses any default. *See Trevino v. Thaler*, 569 U.S. 413, 428 (2013); *Martinez v. Ryan*, 566 U.S. 1, 17 (2012).

## VII. TRIAL COUNSEL FAILED TO INVESTIGATE, DEVELOP, AND PRESENT COMPELLING MITIGATING EVIDENCE OF MR. GRANGER'S BACK-GROUND

Trial counsel failed to investigate, develop, and/or present readily available social history mitigation evidence through the testimony of mitigation specialist Norma Villanueva and numerous presented and unpresented lay witnesses. This unpresented evidence would have painted a compelling picture of the violent, neglect-filled, and mentally and physically unstable environment in which Petitioner was raised. Instead, the only mitigation evidence presented by trial counsel came through the cursory testimony of Mr. Granger himself. Counsel's failure to prepare and present readily available social history evidence deprived Petitioner of effective assistance of counsel.

### A. The Story of Violence, Instability, and Neglect that Could Have Been Presented to the Jury

#### 1. Domestic Violence and Extreme Instability

Bartholomew Granger is the fourth child of Vallire Sapp Ozene and Ulysse Granger, Sr. His older siblings were Samantha (born 1964), Ulysses Gibson Granger, Jr., (1967), and Lyndon Brook Granger (1968). Bartholomew Granger was born in 1970. Throughout all of Vallire's pregnancies, Ulysses, Sr., was physically, verbally, and emotionally abusive. A0270. He was a heavy drinker, who spent the majority of the money he earned on alcohol. *Id.* He often hit her in front of the children. *Id.* These beatings left Vallire with scars on her head and face that are still visible. *Id.* She tried to leave Ulysses, Sr., several times and, in 1972, when Bartholomew was two years old, she finally fled with the children. They moved more than a dozen times, bouncing back and forth multiple times between Port Arthur, Beaumont, Houston, Pasadena, and Lake Charles, Louisiana. Ulysses could not keep track of all of the moves and he lost touch with the family. *Id.*

Vallire still had scabs from Ulysses's last beating when she met David Ross in Lake Charles, Louisiana. David Ross took Vallire and the children in and promised to care for them. A0271. However, immediately after Vallire and David wed, he too became abusive and controlling. *Id.*

As Bartholomew and his siblings grew older, they witnessed this abuse. They watched David get angry with Vallire and violently hit her on the head repeatedly. David started fights at the dinner table if the food Vallire had prepared was not perfect. Those fights ended with David's beating Vallire in front of the children. David would also beat Vallire if he caught her talking to her family. David demanded she keep her head down and not make eye contact with anyone when they were outside their home. On one occasion, David saw her talking to another man and beat her so badly she required seventeen stitches on her head. Bartholomew and his siblings stayed with their aunt while Vallire recovered in the hospital from that beating. A0274.

Bartholomew tried to shield his mother from David's abuse. He would try to get between them to break up their fights, but was too small to stop them. *Id.* He once took a fork from the dinner table and lunged at David. He told David to leave his mother alone and stuck the fork into David's hand. On another occasion, David pulled out a gun and pointed it at Vallire. Bartholomew jumped in front of Vallire to shield her, telling David that if he was going to shoot Vallire, he would have to shoot Bartholomew, too. A0274; A0278.

Vallire tried several times to leave David. She would take the children in the middle of the night and flee the house, but each time, David found her and dragged her home. After several attempts, Vallire successfully fled with her children. Despite David's abuse, Bartholomew missed having a father figure. He wrote David a letter, telling David he missed him, and asked his mother to deliver it. When Vallire delivered the letter to David, he beat her. He hit her on the head and dragged her down the street by her hair. She retaliated by throwing battery acid on David's face. Bartholomew was horrified and felt it was his fault that David had beat his mother. A0275.

## 2. Neglect and Poor Parenting

During Bartholomew's childhood, Vallire moved with the children more than a dozen times, to escape violent partners or keep away from them or because the family had been evicted. A0278. School records indicate that when Bartholomew dropped out of school in the eighth grade, he had attended twenty-two different schools. A0279.

When Bartholomew was seven years old, Vallire began working on ships offshore for the merchant marine. She was away from her children for as long as six months at a time. Bartholomew was greatly affected by his mother's absence. A0277.

When she first began working offshore, Vallire was married to David Ross, and left the children in his care. After she left David, Vallire decided to avoid relationships with men in order to protect herself and her children. For a number of years, she left the children with her girlfriend, Kathy Kennerson. Kathy was an alcoholic. She abused alcohol and mismanaged the household money. Vallire sometimes relied on other friends to care for her children while she was away, but Bartholomew spent much of his time alone during her absences. When she was home, Vallire was often overwhelmed by the responsibility of caring for the children and neglectful of their needs. At times, she would lock them inside the house by themselves and go out for the evening. *Id.*

Despite being away for long periods of time, Vallire ran her home strictly when she was there. *Id.* She whipped the children if they did not behave or if they got hurt playing. *Id.* Additionally, Vallire did not like taking her children to the doctor because that made her vulnerable to questions and scrutiny about her parenting. A0280. Vallire was investigated by Child Protective Services several times. After Bartholomew's sister Samantha was murdered, Vallire took in Samantha's daughter, Vallire Nicole Granger. After an investigation, the State attempted to remove the child from Vallire's home. Later, in 2009, Vallire took in another grandchild, Samara Granger. Child Protective Services found that Samara was malnourished and was not receiving the care she needed. CPS removed Sa-

mara from Vallire's home. A0279.

### 3. Poor Performance in School

Bartholomew struggled in school and repeated second grade. A0280. Beginning in the fifth grade he was enrolled in special education classes. School records from this time indicate he suffered from a learning disability and that emotional and behavioral factors negatively impacted his learning. A0280-81.

School records from sixth grade indicate the school tried to set up a meeting with Vallire by mail and by phone. She did not respond. Later, the school recommended counseling for Bartholomew at no cost to the family. But Vallire never signed the permission slip to allow him to attend counseling. However, she did sign a document stating that she disciplined Bartholomew by keeping him in the house and whipping him. A0281.

In the seventh grade, school officials decided that vocational classes were not a good fit for Bartholomew because of his behavioral problems. Records indicate he was reading at a fourth grade level, and his math functioning level was only slightly higher. The school recommended that he spend 85% of his time in special education classes and only 15% in mainstream classes. *Id.* Throughout middle school, Bartholomew needed special education services. His mother did not attend any of the planned meetings to discuss Bartholomew's educational needs, and she never responded to the letters that were mailed to her about this. *Id.*

After the eighth grade, Bartholomew dropped out of school at age sixteen. Bartholomew did later receive a GED, but reported that his brother Lyndon took the test for him, as he was unable to answer the questions himself. *Id.*

### 4. Murder of Samantha Granger and Growing Distrust

Bartholomew's oldest sibling was his sister Samantha. When Samantha was fifteen years old, while Vallire was away working offshore, Samantha left home to live on the streets, where she

worked as a prostitute. A0282. Samantha became pregnant and Vallire convinced her to have the baby. They named her Vallire Nicole Granger and called her Nicole. A0283. Nicole lived with Vallire most of the time, and Samantha lived in public housing. *Id.* In June of 1987, Vallire and Nicole visited Samantha's apartment and found her shot to death. Vallire suspected that Samantha's boyfriend had killed her and told this to police, but the murder went unsolved. This made Vallire and her sons feel abandoned by the criminal justice system and made them more suspicious of those outside their family. *Id.*

The family was devastated by Samantha's death. Vallire blamed herself for allowing Samantha to leave home. She tried to protect her sons from a similar fate by controlling every aspect of their lives. A0284. Likewise, Samantha's death drove Bartholomew even closer to his mother. Shortly after Samantha's death, Bartholomew dropped out of school. Following the murder, Vallire became even more overprotective of the children, and Bartholomew and Lyndon's relationships with her became more and more codependent. *Id.*

### 5. Vallire's strange behavior and undiagnosed, untreated mental illness

Vallire was controlling, overprotective, and paranoid. She did not allow Bartholomew and his siblings to spend time with other children. She also kept her children away from her extended family, who she believed were bad influences. As a result, Bartholomew and his siblings did not have close friends. Vallire spoke disparagingly of African Americans and told her children not to grow up to be "that kind of black person." In her opinion, African Americans relied on welfare, did not work hard, and spent their time drinking and doing drugs. A0287. Vallire demanded absolute loyalty from her children, and her sons in particular. She tried to turn her sons against their girlfriends and was overtly hostile to the women who married, dated, or spent time with them. She seemed threatened by them, believing they compromised the security of her tight inner circle. A0293.

Vallire reported seeing spirits and demons. She also reported seeing things like red eyes

glowing in the window blinds and ghosts in her bedroom. She could often be overheard talking to spirits. A0286. Throughout her adult life, she exhibited symptoms of mental illness. A0292-93. She talked very quickly and her speech was pressured. She was tangential and not able to stay on a single topic. Sometimes she would not sleep for several days, then crash and sleep for days. A0285. Her paranoia played a role in many of the family's frequent moves. A0278.

In 1992, Vallire was prescribed pain medication for a back injury she suffered working on a ship. Over time, her consumption of pain medication skyrocketed. Lyndon had health problems and also received various prescription medications. Lyndon and Vallire shared their prescription drugs with Bartholomew. Vallire often came home from the pharmacy with large bottles of pills. She sat at the kitchen table and passed the medications out to Lyndon and Bartholomew. A0299-A0300. Vallire, Lyndon, and Bartholomew often took these pills and passed out for days at a time. A0300.

### B. Counsel's Investigation and Presentation of Mitigating Evidence Were Deficient

Trial counsel must present an accurate, detailed picture to humanize their client. *Walbey v. Quarterman*, 309 F. App'x 795, 803 (5th Cir. 2009). Counsel's duty is to present to the jury the nature and extent of the abuse and impairments the accused has suffered in order to allow the jury to meaningfully appraise his moral culpability.

The Fifth Circuit and others have held that controlling Supreme Court precedent required habeas relief in similar capital cases. Applying clearly established federal law, these cases collectively hold that trial counsel in a capital case must make an "informed decision" about mitigation strategy, and must present "the details," "the full picture," the "entire," "cohesive," and "complete" story, not a "scattered" narrative that is "[in]accurate" or "misleading," but "the strongest mitigation case possible." *See Adams v. Quarterman*, 324 F. App'x 340, 349 (5th Cir. 2009); *Walbey v. Quarterman*, 309 F. App'x 795, 802, 803 (5th Cir. 2009); *see also Williams v. Allen*, 542 F.3d 1326, 1329-30, 1340 (11th

Cir. 2008); *Gray v. Branker*, 529 F.3d 220, 225-26, 233 n.2, 235, 237, 238 (4th Cir. 2008).

Here, trial counsel failed to show the jury "a true picture of [Mr. Granger's] tortured childhood." *Lewis*, 355 F.3d at 368. Shortly after being appointed, trial counsel worked towards presenting evidence of Mr. Granger's social history and background as mitigation. Dr. Norma Villanueva was appointed as the defense team's mitigation specialist on August 31, 2012. A0846. Dr. Villanueva and investigator Frank Coffin, Jr., interviewed several of Mr. Granger's family members. In the course of her investigation, Dr. Villanueva developed much of the mitigating evidence set forth above, although not all of it because Mr. Makin curtailed her investigation. A0385-A0457. For example, Dr. Villanueva developed evidence of the severe physical abuse of his mother that Mr. Granger witnessed throughout his childhood. A0373; A0386-0392. Dr. Villanueva also developed evidence of the instability and neglect Mr. Granger endured in his childhood home. *Id.*

On April 30, 2013, Mr. Granger was found guilty of capital murder. After court proceedings concluded for the day, trial counsel contacted Dr. Villanueva and asked her to complete her mitigation report and send it to the rest of the defense team. A0374. Dr. Villanueva finished her report and sent it to trial counsel on May 2, 2013. A0893. Trial counsel did not discuss Dr. Villanueva's report with her once they received it.

Trial counsel began their presentation of witnesses for the penalty phase the next day, May 3, 2013. However, trial counsel failed to present any of the wealth of mitigating evidence contained in Dr. Villanueva's report. Trial counsel never called Dr. Villanueva to testify about the social history evidence in her report. Nor did trial counsel elicit this evidence from the lay witnesses Dr. Villanueva relied on in her report. Rather, the only evidence regarding Mr. Granger's background came from Mr. Granger himself. 28 RR 13-51. As addressed below, this scant testimony was cursory and incomplete.

It was unreasonable for trial counsel to simply cast aside such powerful mitigating evidence

without consulting with both his mitigation specialist and his chosen mental health expert (Dr. Gripon) about its implications. But counsel never talked to Dr. Villanueva about her report before deciding not to present her, nor did they have time to read and incorporate into their presentation the mitigation themes in her seventy-three-page report given that they received it the day before their penalty-phase presentation began. Likewise, counsel called Dr. Gripon to the stand—to address only future dangerousness, not mitigation—without preparing him at all. *See* Claims IV, VI.

Trial counsel had no reasonable strategic basis for failing to consult with Dr. Villanueva or preparing to introduce this evidence. While Mr. Makin averred that he intended to present evidence of Mr. Granger's social history and did in fact present that evidence through lay and mental health expert testimony, the record belies this assertion. *See* A0356. Although trial counsel argued this theory in closing—"part of the problem was the environment [Mr. Granger] was raised in," and Mr. Granger's mother contributed to the person he became, 29 RR 15-17; 20-21—counsel abandoned nearly all of the evidence they had to support that social history–based mitigation case. Failing to present available and compelling evidence in support of the chosen mitigation argument is objectively unreasonable. *Moore v. Johnson*, 194 F.3d 586 (5th Cir. 1999) (citing *Lyons v. McCotter*, 770 F.2d 529 (5th Cir. 1985) ("*Strickland* does not require deference when there is no conceivable strategic purpose that would explain counsel's conduct."). As the Fifth Circuit recently observed, "[e]ven with the two tiers of deference that *Strickland* and AEDPA combine to afford counsel performance, at some point trial strategy becomes trial stupidity," as it did here. *Sanchez v. Davis*, No. 17-10652, 2018 WL 1954096, at *3 (5th Cir. Apr. 25, 2018).

## C.    Counsel's Failures Prejudiced Petitioner

The mitigating evidence set forth above, as well as that contained in the Declaration of Stacie Brown and Dr. Villanueva's report, presents a complete picture of Mr. Granger's life, including detailed accounts of his violent and unstable upbringing. Had the jury heard all this evidence, there is

a reasonable probability that at least one juror would have voted for life. *See Wiggins*, 539 U.S. at 537.

The Supreme Court has recognized that in capital sentencing, where the goal of defense counsel is to humanize their client, details matter. For example, it has granted relief because the "*graphic* description of Williams' childhood, filled with abuse and privation, or the reality that he was 'borderline mentally retarded,' might well have influenced the jury's appraisal of his moral culpability." *Williams*, 529 U.S. at 398 (emphasis added). The inquiry turns on "the nature and the extent" of the evidence. *Wiggins,* 539 U.S. at 535, 537 (had jury heard "nature and the extent" of abuse Wiggins suffered and details of his "excruciating life history," "there is a reasonable probability that at least one juror would have struck a different balance").

Details likewise mattered in *Lewis v. Dretke*, 355 F.3d 364, 366-67 (5th Cir. 2003), where petitioner alleged trial counsel was ineffective for failing to conduct a thorough investigation into his background, including the abuse he suffered as a child. The district court denied relief, noting that trial counsel put on evidence of child abuse through the testimony of petitioner's grandmother. *Id.* at 368. The Fifth Circuit reversed, finding the grandmother's "conclusional testimony contained none of the details provided by Lewis's siblings at the habeas hearing, which could have been truly beneficial." *Id.* Her "skeletal testimony" failed to give "a true picture of the tortured childhood experienced by Lewis." *Id.*[6]

At trial, the only testimony regarding Mr. Granger's background and history came from Mr.

---

[6] *See also Walbey*, 309 F. App'x at 803 (finding testimony on abuse presented at trial was "general and conclusional" and could not "be expected to have communicated to a jury the bloodcurdling facts of his upbringing"); *Foust v. Hook*, 655 F.3d 524, 539 (6th Cir. 2011) (unpresented evidence "paints an altogether different picture of [the petitioner's] childhood"); *Johnson v. Mitchell*, 585 F.3d 923, 943 (6th Cir. 2009) (prejudice established because new evidence "differ[ed] in a substantial way 'in strength and subject matter' from the evidence actually presented at sentencing"); *Johnson v. Bagley*, 544 F.3d 592, 602 (6th Cir. 2008) (state court rejection of claim unreasonable because trial counsel's investigation "only scratched the surface of [petitioner's] horrific childhood"); *Williams*, 542 F.3d at 1342 (evidence counsel failed to uncover "paints a vastly different picture of [petitioner's] background than that created by [his mother's] abbreviated testimony"); *Gray*, 529 F.3d at 235-38 (prejudice found where counsel failed to provide the "full" and "cohesive" picture).

78

Granger himself. See 28 RR 27-49. As in *Lewis* and *Walbey*, Mr. Granger's cursory testimony of his own background was so "scant" and "bereft in scope and detail," *Walbey*, 309 F. App'x at 804, that it failed to give the jury a "true picture of [Mr. Granger's] tortured childhood," *Lewis*, 355 F.3d at 368.

The evidence set forth above contains powerful details that would have conveyed to the jury the full extent and severity of topics only cursorily mentioned by Mr. Granger. For example, regarding the domestic violence he witnessed, Mr. Granger testified only that his stepfather David Ross was "real abusive" to Mr. Granger's mother, and "really, really, really possessive" of her. 28 RR 19. The jury never heard the details of the horrific beatings Vallire suffered in front of the children, such as the time David Ross beat her so badly that she required seventeen stitches on her head. A0273-74. Likewise, the jury never heard learned that Bartholomew continually worried that David Ross would kill Vallire, and that on one occasion Bartholomew threw himself in front of his mother to shield her after David Ross pulled out a gun and pointed it at her. A0274.

Regarding his parents' relationship, Mr. Granger testified only that his parents were married, then divorced when he was about two years old, after which he had limited contact with his father. 28 RR 15. The jury never learned that Ulysses Granger, Sr., beat Vallire, leaving her with scars on her head and face. A0270. Or that he verbally, emotionally, and physically abused her throughout all four of her pregnancies. A0272. The jury heard only that Ulysses and Vallire "split up." However, before they divorced, Vallire tried to leave the relationship several times in order to escape Ulysses's abuse. A0273. The jury never learned that on one occasion, Vallire ran down the street to get away, but Ulysses jumped in his car and tried to run her off the road. *Id.*

The evidence set forth above also addresses important topics the jury never heard about. Trial counsel presented no evidence about the history of mental illness in Mr. Granger's family, including the mental illness of both his mother and his brother. *See, e.g.*, A0266; A0285-89; A0292-93.

The evidence that was available to trial counsel differs substantially in both strength and sub-

ject matter from the scant, cursory, and incomplete testimony that trial counsel unreasonably presented through their client. The evidence contained in Dr. Villanueva's report, which they had in their possession, and the additional evidence about that they could have uncovered, would have humanized Mr. Granger and portrayed him in a drastically different light from what the jury saw. Had the jury heard the wealth of mitigating evidence that was available to trial counsel, there is a reasonable probability that at least one juror would have voted for life. *Wiggins*, 539 U.S. at 537. Alone and in combination with the deficiencies elsewhere in this petition, counsel's deficiency prejudiced the defense.

### D. The State-court Opinion

The Texas Court of Criminal Appeals adopted the trail court's finding and conclusions as to this claim, and found that Petitioner had failed to meet his burden under *Strickland*. A0153. The trial court ruled that trial counsel were not ineffective for failing to present social history evidence, including the testimony of mitigation specialist Norma Villanueva, because "mitigation evidence of the same nature proposed by Norma Villanueva was, in fact, presented [by trial counsel]." A0126. This finding adopted verbatim the State's proposed findings of fact and conclusions of law. The state-court process was unreasonable and unfair, in violation of due process of law, because the trial court never held an evidentiary hearing to consider Petitioner's claims, and because the trial court adopted verbatim the State's proposed findings. The findings therefore do not deserve deference.

To the extent that the state-court ruling is nevertheless reviewed under 28 U.S.C. § 2254(d), the decision was an unreasonable finding of fact and an unreasonable application of Supreme Court precedent. The trial court's factual finding that the evidence presented by trial counsel was "of the same nature" as Dr. Villanueva's proposed testimony was an unreasonable finding of fact. *See* 28 U.S.C. § 2254(d)(2). First, while the topics listed by the court in its opinion were mentioned by Petitioner when he testified, they were mentioned only in passing and not discussed in any detail. No

other witness explored these topics and, contrary to the trial court's finding, Dr. Gripon's testimony did not delve into Petitioner's social history; it focused almost exclusively on the issue of his behavior in prison and future dangerousness. Moreover, there were topics that were not discussed, including, among others, the family's pervasive history of mental health problems.

Where, as here, defense counsel fails to investigate, prepare, and present readily available evidence to support their own strategy, a ruling that counsel's performance was not deficient is unreasonable. *See Wiggins*, 539 U.S. at 527-28. Similarly, where, as here, the state court unreasonably discounts proffered mitigating evidence, its decision is unreasonable. *Porter*, 558 U.S. at 42-44. Because the state court unreasonably applied the law and determined the facts, and because the controlling law requires relief, the Court should grant the writ on this ground.

## VIII. PETITIONER WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EF-FECTIVE ASSISTANCE OF COUNSEL AT THE PENALTY PHASE OF TRIAL AS A RESULT OF COUNSEL'S FAILURE TO ADEQUATELY INVESTIGATE AND PREPARE WITNESSES AND THROUGH COUNSEL'S PRESENTA-TION OF OVERTLY HARMFUL EVIDENCE

Counsel's penalty-phase presentation was sorely deficient. Counsel came to court unprepared for direct and cross-examinations and failed to take necessary steps in court to protect their client. For example, just as in the guilt phase, counsel reserved opening argument and then never gave one at all. *See* 26 RR 16; 27 RR 6. When the State presented its case for death, counsel failed to object to inadmissible testimony from a number of State's witnesses and elicited harmful testimony from these same witnesses on cross-examination. Then, in their case in chief, defense counsel presented witnesses who hurt the case that Mr. Granger deserved a life, rather than death, sentence. Several times, counsel elicited, or allowed the State to elicit, evidence the court had excluded pretrial at counsel's request. Finally, in closing argument, counsel belittled Petitioner, highlighted harmful evidence, never explicitly asked the jury to spare Petitioner's life, and even suggested that death was the appropriate sentence for him.

Counsel's deficient performance throughout the penalty phase of trial, in combination with their failure to develop, prepare, and present compelling mitigation evidence in their possession, *see* Claims VI, VII, denied Petitioner his Sixth Amendment right to effective assistance of counsel, as well as his Eighth and Fourteenth Amendment rights to a fair and reliable sentencing proceeding.

### A. Counsel's Deficient Performance during the State's Presentation of Its Penalty Phase Case

Prior to trial, trial counsel filed a motion arguing that due process and *Kinnamon v. State*, 791 S.W.2d 84, 92 (Tex. Crim. App. 1990), required the State to provide the defendant with discovery and sufficient notice of the extraneous acts of misconduct it planned to present so that counsel could effectively investigate and defend against them. *See* Defendant's Motion to Discovery State's Extraneous and/or Unadjudicated Acts of Misconduct to Be Offered at Guilt or Punishment.[7] The Court granted this motion. 5 RR 40. Although counsel's strategy was to exclude extraneous bad acts, they undid their own strategy by allowing the State to bring them in.

The State presented the testimony of a number of Jefferson County Sheriff's Office employees who worked in the county jail when Petitioner was confined there prior to trial. The State's first witness, Craig Turner, testified that Petitioner used abusive language towards employees of the jail, which he testified was "detrimental" to the security of the jail and caused problems maintaining order. 26 RR 20-25. He recounted one incident where he overheard Petitioner call a guard a "fat bitch" after he lost a disciplinary hearing and another incident where Petitioner called him a sellout. *Id.* at 22-23. On cross-examination, counsel brought out additional bad acts, explicitly asking Mr. Turner if he was aware of other incidents where Petitioner was verbally abusive, and Mr. Turner responded, "Yeah, I've heard of other incidents." *Id.* at 32. Then, when the prosecutor inquired on re-

---

[7] This motion was one of forty-six boilerplate pretrial motions counsel filed in this case. None of these motions directly addressed the specific facts of Mr. Granger's case. *See* 2 Supp. CR 109-11(Index of Motions).

direct if Petitioner was "a risk to other guards and inmates in the jail," without objection from counsel, the witness responded "yes." *Id.* at 35.

A second employee of the county jail, Deputy Daniel Leday, testified about an incident where he pepper-sprayed Petitioner, who he testified came at him aggressively as he was being escorted to the isolation cell. 26 *RR* 54-55. Without objection from counsel, the prosecutor asked if the witness was "aware of any other instances with inmate Granger with other deputies" and the witness responded, "I've read some reports, yes." *Id.* at 56.

A third employee of the Jefferson County Jail, Lieutenant Richard Gutierrez, testified that on August 22, 2012, he received information from an unknown inmate stating that Petitioner had formulated a plan to escape jail and that he considered Petitioner "an escape risk ever since he arrived at the jail." 26 RR 49-50. Although counsel had filed pretrial motions requesting notice of extraneous acts of misconduct the state planned to introduce at the penalty phase and there was no indication they were given notice of this evidence, they did not object to this line of questioning. Moreover, counsel failed to object on the additional grounds that Mr. Gutierrez's unsubstantiated belief that Petitioner was an "escape risk" was inadmissible as it was based solely on unreliable hearsay statements made by an unknown inmate and was irrelevant to any determination before the jury.

Counsel's representation—eliciting overtly harmful evidence on cross-examination of State's witnesses and failing to object to unsubstantiated and unreliable opinion testimony that Petitioner posed a future danger and was an escape risk—fell below any objective standard of reasonableness. *See Strickland v. Washington*, 466 U.S. 668, 694 (1984). Particularly in light of counsel's pretrial strategy to limit and/or exclude such evidence, counsel could have no strategic reason for failing to object to this evidence at trial.

Counsel's acts and omissions resulted in the admission of rank hearsay evidence, which otherwise would not have been admitted. *See East v. State*, 702 S.W.2d 606, 613 (Tex. Crim. App. 1985)

(acknowledging that in capital murder prosecution lay witness opinion testimony that defendant was a future danger based solely on hearsay evidence is inadmissible). And it resulted in the admission of bad acts that the court had excluded before trial. The improper admission of this evidence violated Petitioner's Sixth and Fourteenth Amendment rights to due process, a fair trial, confrontation of the witnesses, and a jury determination based on competent, reliable evidence. *See Chambers v. Mississippi*, 410 U.S. 284, 302 (1973); *Davis v. Alaska*, 415 U.S. 308, 320-21 (1974). The admission of these multiple pieces of hearsay evidence further impugns the reliability of Petitioner's death sentence.

Trial counsel was ineffective for failing to object and for eliciting much of this harmful evidence. There is a reasonable probability that counsel's deficient representation had an effect on the outcome, alone and in combination with the other deficiencies set forth in this petition.

B.     **Counsel Presented Harmful Evidence**

Trial counsel presented a number of "defense" witnesses who did more to support the State's case for death than they did Petitioner's case for life. At times defense counsel themselves asked questions that elicited harmful information; at other times the State, without any prior notice or objection from counsel, brought out hurtful information on cross-examination. Due to counsel's lack of preparation, this same scenario repeated itself with defense witness after defense witness.

1.     **Reverend James McAbee**

One of Petitioner's most harmful penalty-phase witnesses was Reverend McAbee, who ministered to inmates in the Jefferson County Jail on a weekly basis, had himself spent a few years in prison for burglary, and went by the nickname "pistol packing pastor." *Id.* at 33-35. The only helpful testimony Rev. McAbee provided was his recollection that Petitioner felt bad about Ms. Sebolt's death, although he also testified that Petitioner adamantly denied any responsibility for it. 27 RR 39. The remainder of his testimony, some of it elicited by defense counsel, was devastating to Petitioner. He testified that:

- Petitioner was not at all remorseful about what happened to Claudia and Samantha (*Id.* at 40);

- If he had been at the courthouse on the day of the shooting, he would have shot at Petitioner (*Id.* at 46);

- He personally believed in the death penalty (*Id.* at 44); and

- He could probably side with putting Mr. Granger to death (*Id.* at 45-46).

Reasonable counsel, planning to present this witness, would have investigated his background, his knowledge of and opinions about Petitioner, and his beliefs about the death penalty sufficiently to be aware of this damaging information. Knowing this would be Rev. McAbee's testimony, reasonable defense counsel would not have presented him.

### 2. Ulyssess Granger, Sr.

Counsel did not meet with Petitioner's father, Ulysses Granger, Sr., before presenting him as a witness. 27 RR 55. This lack of preparation was apparent. Ulysses, Sr., had absolutely nothing helpful to say, except that he did not want his son, whom he had not seen in a very long time, to be put to death. *Id.* at 61-62. In contrast, he provided the following hurtful testimony, most of which was elicited on direct or redirect examination by defense counsel:

- Petitioner told him that the shooting happened in the middle of a sexual assault trial because "he just couldn't control hisself (sic) anymore," *id.* at 54; and

- Vallire took his children and hid them from him for years, just as Petitioner was alleged to have done to Claudia, and that Claudia had called him a few years earlier looking for Bartholomew and the kids, *id.* at 62-64.

Counsel had no reasonable strategy to present this witness as his only potentially helpful testimony was specifically precluded by the court prior to trial. *See* 2 Supp. CR 498-507 (Motion to Introduce the Testimony of Defendant's Family and Friends Regarding Their Feelings on the on the Prospect of a Death Sentence); 5 RR 45 (denying this motion).

### 3. Fellow Inmates

It appeared that counsel was hoping to present Jefferson County inmates Jonathon Gonzales

and Jeffrey Sias to confirm the abuse Petitioner experienced in prison. However, counsel's failure to prepare these witnesses led to their inability to elicit much helpful testimony, and in the case of inmate Sias, allowed for devastating cross-examination.

Counsel did not meet with inmate Gonzales before presenting him as a witness, 27 RR 65, and it showed. Counsel asked questions without knowing how Gonzales would answer. For example, when Mr. Gonzales was asked if Petitioner ever expressed any remorse for killing Ms. Sebolt, he responded no, "he say he didn't kill the—the lady." *Id.* at 72. When asked this a second and third time, the witness repeated, "he say he didn't kill nobody." *Id.* Petitioner's lack of remorse was a fact that helped the prosecution, yet it was inexplicably and repeatedly elicited by the defense.

Counsel was equally unprepared to present the testimony of inmate Jeffrey Sias. The failure to investigate this witness before presenting him led to little direct testimony that was of help and devastating cross-examination that directly contradicted Petitioner's sworn testimony. While inmate Sias recalled one incident where he overheard a guard giving Mr. Granger a hard time about his medication, 27 RR 80, when specifically asked about other problems Petitioner experienced in jail, he denied knowing anything. In particular, when Sias was asked if he recalled other incidents "regarding food or anything else," like the incident with the medication, he responded "no, not to my knowledge, no, sir." *Id.* at 80. When counsel inquired again if "Mr. Granger had problems with trustees depriving him of food," the witness responded "no, sir, not that I—not of my knowledge, no sir." *Id.* at 83. When asked if he ever saw Petitioner get "struck" by a guard or another inmate, he responded "no, sir." *Id.* at 80. Inexplicably, counsel ended his examination of Sias by getting him to agree that Petitioner "talked a lot" while in prison and sometimes said what counsel characterized as "boastful, King Kong type of stuff." *Id.* at 84.

On cross-examination, the prosecutor questioned Sias about damaging admissions Petitioner purportedly made to him, that he relayed to an investigator from the Jefferson County District At-

torney's Office. Mr. Sias testified that while in jail, Petitioner admitted that on one occasion he called his daughter over to his house, had her take a shower while he masturbated, and then he and his brother molested her when she got out of the shower. 27 RR 90-91. Counsel did not object to this line of questioning, although he seemed blindsided by it and had filed pretrial motions specifically requesting notice and an opportunity to contest the admission of any statements made by his client before they were admitted. *See* 2 Supp. CR 459-463 (Motion for Hearing on Admissibility of Any Statement by Defendant); 5 RR 41 (parties agree to defer ruling on motion until issue arises and prosecutor agrees to go to sidebar before attempting to admit such statements); *see also* 2 CR Supp. 137-43 (Motion to Preclude Creation of Snitch Testimony); 5 RR 13-14 (ruling on motion deferred until issue arises based on counsel's belief State did not plan to sue snitch testimony).

On redirect, Sias testified that he had never told anyone about Petitioner's admission before, because nobody asked. 27 RR 92. Nobody obviously included trial counsel. Petitioner repeatedly testified that he did not sexually abuse his daughter and was being falsely accused and set up by his ex-wife Claudia. 23 RR 22; 28 RR 14. Counsel's failure to adequately investigate and prepare Mr. Sias allowed the prosecution to use this defense witness to argue that Petitioner was a liar. Objectively reasonable counsel would have thoroughly interviewed and investigated this witness, uncovered this admission, and either opted not to present Mr. Sias or limited the scope of the testimony he gave.

Given that counsel filed pretrial motions explicitly requesting notice of any snitch testimony and notice of the State's intention to admit any of Petitioner's statements at trial, and the fact that no such notice appears to have been given with regard to Petitioner's statements to Sias, counsel could have no strategic reason for asking Sias a series of questions to which counsel did not know the answers, or for failing to object to cross-examination questions that elicited inadmissible, damaging information. At the very least, counsel could have no strategic reason not to request a corrective instruction or mistrial once it was elicited.

### 4. Petitioner's Mother—Vallire Ozene

Counsel's inadequate preparation of Petitioner's mother, Vallire Ozene, was readily apparent and striking. Ms. Ozene not only acted inappropriately on the stand—blowing kisses at her son, 27 RR 97, 113, and winking at him, 27 RR 103, her testimony was more damaging and offensive than it was helpful.

Although Ms. Ozene testified that she was sad about what had happened to Ms. Sebolt, 27 RR 98, and that her son wasn't in his right mind at the time of the shooting, 27 RR 102, when explicitly asked by the prosecutor, Ms. Ozene denied her son had anything to do with Ms. Sebolt's death: "He did not do that. You know it, and I know it." 27 RR 103. Despite the jury's finding otherwise, she went on to squarely blame Ms. Sebolt's death on the police:

> I think the cops should be put in jail behind this . . . . I need the cops to be put in jail, 'cause that's what killed this lady. . . . They will never go to prison for killing her.

27 RR 108-09.

Ms. Ozene attempted to justify her son's actions: "I love my son. . . . And I'm supporting him 150 percent." 27 RR 103. She went on to state:

> I stand behind what he did. . . . I stand behind what he did because he is my son. I— I don't excuse him for what he did, but I'm gonna be there. I've always been there for my sons.

27 RR 106-07.

Ms. Ozene also expressed a shocking lack of sympathy, and at times outright disdain, for victims Claudia and Samantha. When asked by defense counsel how she felt about what happened to her granddaughter Samantha, she testified:

> I, again, was upset; but at that time, see, she was in court the day before taunting us and I—I swear to God it was a lot for use to take, what she was doing to us, and Claudia and Rebecca . . . . It angered me. It angered me to the highest.

27 RR 99. When asked about the appropriate punishment for what Bartholomew did to Samantha, she testified that he "deserve[d] to be in jail a little while for that." 27 RR 110. When asked, again by

defense counsel, how she felt about Claudia being shot, she said: "To be honest with you, to all of you guys, I didn't give a damn . . . ." 27 RR 101.

Ms. Ozene expressed no remorse for the harm her son had caused, little sympathy for the victims, and absolutely no respect for the jury's guilt-phase verdict. Counsel's failure to adequately prepare her and learn what she would testify to was deficient, as was counsel's decision to nonetheless present Ms. Ozene.

There is a reasonable probability that, if counsel had prepared their client's mother to testify, they would have anticipated that issues of remorse, sympathy, and blame were all fair game for inquiry. They would have prepared Ms. Ozene to respond to these questions in a way that would not alienate and offend the jury, or would have decided not to call such a devastatingly damaging witness to the stand.

### C.      Counsel's Inept Closing Argument

Counsel painted an unsympathetic picture of Petitioner in closing argument, emphasizing how eyewitnesses rightfully wanted to kill him; characterizing his conversations from prison as bigoted, vulgar, and profane; and belittling and dehumanizing their client. Counsel did very little to present the case that he was worthy of life, rather than death. In fact, neither Mr. Makin nor Mr. Cribbs directly asked the jury to spare their client's life. The closest either of them came to doing so was when Mr. Makin stated, "if you haven't figured it out yet, both of us [Mr. Cribbs and I] are kind of on the side of life." 29 RR 19. He then told the jury they had a choice to make. *Id.*

Instead of arguing that Petitioner was worthy of life, Mr. Makin emphasized how a number of witnesses rightfully wanted to kill him:

What is the punishment that is proper for the acts of March 14th, 2012?

Any man, any veteran, any woman with a gun in that parking lot on that day would have taken it out and shot Mr. Granger. His spiritual advisor told you, "I conduct concealed handgun classes. If I would've been in that parking lot, I would have taken it out and shot Mr. Granger."

> Mr. Hamilton, if you remember him, the Marine, who feels guilty 'cause he didn't have a gun, would have done something.

> And that's what people do in those kind of situations and it's amazing that all of the responding officers as they're running toward the chaos didn't shoot better, but none of that happened.

29 RR 14-15. Mr. Cribbs took it a step further, questioning how the jury could find for anything other than death:

> It's hard for me to sit here and—and justify or ask you to give him life in the penitentiary, life without parole. He'll be locked in a cage for the rest of his life. He won't be out, but he'll be there forever.

29 RR 21.

In attempting to argue that his client was not a future danger, but simply a big mouth and a blowhard, Mr. Makin belittled his client and reiterated the worst portions of the prison phone calls:

> If the calls are nothing else, they're a window into the life of Mr. Granger and his mother. . . . He's infamous. He's the worst. He's a rap star. He's a soldier, an angel, a warrior, a vampire. Groupies are writing him. His polling numbers in Dallas are up. Demons, Hannibal Lecter, liars, Mike Tyson, selling interviews to raise money, the Secret Service came down from Washington, political connections, a conspiracy of repression, bigotry and evil, anarchy is coming, the apocalypse is upon us, a civil war is coming, Bruce Banner and the Hulk, Skeletor, language that offends every person, race, creed, paranoia, plots, Ku Klux Klan, total uncaring of fellow human beings, women issues, man issues, father issues, parent issues, family issues, learning issues, individual and general words of hate and vindictiveness, personal and specific threats of immediate harm.

> His words of hate were all-inclusive but yet no action on anything, just a bunch of words.

> . . .

> All those phone calls and language are probably the most inappropriate, bigoted, vulgar, profane, sick collection of misconceptions, fantasies, unconnected thoughts and words that any of us have ever heard.

29 RR 15-17.

If counsel had presented evidence of Petitioner's profound mental illness, *see* Claim VI, he could have persuasively argued that Petitioner's words and behavior were symptomatic of his impairments. But counsel did the opposite. He affirmatively argued his client was not mentally ill:

> He's not insane. He's not mentally ill . . . he's an individual not like us, not like you, not like me. He should be removed from normal society. He should be locked up and handled by professionals, people with training.
>
> . . .
>
> Well, he's Mr. Hyde. Having never read the short story "The Strange Case of Dr. Jekyll and Mr. Hyde"—who are the same person. It was the classic good versus evil—you have to wonder, does Mr. Granger even know they were the same person?"

29 RR 18. Rather than humanize their client at sentencing, as basic tenets of loyalty and the standards for capital defense representation demand counsel to do, counsel belittled and dehumanized Mr. Granger. *See* 2003 ABA Guidelines, Guideline 10.11(F).

Counsel's deficient penalty-phase closing deprived Mr. Granger of his right to effective assistance of counsel, as guaranteed by the Sixth Amendment. *See Rickman v. Bell*, 131 F. 3d 1150, 1153 (6th Cir. 1997), *aff'g* 864 F. Supp. 686 (M.D. Tenn. 1994) (counsel did not serve as advocate but, instead, showed contempt for his client such that he was a "second prosecutor" and defendant would have been better off without counsel); *United States v. Swanson*, 943 F.2d 1070 (9th Cir. 1991) (counsel ineffective for conceding in closing argument there was no reasonable doubt concerning the factual issues in dispute).

### D. Petitioner Was Prejudiced as a Result of Counsel's Harmful Acts and Omissions

To show prejudice, the "undermines confidence" standard requires only "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. This standard can be shown by less than a preponderance of the evidence. *Id.*

But for counsel's repeated errors throughout the penalty phase, including in failing to adequately investigate and prepare witnesses, failing to assert Petitioner's rights to exclude inadmissible evidence, failing to present compelling mitigation testimony, *see* Claims IV, VI, & VII, and present-

ing inept and contemptuous closing arguments, there is a reasonable probability that at least one juror would have voted for life. *Wiggins v. Smith*, 539 U.S. 510, 537 (2002) ("a reasonable probability that at least one juror would have struck a different balance"); *Ruiz v. Stephens*, 728 F.3d 416, 424 (5th Cir.2013) ("reasonable probability that at least one juror could have determined that . . . death [is] not an appropriate sentence"); *see also White v. Thaler*, 610 F.3d 890 (5th Cir. 2010) (applying cumulative *Strickland* prejudice analysis to multiple instances of deficient performance); *Richards v. Quarterman*, 566 F.3d 553 (5th Cir. 2009) (same).

E.     **State Habeas Counsel Ineffectiveness**

None of these claims were raised in state habeas proceedings. State habeas counsel's ineffectiveness for failing to raise these meritorious ineffective-assistance-of-trial-counsel claims in state habeas proceedings excuses any default the State may allege, both alone and in combination with other instances of ineffectiveness set forth herein. *See Trevino v. Thaler*, 569 U.S. 413, 429 (2013).

IX.     **TRIAL COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT SAMANTHA JACKSON'S DIARY OR OTHER AVAILABLE DOCUMENTARY EVIDENCE, TO REBUT HER CLAIM THAT HER FATHER SEXUALLY MISTREATED HER, DEPRIVED MR. GRANGER OF THE EFFECTIVE ASSISTANCE OF COUNSEL AT THE PENALTY PHASE**

The climax of the State's case for death was the testimony of Samantha Jackson accusing her father of sexually assaulting her over a course of years. 26 RR 88-96, 26 RR 124. Mr. Granger's attorneys sought throughout the trial to contest Ms. Jackson's claims, presenting family witnesses at both phases who said or suggested they were false. 23 RR 21-18, 111-15, 118-23, 130-31. At the penalty phase, Cribbs referred repeatedly in his cross-examination of Ms. Jackson to her "allegations," 26 RR 105, 113, to what was "supposed" to have happened, 26 RR 106, 108, and to the fact that Ms. Jackson never complained until she went to live with her mother, 26 RR 107, 114, and he asked her whether her mother had "made up" the allegations, 26 RR 109.

Nevertheless, counsel never located or presented powerful rebuttal evidence that was readily

available in the prosecution's possession: the diary that Samantha Jackson kept during the same years that, she claimed, her father was mistreating her. The diary would have enabled counsel to impeach Ms. Jackson's testimony with her own contemporaneous words and establish affirmative mitigating evidence of Mr. Granger's positive relationship with his daughter. Counsel also could have impeached Ms. Jackson's credibility with records that could have supported their contention that her allegations against Mr. Granger's brother were also false. Counsel's failure to investigate and present the diary and other evidence deprived Mr. Granger of the effective assistance of counsel at the penalty phase. U.S. Const. amends. VI, XIV.

### A. Counsel Failed to Discover or Use the Diary

Ms. Jackson's diary first surfaced during the sexual assault trial, which was transcribed on trial counsel Makin's motion by October 4, 2012, six months before the capital trial. A0743. Rife Kimler, Mr. Granger's counsel in that case, attempted unsuccessfully to cross-examine a State's witness using the diary. The court ordered him to provide a copy to the prosecutor. A0726-32; A0733.

Capital trial counsel knew about the diary's existence and importance throughout the pretrial preparation period. After the shootings, law enforcement officers discovered Mr. Granger's briefcase in his truck and collected it as evidence. Discovery provided to capital trial counsel showed that the briefcase containing papers was seized from Mr. Granger's truck. A0827-31; A0834. Counsel could have learned from Mr. Kimler that the diary was in the briefcase. Mr. Kimler testified at the capital trial that Mr. Granger brought a briefcase containing a red spiral notebook containing the diary of his daughter to the sexual assault trial. Mr. Kimler read through the diary. He thought it was "helpful" and "exculpatory," and would have liked to cross-examine Ms. Jackson with it. It said nothing about the allegations that she was making at trial. The judge photocopied the diary, and Mr. Kimler returned it to Mr. Granger with instructions to bring it to court the next day. 23 RR 175-76, 183-84, 189.

Nevertheless, counsel never spoke to Mr. Kimler about the diary and never attempted to locate or review it before trial. A0377. Attorneys Makin and Cribbs submitted affidavits that the State attached to its response to Mr. Granger's habeas petition. Using identical language, they both claimed that they had "extensively interviewed" Mr. Kimler about the contents of the diary (contradicting Mr. Kimler), that Mr. Granger did not know where it was, that the judge said he did not have it, and that it was not in the court file. A0355-62.

When Mr. Granger's state habeas counsel asked to review the State's physical evidence a few years later, the prosecutor wheeled out a cart containing the briefcase, allowed counsel to look inside, and gave them a photocopy of the diary they found there. A0365. Both Samantha Jackson's grandmother, Valire Ozene, and good friend, Shemerial Sewell, identified the handwriting in the diary as Ms. Jackson's. A0354; A0370-71.

### B. Counsel's Failure to Investigate the State's Case for Death Was Deficient

Counsel had a duty to investigate the circumstances of the State's case in aggravation, and uncover any facts that would rebut or mitigate the State's evidence. *See Rompilla v. Beard*, 545 U.S. 374, 385-86 (2004); *see also Battenfield v. Gibson,* 236 F.3d 1215 (10th Cir. 2001) (counsel ineffective for, among other deficiencies, failure to investigate prior conviction that prosecution planned to introduce in aggravation); *Summit v. Blackburn,* 795 F.2d 1237 (5th Cir. 1986) (counsel ineffective for failing to object to or argue lack of corroboration for aggravating factor). Long before Mr. Granger's trial in 2013, prevailing professional norms required capital trial counsel to undertake thorough investigation of the state's case at the punishment phase. *See* 2003 ABA Guidelines, Guidelines 1.1 cmnt.; 10.7(A); 10.11(H); Tex. Guidelines, Guidelines 11.1(A), (A)(3). These norms included an obligation to use available discovery mechanisms to prepare to rebut the state's aggravating evidence and secure information possessed by the state or law enforcement. 2003 ABA Guidelines, Guideline 1.1 cmnt.; 10.7 cmnt.; Tex. Guidelines, Guideline 3(a).

Mr. Granger's capital counsel flouted these norms by failing to prepare to implement their own strategy of attacking Ms. Jackson's credibility. They wanted to suggest that the sexual assault allegations were false, and they wanted to use the diary to do that. They ordered and obtained the sexual assault trial transcript, and thus knew or should have known that Rife Kimler had the diary in court on the day before the shooting, and that the judge had photocopied it. They knew from the discovery the State gave them that detectives had seized and searched a briefcase from Mr. Granger's truck, and that the briefcase contained paperwork. This information alone should have led them to ask the State for an opportunity to examine the briefcase, in which they would have found the diary. At the very least, by the time Mr. Kimler testified at the guilt phase that Mr. Granger brought the notebook to court in his briefcase, they should have known to examine the briefcase.

Nevertheless, counsel never asked Mr. Kimler about the diary and never obtained it from the prosecution. By failing to obtain and use obvious impeachment material to cross-examine the State's key witness and develop mitigating evidence, counsel rendered deficient performance.

### C. Counsel's Failure to Investigate and Present the Diary Prejudiced the Defense at the Penalty Phase

Because counsel did not have the diary at hand to cross-examine Ms. Jackson, they had to rely solely on testimony by Mr. Granger and his family to implement their own strategy of casting doubt on her profoundly prejudicial allegations. Ms. Jackson testified that Mr. Granger began molesting her when she was in the fifth grade and began having sex with her when she was fourteen or fifteen years old (i.e., at some point between April 2005, when she turned fourteen, through April 2007, when she turned sixteen). Given that she made the diary entries in late 2008 or early 2009,[8] the alleged sexual assaults would have predated the entries by at least eighteen months. The prosecution opened the door to examination about the diary by bringing it up on direct examination, asking Ms.

---

[8] Samantha's education records indicate that she entered the ninth grade in 2007. A0948. One of the diary entries indicates that she was in the tenth grade at the time of writing. A0930. That would date her diary to late 2008 or early 2009.

Jackson if she had said "some nice things" about her father in it. 26 RR 99-100. Therefore, defense counsel could appropriately have used the diary in cross-examination—if counsel had obtained it and had it in the courtroom.

### 1. The Diary Does Not Say or Suggest that Mr. Granger Sexually Abused His Daughter

The diary discusses several private and potentially embarrassing issues. Ms. Jackson writes of her distaste for her mother, A0923; A0940, her loneliness and desire to have a boyfriend, A0924, fights with her cousin Vallire Nicol, A0925, the teasing of an ex-boyfriend who called her "stupid" and "fat," A0927-28, her feelings of inadequacy because she might have to repeat the tenth grade, A0930, and the possibility that her brother might be gay, A0941. At trial, she denied on direct examination that she had any fear her father would read writings in her room. 26 RR 100. Nevertheless, the diary nowhere mentions the sexual abuse by her father and uncles that she alleged at trial. Because it would have been natural for her to include allegations about her father's sexual abuse in this context if they had really occurred, the omission could have been admissible impeachment material. *See* Tex. Trial Procedure & Evidence 2016, § 12-7; 1-5 Tex. Evidentiary Foundations § 5.13 (2015) (*citing Waldon v. Longview*, 855 S.W.2d 875, 878 (Tex. App. Tyler 1993)).

### 2. Ms. Jackson Refers to Mr. Granger As Her "Mother and Dad and[] Friend"

The diary also describes Ms. Jackson's loving relationship with her father. It repeatedly describes Mr. Granger as a "good guy" and states that she loves him "so so much." A0921; A0924; A0939. At one point the diary discusses Ms. Jackson's disdain about her mother's absenteeism, and she vows to be a better mother to her own children. A0938. The diary continues, "My dad took care of me ever since I was a baby. He is my mother and dad and my friend. So I don't need her [Claudia]."[9] A0939. Trial counsel could have used this evidence to impeach Ms. Jackson's negative charac-

---

[9] For easier reading, misspellings are corrected without the use of "sic."

terizations of her father on direct examination.

Moreover, the diary, by demonstrating that Ms. Jackson regarded Mr. Granger as a good, loving father and gave him credit for raising her from babyhood, could have served independently as mitigating evidence. *See Hitchcock v. Dugger,* 481 U.S. 393, 398-99 (1987) (Florida statute unconstitutional for not providing a way for jurors to consider and give effect to mitigating evidence, including fact that petitioner was a "fond and affectionate uncle").

### 3. Counsel's Deficiency Deprived Mr. Granger of Valuable Rebuttal and Mitigation Evidence

The undiscovered diary could have served multiple roles in Mr. Granger's penalty-phase defense. First, the diary's omission of any mention of sexual assault contradicted Ms. Jackson's testimony, providing an exculpatory negation of the abhorrent offense of sexual assault, on which the State heavily relied in support of its case for death. Second, the diary portrayed Mr. Granger's relationship with his daughter in a positive light, a powerful form of mitigating evidence. There is a reasonable probability that, for these reasons alone, counsel's investigation and presentation of the diary at the penalty phase would have led at least one juror to vote for life.

Furthermore, counsel's deficiencies respecting the diary caused cumulative prejudice. Specifically, counsel could have investigated and presented mitigating evidence that focused on and explained Mr. Granger's inability to cope with the pressure of the false allegations brought against him, ultimately bringing him to a breaking point on March 14, 2012. The diary could have supported this explanatory mitigating account by confirming, by omission, that the allegations were false. Counsel's deficient performance in this respect, in combination with all other instances of deficient performance set forth in this petition, prejudiced Mr. Granger at the penalty phase. But for all of counsel's deficiencies, there is a reasonable probability that at least one juror would have voted for life.

### D. Because The State Court's Ruling Rested on an Unreasonable Determination of the Facts and No Conclusions of Law, This Court's Review Is De Novo

The state courts never resolved the key contested factual questions underlying this claim. In the affidavits attached to the State's response to Mr. Granger's application for postconviction relief, both Mr. Makin and Mr. Cribbs made the same factual assertions:

> Trial Counsel extensively interviewed attorney Rife Kimler as to the contents and statements of Mr. Granger's daughter in the "diary." Mr. Granger said he did not know where the diary was. Criminal District Court Judge said he or the Court did not have it, although attorney Kimler insisted that the Court had it and had made a copy of it. Counsel searched the court file and found nothing. Trial Counsel cross-examined Mr. Granger's daughter on the contents and statements therein.

A0356; *see also* A0361. Mr. Granger's state habeas counsel contested these allegations on his behalf. When the district court ruled that it found no contested material questions of fact, A0186, counsel objected and requested an evidentiary hearing. On this claim, counsel argued that only testimony by trial counsel and Mr. Kimler at an evidentiary hearing could resolve material factual questions: (1) what they thought of the discovery describing "papers" recovered in the briefcase, (2) whether they asked to inspect the briefcase and contents, and (3) whether Kimler told them the diary was in the briefcase. *See* A0206. Counsel also disputed Mr. Makin's and Mr. Cribbs's claim that they cross-examined Ms. Jackson about the diary; the trial transcript flatly contradicted that claim. *Id.* at 10-11. The court rejected this argument and denied an evidentiary hearing. A0187.

Mr. Granger's state habeas counsel then alleged in proposed findings of fact and conclusions of law that trial counsel never reviewed, obtained, or sought to introduce the diary at trial and never cross-examined Ms. Jackson about it. They demonstrated that, at the latest, trial counsel knew by the sixth day of trial—through Mr. Kimler's testimony and pretrial discovery—that they could find the diary in the briefcase. A0086-87. Nevertheless, the State's proposed findings, later adopted by the district court, alleged:

> Applicant's daughter, Samantha Jackson, composed a crudely handwritten diary earlier in her life. She indicates therein she loved her father.

> Based upon the Affidavits attached to the Writ, trial counsel extensively interviewed Rife Kimler, trial counsel in the underlying sexual assault case against Samantha.

Kimler relayed the contents of the diary. Most importantly, trail counsel cross-examined Samantha about the diary. She testified she was too young at the time to remember its contents.

A0128.

The Court of Criminal Appeals corrected one glaring error in this fact-finding—the assertion that counsel had cross-examined Ms. Jackson about the diary. A0150. The court made the following additional finding of fact concerning this claim:

> Based on the affidavits attached to the State's response filed by its attorney pro tem, trial counsel extensively interviewed Rife Kimler, who represented applicant in the underlying sexual assault case. Kimler related the contents of the diary to trial counsel. During her punishment phase direct examination by the State, Samantha testified: "I do not remember. I was too young to—I was too young. I wrote it, but I really don't remember. . . what I wrote."

A0150-51. Although the court noted that the district court had issued no conclusions of law on this claim, A0149, it made no legal findings of its own, indicating only that "we otherwise adopt the trial court's findings and conclusions." A0153.

State habeas counsel could have contested trial counsel's claims about the diary if the court had granted a hearing. Mr. Kimler could have testified, consistently with his trial testimony, that Mr. Granger brought the diary to court in the briefcase, that he returned it to Mr. Granger and told him to bring it back the next day, and that trial counsel never asked him about the diary. A0377. State habeas counsel could have presented the testimony of trial counsel, confronted them with this information, and elicited their explanation.

In sum, attorney Kimler testified under oath that the diary was in Mr. Granger's briefcase, and the discovery showed that police seized the briefcase from Mr. Granger's car after the shooting. Trial counsel nevertheless swore in their affidavits they searched for the diary and "found nothing," without mentioning any effort to find it in the briefcase that was in police custody. Mr. Granger never received a hearing to resolve the unresolved and material factual question: whether they knew where the diary was. Tex. Stat. Ann. art. 11.071, § 9. Because the state court denied Mr. Granger an

opportunity to present evidence that his trial counsel knew or should have known where to find the diary and failed to pursue it, the state district court's ruling rested on an unreasonable determination of the facts. The Court of Criminal Appeals adopted the lower court's ruling. The state courts' rulings therefore deserve no deference. 28 U.S.C. § 2254(d)(2). This Court's review is de novo.

Moreover, neither the district court nor the Court of Criminal Appeals issued any conclusion of law on this claim. Because the claim received no ruling on the merits, this Court's review is de novo for that reason as well. *See, e.g.*, *Treviño v. Davis*, 861 F.3d 545, 552 (5th Cir. 2017) ("[W]e must apply *de novo* review because no state court adjudicated Treviño's claim of penalty-phase ineffective assistance of counsel on the merits" (citing *Cone v. Bell*, 556 U.S. 449, 472 (2009))), *pet. for certiorari filed on other grounds*, No. 17-6883, Nov 20, 2017.

For all the reasons above, this Court should grant habeas relief on this ground.

## X. PETITIONER'S RIGHT TO DUE PROCESS WAS INFRINGED BY IMPROPER PROSECUTORIAL ARGUMENT AT PENALTY-PHASE SUMMATION, AND HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL WAS INFRINGED BY THE FAILURE OF TRIAL COUNSEL TO OBJECT

Prosecutor Patrick W. Knauth, in his portion of the prosecution's closing at the penalty phase, said that "if you read more of the Bible, there's also, 'Eye for an eye.'" A0807. He later said, "Proverbs 21:15 says: When justice is done, it brings joy to the righteous and terror to the evildoers." A0811.[10] Arguments based on scripture are clearly improper, and courts have condemned them time and again. *See, e.g.*, *Sandoval v. Calderon*, 241 F.3d 765, 777 (9th Cir. 2000) (collecting cases).

Mr. Knauth also said to the jury, "I suspect you've made up your minds as of last week, and everything that happened this week just confirmed your opinion." A0807. In so doing, Mr. Knauth affirmed for the jury the unconstitutional idea that automatically imposing the death penalty upon a

---

[10] Trial counsel also invoked the Bible, but only to point to the parable of Cain and Abel. Trial counsel pointed to a Biblical *story*, whereas the prosecutor used the Bible for its *directives*—take an eye for an eye, and thus do justice.

finding of guilt is proper, and that ignoring all the evidence presented at the penalty phase—including mitigating evidence—is fine. This improperly interfered with Petitioner's right to a separate penalty phase where mitigating evidence could be considered. *Gregg v. Georgia*, 428 U.S. 153, 195 (1976); Tex. Code Crim. Proc. art. 37.071.

In Mr. Shettle's portion of the prosecution's closing, he remarked, of Petitioner, "He is a very angry, evil man. And when he doesn't get his way, when he loses control—and he's gonna hurt somebody." A0813. He also referred to Petitioner and the entire Granger family as a "cancer": "My God, don't you understand that his whole family's that way? It's horrible. It's like a—it's like a cancer. It's scary." A0814. This was improperly inflammatory, especially in combination with his earlier characterization of Petitioner as a "murdering son of a bitch," *see* Claim XIII. Like that earlier remark, these were foul blows that infected the trial with unfairness. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *United States v. Diaz Carreon*, 915 F.2d 951, 956 (5th Cir. 1990). The remarks "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

Counsel's inexplicable failure to object to *any* of these glaring instances of misconduct at penalty-phase closing was deficient. *Ward v. Dretke*, 420 F.3d 479, 495-96 (5th Cir. 2005) (failure to object deficient, where it was unreasonable and could not be recast as a strategic decision); *Riddle v. Cockrell*, 288 F.3d 713, 717 (5th Cir. 2002) (failure to object deficient where there was no reasonable tactical basis for so failing). Had counsel objected, it is reasonably probable that the objections would have been sustained and that the jury, having not been infected by the prosecutor's improper arguments, would have sentenced Petitioner to life.

State habeas counsel raised a claim that included some of these instances of prosecutorial misconduct, through an ineffective-counsel lens (invocation of "eye for an eye," the remark about the jurors' already having made up their minds), but not others (invocation of Proverbs, calling Peti-

tioner and his family "evil" and a "cancer"). As to the parts of this claim state habeas counsel did

not raise, state habeas counsel were ineffective for failing to raise them, with prejudice accruing both

individually and cumulatively. *Trevino v. Thaler*, 569 U.S. 413, 429 (2013) (procedural default will not

bar ineffective-assistance claim where state-postconviction counsel was ineffective); *Martinez v. Ryan*,

566 U.S. 1, 14 (2012) (discussing the necessity of a habeas court's hearing substantial ineffective-

assistance-of-counsel claims otherwise defaulted by attorney "errors" in initial-review collateral pro-

ceeding). As to the parts of the claim state habeas counsel did raise, the state court rejected them by

summarily declaring that Petitioner had failed to meet his *Strickland* burden. *Ex parte Granger*, No.

WR-83,135-01, 2017 WL 3379285, at *4 (Tex. Crim. App. May 17, 2017), *cert. denied sub nom. Granger*

*v. Texas*, 138 S. Ct. 470 (2017). The state court's conclusion unreasonably applies *Strickland v. Wash-*

*ington*, 466 U.S. 668, 693 (1984). Petitioner is entitled to a new penalty hearing.

As explained in Claim XIII, *infra*, the prejudice that arises from instances of prosecutorial

misconduct must be considered cumulatively, not just individually. Each instance of prosecutorial

misconduct described above and in Claim XIII deprived Petitioner of due process; cumulatively, all

the more so. Similarly, the deficiency of failing to object to each of the prosecutors' remarks preju-

diced Petitioner, both alone and cumulatively with other deficiencies. *Strickland*, 466 U.S. at 694

(prejudice assessed from combined effect of "counsel's unprofessional errors"). State habeas counsel

raised the cumulative prejudice of counsel's failure to object to some of the prosecutors' improper

arguments; the state court rejected this claim by summarily declaring that Petitioner had failed to

meet his *Strickland* burden. *Ex parte Granger*, 2017 WL 3379285, at *4. The state court's conclusion

unreasonably applies *Strickland*, 466 U.S. at 693. Petitioner is entitled to habeas relief on this ground.

## XI. PETITIONER WAS DENIED HIS SIXTH AMENDMENT RIGHTS TO EF-FECTIVE ASSISTANCE OF COUNSEL AND A FAIR TRIAL AS A RESULT OF TRIAL COUNSEL'S FAILURE TO INVESTIGATE, PREPARE, AND PRE-SENT A COHERENT GUILT PHASE DEFENSE; COUNSEL'S INTRODUC-TION OF OVERTLY HARMFUL EVIDENCE; AND COUNSEL'S FAILURE TO OBJECT TO IRRELEVANT AND OVERLY PREJUDICIAL EVIDENCE

**AND ARGUMENT**

From the beginning of trial, counsel had many failures of advocacy that had ripple effects throughout both the guilt-innocence and penalty phases. At the guilt phase of trial, defense counsel deferred opening argument until after the close of the State's case and then never gave an opening at all. *See* 18 RR 22 (defense defers opening); 22 RR 7 (no opening by defense). Then counsel presented a total of eight witnesses, seven of whom testified mainly about the underlying sexual assault charges that Petitioner was on trial for at the time of the shooting. Until this testimony, the nature of the charges Petitioner faced had been kept from the jury. The final witness, forensic pathologist Dr. Grossberg, testified about Ms. Sebolt's injuries and concluded that the bullets that killed her must have come from the street, where Petitioner was located. *See* Claim XII (alleging ineffective assistance of counsel for presenting Dr. Grossberg). This was also the first time any witness testified as to the location of the shooter who fired the shots that killed Ms. Sebolt.

To the extent there was a theme to the defense presentation, and it's not clear that there was, it seemed to consist of raising doubts about the veracity of the sexual assault charges for which Petitioner was on trial when the shooting occurred and also raising doubts about who fired the shots that killed Ms. Sebolt. However, Petitioner's guilt or innocence of the sexual assault charges had nothing at all to do with his guilt or innocence of the capital murder of Ms. Sebolt. Moreover, the defense introduction of this testimony only served to provide Petitioner with a motive to shoot at Samantha and Claudia, at the same time that it inflamed the passions of the jury and biased them against Petitioner. Similarly, counsel's handling of the ballistics evidence, rather than raising doubt about whose bullet actually killed Ms. Sebolt, suggested that Petitioner was the likely shooter. *See infra* Claim XII.

In addition to presenting evidence and a defense theory that was more harmful than helpful, defense counsel failed to: (1) adequately prepare Mr. Granger to testify and object to irrelevant and

prejudicial cross examination of him; (2) adequately prepare Lyndon Granger and object to irrelevant and prejudicial cross examination of him, and (3) object to the prosecutor's objectionable closing argument. As a result of counsel's failures, damning evidence and argument was admitted that otherwise would not have been and Petitioner's constitutional rights to effective assistance of counsel and a fair and impartial trial were compromised. *Strickland*, 466 U.S. at 693; *Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014).

### A. Counsel's Chosen Guilt-phase Defense Was Not a Defense to Murder and Only Prejudiced the Jury Against Petitioner

Petitioner was only tried on one charge: capital murder for the death of Minnie Ray Sebolt. The theory behind this charge was that, with the intent to kill Claudia Jackson in retaliation for her testimony against him, Petitioner caused the death of Ms. Sebolt. *See* 18 RR 12. While Petitioner was not facing any charges involving his daughter Samantha, the course of events that led to the killing of Ms. Sebolt, as presented by the prosecution, included testimony from numerous eyewitnesses that Petitioner shot at Samantha Jackson, hitting her numerous times, and shortly thereafter ran her over with his truck.

Before the defense presented its case, the jury knew only that at the time of the shooting Petitioner was on trial for a felony offense and that his daughter Samantha and ex-wife Claudia Jackson had testified adversely to him in that case. *See* 18 RR 16 (prosecutor's opening); 18 RR 30-32. Although there was no specific pretrial motion addressing the nature of the underlying charges Petitioner was on trial for at the time of the shooting, the prosecutors still went out of their way to keep this information from the jury, seemingly recognizing that mention of this irrelevant, overly prejudicial fact would compromise Petitioner's right to a fair trial on the murder charges.

Despite these efforts, counsel, through Mr. Granger's testimony, as well as the testimony of six other witnesses, not only inserted this prejudicial fact into the case, but made it the core of their defense. Counsel actively elicited this from Mr. Granger on direct examination:

Q. What happened?

. . .

A. A detective called me.

Q. Okay. And you can't say what he said, but what was the outcome of that contact?

A. He—he was accusing me of sexually assaulting my daughter in Houston.

. . .

Q. Okay. Well, how did you come to be in trial in Jefferson County in March of 2012?

A. What Claudia and Samantha did, they went to Jefferson County and filed a complaint against me and Lyndon Granger.

Q. Okay. And that was for sexual assault?

A. Yes, for sexual assault. It was a complaint they filed.

23 RR 20-22.

In addition to Petitioner's testimony, counsel subpoenaed and presented an additional six witnesses to testify further about the sexual assault allegations and to disparage Samantha and Claudia, both of whom made these allegations. *See* 23 RR 88, 98-100 (Petitioner's brother, Lyndon Granger); 23 RR 111-12 (Petitioner's son, Bartholomew Granger, Jr.); 23 RR 128-31 (Petitioner's mother, Vallire Ozene); 23 RR 193-98 (Petitioner's brother, Ulysses Granger); 23 RR 173-75 (Petitioner's attorney for the sexual assault case, Rife Kimler); 23 RR 122-26 (Samantha's friend, Shemerial Sewell).

Evidence that Petitioner did not sexually assault his daughter was not at all relevant to disproving any of the elements of capital murder. *See* Tex. Penal Code Ann. § 19.03(a)(2) (murder in course of committing retaliation). If anything, this evidence was extremely prejudicial to Petitioner's defense. It not only suggested Petitioner had motive to commit murder—to seek revenge against his false accusers—it also unnecessarily inflamed the passions of the jury, engendering sympathy for Samantha, biasing the jury against Petitioner; and allowed the State to argue in closing that the Peti-

tioner's defense was that "Samantha Jackson needed killing." 24 RR 53. Counsel's performance in presenting this evidence fell below the objective standard of reasonableness. *See Harding v. Sternes*, 380 F.3d 1034, 1044 (7th Cir. 2004) (finding deficient performance when counsel elicited harmful evidence—his client's prior conviction and lengthy sentence for armed robbery—during redirect in effort to counter cross showing defendant generally feared police and gave false name and address). In presenting this harmful evidence, counsel violated his duty of loyalty to his client, acting more as an arm of the prosecution than as a defense attorney. *Strickland*, 466 U.S. at 688 (counsel has a duty to advocate the defendant's cause and to "bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process"). There could be no strategic rationale that justified counsel's presentation of this purely prejudicial evidence at the guilt phase of trial.

### B. Counsel's Introduction of Otherwise Inadmissible Bad Acts through Petitioner's Own Testimony was Deficient Performance

Petitioner testified on direct examination that he was a not high school graduate, but earned a living as a truck driver and enjoyed rapping with his brother Lyndon, which they did under the rap names Ice Man and Cyanide and Dr. Jekyll and Mr. Hyde. 23 RR 9-12. Petitioner explained his tumultuous relationship with Claudia Jackson, the mother of Samantha and Bart, Jr., including how they began dating young and had a history of fighting for custody of the kids. 23 RR 8-18. He testified to one incident where Claudia claimed he was being abusive and he tried to cut her with a knife, and as a result she called the police and left with the children. 23 RR 15-16. He testified that Samantha suffered lifelong disabilities as a result of a smoke bomb incident when she was a newborn, and that in 2008 or 2009, he was accused of sexually molesting Samantha in Houston and then in Jefferson County, where he was ultimately on trial at the time of the shooting. 23 RR 10-14, 20-22. Petitioner denied molesting his daughter and admitted he was angry because everyone assumed he was guilty. 23 RR 22, 35-36. Petitioner testified that he did not have a clear memory of the events of March 14, although he stated that things had been coming back to him over time. 23 RR 23. He tes-

tified that he recalled being at the courthouse, running across the street and shooting at Samantha three times, at which point he ran out of bullets. 23 RR 29-30. He denied shooting at Claudia, Ms. King, or the decedent. 23 RR 34.

Counsel's preparation of Petitioner was sorely inadequate, as evidenced by the amount of damaging prior bad act and propensity for violence evidence that Petitioner's testimony inserted, for the first time, into the case. Petitioner was the first witness in the case to inform the jury that he was facing sexual assault charges against his daughter at the time of the shooting. In addition, Petitioner's direct testimony brought into evidence the fact that Claudia had previously called the police, alleging that he had threatened her with a knife and was abusive towards her.

Defense counsel filed a pretrial motion to discover the extraneous acts of misconduct the State planned to present, presumably to counter or challenge the admission of that evidence, yet counsel inexplicably presented such evidence in his case in chief. *See* 2 Supp. CR 447-51. Absent Petitioner's testimony about these asserted prior bad acts, this prejudicial evidence would have been kept from the jury. 5 RR 40 (granting pretrial motion regarding prior bad acts); Tex. R. Crim. Evid. 404(b); *Hadden v. State*, 829 S.W.2d 838, 842 (1992) (police officer's references to extraneous offenses—statements Hadden gave regarding other burglaries committed—even though followed by instruction to disregard testimony, was reversible error).

In addition to these prior bad acts, Petitioner's testimony also led to the admission of evidence that suggested his proclivity towards violence, including the irrelevant fact that he and his brother had a rap group and that they went by the rap names Ice Man, Cyanide, Dr. Jekyll, and Mr. Hyde. Again, this unhelpful testimony was largely elicited by counsel:

Q. Okay. And do y'all have like rap names?

A. Yes.

Q. And what are your rap names?

A. Ice Man.

. . .

Q. Okay. And what's his rap name?

A. Cyanide.

Q. Okay. And does he have other names he uses?

A. Dr. Jekyll, and I use Mr. Hyde.

23 RR 12. This irrelevant testimony opened door to the devastating cross-examination about Mr. Granger's taking the name of "Mr. Hyde," who was the beast in the book, and his composition of a rap lyric, "Helloween," about murdering children who came to his door. 23 RR 56. Had counsel not elicited this testimony, evidence of Petitioner's rap names and the lyrics to his songs never would have been admitted in evidence, nor would the State's devastating line of cross-examination have been possible.

### C.    Counsel's Failure to Object to Cross-examination of Petitioner Regarding Irrelevant, Highly Prejudicial Prison Phone Calls Was Deficient Performance

On cross-examination, the prosecutor, without any objection from counsel, questioned Petitioner about phone calls he made to family members from the prison. Specifically, the prosecutor asked Petitioner if he recalled telling his mother that "[a]ll black women are Babylonian whores" and that "all of them need their throats cut" and inquired if Claudia and Samantha were two such women. 23 RR 49-50. He also inquired if Petitioner recalled telling his family that he was ready for a war of Armageddon. 23 RR 61-62. He went on to reiterate comments Petitioner made about other inmates in prison, such as: "I can start shit any time with these demons and they can't do anything to me and then I can do anything I want to with these other fuckers." 23 RR 51. The prosecutor then questioned him about comments he made about the guards, including: "I will break their necks. They're the ones that should be afraid of me. It shouldn't be y'all worrying about me. It should be y'all worrying about them. They don't know who they're fucking with. I'm a soldier." *Id.* Much of

this questioning was totally outside the scope of Petitioner's direct testimony, irrelevant to any issue in the guilt phase of the case, and highly prejudicial.

The admission of these phone calls served no purpose other than to improperly impugn Petitioner's character and suggest that he had a propensity for violence. Petitioner never stated on direct that he was a peaceful, nonviolent person, which might have made this line of cross-examination appropriate rebuttal. *See* Tex. Rs. Crim. Evid. 404 & 405. Had counsel objected to the prosecutor's cross-examination of Petitioner about the content of these recorded prison calls, this prior bad act evidence would have been excluded.

The court, with the consent of the State, granted a motion in limine pertaining to the admission of out-of-court statements made by Mr. Granger—including Petitioner's statements on the recorded prison phones calls. 5 RR 41. During the penalty phase, prosecutor Shettle specifically mentioned this "order in limine that the Court has in place . . . regarding out-of-court statements made by the defendant and, more specifically, those statements which were recorded over the telephone conversations." 26 RR 9. Mr. Shettle admitted he was "under an order not to proceed with those until [he] got permission from the Court" and then requested the court's pretrial order be lifted and he be permitted to mention those recordings in opening and introduce them as well. 26 RR 9-10.

Despite the court's pretrial ruling and the lack of advance notice by prosecutors as to which statements they intended to use to impeach Petitioner, counsel did not object to the use of these phone calls to cross-examine Mr. Granger in the guilt phase of trial. Had counsel demanded such notice, as the court's pretrial ruling entitled him to have, he could have objected to and prevented the use of many of these harmful statements as improper character evidence that was well beyond the scope of direct examination. Counsel could have no reasonable basis for failing to object to this harmful line of questioning, particularly in light of the fact that they had successfully sought preclusion of such evidence prior to trial. *See United States v. Wolf*, 787 F.2d 1094, 1099-1101 (7th Cir. 1986)

(counsel's failure to object to improper cross-examination of defendant constituted ineffective assistance of counsel, which, in combination with counsel's other errors, denied defendant a fair trial).

### D. Counsel's Failure to Adequately Investigate and Prepare Lyndon Granger, Which Resulted in the Admission of More Damaging Than Helpful Evidence, Was Deficient Performance

Wearing prison garb, Petitioner's brother Lyndon Granger testified for the defense that he was in Jefferson County Jail awaiting trial on charges of indecent assault on a child, his niece Samantha Granger. 22 RR 88-89, 98. He explained that he and his brother Ulysses had initially faced similar charges in Harris County, but that those charges were dropped and shortly thereafter he was arrested in Jefferson County. 29 RR 99.

Lyndon's testimony that he, Petitioner, and his brother Ulysses were all charged with sexually assaulting Petitioner's daughter served no purpose at the guilt phase of this murder trial. It was not relevant to disproving any of the elements of first-degree murder and only prejudiced Petitioner, providing further evidence that Petitioner had motive to kill Samantha and her mother Claudia to avenge the havoc her allegations had brought upon him and his brother.

Moreover, Lyndon's direct testimony opened the door to devastating cross-examination. The prosecutor, without objection from counsel, asked about statements Lyndon had purportedly made to fellow inmate R.J. Jackson. These statements included Lyndon's purported admission that he had fondled and had oral sex with Samantha and his belief that he had gotten away with it because it was over ten years earlier. 29 RR 104-05.

Counsel had filed a pretrial motion requesting a list of all the State's witnesses and requesting production of impeachment evidence. *See* 5 RR 31-33. Although this motion was denied by the court, as it pertained to lay witnesses, the prosecution voluntarily provided Mr. Cribbs with a pretrial letter listing all the witnesses it intended to call during Petitioner's trial. *See* A0816-19. R.J. Jackson was not on that list and counsel did not appear to be aware of this witness and/or his proposed tes-

timony. The State never did present the testimony of Mr. Jackson. Given that Mr. Jackson was not on the State's voluntarily provided witness list, counsel should have anticipated the State did not plan to call him and objected to this line of questioning on the grounds it was based solely on inadmissible hearsay.

To the extent counsel were notified of this witness prior to trial, although there is no indication they were, their failure to interview this witness and discover this damning evidence was deficient performance. Moreover, given the irrelevant and prejudicial nature of Lyndon's testimony, which only opened to the door to this harmful cross-examination, counsel's decision to present Lyndon Granger was objectively unreasonable.

### E. Counsel's Failure to Object to the Prosecutor's Improper Closing Argument Was Deficient Performance

Trial counsel made no objection as the prosecution made repeated improper arguments in closing. The State repeatedly and explicitly disparaged Petitioner, referring to him as evil, disgusting, a liar, and "incapable" of showing empathy, sympathy, or remorse. *See* 24 RR 31 (without objection, State argues Mr. Granger is "incapable" of empathy); 29 RR 34 (without objection, State argues Petitioner bragged rather than show remorse); 29 RR 49 (over objection, State refers to Mr. Granger as an "evil creature" and an "evil person" and then asks: "Is he even a person?"); 29 RR 56 (without objection State refers to Petitioner as "the personification of the evil that we deal with in the criminal justice system"); 29 RR 49 (without objection, State argues that Petitioner "has more than the guts of a skydiver to come in here and lie to your faces"); 29 RR 55 (without objection prosecutor says: "I don't want to look him in the eye. He's disgusting."). Such disparaging comments, having no basis in the evidence and including the prosecutor's personal assessment of the defendant's credibility, had no place in closing argument. *United States v. Drummond*, 481 F.2d 62, 63-64 (2d Cir. 1973) (holding that characterization of the accused's defense as "preposterous" and calling the defendant and his witnesses "liars" was misconduct); *State v. Graves*, 668 N.W.2d 860, 881-83 (Iowa 2003)

(counsel ineffective for failing to object and move for mistrial when prosecutor repeatedly accused defendant of being liar); *Williams v. State*, 803 A.2d 927, 930 (Del. 2002) (holding prosecutor's remarks characterizing the defendant as lying were "patently improper"); *State v. Davis*, 61 P.3d 701, 710 (Kan. 2003) ("It is improper for a prosecutor to accuse a defendant of lying.").

In contrast, the State commented on the victim's upstanding character and implicitly her comparative worth: "This is about Minnie Sebolt (displaying photo), a very fine lady. You know someone like Minnie. And I wish I knew Minnie, but I don't get that chance." 24 RR 30. Personal comments on the victim's character and comparisons between the defendant and victim's comparative worth are improper. *Payne v. Tennessee*, 501 U.S. 808, 823 (1991) ("As a general matter, victim impact evidence is not offered to encourage comparative judgments . . . .").

The State improperly asked the jury to convict Petitioner based on a number of things that had nothing to do with an objective assessment of the evidence and an impartial determination that this evidence established, beyond a reasonable doubt, all of the elements of first-degree murder. First the State appealed to the jurors' anger, asking them to convict out of anger in response to Petitioner's purportedly untruthful testimony. 24 RR 51-52 (with objection, State argues: "for him to perpetrate that fraud on you   is—that's enough reason right now to be so angry that you—"). Second, the State requested that the jury convict and sentence Petitioner to death because of his purported "lack of sympathy, empathy and remorse." Third, the State, while referencing a Bible verse, explicitly told the jury to throw impartiality aside and convict based solely on its outrage at the crime and its empathy for the victim:

> Your time of impartiality is at an end. It is time to make a stand about what is acceptable, what is not, what is right, what is wrong. It is time to have empathy for those that have been injured and hurt.
>
> . . .
>
> But the wisdom of Solomon says let's ask the other side. What if Minnie was your aunt, your mother, your daughter, your sister, your friend that you were helping out

at the courthouse? What would you expect a jury of your peers to do? Would you expect to hold him accountable? I know you would.

24 RR 31-32. Finally, the State appealed to the jurors' fears, arguing that Mr. Granger should be convicted to protect the citizens of Jefferson County, emphasizing that if he wasn't convicted he would be walking out of courtroom a free man—in lock step with the jurors. 24 RR 50 (over objection, State argues: "if [the law of transferred intent] doesn't [apply in this case], he, along with you, walks out of this courtroom"); 24 RR 58 (without objection States argues: "Bartholomew Granger needs to be convicted of capital murder to protect the good people of Jefferson County").

Impartiality is a fundamental requirement of a fair trial and the introduction of extraneous factors diverted the jury from its duty to decide the case on the facts alone. *Caldwell v. Mississippi*, 472 U.S. 320, 336 (1985). The State's repeated requests to set aside impartiality and convict based on fear of Mr. Granger, empathy for the victim, and feelings of outrage "so infected [Petitioner's] trial with unfairness as to make [his] resulting conviction a denial of due process." *United States v. Mendoza*, 522 F.3d 482, 493 (5th Cir. 2008) (quoting *DeChristoforo*, 416 U.S. at 643).

Even where individual remarks by themselves do not create a due process violation, their cumulative effect may do so. *Berger v. United States*, 295 U.S. 78, 89 (1935) (misconduct was not "slight or confined to a single instance, but . . . was pronounced and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential"); *see also Floyd v. Meachum*, 907 F.2d 347, 355 (2d Cir. 1990) (cumulative effect of prosecutor's improper remarks in closing argument, including vouching for the credibility of a witness and disparaging the defense, violated due process where the only curative instruction was the standard instruction that counsel's arguments are not evidence).

Counsel did not object to the majority of these offensive and improper arguments. In light of the blatant impropriety of the prosecutor's arguments, which explicitly instructed the jury to set aside its impartiality and convict on emotive grounds totally unrelated to the evidence and made

comparisons between the worthiness of the victim and the defendant, counsel could have no reasonable basis for failing to object and seek corrective instructions and a mistrial. And counsel's deficiency prejudiced the defense, as described below.

### F. Petitioner Suffered Prejudice as a Result of Counsel's Combined Failures

Before the defense presented its case, which consisted of the irrelevant and prejudicial evidence set forth *supra*, there was a reasonable probability that given the chaos of the scene and the number of people who fired their weapons, the jury would have had a reasonable doubt as to whose bullet killed Ms. Sebolt. The defense evidence and argument not only took away that doubt, it also biased the jury against Petitioner and very likely offended jurors' sensibilities by attacking the veracity and character of some very sympathetic victims.

To make matters worse, the State exploited counsel's deficient preparation and presentation of evidence and a defense at every turn. In closing argument the prosecutors made repeated references to the sexual assault charges Petitioner faced, including repeated references to him as an "accused child molester" and mockingly, but accurately, characterized his defense as being "Samantha Jackson needed killing." Likewise, the prosecutor made extensive reference to the content of the phone calls used to cross-examine Mr. Granger and argued extensively about Petitioner's having taken the rap name Mr. Hyde:

> It is incredibly ironic that this man, during the course of the time that he was free on this earth, adopted the name Mr. Hyde. That just is so evilly ironic, because those of you who know that story . . . it was all about the evil side of the human spirit and how it dominated the good Dr. Jekyll. Mr. Hyde was a beast, an absolute personification of everything that was evil in the human psyche. And, in fact, he was so evil and so powerful that he overcame the good in Dr. Jekyll and in a last desperate grasp at sanity, Dr. Jekyll took his own life to keep Dr. Hyde—Mr. Hyde from—from being released on the world, released on the population. It's just incredibly ironic that he considers himself Mr. Hyde, 'cause he is. He is the personification of evil that we deal with in the criminal justice system.

24 RR 56. But for counsel's deficient performance—including the presentation of overtly harmful evidence—the State would not have had the fodder with which to make these arguments. Thanks to

the defense, it did. As a result of counsel's collective failures and errors throughout the guilt phase of trial, confidence in the jury's verdict at both phases of trial is undermined.

As the guilt-phase evidence was incorporated into the penalty phase of trial, the jury's consideration of the improper evidence and argument set forth above violated Petitioner's Sixth, Eighth, and Fourteenth Amendment rights to effective assistance of counsel and a fair and reliable sentencing proceeding.

### G. State Habeas Counsel Ineffectiveness

None of these claims were raised in state habeas proceedings. State habeas counsel's ineffectiveness for failing to raise these meritorious ineffective-assistance-of-trial-counsel claims in state habeas proceedings, alone and in combination with other instances of their ineffectiveness, excuses any default the State may allege. *See Trevino*, 569 U.S. at 429 (acknowledging that state postconviction counsel's ineffectiveness, in failing to raise an arguably meritorious claim of trial-counsel ineffectiveness, can provide cause to excuse default in federal court).

## XII. PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL AND A FAIR TRIAL AND SENTENCING AS A RESULT OF COUNSEL'S HANDLING OF THE BALLISTICS EVIDENCE, INCLUDING PRESENTATION OF HARMFUL EXPERT TESTIMONY AND FAILURE TO OBJECT TO THE STATE'S PRESENTATION OF FALSE TESTIMONY AND OVERSTATED CLOSING ARGUMENT

Counsel's handling of the ballistics was sorely deficient, and in certain respects, overtly harmful. As a result of counsel's deficient performance, and their failure to remain loyal to their client and zealously advocate on his behalf, confidence in the jury's verdict was undermined.

### A. Relevant Facts

Petitioner admitted that on March 14, 2012, he fired his weapon with the intent of shooting his daughter Samantha, but he denied firing in the direction of his ex-wife Claudia and adamantly denied that any of the bullets he fired shot or killed Ms. Sebolt. 23 RR 29-30, 34. Petitioner testified that he had no intent whatsoever to harm Ms. Sebolt and expressed remorse over the fact that she

was killed in the cross-fire. 23 RR 55.

It is undisputed that dozens of law enforcement officers and civilians fired their weapons, many from a location at or near the entrance to the courthouse. *See, e.g.*, 18 RR 162-63 (Beaumont Police Chief Jim Singletary testifying that there was a full scale immediate response once shooting began and that sixty to seventy officers responded to the crime). In total, nine law enforcement officers, a bailiff, and an unknown number of civilians fired at least sixty-three bullets during the incident. *See* A0868 (nine police officers' weapons were fired during the altercation and submitted for testing); A0822-29.

There were no bullets recovered from Ms. Sebolt's body, as the two gunshot wounds were through and through. 21 RR 21-23. As a result, ballistics evidence was unable to definitely determine what caliber of bullet(s) caused her fatal injuries.

Petitioner's defense was that the State had failed to prove that the bullets Petitioner fired killed Ms. Sebolt. *See* 24 RR 17-23 (arguing that it was a chaotic day with lots of people firing guns; ballistics people test only what was sent to them; no one could say which bullet fragment hit Ms. Sebolt; government failed to prove its case). Relative to this issue, the State's firearms examiner and medical examiner testified, and the defense presented the testimony of Dr. Lee Ann Grossberg.

Robert Baldwin, the State's firearms examiner, testified that numerous bullet jacket fragments (items 11B, 11C, 11D, 14, 16B, 16D, 17A, 17B, and 17C) and numerous cartridge casings (items 12A-12F and items 13A-13D) were fired from Petitioner's Beretta. 21 RR 87-90. Cross-examination established that the source of some of the ballistics evidence collected could not be identified. *Id.* at 95.

Dr. Lisa Funte, the medical examiner who conducted the autopsy of Minnie Sebolt, testified that Ms. Sebolt was shot two times, once in the left thigh and once in the right knee. She created a diagram of the body reflecting these gunshot wounds. 21 RR 18-20 (State's Ex. 93, the diagram, was

admitted into evidence). Based upon examination of the wounds, she testified that both bullets entered the victim's body *from the front* and exited out the back. *Id.* at 19-20. She further testified that both gunshot wounds were perforating, meaning the bullets passed through the body, and as a result, no bullets were recovered during the autopsy. *Id.* at 21-22. Dr. Funte determined that the cause of death was multiple gunshot wounds. *Id.* at 25. She did not provide any testimony about where the bullets that caused Mr. Sebolt's injuries came from.

Dr. Lee Ann Grossberg, the forensic pathologist hired by the defense, testified that after reviewing the autopsy report, autopsy photographs, and video surveillance of the shooting, she reached opinions regarding the victim's wounds and the cause of death. 23 RR 147-48. At that point, the prosecutor requested a hearing pursuant to Rule 705 of the Texas Rules of Evidence. *See* Tex. R. Evid. 705 (permitting an adverse party to examine an expert about underlying facts and data, outside the presence of the jury, before the expert testifies to opinions). At that hearing, Dr. Grossberg testified that, contrary to Dr. Funte's conclusion and testimony, the fatal bullets entered the victim's left thigh and right knee *from the back* and exited through the front—which was consistent with the bullets' coming from the street where Petitioner was, not from the courthouse. *See* 23 RR 155.

Before the hearing was completed, Mr. Makin asked to question the witness further, stating: "Your Honor, just to clarify—and because *I want full disclosure here.*" 23 RR 155. Then he proceeded to ask Dr. Grossberg if she had an opinion about where the bullet that caused Ms. Sebolt's fatal injury came from:

> Q: Dr. Grossberg, you talked about the . . . Dr. Funte having the entry and exits wound reversed, right?
>
> A: That is my opinion, yes.
>
> . . .
>
> Q. Okay. And reason and common sense tells you that, if you're correct, where did the bullet come [from] that went in there and lacerated her vein?

A.     If—*if I'm correct, then the bullet would have come from the street.*

Q.     Okay. And if Dr. Funte is correct, where did the bullet come from?

A.     *If Dr. Funte was correct in saying that the entry wound was in the front, then the bullet must have come from inside the courthouse.*

. . .

Mr. Makin: Your Honor*, I just wanted to clarify that. I wasn't sure the State got that.*

23 RR 156-57. Not surprisingly, the prosecutor agreed to presentation of her testimony. *Id.* at 159.

Following this hearing, Mr. Makin inquired if "Dr Grossberg is going to be allowed to testify as a—to give opinions?" 23 RR 59. The prosecutor responded, "We have no objections, your Honor, to her testifying regarding her expert opinion." *Id.*

Back in the presence of the jury, trial counsel continued with his direct examination. Dr. Grossberg explained her opinions, including that the bullet that caused the fatal wound to Ms. Sebolt's thigh entered from the back and exited from the front. 23 RR 164. Counsel questioned Dr. Grossberg further, purposefully eliciting her harmful opinion that the gunshots must have come from the street where Petitioner was standing:

Q.     Okay. *And if the gunfire were to have come from where you say the wounds were, where would that gunfire have come from*?

A.     *From the street.*

Q:     Okay. And if the entry and exit wounds as found by Miss—Dr. Funte are correct, where would that gunfire have had to come from?

A.     I have to correct when I say "the street." *I meant the street side of the—of where they were standing*—

Q.     Uh-huh

A.     —not necessarily the street. And, then if Dr. Funte was correct and the entrance was in the front, based on the body positioning in the video, the gunshot—the gunfire must have come from inside the courtroom [sic]—

Q.     Okay.

A.     —courthouse.

*Id.* at 165.

**B.      Deficient Performance**

Counsel committed numerous errors respecting the ballistics evidence and Dr. Grossberg's testimony. There was no reasonable strategic basis for any of them.

> **1.      Counsel Failed to Highlight Helpful Evidence and Elicited Very Damaging Evidence**

The only real issue for the defense at the guilt phase was whether Petitioner's bullet(s) caused Ms. Sebolt's fatal injuries. As evident from counsel's questioning of a number of State witnesses and closing argument, this appeared to be counsel's chosen defense. *See* 18 RR 162-63 (cross of police chief); 19 RR 27-28 (cross of eyewitness); 20 RR 41-42 (cross of eyewitness); 24 RR 17-23 (closing argument). Counsel's handling of the ballistics evidence was sorely deficient, ultimately doing far more harm than good for this defense.

First, counsel missed the opportunity to highlight physical evidence that supported the chosen defense. While they elicited from the State's expert testimony that there was ballistics evidence that was unidentifiable or not suitable for comparison, they failed to elucidate that this unidentifiable evidence consisted of bullet fragments, four in total, that were located near the entrance to the courthouse. *See* Item 16A—one bullet fragment—recovered from in front of courthouse dedication sign not suitable for comparison; item 17B and 17C—one lead fragment and two metal fragments retrieved from "front of courthouse pole" submitted as bullets, but not suitable for comparison (A0863-70 (recovered evidence); A0848-61 (Jefferson Cty. Firearms Report); A0841-45 (Harris Cty. Firearms Report)).

Moreover, trial counsel allowed Mr. Baldwin to testify inaccurately that bullet jacket fragments identified as 17B and 17C were fired from Petitioner's Beretta, when in fact laboratory testing was unable to identify the source of these fragments. 21 RR 87-90. Had counsel corrected this false testimony and provided this additional information, they would have had a concrete basis to support

their chosen defense that the source of the bullets that killed Ms. Sebolt was unclear, and that these bullets very well could have come from a police officer's firearm. Such evidence would have foreclosed the prosecutor from overstating the ballistics evidence as he did in closing argument. *See* 24 RR 33.

Further, Dr. Funte's testimony and the State's case in chief studiously avoided eliciting the evidence indicating that since the bullets entered the front of Ms. Sebolt's body they must have come from the direction of the courthouse. Defense counsel deficiently failed to elicit that helpful evidence and then inexplicably elicited harmful testimony from their own expert that the gunshots entered the back of Ms. Sebolt's body and thus came from the street—where Petitioner was located when he shot his weapon.

Despite obtaining a clear understanding of Dr. Grossberg's opinions and ultimate conclusion at the Rule 705 hearing, which squarely contradicted the defense that counsel was presenting, counsel presented her testimony to the jury and inexcusably made "sure the State got that." 23 RR 157. Counsel's actions fell below any objective standard of reasonableness and violated the duty of loyalty to the client. *See United States v. Vasquez*, 298 F.3d 354, 360 (5th Cir. 2002); *Beets v. Scotts*, 65 F.3d 1258, 1265 (5th Cir. 1995).

### 2.    Counsel Failed to Prepare Dr. Grossberg to Testify

While counsel hired Dr. Grossberg to look into potential forensic and medical issues in the case and provided her with voluminous materials, they did little else. They did not guide her review of those materials, or highlight for her the issues of interest. According to Dr. Grossberg, she spoke substantively with counsel only one time over the phone for twenty minutes and one time in person—outside the courtroom just before she took the stand. 23 RR 156; A0363 (Grossberg Decl. ¶ 4).

Although there was a pretrial order indicating that expert opinions did not need to be con-

veyed before the witness took the stand, Dr. Grossberg testified that she conveyed her opinions *to prosecutor Shettle* before the trial began. *See* 5 RR 36-39 (pretrial ruling that only name and address of expert witness was required to be provided before expert testified); *see also* 23 RR 150 (Dr. Grossberg testified that she previously spoke with prosecutor Shettle on the phone); A0363 (Grossberg Decl. ¶ 5). Prior to trial, counsel never instructed Dr. Grossberg that she was not required to share her opinions with any prosecutors or other State agents, unless and until she took the stand. In fact, counsel authorized her to do just the opposite.

Further, counsel's lack of preparation and consultation with their own expert led them to overlook her mistaken testimony as to the location of the fatal entry and exit wound to the thigh. As Dr. Grossberg's own notes reflect, the trajectory of the fatal bullet to the thigh was definitely front to back, not back to front as she testified. A0363 (Grossberg Decl. ¶ 6). This conclusion was consistent with the State's evidence and would have resulted in her uncontested conclusion that the fatal bullet came from the courthouse, not Petitioner's direction. A0363 (Grossberg Decl. ¶ 8) ("I stand by my testimony that, if the entrance wounds were on the front of her body, she would have been shot from the direction of the courthouse, not the street."). Trial counsel was so unprepared and unfamiliar with her opinions and her notes that they failed to correct her error. Counsel's actions were objectively unreasonable.

### 3. Counsel Failed to Object to the Prosecutor's Overstatement in Summation

Finally, counsel failed to object and seek a corrective instruction when the prosecutor in closing argument overstated the ballistics evidence. The prosecutor argued in closing:

> The ballistics nail 'em. Every single slug that was found in the courthouse, the one behind Minnie, the one inside that pole in front of Minnie, the one by the newspaper, the one inside the courthouse that went through the shattered windows, all those match this gun (displaying), State's 73, which witness after witness said they saw him holding and firing, which when the police arrested him they took off of him, which that ballistics expert that he referred to said matched those slugs.

24 RR 33. This was not accurate. In fact, the ballistics reports in this case showed that four bullet fragments located in or near the courthouse entrance could not be traced to anyone's weapon. This included one bullet fragment recovered from inside the courthouse in front of the courthouse dedication sign and three fragments retrieved from the front of courthouse pole. *See* reference to items 16A, 17B and 17C (A0863-70 (recovered evidence); A0848-61 (Jefferson Cty. Firearms Report); A0841-45 (Harris Cty. Firearms Report)). Despite the overstated and inaccurate nature of the prosecutor's closing argument, counsel did not object. Counsel's failure to object to the prosecutor's misconduct was also deficient.

### C. Prejudice

Petitioner was prejudiced as a result of counsel's deficient performance. But for counsel's failure to show that the physical evidence was consistent with his chosen defense, counsel's presentation of Dr. Grossberg's clearly harmful testimony, and the prosecutor's overstated closing argument, there is a reasonable probability that the jury would have had reasonable doubt as to the origin of the bullets that killed Ms. Sebolt and found Petitioner not guilty of capital murder.

Just as trial counsel stood by and let the State's witness testify incorrectly, without emphasizing the helpful aspects of the evidence, once more, they failed to correct Dr. Grossberg, who was mistaken about the location of the entry and exit wounds, as her own notes reflected. Had counsel noted and corrected Dr. Grossberg's erroneous testimony, which Mr. Makin could have done at the Rule 705 hearing outside the presence of the jury, her conclusions would have been supportive of Petitioner's defense rather than contrary to it.

Counsel's deficient performance in handling the ballistics evidence, in combination with their other failures throughout the guilt phase of trial, *see* Claim XI, undermines confidence in the jury's verdict. As the guilt-phase evidence was incorporated into the penalty phase, this error also undermines confidence in the jury's verdict at the penalty phase.

### D. State Habeas Counsel Ineffectiveness

None of these claims were raised in state habeas proceedings. State habeas counsel's ineffectiveness for failing to raise these meritorious ineffective-assistance-of-trial-counsel claims in state habeas proceedings, individually and cumulatively, excuses any default the State may allege. *See Trevino*, 569 U.S. at 429.

### E. The Prosecutor Knowingly Presented False Testimony

The State's presentation of exaggerated and false argument on an important and contested guilt-phase issue—the origin of the bullets found near the body—violated *Napue v. Illinois*, 360 U.S. 264, 269 (1959). The United States Supreme Court has long recognized that "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Id.*; *see also United States v. Agurs*, 427 U.S. 97, 103 (1976). "[T]here is . . . [a] reasonable likelihood that the false testimony could have affected the judgment of the jury" and Petitioner must receive relief on these grounds alone. *Agurs*, 427 U.S. at 103.

### XIII. PETITIONER'S RIGHT TO DUE PROCESS WAS INFRINGED WHEN THE PROSECUTOR CALLED HIM A "MURDERING SON OF A BITCH" DURING GUILT-PHASE CROSS-EXAMINATION, AND HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL WAS INFRINGED BY THE FAILURE OF TRIAL COUNSEL TO OBJECT OR SEEK A MISTRIAL

When prosecutor Ed Shettle cross-examined Petitioner at the guilt phase, the following exchange occurred:

Q. Why did you bring that to Beaumont?

A. I don't even remember bringing it.

Q. That's a— you know, that's a pretty convenient answer.

A. Well, that's the only answer I have. How is it convenient?

Q. 'Cause you can't remember. It's like being in the bathroom when the crime's committed, isn't it?

A. Excuse me?

Q.     It's like being in the bathroom when the crime's committed; you didn't see a thing.

A.     You say it's really convenient for me?

Q.     Sure, it's convenient.

A.     Why is it that people automatically assume that I'm lying? Why—why isn't my word good enough?

Q.     You want me to answer that question?

A.     Yeah, answer it.

Q.     Because you're a murdering son of a bitch. That's why.

A0799-A0800. The court then admonished Mr. Shettle: "Okay. Let's not use that kind of language." A0800. The court intervened on its own, but trial counsel did not object or seek a mistrial to preserve the issue.

The prosecution's duty in a criminal prosecution "is not that it shall win a case, but that justice shall be done." *Berger*, 295 U.S. at 88. As part of this duty, a prosecutor is required to avoid improper argument to the jury. Because of the prosecutor's prominent courtroom role as the State's representative, jurors are predisposed to give great deference to the prosecutor's words, and improper prosecutorial arguments "are apt to carry much weight . . . when they should properly carry none." *Id.* "The Government's representative may prosecute with earnestness and vigor—indeed he should do so. But while he may strike hard blows, he is not at liberty to strike foul ones." *Diaz Carreon*, 915 F.2d at 956 (quotation omitted). Mr. Shettle's outburst was an emotion-fueled argument, not professional cross-examination, and when a prosecutor's argument infects the trial with unfairness, due process is violated. *DeChristoforo*, 416 U.S. at 643; *United States v. Murrah*, 888 F.2d 24, 27 (5th Cir. 1989).

Here, the prosecutor engaged in badgering and name-calling. "Badgering and interrupting a witness[ and] name-calling . . . are tactics so deplorable as to define the term 'prosecutori-

al misconduct.'" *Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000). What's more, Mr. Shettle himself should have been more aware than most of the wrongfulness and the consequences of improper conduct in front of the jury, as his inflammatory comments before the jury in a prior capital case caused the reversal of the conviction. In that case, his improper argument was held to be reversible error. *Wilson v. State*, 938 S.W.2d 57, 58 (Tex. Crim. App. 1996), *abrogated in irrelevant part by Motilla v. State*, 78 S.W.3d 352 (Tex. Crim. App. 2002). The appellate court held that "[i]t is axiomatic that the State may not strike at a defendant over the shoulders of his counsel or accuse defense counsel of bad faith and insincerity" and that "the argument was outside the record, manifestly improper, harmful and prejudicial to the rights of the accused." *Id.* at 60. Accordingly, the court overturned the conviction. *Id.* at 62.

Mr. Shettle thus knew what kind of conduct violates a defendant's rights, but he called Petitioner a murdering son of a bitch anyway. This was a foul blow that infected the trial with unfairness, in violation of Petitioner's due process rights, as it "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637. Trial counsel were ineffective for failing to object or request a mistrial and thus preserve this issue. U.S. Const. amends. VI & XIV; *Strickland*, 466 U.S. at 693.

**The State-court Opinions.** Direct-appeal counsel raised a prosecutorial-misconduct claim based on Mr. Shettle's calling Petitioner a murdering son of a bitch, but the court rejected this claim because trial counsel failed to object, so the claim was not preserved for review. *Granger v. State*, No. AP-77,017, 2015 WL 1875907, at *3 (Tex. Crim. App. Apr. 22, 2015). State habeas counsel raised trial counsel's ineffectiveness for failure to preserve this claim, but the state court rejected the claim—along with all Petitioner's other ineffective-assistance-of-counsel claims—by summarily declaring that

> applicant fails to meet his burden under *Strickland v. Washington*, 466 U.S. 668 (1984), to show by a preponderance of the evidence that his counsel's representation fell be-

low an objective standard of reasonableness and that there was a reasonable probability that the result of the proceedings would have been different but for counsel's deficient performance.

*Ex parte Granger*, 2017 WL 3379285, at *4.

Counsel has a duty to raise reasonable objections. *Dretke*, 420 F.3d at 495-96 (failure to object deficient, where it was unreasonable and could not be recast as a strategic decision); *Riddle*, 288 F.3d at 717 (failure to object deficient where there was no reasonable tactical basis for so failing). Counsel's failure to object here is inexplicable. Had counsel objected, it is reasonably probable that the objection would have been sustained and that the jury, having not been infected by the prosecutor's outrageous commentary, would have found Petitioner not guilty. Had counsel moved for a mistrial, it is reasonably probable that the motion would have been granted. The state court's conclusion to the contrary unreasonably applies *Strickland*, 466 U.S. at 693. Petitioner is entitled to a new trial.

Alternatively, Petitioner is entitled to a new penalty-phase proceeding because Mr. Shettle's outrageous commentary necessarily had substantial and injurious effect on the jury's punishment deliberations. *Brecht*, 507 U.S. at 637.

The prejudice that arises from instances of prosecutorial misconduct must be considered cumulatively, not just individually. *See, e.g.*, *Kyles v. Whitley*, 514 U.S. 419, 437-38 (cumulative prejudice from state's failure to reveal multiple pieces of exculpatory evidence undermined fairness of trial and entitled defendant to relief); *Berger*, 295 U.S. at 89 (misconduct was not "slight or confined to a single instance, but . . . was pronounced and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential"). Each instance of prosecutorial misconduct described above and in Claim X deprived Petitioner of due process; cumulatively, all the more so. Similarly, the deficiency of failing to object or move for a mistrial prejudiced Petitioner at both the guilt and penalty phases, both alone and cumulatively with other deficiencies. *Strickland*, 466 U.S. at

694 (prejudice assessed from combined effect of "counsel's unprofessional errors"). State habeas counsel raised the cumulative prejudice of counsel's failure to object to some of the prosecutors' improper arguments; the state court rejected this claim by summarily declaring that Petitioner had failed to meet his *Strickland* burden. *Ex parte Granger*, 2017 WL 3379285, at \*4. The state court's conclusion unreasonably applies *Strickland*, 466 U.S. at 693. Petitioner is entitled to habeas relief.

## XIV. BECAUSE BARTHOLOMEW GRANGER'S BRAIN DAMAGE AND PSYCHOSIS—DEFECTS BEYOND HIS CONTROL—ARE MORALLY INDISTINGUISHABLE FROM INTELLECTUAL DISABILITY, HE IS CATEGORICALLY INELIGIBLE FOR THE DEATH PENALTY, AND HIS COUNSEL WERE INEFFECTIVE FOR FAILING TO MAKE THAT CLAIM.

In *Atkins v. Virginia*, 536 U.S. 304 (2002), the Supreme Court considered whether the punishment of death for intellectually disabled[11] offenders was "excessive," or disproportionate to their crimes. *Id.* at 311. To make this judgment, it applied not the standards that prevailed in seventeenth-century England or upon the adoption of the Bill of Rights in the eighteenth-century United States but "'the evolving standards of decency that mark the progress of a maturing society.'" *Id.* at 311-12 (quoting *Trop v. Dulles*, 356 U.S. 86, 100-101 (1958)). It first reviewed the "objective" evidence of an evolving societal consensus, observing that numerous state legislatures had prohibited capital punishment for the intellectually disabled and that death sentences for such offenders were increasingly infrequent even in states that permitted it, that "organizations with germane expertise" had spoken out against it, and that polling data reflected "widespread consensus . . . that executing the mentally retarded is wrong." 536 U.S. at 312-17 & n.21.

This objective evidence, while important, was not dispositive. The Constitution, the Court held, required it to exercise its "own judgment" about whether there was "reason to disagree with" the societal consensus. *Id.* at 312-13. It found:

---

[11] *Atkins* and some of the other cases cited in this claim use the then-current term "mentally retarded." Practitioners in the field now generally use the term "intellectually disabled."

> Mentally retarded persons frequently know the difference between right and wrong, and are competent to stand trial. Because of their impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others. There is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders. Their deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability.

*Id.* at 318.

These deficiencies prevented either of the traditionally recognized justifications for capital punishment from applying to intellectually disabled offenders. First, the Court's "narrowing" jurisprudence, which restricts the society's most extreme retributive sanction of death to the most serious offenders, necessarily excluded them. "If the culpability of the average murderer is insufficient to justify the most extreme sanction available to the State, the lesser culpability of the mentally retarded offender surely does not merit that form of retribution." *Id.* at 319.

Similarly, the Court found that, because deterrence applies only to premeditated and deliberate murders, imposing the death penalty on the intellectually disabled could not promote that goal:

> [I]t is the same cognitive and behavioral impairments that make these defendants less morally culpable— for example, the diminished ability to understand and process information, to learn from experience, to engage in logical reasoning, or to control impulses— that also make it less likely that they can process the information of the possibility of execution as a penalty and, as a result, control their conduct based upon that information.

Thus, the Court's "independent evaluation" of the issue yielded no reason to disagree with the objective indicia of societal consensus it had reviewed. It concluded that Atkins's death sentence constituted cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. *Id.* at 321.

Since *Atkins,* informed observers have increasingly recognized that other severe mental dis-

orders are morally indistinguishable from mental retardation. In 2006, the American Bar Association adopted a resolution providing in relevant part:

> Defendants should not be executed or sentenced to death if, at the time of the offense, they had a severe mental disorder or disability that significantly impaired their capacity (a) to appreciate the nature, consequences or wrongfulness of their conduct, (b) to exercise rational judgment in relation to conduct, or (c) to conform their conduct to the requirements of the law.

Am. Bar Ass'n, Resolution 122A (Aug. 7-8, 2006), *reprinted in* 30 Mental & Physical Disabilities L. Rev. 668 (Sept.-Oct. 2006). The American Psychiatric Association, the American Psychological Association, and the National Alliance of the Mentally Ill had previously adopted this resolution in identical form. *Id.* at 668.25.[12]

Several experienced jurists, faced with the excruciatingly difficult duty of reviewing death sentences imposed on severely mentally ill defendants, have concluded that the categorical exclusion of *Atkins* should not be limited to the intellectually disabled. In *Corcoran v. State*, 774 N.E.2d 495 (Ind. 2002), Justice Rucker, citing *Atkins* and dissenting, wrote:

> There has been no argument in this case that Corcoran is mentally retarded. However, the underlying rationale for prohibiting executions of the mentally retarded is just as compelling for prohibiting executions of the seriously mentally ill, namely evolving standards of decency. . . . I would hold that a seriously mentally ill person is not among those most deserving to be put to death. To do so in my view violated the Cruel and Unusual Punishment provision of the Indiana Constitution.

*Id.* at 502-03; *accord State v. Scott*, 748 N.E.2d 11, 20 (Ohio 2001) (Pfeifer, J., dissenting)

---

[12] All three of these organizations, and the National Mental Health Association, had previously taken official stances against capital punishment for persons with severe mental illness. *See* Nat'l Mental Health Ass'n, News Release, NMHA Announces Position on Death Penalty (Apr. 3, 2001), http://www1.nmha.org/newsroom/system/news.vw.cfm?do=vw&rid=276; Nat'l Alliance for the Mentally Ill, Press Release, No Death Penalty for Persons with Severe Mental Illnesses (Jan. 12, 1998), http://www.nami.org/Template.cfm?Section=Press_Release_Archive; *see also* Am. Psychiatric Ass'n, Moratorium on Capital Punishment in the United States (2000) (basing support for moratorium in part in effect of capital punishment on the mentally ill), http://www.psych.org/edu/other_res/lib_archives/archive/2006.pdf.

("evolving standards of decency" should preclude execution of defendant who has chronic schizophrenia, a medical disease); *see also State v. Ketterer*, 855 N.E.2d 48, 81-87 (Ohio 2006) (Stratton, J., concurring) (citing ABA resolution, and concluding that "[t]he time has come for our society to reexamine the execution of persons with severe mental illness"). Other jurists have voiced similar reservations in other contexts, as have representatives of religious communities, the European Union, and the United Nations Commission for Human Rights. *See* Laurie T. Izutsu, Note, *Applying* Atkins v. Virginia *to Capital Defendants With Severe Mental Illness*, 70 Brook. L. Rev. 995, 1007-10 & nn.86-103 (2005) (collecting references). National polling data, too, reflect increasing public opposition to the execution of those with severe mental impairments. *Id.* at 1010-11 & nn.105-16.

In summary, Justice Stevens's reasons for declaring the execution of the intellectually disabled unconstitutional apply equally to those who, like Bartholomew Granger, suffer serious mental illness: "Because of their disabilities in areas of reasoning, judgment, and control of their impulses . . . they do not act with the level of moral culpability that characterizes the most serious adult criminal conduct." *Atkins*, 436 U.S. at 306.

This Court should declare Bartholomew Granger ineligible for the death penalty because his conditions undermined his moral culpability, and because his conditions originated in his biology, not his choice. The Court should therefore grant the writ on this ground.

## XV. PETITIONER'S DEATH SENTENCE IS INCONSISTENT WITH THE EVOLVING STANDARDS OF DECENCY THAT MARK THE PROGRESS OF A MATURING SOCIETY

Petitioner's death sentence is unconstitutional under the Eighth and Fourteenth Amendments to the United States Constitution because capital punishment defies evolving standards of decency, operates arbitrarily, fails to serve any valid penological purpose, and inflicts torture. There is a national trend towards abolition, and nation's the death penalty is excessive, is out of step with the

international community's consensus against the death penalty, and has failed to ensure reliability, consistency, and equal protection of the law.

Texas sentenced Petitioner to death under an arbitrary process that failed to limit the death penalty to the worst offenders and instead channeled and fostered discrimination on the basis of race. *Furman v. Georgia*, 408 U.S. 238, 242, 256 (1972) (Douglas, J., concurring); *id.* at 274 (Brennan, J., concurring); *id.* at 310 (Stewart, J., concurring); *id.* at 311-14 (White, J., concurring); *id.* at 364-65 (Marshall, J., concurring). Petitioner's death sentence and continued confinement deprive him of his rights to due process, equal protection, and freedom from the infliction of torture and cruel and unusual punishment, as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution; decisional law and other mandatory rules; and international law as set forth in treaties, customary law, and international human rights law. Petitioner's death sentence is also unconstitutional because he has been and will continue to be confined for a gratuitously long time under torturous, inhumane conditions.

Justices of the Supreme Court have increasingly opined that the delay that accrues between a capital prisoner's conviction and his execution violates the Eighth Amendment in light of existing standards of decency because it subjects the prisoner to—in addition to violent forfeiture of life and the anticipation thereof—the endurance of many years of living under sentence of death under extraordinary psychological duress and extreme physical and social conditions and restrictions. *Glossip v. Gross*, 135 S. Ct. 2726, 2756, 2764-72 (2015) (Breyer, J., dissenting); *Davis v. Ayala*, 135 S. Ct. 2187, 2208-10 (2015) (Kennedy, J., concurring); *Thompson v. McNeil*, 556 U.S. 1114, 1114 (2009) (Stevens, J., respecting denial of certiorari); *Lackey v. Texas*, 514 U.S. 1045, 1045 (1995) (Stevens, J., same).

The conditions of confinement on Texas's death row are draconian: at the Polunsky Unit, inmates under sentence of death are automatically and permanently housed in solitary confinement. Burke Butler, *Solitary Confinement on Texas's Death Row*, in The Liman Report 15-16 (Fall 2014). For

two days a week, inmates are confined to steel-door-enclosed cells twenty-four hours each day, with only a few minutes outside their cells to shower. The other five days per week, inmates are permitted a maximum of two hours per day in a recreation area—a cage slightly larger than their cells. Dave Mann, *Solitary Men*, Tex. Observer, Nov. 10, 2010, https://www.texasobserver.org/solitary-men/. Glass separates visits, as both visitor and prisoner communicate by telephones bolted to the wall. Inmates receive no educational programming, and outside ministerial and spiritual advisers may visit only at the warden's discretion. These conditions of confinement dangerously impair inmates' mental health—there have been several suicides and suicide attempts in recent years on Texas's death row. Eric Dexheimer, *Texas Prison Suicide Rate High Among Inmates in Isolation*, Austin American-Statesman, May 25, 2013, http://www.mystatesman.com/news/news/crime-law/texas-prison-suicide-rate-high-among-inmates-in-is/nX3xK/ (recounting seven suicides on death row at the Polunsky Unit, 2004-13).

It is well established that what is constitutionally tolerable under the Eighth Amendment is not static. "The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop*, 356 U.S. at 100-01. And of course, "the Clause forbidding 'cruel and unusual' punishments 'is not fastened to the obsolete but may acquire meaning as public opinion becomes enlightened by a humane justice.'" *Gregg*, 428 U.S. at 171 (quoting *Weems v. United States*, 217 U.S. 349, 378 (1910)).

**The State-court Opinions.** Trial counsel substantially raised this claim in a pretrial motion, 2 Supp. CR 198-267, but the trial court denied the motion, 5 RR 29, and direct-appeal counsel failed to raise this issue on direct appeal. State habeas counsel likewise substantially raised this claim, but the Texas Court of Criminal Appeals concluded that the claim was "procedurally barred because habeas is not a substitute for matters which should have been raised on direct appeal." *Ex parte Granger*, 2017 WL 3379285, at *4.

The doctrine of procedural default is judge-made law designed "to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism." *Martinez*, 566 U.S. at 9. The doctrine imposes a bar on federal review of claims that "a state court declined to hear because the prisoner failed to abide by a state procedural rule." *Id*. But the bar may be applied only if "the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed." *Id*. (citations omitted). Texas's "rule" of disallowing claims in state habeas that could have been raised on direct appeal is neither firmly established nor consistently followed and so does not bar federal habeas review. *Ex parte Carter*, 521 S.W.3d 344, 359-60 (Tex. Crim. App. 2017) (Alcala, J., dissenting) (describing how the "rule" is not a rule: it is neither firmly established nor consistently followed). Petitioner is entitled to a new penalty hearing.

## XVI. THE PRESENTATION OF EVIDENCE OF "EXTRANEOUS" CONDUCT VIOLATES THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS

Under Article 37.07 and Article 37.071, the State is permitted wide latitude to introduce evidence of "extraneous" offenses during the penalty phase. The State may introduce "any other evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible, regardless of whether he has previously been charged with or finally convicted of the crime or act," Art. 37.07, § 3 (a)(1), including "an extraneous crime or bad act that has not resulted in a final conviction in a court of record or a probated or suspended sentence," Art. 37.07, § 3(g). Normal evidentiary rules are relaxed during the penalty phase, so that the State may introduce "any evidence the court deems relevant to sentence." Art. 37.071, § 2 (a)(1). The "extraneous" evidence may be considered by the jury in deciding both of the special issues.

The presentation of extraneous conduct to support a finding of the first special issue violates

the Fifth Amendment's presumption of innocence and the Sixth Amendment's jury trial guarantee and creates a risk of arbitrary and unreliable capital sentencing in violation of the Eighth and Fourteenth Amendments. The Supreme Court has held that death-eligibility factors are the functional equivalent of elements of a greater offense and must be found by the jury beyond a reasonable doubt. *Ring v. Arizona*, 536 U.S. 584, 609 (2002). This sentencing scheme, however, permits the prosecution to offer evidence of unadjudicated offenses and charges that did not lead to a conviction, and does not require the jury to find beyond a reasonable doubt that the defendant is guilty of those offenses before the jury may consider them in deciding the special issues. Instead, the jury must decide the first special issue, a broad question about "continuing threat to society," beyond a reasonable doubt; the jury may also consider the extraneous offenses in considering the second special issue. This collective consideration of unadjudicated offenses and charges that have not led to a conviction invites arbitrariness into the capital sentencing decision, because there are no procedural safeguards attached to the extraneous offenses.

This issue was raised by the defense pretrial, 2 Supp. CR 437-45, but the trial court denied the motion, 5 RR 40. Neither appellate counsel nor state habeas counsel raised this claim. Though trial counsel had moved pretrial to preclude such evidence, when the prosecutor included prior bad acts in closing argument at the penalty phase, A0808; A0809-12; A0814, trial counsel did not object, nor did they object when the court instructed the jury,

> The State has introduced evidence of extrinsic crimes or bad acts other than the one charged in the indictment in this case. This evidence was admitted only for the purpose of assisting you, if it does, in determining the proper punishment for the offense for which you have found the defendant guilty. You cannot consider the testimony for any *other* purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other acts, if any, that were committed.

A0806. This instruction tells the jurors they may not consider such evidence for purposes *other than* determining the proper punishment; the instruction thus tells the jurors, by omission, that they *can* consider such evidence in determining punishment even if they do *not* believe Petitioner committed

the act or acts beyond a reasonable doubt. Thus, the jurors were permitted, in making their future-dangerousness determination, to consider evidence not proven beyond a reasonable doubt. Failing to object to this instruction was deficient; because the jurors' consideration of extraneous bad acts without the understanding that such acts needed to be proven beyond a reasonable doubt resulted in an unconstitutional death sentence, trial counsel were ineffective. *Strickland v. Washington*, 466 U.S. 668, 693 (1984). Moreover, trial counsel's failure to preserve the issue foreclosed any opportunity to secure relief on appeal. There is a reasonable probability that, if preserved, the claim would have garnered appellate relief. State habeas counsel were ineffective for failing to raise this claim. *Trevino*, 569 U.S. at 429. State habeas counsel's deficiency in failing to raise this meritorious claim prejudiced Petitioner both alone and cumulatively with other deficiencies. *Martinez*, 566 U.S. at 14 (discussing the necessity of a habeas court's hearing substantial ineffective-assistance-of-counsel claims otherwise defaulted by attorney "errors" in initial-review collateral proceeding).

## XVII. THE JURY'S DETERMINATION OF SPECIAL ISSUE ONE LACKED THE GUIDED DISCRETION REQUIRED BY THE EIGHTH AND FOURTEENTH AMENDMENTS, BECAUSE THE TERMS OF THE QUESTION ARE VAGUE AND UNDEFINED, AND THE USE OF "PROBABILITY" UNDERMINES THE STATE'S BURDEN OF PROOF

### A. The "First Special Issue" is Unconstitutionally Vague, and Fails to Provide the Constitutionally Required Guided Discretion to the Sentencing Jury

Neither the Texas capital sentencing statute nor the required jury charge define the terms "probability," "criminal acts of violence," or "continuing threat to society." *See* Tex. Code Crim. Proc. art. 37.071, § 2(b)(1).[13] This contravenes the Eighth Amendment principle that a state's aggra-

---

[13] To illustrate the vagueness of the term, the Texas Court of Criminal Appeals has held both that "society" means prison society, to which any life- or death-sentenced prisoner would be confined, *and*, conversely, that it includes society at large. *Compare Berry v. State*, 233 S.W. 3d 847 (Tex. Crim. App. 2007) (vacating death sentence for lack of sufficient evidence of future dangerousness where defendant is dangerous only toward her own children, and it is "very unlikely" she will have more children while sentenced to life imprisonment), *with Martinez v. State*, 327 S.W. 3d 727, 735 (Tex. Crim. App. 2010) (future dangerousness special issue would be satisfied if defendant would be a threat "whether in or out of prison").

vating factors may not be defined in such a way that people of ordinary sensibilities could find that nearly every murder meets the stated criteria. *Godfrey v. Georgia*, 446 U.S. 420, 428-29 (1980).

Moreover, the use of "probability" in an issue that the jury is instructed to determine beyond a reasonable doubt improperly lessens the State's burden to prove the aggravating factors beyond a reasonable doubt, which is required by the Sixth Amendment. *See Ring v. Arizona*, 536 U.S. 584, 602-09 (2002).

### B.     The State-court Opinion

This issue was raised by trial counsel, 2 RR 305-12, but the trial court denied the motion, 5 RR 31, and direct-appeal counsel failed to raise this issue on direct appeal. State habeas counsel, however, raised this issue, but the Texas Court of Criminal Appeals concluded that the claim was "procedurally barred because habeas is not a substitute for matters which should have been raised on direct appeal." *Ex parte Granger*, No. WR-83,135-01, 2017 WL 3379285, at *4 (Tex. Crim. App. May 17, 2017), *cert. denied sub nom. Granger v. Texas*, 138 S. Ct. 470, 470 (2017). For the reasons given in Claim XV, this adjudication does not bar this Court's review of this claim.

## XVIII. PETITIONER'S RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WERE VIOLATED BECAUSE THE TRIAL COURT DID NOT INSTRUCT THE JURY THAT A VOTE FOR LIFE BY ONE JUROR WOULD RESULT IN A LIFE SENTENCE

The Texas capital sentencing scheme, on its face and as applied to Petitioner, violates the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

### A.     The Trial Court Instructed the Jury that Ten Votes Were Required for a Life Sentence, but Did Not Inform the Jury a Vote for Life by One Juror Would Result in a Life Sentence

Under Texas law, up to three special issues are submitted to the jury during the sentencing phase of a capital trial: (1) whether there is a probability that the defendant constitutes a continuing threat to society; (2) whether the defendant actually caused, intended, or anticipated the death of the

deceased;[14] and (3) whether, considering all of the evidence, there are sufficient mitigating circumstances to warrant life without parole rather than death. Tex. Code Crim. Proc. art. 37.071, § (2)(b)(1)-(2), (e)(1).

A defendant is to be sentenced to death if the jury answers "Yes" on the first issue and "No" on the third issue. If the jury returns a "No" answer to the first special issue or a "Yes" answer to the third issue, or if the jury is unable to answer all the questions submitted to them under the statute, the court shall sentence the defendant to life without parole. Tex. Code Crim. Proc. art. 37.071, § 2(g).

The Texas sentencing statute requires the jury to receive inaccurate, incomplete instructions about the requirements for a life sentence. It requires the jury be instructed: (1) that the prosecution must prove the first special issue beyond a reasonable doubt; (2) the jury shall return a verdict of "Yes" or "No" on the first special issue; the jury may not return a "Yes" verdict unless it is unanimous, and it may not return a "No" verdict unless ten or more jurors agree. Tex. Code Crim. Proc. art. 37.071, § 2(c) & (d). Petitioner's jury was so instructed. A0912; A0916.

The instructions required by the statute on the third special issue, the mitigation question, are similar. The statute requires the jury to be instructed: (1) the jury shall return an answer of "Yes" or "No"; (2) the jury may not return a "No" unless it is unanimous and may not return a "Yes" unless at least ten jurors agree. Tex. Code Crim. Proc. art. 37.071, § 2(e)(2). Petitioner's jury was so instructed on the mitigation question. A0916.

The statute expressly bars the jury from being instructed that if the jury is unable to reach a unanimous or at-least-ten verdict on either of the special issues, the trial court is required to sentence the defendant to life in prison. Tex. Code Crim. Proc. art. 37.071, § 2(a) (barring instruction on

---

[14] This special issue was not at issue in Petitioner's case. Petitioner's jury was given only the first and third statutory issues, which the trial court referred to as issues one and two.

the effect of a failure to agree); § 2(g) (life sentence required if jury is unable to agree). The trial court complied with the statute, and did not inform the jury that a life sentence would be imposed if the jury was unable to agree.

The statute and the confusing instructions created a farcical scenario in which the opposite of "unanimous" is "ten people agree." Deliberations in a jury room on a death sentence could reach multiple outcomes that fall into neither category: a vote of nine to three, eight to four, seven to five, and so on. However, juries are given no instruction on how to proceed if that likely scenario plays out. Instead, jurors are instructed that, in order to make the predicate findings that would result in a sentence of life imprisonment, "ten (10) or more jurors [must] agree." A0916. Thus, the statute requires that the jury instructions tell a lie. The truth is that if even one juror would answer the third issue "Yes" and all eleven others would answer it "No," that finding would also result in a sentence of life imprisonment.

The instruction thus violates *Mills v. Maryland*, 486 U.S. 367, 384 (1988). As in *Mills*, a reasonable juror would be compelled to understand the jury charge to mean that her single vote for life imprisonment would have no effect. *Id.* at 375-76. Indeed, Petitioner's jury was instructed that it "may not answer" special issue number two "Yes" (mitigation warrants a life sentence) "unless ten (10) or more jurors agree." A0916. This is precisely the kind of ambiguity that the Constitution does not tolerate in a capital sentencing scheme. *Lockett v. Ohio*, 438 U.S. 586, 605 (1978) ("[T]he risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty . . . is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments."); *Andres v. United States*, 333 U.S. 740, 752 (1948) ("That reasonable men might derive a meaning from the instructions given other than the proper meaning . . . is probable. In death cases doubts such as those presented here should be resolved in favor of the accused.").

The statute and instructions also create an unconstitutional risk of jury coercion, wherein the

jurors perceive that they must reach a certain result. *See Jenkins v. United States*, 380 U.S. 445, 446 (1965).

This portion of the jury instruction, which suggests that it requires the agreement of ten out of twelve jurors to find "No" on the first special issue and to find "Yes" on special issue two, unconstitutionally diminished each juror's individual sense of responsibility in the sentencing process in violation of the Eighth Amendment. The plain language of the statute creates the impression that one juror's dissent from the remaining members of the jury would be insufficient to make a difference in the determination of either of these special issues or the ultimate sentence the jury imposes. For this reason, this instruction is also a violation of *Caldwell v. Mississippi*, 472 U.S. 320, 328-29 (1985). Moreover, capital sentencing instructions amount to constitutional error if "there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990). And, by actively misleading potential holdout jurors (even a large majority of holdouts fewer than ten) to believe their individual votes would not change the outcome, the instruction injects arbitrariness and unfairness into the penalty phase, in violation of Petitioner's right to due process. *See Simmons v. South Carolina*, 512 U.S. 154 (1994) (misleading penalty-phase jury instructions violate due process); *see also Jones v. United States*, 527 U.S. 373, 417 (1999) (Ginsburg, J., dissenting) (to make out a constitutional violation, "[i]t should suffice that the potential to confuse existed, *i.e.*, that the instructions could have tilted the jury toward death"); *People v. LaValle*, 817 N.E.2d 341, 359 (N.Y. 2004) (coercive jury instruction violates due process clause of state constitution). The lies these instructions told the jury "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637.

## B.     The State-court Opinion

Trial counsel moved pretrial to have the 10-12 Rule declared unconstitutional, 2 CR Supp.

344-70, but the trial court denied the motion, 5 RR 31, and direct-appeal counsel failed to raise this issue on direct appeal. State habeas counsel, however, raised the unconstitutionality of the 10-12 Rule, but the Texas Court of Criminal Appeals concluded that the claim was "procedurally barred because habeas is not a substitute for matters which should have been raised on direct appeal." A0149; *see Ex parte Granger*, 2017 WL 3379285, at *4. For the reasons given in Claim XV, this adjudication does not bar this Court's review of this claim.

## XIX. THE TRIAL COURT'S INSTRUCTIONS AND THE PROSECUTOR'S ARGUMENTS LIMITED THE JURY'S ABILITY TO GIVE EFFECT TO MITIGATING EVIDENCE, IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS

The Texas capital sentencing statute defines "mitigating evidence" as "evidence that a juror might regard as reducing the defendant's moral blameworthiness." Tex. Code Crim. Proc. art. 37.071, § 2(f)(4). The statute requires the trial court to instruct the jury that, in determining whether sufficient mitigating evidence exists to warrant a life sentence, it must filter mitigating evidence through that definition. *Id.* The trial court so instructed the jury. A0917.

This instruction unconstitutionally restricted the jury's decision-making process in two ways: (1) it precluded meaningful consideration of *all* relevant mitigating evidence and, instead, required consideration only of evidence which reduces "moral blameworthiness," i.e., guilt; (2) it required the jury to consider only evidence that is linked to the defendant's "moral blameworthiness," i.e., guilt, for the capital offense. As a result, the instruction violated the Eighth and Fourteenth Amendments to the United States Constitution.

A sentence of death cannot stand if an ambiguous jury instruction fails to allow a jury to give effect to mitigating evidence that might call for a sentence other than death, *see Mills*, 486 U.S. at 375-78; *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986), so a jury must be able to consider "whatever mitigating evidence" may be presented by the defendant, including "any aspect of a defendant's character or record and any circumstances of the offense the defendant proffers as a basis for a sen-

tence less than death or record," *Lockett*, 438 U.S. at 604, 607. Relevant mitigating evidence is "evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." *Tennard v. Dretke*, 542 U.S. 274, 284 (2004).

The jury instruction likely led the jurors to believe that the only evidence they were permitted to consider as mitigating was evidence that somehow reduces the defendant's "blameworthiness" or guilt. Besides unconstitutionally restricting the type of evidence the jury could consider mitigating, the instruction also unconstitutionally required the jury to consider only mitigating evidence that was connected to the crime itself. The court instructed the jury that it could give effect only to mitigating evidence that "reduc[es] the defendant's moral blameworthiness." A0917. It is reasonably likely that the jury interpreted this instruction to mean that it could consider only evidence that reduced Petitioner's blame for the crime.

The Supreme Court has expressly disavowed limiting consideration of mitigating evidence in this manner. In *Tennard*, the Supreme Court "unequivocally rejected" any requirement that a mitigating circumstance bear a "nexus to the crime." 542 U.S. at 284.

Here, the "blameworthiness" instruction unconstitutionally precluded the jury from meaningfully considering a wide variety of evidence that may serve as a basis for a sentence less than death, despite having nothing to do with the crime or the defendant's guilt. The jury was precluded from considering evidence that may not have made Petitioner "less guilty," but nevertheless was "proffer[red] as a basis for a sentence less than death." *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982). The defense presented evidence that Petitioner was extroverted and kind towards children, and that Petitioner's father had little contact with him after his strained marriage to Petitioner's mother dissolved. A0801-02; A0806-07. Yet the jury was instructed in a way that allowed it to disregard this evidence unless it had a nexus to the offense.

The State exploited the instruction to force home the idea that the jury should not consider

much of Petitioner's mitigation case. In its closing argument, the State reinforced the idea that the "moral blameworthiness" requirement limited its consideration of mitigating evidence to evidence connected to the crime itself:

> What have you heard that reduces this man's moral blameworthiness? That's what Question No. 2's all about. What have you heard? Have you heard anything, except the pleas of his lawyers that they believe in life in prison is appropriate? But what facts have you heard that reduces his moral blameworthiness?
>
> The facts of the crime? The fact that he's a child molester? The fact that he's a murderer? The fact that he's a kidnapper? The fact that he commits aggravated assault? The fact that he is—calls himself Mr. Hyde?
>
> What did you hear in those audiotapes, those telephone calls that was mitigation, that reduced his moral blameworthiness, that he grew up in a family that caused him to be that way?
>
> My God, don't you understand that his whole family's that way? It's horrible. It's like a—it's like a cancer. It's scary.
>
> But they—they can be controlled by you—at least this man can.
>
> . . . [T]he answer to Question No. 2 is "no," because if you've heard anything good—and I—and I defy you to find something. But if you can find anything from that witness stand about that man that was good, that's gonna outweigh the bad you've heard about him?
>
> Take comfort in those questions. Anything, anything else than answering those questions according to the law and evidence is a terrible injustice.

A0814-15.

The State repeatedly told the jurors that the law required that they first determine whether purportedly mitigating evidence reduced Petitioner's "moral blameworthiness." The State thus effectively conveyed to the jurors that the law permitted them to consider evidence about Petitioner's life to reduce his guilt *only if* it was sufficiently connected to the crime.

Accordingly, there is a reasonable likelihood that the jury applied the instructions in a way that prevented its consideration of "constitutionally relevant" evidence. *Boyde*, 494 U.S. at 380. And, because the prosecution relied heavily on the instructions in arguing for death, they "had substantial

and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637.

**The State-court Opinion.** Trial counsel failed to object to this unconstitutional restriction on the jury's decision-making process. In this case, counsel followed a strategy of challenging unconstitutional aspects of the Texas death penalty statute. *See* Claim XVII. Thus, counsel could have had no reasonable strategy for failing to raise this meritorious constitutional issue. Because the statutory restriction of the jury's decision-making process resulted in an unconstitutional death sentence, Petitioner was prejudiced by counsel's deficient representation. Trial counsel were thus ineffective. Moreover, trial counsel's failure to preserve the issue foreclosed any opportunity to secure relief on appeal. There is a reasonable probability that, if preserved, the claim would have garnered appellate relief.

State habeas counsel raised this issue but did not raise prior counsel's ineffectiveness for failure to raise the claim at trial or preserve for review on direct appeal. The Texas Court of Criminal Appeals concluded that the claim was "procedurally barred because habeas is not a substitute for matters which should have been raised on direct appeal." *Ex parte Granger*, 2017 WL 3379285, at *4. For the reasons given in Claim XV, this adjudication does not bar this Court's review of this claim.

Furthermore, state habeas counsel were ineffective for failing to raise prior counsel's ineffectiveness for failure to raise the claim and for failing to argue the inadequacy of the procedural bar in support of this meritorious ineffective-assistance claim, and their ineffectiveness excuses any procedural default. *Trevino*, 569 U.S. at 429. State habeas counsel's deficiency in failing to raise this meritorious claim prejudiced Petitioner both alone and cumulatively with other deficiencies. *Martinez*, 566 U.S. at 14 (discussing the necessity of a habeas court's hearing substantial ineffective-assistance-of-counsel claims otherwise defaulted by attorney "errors" in initial-review collateral proceeding).

## XX. THE TRIAL COURT ERRED IN FAILING TO INSTRUCT THE JURY THAT MITIGATING CIRCUMSTANCES DO NOT NEED TO BE PROVEN BEYOND A REASONABLE DOUBT, VIOLATING PETITIONER'S EIGHTH AND FOURTEENTH AMENDMENT RIGHTS; TRIAL COUNSEL WERE IN-

**EFFECTIVE FOR FAILING TO MOVE FOR A PROPER INSTRUCTION OR OBJECT TO THE INSTRUCTION AS GIVEN**

The Eighth and Fourteenth Amendments require that a capital sentencing jury be able to consider and give effect to mitigating evidence in order to reach an individualized sentence:

> Indeed, it is precisely because the punishment should be directly related to the personal culpability of the defendant that the jury must be allowed to consider and give effect to mitigating evidence relevant to a defendant's character or record or the circumstances of the offense. Rather than creating the risk of an unguided emotional response, full consideration of evidence that mitigates against the death penalty is essential if the jury is to give a reasoned moral response to the defendant's background, character, and crime.

*Penry v. Lynaugh*, 492 U.S. 302, 327-28 (1989). This principle was violated in this case when the trial court instructed the jury that the burden of proof for the special issues was beyond a reasonable doubt. The jury was not instructed that mitigating circumstances need not be proven beyond a reasonable doubt. Thus, any reasonable juror would assume that the only burden of proof described in the instructions applied to all the issues to be determined at the penalty phase. This violated Petitioner's Eighth and Fourteenth Amendment rights to individualized, reliable capital sentencing.

Under Article 37.071, a capital defendant may be sentenced to death only if the jury unanimously[15] answers the first special issue (future danger) "Yes" and the second special issue (weighing mitigation) "No." The first special issue is "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Art. 37.071, § 2(b)(1). The statute requires that the prosecution prove beyond a reasonable doubt each issue submitted under the first question. Art. 37.071, § 2(c). The second special issue is: "Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without

---

[15] The constitutionality of the unanimity requirement juxtaposed with the ten-votes requirement is discussed in Claim XVIII.

parole rather than a death sentence be imposed." Art. 37.071, § 2(e)(1). The statute does not specify a burden of proof for mitigating circumstances.

Here, the trial court instructed the jury more than once that the burden of proof for the first special issue was beyond a reasonable doubt:

> The prosecution has the burden of proving that the answer to Special Issue Number 1 should be "Yes," and it must do by proving a "Yes" answer to Special Issue Number 1 beyond a reasonable doubt, and if it fails to do so, you must answer Special Issue Number 1 "No."

A0912. The court also instructed the jury that extraneous crimes or bad acts, other than the conviction in this case, "cannot [be] consider[ed] . . . for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other acts, if any were committed." A0917. The court also described the answers to both Special Issues as a "finding," further emphasizing the similarity of the jury's tasks on both issues. *Id.*

The jury received a written copy of the charge with the verdict sheet attached. The verdict sheet stated, as to the first Special Issue, "Do you find from the evidence beyond a reasonable doubt that there is a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society?" A0913. It stated, as to the second Special Issue, "Taking into consideration all of the evidence, including the circumstances of the offense, the Defendant's character and background, and the personal moral culpability of the Defendant, do you find that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed?" A0913-14. The verdict sheet was structured identically with respect to the Special Issues. *Id.* Of course, the jury had also been instructed at the guilt-innocence phase of trial that its findings had to be made beyond a reasonable doubt. A0909-11 (using the phrase "beyond a reasonable doubt" five times).

Given the charge of the court and the verdict sheet as a whole, a reasonable juror would believe that all findings, including findings of mitigating circumstances, were required to be made be-

yond a reasonable doubt. This unconstitutionally limited the jury's ability to consider and give effect to mitigating evidence. *See, e.g.*, *Lockett*, 438 U.S. at 605. Here, jurors were forced to ignore relevant mitigating evidence that they felt was not proven—or capable of being proven—beyond a reasonable doubt. That is, they could not "consider" all relevant mitigating evidence as *Lockett* and its progeny require.

Trial counsel failed to move for a proper jury charge and verdict sheet, and failed to object to the court's charge and verdict sheet. Before trial, counsel followed a strategy of challenging unconstitutional aspects of the Texas death penalty statute, *see* Claim XVIII, and counsel raised similar issues in, for instance, a Motion to Declare Article 37.071, § 2(e) and (f) of the Texas Code of Criminal Procedure Unconstitutional on Its Face, 2 Supp. CR 295-303, and a Motion to Hold Unconstitutional Tex. Code Crim. Proc. Art. 37.071 Sec. 2(e) and (f) - Burden of Proof, 2 Supp. CR 314-19. Thus, counsel could have had no reasonable strategy for failing to raise this meritorious constitutional issue. Because the jury charge and verdict sheet resulted in an unconstitutional death sentence, Petitioner was prejudiced by counsel's deficient representation. Moreover, trial counsel's failure to preserve the issue foreclosed any opportunity to secure relief on appeal. There is a reasonable probability that, if preserved, the claim would have garnered appellate relief. State habeas counsel were subsequently ineffective for failing to raise this meritorious ineffective-assistance-of-trial-counsel claim, and their ineffectiveness excuses any default. *Trevino*, 569 U.S. at 429. Trial counsel's failure in this instance prejudiced Petitioner both alone and cumulatively with other deficiencies. *Strickland*, 466 U.S. at 694 (prejudice assessed from combined effect of "counsel's unprofessional errors"). Similarly, state habeas counsel's deficiency in failing to raise this meritorious claim prejudiced Petitioner both alone and cumulatively with other deficiencies. *Martinez*, 566 U.S. at 14 (discussing the necessity of a habeas court's hearing substantial ineffective-assistance-of-counsel claims otherwise defaulted by attorney "errors" in initial-review collateral proceeding).

## PRAYER FOR RELIEF

WHEREFORE, Petitioner prays that this Court:

Permit Petitioner to amend the motion, if warranted, permit Respondent to file an answer, and allow Petitioner reasonable time to file a reply, according to a schedule that Petitioner will request by separate motion; and permit Petitioner to file any additional legal memoranda or briefs that may be necessary to respond or reply to any defenses raised and/or motions filed by the government;

Order discovery, as Petitioner will specifically request by separate motion;

Conduct an evidentiary hearing after the completion of discovery, as Petitioner will request by separate motion;

Permit further amendment to and briefing of the motion if the fact-development procedures so warrant, and allow reasonable time for briefing the merits of grounds asserted in the motion and any amendments thereto, after discovery is complete and an evidentiary hearing is conducted;

Grant Petitioner habeas relief from his conviction and death sentence; and

Grant such additional relief as may be necessary and to which Petitioner may be entitled.

Respectfully submitted,

/s/ Peter Walker
PETER WALKER
CLAUDIA VAN WYK
Asst. Federal Defenders
Federal Community Defender for the
Eastern District of Pennsylvania
Curtis Center – Suite 545 West
601 Walnut Street
Philadelphia, PA 19106
(215) 928-0520
Peter_Walker@fd.org
TX Bar #24075445
PA State Bar #315693

Dated: May 11, 2011

## CERTIFICATE OF SERVICE

I, Peter Walker, hereby certify that on this 11th day of May 2018, I served the foregoing on the following person via the Electronic Case Filing System:

Gwendolyn S. Vindell
Assistant Attorney General
Office of the Attorney General
Criminal Appeals Division
P.O. Box 12548, Capitol Station
Austin, TX 78711-2548

/s/ Peter Walker
Peter Walker

Dated: May 11, 2018