**UNITED STATES DISTRICT COURT**　　　　　**EASTERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| BARTHOLOMEW GRANGER, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| *versus* | § | CIVIL ACTION NO. 1:17-CV-291 |
| | § | |
| DIRECTOR, TDCJ-CID, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM OPINION AND ORDER

Petitioner Bartholomew Granger ("Granger"), a death row inmate confined in the Texas Department of Criminal Justice, filed the above-styled and numbered petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He challenges his 2013 capital murder conviction and death sentence imposed by the 58th Judicial District Court of Jefferson County, Texas, in Cause Number 13-16388; *The State of Texas vs. Bartholomew Granger*. *Ex parte Granger*, No. WR-83,135-01, 2017 WL 3379285, at *1–2 (Tex. Crim. App. May 17, 2017) ("*Ex parte Granger I*"); *Ex parte Granger*, No. WR-83,135-02, 2020 WL 915434, at *1 (Tex. Crim. App. Feb. 26, 2020) (*Ex parte Granger II*). Granger was indicted (#48-3 at 6) and sentenced to death for killing Minnie Sebolt ("Sebolt") while retaliating against and intending to kill Claudia Jackson ("Claudia") due to her service as a witness in Granger's prior trial for sexual assault of a child.[1] For the reasons set forth below, the court finds that the petition should be **DENIED**.

---

[1]　　　Granger was not indicted or tried for attempting to kill Samantha Jackson ("Samantha") or Rebecca Richard ("Richard") in Cause No. 13-16388.

I.    Background

The Texas Court of Criminal Appeals ("TCCA") summarized the factual background of

the case as follows:

> The record shows that, at the time of Seboldt's[2] [sic] death, [Granger] was on trial
> for sexual assault of a child—his then-twenty-year-old brain-damaged and learning-
> disabled daughter, Samantha Jackson.  Samantha and her mother, Claudia Jackson,
> had testified against [Granger] on Tuesday, March 13, 2012.  Samantha's cross-
> examination was to begin when trial resumed at 1 p.m. on Wednesday, March 14,
> and Rebecca Richard, [Granger]'s estranged wife, was under subpoena to testify.
>
> [Granger] arrived at the courthouse several hours early on Wednesday and parked
> his truck in a lot across the street.  He periodically opened the truck's door and
> looked over it toward the street in front of the courthouse.  When Samantha,
> Claudia, and Richard arrived and began walking toward the courthouse, [Granger]
> approached and began shooting at them with a semi-automatic rifle.
>
> Richard fled toward the parking lot and was not hit.  Samantha, however, froze in
> place when the shooting began.  [Granger] shot her multiple times and also ran
> over her with his truck before fleeing the scene.  Nonetheless, Samantha survived.
> Claudia, who also survived the attack, was shot in the buttocks as she ran toward
> the courthouse.  As she approached the courthouse, Claudia saw a bystander, later
> identified as Sebolt, lying on the ground in front of the courthouse doors.  Sebolt
> suffered multiple gunshot wounds and died at the scene.  Leslie King, another
> bystander who was in front of the courthouse, saw [Granger] turn his gun in her
> direction.  King was wounded in the little finger as she heard bullets going past
> her.
>
> Law enforcement officers shot and wounded [Granger] as he returned to his truck.
> [Granger] fled a short distance, then abandoned his vehicle and took hostages at a
> nearby business.  He made a number of statements in which he incriminated
> himself as the shooter and blamed Samantha, Claudia, and Richard for his actions.
> Law enforcement officers took [Granger] into custody after his hostages
> overpowered him.  [Granger] made additional incriminating statements while
> receiving medical care for his wounds.
>
> [Granger] testified at both phases of his capital murder trial.  At the guilt-innocence
> phase, he admitted to shooting Samantha and to intentionally running over her with
> his truck.  However, he denied causing Sebolt's death or Claudia's and King's

---

[2]    The TCCA's recitation of the facts repeatedly misspells Sebolt's name.  The court will correctly spell Sebolt's
name in this section and the section that follows without notation.

wounds.  [Granger] claimed that he had not shot in the direction of the courthouse because he had used all of his bullets on Samantha.  The jury found [Granger] guilty of capital murder as alleged in the indictment.

*Ex parte Granger I*, 2017 WL 3379285, at *1–2.

In addition to the facts of the crime presented during the guilt phase at trial, the State presented evidence at the punishment phase of the trial to demonstrate Granger's future dangerousness:

> During the State's punishment case, the jury heard in graphic detail from Samantha [Jackson] that [Granger] began sexually molesting her when she was twelve years old because "he would rather show [her] how to have sex than let [her] go out on the streets and do it with someone else"; that he first had vaginal intercourse with her when she was about fourteen or fifteen; and that he also had anal intercourse with her.  Samantha additionally testified that [Granger] was very controlling of her and that he physically and verbally abused both her and her younger brother, Bartholomew, Jr.  Samantha denied that her mother, Claudia [Jackson], had told her to accuse [Granger] of molestation.

> [Rebecca] Richard testified that, before she and [Granger] separated, he asked her to take Samantha to the doctor.  [Granger] explained to Richard that Samantha had taken a shower while Richard was not home.  "[H]e had a towel on the floor in the bedroom where he had ejaculated and [Samantha] came in and grabbed the towel and went to dry off," and so [Granger] was afraid that she was pregnant.  Richard acknowledged that Samantha denied that anyone had touched her and that she had not turned out to be pregnant.  However, Richard and [Granger] separated soon after the incident.

> The State also presented testimony from three jail guards and a jail nurse who had interacted with [Granger] while he was incarcerated awaiting trial for capital murder.  Collectively, these witnesses testified that [Granger]:  was extremely verbally abusive, directing racist, misogynistic, and homophobic epithets at them; engaged in other disruptive behavior that required jail[e]rs [to] use physical force and chemical measures to subdue him; and falsely alleged that other inmates had assaulted him by throwing their feces on him.

> The jury additionally heard excerpts from numerous profanity-laced telephone calls [Granger] made from jail while awaiting trial.  During these calls, [Granger] expressed threats, hatred, and a lack of remorse regarding virtually everyone associated with his sexual assault trial—especially Samantha and her mother—as well as hatred toward many other groups.

*Ex parte Granger I*, 2017 WL 3379285, at *1–2.

Conversely, the defense presented nine witnesses, including Granger, in mitigation of punishment.  *See* 27 Reporter's Record ("RR") 7–127; 28 RR 13–72.  The TCCA summarized the remaining punishment evidence as follows:

> Dr. Edward Gripon, a forensic psychiatrist who examined [Granger] multiple times as the date of the capital murder trial approached, testified that [Granger] was not psychotic.  However, Gripon agreed that [Granger]'s thoughts and ideas were not always reasonable, logical, or coherent.
>
> Gripon, who diagnosed [Granger] as having a paranoid personality disorder, testified that having a personality disorder was a factor that psychiatrists use when attempting to determine someone's risk of future dangerousness.  Gripon also acknowledged that [Granger]'s jail phone calls were filled with ranting, threats, name-calling, and cursing.  But on balance, Gripon concluded, [Granger] "was mostly a lot of talk."  Gripon acknowledged that the courthouse shooting was an exception and reflected the violence of which [Granger] could be capable in certain circumstances.  However, Gripon opined that [Granger]'s primary pattern was a verbal response to people and events he perceived negatively.
>
> An inmate who had been housed near [Granger] while [Granger] was awaiting his capital murder trial testified that:  [Granger] acted "normal" in jail; although [Granger] tried to leave other inmates alone, they harassed him; jail guards treated [Granger] badly; and [Granger] cursed at guards sometimes, but did not assault them.  Another inmate who had been housed with [Granger] gave substantially similar testimony.  However, on cross-examination, the second inmate acknowledged that he heard [Granger] admit to having sexually molested Samantha.  The inmate's testimony about [Granger]'s admission was consistent with Richard's punishment phase testimony.[3]
>
> Through the testimony of a pastor who visited [Granger] weekly in jail, trial counsel presented evidence that [Granger] "hated what had happened to" Sebolt.  However, the pastor acknowledged that [Granger] never admitted that he killed Sebolt and he continued to express hatred for Samantha, Claudia, and Richard.
>
> Through his direct examination testimony and the testimony of his parents, [Granger] presented evidence of his social history from birth through adolescence and adulthood.  Through their questions, trial counsel also traced [Granger]'s educational, work, medical, and psychological history.  At the end of his direct examination, [Granger], who had testified at the punishment phase against trial

---

[3]   According to the inmate, [Granger] admitted that he had called his daughter to come over to his house, had her take a shower, masturbated while she did so, and when she finished showering and he finished masturbating, he and one of his brothers molested her.

counsel's advice, gave non-responsive answers in which he stated that he wanted to receive the death penalty.

On cross-examination, [Granger] also stated that he wanted the death penalty. And, among other things, he denied having killed Sebolt and blamed the responding officers for her death; called Samantha a "liar" and "a whore"; and declared "[t]his is not a fucking court.  This is a lynching of another nigger" by "a[n] all-white jury" with "one fucking jigaboo bitch."  When the trial court called a recess and had him removed from the courtroom, [Granger] directed several mocking and profane remarks at the prosecutor while the jury was still present.

[Granger]'s testimony remained generally combative, profane, and mocking when his cross-examination resumed.  He accused the State of having mounted a "witch hunt" against him with the sexual assault charges and "then when shit happens, then everybody want[s] to get upset with me."  When his testimony ended, [Granger] continued to be obstreperous and mocking in the jury's presence, stating "Giving me liberty or give me death.  That's what I want" and laughing aloud.

During the State's closing arguments, [Granger] displayed to the jury a legal pad with the word "Death" written on it.  After he interrupted the State's argument several times and disregarded the trial judge's admonitions to remain quiet, [Granger] was removed from the courtroom and taken to a holding cell, where he stayed for the rest of the argument.  While the prosecutor continued his argument, [Granger] made loud noises from the holding cell that were audible inside the courtroom and prompted a response from courtroom bailiffs.

*Ex parte Granger I*, 2017 WL 3379285, at *2–3.

II.    Procedural History

Granger was convicted and sentenced to death for capital murder.  Clerk's Record ("CR")

19–21.  The TCCA affirmed Granger's conviction and sentence on direct review.  *Granger v. State*, No. AP-77,017, 2015 WL 1875907, at *1 (Tex. Crim. App. Apr. 22, 2015).  Granger did

not seek certiorari review.  While the direct appeal was pending, Granger filed a 115-page state

habeas application raising ten claims for relief.  1 SHCR-01[4] at 27–114.  The trial court entered

---

[4]     "SHCR-01" refers to the State Habeas Transcript compiled by the state court in Granger's initial state habeas proceeding, preceded by volume number and followed by page reference.  Supplemental transcripts will be denoted as "SHCR-01.Supp." with the supplemental number appended at the end of the citation.  Similarly, "SHCR-02" refers to the transcript compiled by the state court in Granger's subsequent state habeas proceeding, followed by the page number.

findings of facts and conclusions of law recommending denial of relief.  SHCR-01.Supp.2 at 329.
The TCCA denied relief based upon the findings and conclusions of the trial court, their own
review of the record, and their independent findings and conclusions.  *Ex parte Granger I*, 2017
WL 3379285, at *5.  The United States Supreme Court denied Granger a writ of certiorari.
*Granger v. Texas*, 138 S. Ct. 470 (2017).

Granger filed his initial federal habeas petition on May 11, 2018.  (#11).  Pursuant to the
court's scheduling order, he filed an amended federal habeas petition on December 17, 2018.  (#s
15 and 20).  Two months after filing his amended petition, Granger filed a motion to stay and
abate his federal habeas proceedings so that he could exhaust twelve unexhausted claims in state
court.  (#22).  The court granted Granger's request on September 23, 2019.  (#34).

Granger returned to state court to file a second-in-time or successive state habeas
application.  SHCR-02 at 20–147.  The TCCA dismissed the application as an abuse of the writ.
*Ex parte Granger II*, 2020 WL 915434, at *1.

Upon return from state court, Granger filed his second amended petition for federal habeas
corpus relief.  (#44).  The Director filed his response on December 2, 2020.  (#53).  Granger filed
a Reply on May 27, 2021.  (#61).

III.    Grounds for Relief

Granger brings the following grounds for relief:

1.    Trial counsels' conflicting loyalties actually affected their performance, and the
cumulative effect of their deficient performance prejudiced Granger's defense.

2.    Trial counsel were ineffective at *voir dire* for failing to challenge ten of the twelve
seated jurors as biased or otherwise unqualified to serve.

3.    Trial counsel failed to raise an Equal Protection challenge to the State's racially
disproportionate exercise of peremptory challenges.

4. Granger's rights were violated by trial counsels' retention of the court's competency expert as a punishment defense expert.

5. Trial counsel were ineffective for hiring as their lead investigator the father of a State's witness.

6. Trial counsel failed to investigate, prepare, and present readily available mental health evidence at the punishment phase of trial.

7. Trial counsel failed to investigate, develop, and present Granger's life history and background as mitigation.

8. Trial counsel failed to investigate and prepare punishment witnesses adequately, which resulted in the presentation of overtly harmful evidence.

9. Trial counsel failed to investigate and present Samantha Jackson's diary to rebut her claim that Granger sexually assaulted her.

10. The State's punishment-phase closing argument was improper.

11. Trial counsel were ineffective in their guilt-phase representation.

12. Trial counsel mishandled the State's false presentation of ballistics evidence during guilt/innocence.

13. The State improperly called Granger a "murdering son of a bitch" during Granger's guilt-phase cross-examination.

14. Granger is ineligible for the death penalty because his brain damage and psychosis are morally indistinguishable from intellectual disability.

15. His death sentence is unconstitutional because it is inconsistent with evolving standards of decency.

16. His rights were violated by the improper presentation of extraneous offense evidence.

17. The future dangerousness special issue is unconstitutionally vague.

18. The trial court was unconstitutionally prohibited from instructing the jury that a vote for life by one juror would result in a life sentence.

19. The definition of mitigating evidence is unconstitutionally restrictive.

20.    The trial court erred by not charging the jury that mitigating circumstances need not be proven beyond a reasonable doubt.

(#44 at 42–179).

IV.    <u>State Court Proceedings</u>

In order to discuss and analyze Granger's grounds for relief, the court reviewed the evidence presented at Granger's capital murder trial.  In addition to the observations made by the state courts in the rulings quoted above, this court's review of the trial transcript reveals the following:

A.    <u>The Guilt-Innocence Phase</u>

At the guilt-innocence phase of trial, the State's case against Granger consisted of testimony from the criminal trial judge overseeing Granger's sexual abuse of a child trial at the time of the shooting, numerous eyewitnesses, various police officers who responded to the scene and collected evidence, an employee of criminal defense attorney, Rife Kimler ("Kimler")[5], who spoke with Granger on the phone the night before the shooting, four people who were held hostage by Granger at a nearby business called RCI, and the medical examiner who conducted the autopsy of Sebolt.  The State also presented numerous maps of the area and the scene of the shooting, video footage of the parking lot and the courthouse entrance, the semiautomatic rifle recovered from RCI when Granger was arrested, and an apparent suicide note recovered from Granger's briefcase.

The criminal trial judge testified that Granger was on trial for a felony offense and that Granger's daughter and her mother had testified against him in that case.  The judge did not describe the nature of the offense.  18 RR 29-32.  Kimler's secretary testified that Granger called

---

[5]    Kimler represented Granger in his sexual assault of a child trial.

8

Kimler's office the night before the shooting upset about how the trial was going, wanting a change of venue, and then stating he would "take care of it tomorrow." 18 RR 43-46.

The eyewitnesses presented by the State all agreed that Granger fired in the direction of Samantha, Claudia, and Richard. The eyewitnesses agreed that Granger returned to his truck and then ran Samantha over with the truck. Many of these witnesses also testified that a passerby, Sebolt, was shot and killed at the door of the courthouse during the shooting. 19 RR 7-24 (William Anderson ("Anderson")), 19 RR 37-53 (Sheriff's Deputy Anthony Barker ("Barker")), 19 RR 59-73 (Sheriff's Deputy Donald Hayes ("Hayes")), 19 RR 77-87 (Vicki Hollingsworth ("Hollingsworth")), 19 RR 106-18 (Richard), 19 RR 140-50 (Officer John Poole ("Poole")), 19 RR 156-63 (Detective Tomora Hamilton ("Hamilton")), 19 RR 167-79 (Officer James Robichaux ("Robichaux")), 20 RR 5-16 (Attorney David Dies ("Dies")), 20 RR 23-39 (Attorney Troy Soileau ("Soileau")), 20 RR 45-62 (Claudia), and 20 RR 66-75 (Samantha). Many of the witnesses testified that they saw numerous police officers and court personnel also firing their weapons, mainly in response to shooting by Granger and mainly at his truck as he pulled away. *See, e.g.*, 19 RR 161-64 (Police Chief Jim Singletary ("Chief Singletary")), 19 RR 70-71 (Hayes).

The video footage showed Granger arriving in the parking lot across from the courthouse at approximately 7:30 a.m. and later getting out of his truck when Samantha, Claudia, and Richard left their cars and headed toward the courthouse. The video footage did not capture Granger firing his weapon, but it did capture Sebolt falling to the ground as she attempted to enter the revolving door that led to the courthouse. The video also showed Granger's truck running over Samantha. 18 RR 135-42 (State's Ex. 72A, clips from the video played for the jury).

The medical examiner testified that Sebolt was shot twice, once in her right knee and once in her left thigh. The fatal bullet entered her thigh from the front, went through her femoral vein,

and exited out the back.  21 RR 23-29.  Because both bullets exited the body, no bullet was recovered from the body.  21 RR 21-23.  Testimony of law enforcement officers established that all the bullet fragments and bullet jacket fragments recovered near the courthouse were identified as coming from Granger's weapon, numerous shell casings near the courthouse came from law enforcement weapons, ten shell casings in the street came from Granger's weapon, and other ballistics evidence (the nature and location of which were not elicited) was unidentifiable.  21 RR 74-78 (Brandy Henley ("Henley")), 21 RR 86-91, 95 (Robert Baldwin ("Baldwin")).

Witnesses at RCI and at the hospital—where Granger was taken after he was arrested—testified to numerous incriminating statements Granger made about the shooting and his intentions when he started firing, including "I tried to shoot my daughter, ex-wife and ex-girlfriend," "I wanted to kill them, if I killed anyone else I'm sorry," "How much can a man take," "they set me up," and "they treat me like a killer, I will act like one."  20 RR 175-76 (Officer Michael Custer ("Custer")), 20 RR 117-18 (Melvin Bond ("Bond")), 20 RR 186-89 (Frank Coffin, III ("Coffin, III")), and 20 RR 199 (Stuart Hanley ("Hanley")).

Granger testified that he fired at his daughter, Samantha, and ran her over with his truck, with the intent to harm her, but denied firing in the direction of Claudia or killing Sebolt.  He maintained that the police firing at him were responsible for her death.  23 RR 29-34.

The defense presented a total of eight guilt-phase witnesses.  Seven of the witnesses testified primarily about the underlying sexual assault charges for which Granger was on trial at the time of the shooting.  *See* 23 RR 20-22 (Granger's testimony about the sexual assault charges he and his brothers faced), 23 RR 88, 98-100 (Lyndon Granger's testimony about the sexual assault charges he and his brothers faced ("Lyndon")), 23 RR 111-12 (Bartholomew Granger, Jr.'s testimony that he never saw any improper sexual activity ("Bartholomew")), 23 RR at 128-31

(Vallire Ozene's testimony that the sexual assault allegations were lies ("Vallire")), 23 RR at 193-98 (Ulysses Granger, Jr.'s testimony about false accusations of rape against him, Granger, and Lyndon in Houston, Texas, and Jefferson County, Texas ("Ulysses")), 23 RR at 173-75 (Kimler's testimony confirming that Granger was on trial for the sexual assault of Samantha, that Claudia had testified the day before, and that he planned to cross-examine Samantha that day), and 23 RR at 122-26 (Shemerial Sewell's testimony that her friend, Samantha, was gullible, easily led, and never disclosed any sexual abuse ("Sewell")).

Granger's direct testimony, in addition to describing the sexual assault charges, and his rap career, 23 RR 9-12 (Granger and Lyndon rap under the names Ice Man and Cyanide and Dr. Jekyll and Mr. Hyde), included coverage of additional prior bad acts and propensity for violence. *See, e.g.*, 23 RR 15-16 (Claudia called the police alleging Granger was abusive and tried to cut her with a knife), 23 RR 29-32 (detailing the shooting and running over of Samantha at the Jefferson County courthouse and his desire to kill Claudia).   The prosecution cross-examined Granger and his brother, Lyndon.   *See* 23 RR 49-62 (cross of Granger with jail phone calls), 23 RR 104-05 (cross of Lyndon about his purported admission to fellow inmate that he sexually assaulted Samantha).

The final defense witness, forensic pathologist, Dr. Lee Ann Grossberg ("Dr. Grossberg"), testified about Sebolt's injuries and concluded that the bullets that killed her must have come from the street, where Granger was located.   23 RR 164-65; 23 RR 155 (as an offer of proof, Dr. Grossberg states her opinion on the record and in the presence of counsel before she testified).

B.    The Penalty Phase

As the jury entered the courtroom for the start of the penalty phase on May 1, 2013, Granger had an outburst:

> THE DEFENDANT:  I can't do this.  I don't care what they are.  I'm gonna tell the truth.  I can't do this.  I was lied on.  They didn't give me the opportunity.

25 RR 4.  The judge excused the jury, and Sonny Cribbs ("Cribbs"), one of Granger's trial counsel, asked the judge to appoint a psychiatrist to determine Granger's competence to go forward.  The judge indicated that he thought Granger could control himself "when he wants to." 25 RR 5.  The judge attempted to address Granger regarding his courtroom behavior during the punishment phase.  25 RR 8-9.  Outside the presence of the jury, Granger launched into a tirade, touching on a scrambled set of topics and individuals:  Granger's belief that people were "lying on me," his innocence of the sexual assault charges, his opposition to trial in Galveston where they had built the jail "on the backs of black men," his sexual impotence, the responsibility of the police for "kill[ing] the old lady," the persecution of his brother by the authorities, and the closed minds of the members of the nearly all-white jury.  25 RR 8-20.  The judge ordered Granger to be escorted from the courtroom and took a short recess.  25 RR 20.  Court resumed on the record, outside the presence of the jury.  Prosecutor Ed Shettle ("Shettle") requested permission to approach the bench.  25 RR 21.  Granger began yelling insults at Shettle.  25 RR 21.  James Makin ("Makin"), another of Granger's trial counsel, reiterated that he believed that Granger had suffered a breakdown and could no longer communicate with counsel.  Granger interrupted:

> THE DEFENDANT:  I'm controlling myself.  I'm fine.  He don't know what he talking about.  Let's proceed.  Let's move forward.  Give me liberty or give me death.  I want death.  (Yelling)  Give me fucking death.  I want it.  I rather be dead.

25 RR 21.  After one additional unproductive exchange with Granger, the judge dismissed the jurors for the day.  25 RR 25-26.

The court appointed Dr. Vincent Scarano ("Dr. Scarano") to conduct a competency assessment.  Dr. Scarano issued a report the next day, concluding that Granger could control himself and was only seeking attention.  26 RR 5-9.  The judge found Granger competent, and the trial resumed.  26 RR 5-9.  Granger apologized to the judge, the City of Galveston, and Sebolt's family, 26 RR 8, but he continued to engage repeatedly in emotional outbursts throughout the penalty phase of the trial.

The State's case for death involved evidence of Granger's jail infractions for outbursts and threats, testimony by his daughter and former wife describing his alleged sexual assaults, and excerpts of phone calls he had made from the county jail.  The jurors heard from several county jail employees about verbal insults, threats, one instance of physically resisting detention, and a purported escape plan.  The jail employees testified that Granger cursed at a female disciplinary officer, 26 RR 19 (C. T. Turner), 26 RR 74 (Bryan Jones), physically resisted while officers removed him to a detention cell for screaming and kicking the door of his regular cell, 26 RR 43 (Richard Gutierrez ("Gutierrez")), 26 RR 44 (David Leday ("Leday")), tauntingly cursed at a nurse, 26 RR 57 (Marissa Jarell ("Jarrell")), and repeatedly insulted and taunted an African American officer, 26 RR 66 (Laquintin Wilson ("Wilson")).

Samantha testified that, beginning when she was about twelve, her father engaged in acts of sexual conduct that culminated in sexual intercourse when she was fourteen or fifteen.  26 RR 87-96.  She recalled that she had kept a diary during that time.  26 RR 99.  In 2009, when she was about seventeen, her mother, Claudia, invited her to come visit for the summer and Samantha

decided to stay with her.  When Samantha broke this news to her father, he threatened her.  26 RR 97-99.  She claimed that her father was abusive and controlling and also abused her brother, Bartholomew.  26 RR 100-02.

Granger's ex-wife, Richard, described an incident in about 2003, when Granger asked her to take Samantha to the doctor because Samantha had dried off with a towel he had used to ejaculate and he was afraid she was pregnant.  Samantha was not pregnant.  When Richard inquired, Samantha denied that anyone had ever touched her inappropriately.  26 RR 122-24.

The State's case ended with a series of excerpts from tapes of phone calls by Granger, from the jail, to his mother and other family members.  Makin's objection that the excerpts were incomplete was overruled.  As part of the defense case, Makin played numerous calls in full.  26 RR 126-34.

In the defense case in chief, Granger called eight witnesses and himself—against the advice of his attorneys—to testify on his behalf.  27 RR 7-126; 28 RR 13-72.  Psychiatrist Edward Gripon ("Dr. Gripon") addressed the question of future dangerousness.

On direct examination, Dr. Gripon indicated that the opinion he had formed the year before as the court's competency expert had not changed.  27 RR 16.  During phone calls Granger had made to his family from jail, his mood varied from "reasonable emotional control" to quite agitated and upset.  Dr. Gripon recognized that "many of his thoughts or ideas are certainly not ones I would subscribe to as reasonable, logical, or sometimes coherent."  27 RR 16.  Dr. Gripon saw no evidence of psychosis.  27 RR 16.  He found that Granger had a "paranoid personality," a diagnosis that fell on Axis II, but he indicated that this was not a mental illness.  27 RR 19.  As a jail inmate, Granger may have made threats but was "mostly a lot of talk," and he could control

14

his behavior when he wanted to, despite his struggles to do so during the competency evaluation. 27 RR 20-21.

Dr. Gripon acknowledged that the murder "clearly tells you under certain circumstances what he's capable of." He would not feel comfortable seeing Granger with a loaded weapon. Because Granger had an intermittent explosive disorder, he was potentially dangerous. 27 RR 25-28. In Dr. Gripon's view, Granger suffered from an "almost uncontrolled level of internalized anger," and when he elected not to control that anger, "he can be very dangerous." 27 RR 30.

Wanda Hayes, Granger's cousin, testified that Granger had "clowned around with my boys a lot" when they were younger. She stated that she did not think he deserved to die. 27 RR 49-53. Five other witnesses—Granger's mother and father, a prison chaplain, and two fellow jail inmates—each were called to testify on Granger's behalf.

Granger testified against the advice of counsel. 28 RR 8. He touched on his parents' marriage and divorce, his mother's abusive relationships, his placement in special education classes, his sister Samantha Granger's murder, and his failure to return to school after his sister's death. 28 RR 14-27. He had a variety of jobs and suffered a number of accidental injuries, and, as a result, he needed surgery and medication for the pain. He insisted that he would rather receive the death penalty than life in prison. 28 RR 45.

Granger's response to cross-examination was argumentative and intemperate. At one point, it climaxed in a rambling tirade and his removal from the courtroom. 28 RR 52-64. The examination continued after a break, but culminated in another tirade. 28 RR 64-72. It ended:

> THE DEFENDANT: Say "Hello" to the bad guy. Give me liberty or give me death. That's what I want.

28 RR 72.

In summation, both Makin and Cribbs focused primarily, but not exclusively, on the issue of future dangerousness. 29 RR 13, 19. Specifically on future dangerousness, trial counsel told the jury that, in fourteen months at the jail, despite "all these horrible words and rants," Granger had inflicted "not one little injury." Their client was a "blowhard, a big mouth." 29 RR 15. For mitigation, counsel relied on Granger's phone calls with his mother: "All those phone calls and language are probably the most inappropriate, bigoted, vulgar, profane, sick collection of misconceptions, fantasies, unconnected thoughts and words that any of us have ever heard"; Granger "stands on [his mother's] shoulders." 29 RR 15-17. Counsel told the jurors that, although Granger was not insane or mentally ill, he was "not like us," and should be "removed from normal society. He should be locked up, and handled by professionals." 29 RR 18. Counsel concluded by advising the jury that he and his co-counsel were "kind of on the life side." 29 RR 19.

Cribbs argued that "part of the problem was the environment he was raised in," that none of the defense witnesses had "testified on his behalf," but even Cain was only banished for killing Abel. 29 RR 20-21. He asked the jurors to vote for life "even though he doesn't want it." 29 RR 22.

As prosecutor Pat Knauth ("Knauth") argued that Granger was dangerous and thanked the professionals who had kept him under control at the jail, Granger repeatedly laughed and interjected comments. 29 RR 25, 28. Prosecutor Shettle's summation provoked him further. He hooted derisively at Shettle's argument that Granger had shown no remorse and contradicted Shettle's assertion that the prosecution had proven that Granger had molested his daughter. 29 RR 31-32. He called Shettle a liar and exclaimed that one of the inmate witnesses was a "jailhouse snitch." While Shettle continued the argument, Granger wrote on a pad that he displayed to the

jury, "DEATH."   32 RR Court's Exhibit No. 2.   The judge ordered him removed from the courtroom.   Shettle maintained that the defense had not produced any evidence to mitigate Granger's culpability.   When Shettle commented on Dr. Gripon's testimony that Granger tended to lose his temper ("This is mitigation evidence that he wanted you to hear?"), and insisted that Granger was in control of his defense, those in the courtroom could hear loud noises from the holding cell.   29 RR 33-40, 42.

For the verdict, the judge had Granger returned to the courtroom, where he made more intemperate remarks before the jurors entered.   29 RR 43-44.   The jurors answered the first special question "Yes" and the second special question "No," and the judge advised Granger that he would impose a sentence of death.   29 RR 44-49.[6]   As the victim's daughter prepared to give a statement about the loss of her mother, Granger loudly insisted that he had not killed Sebolt. The judge ordered him restrained and gagged while the daughter continued her statement.   29 RR 49-55.

C.   Findings of Fact and Conclusions of Law

In addition to reviewing the evidence presented during Granger's capital trial, the court reviews the Findings of Fact, Conclusions of Law, and Order of the 58th District Court of Jefferson County, Texas, in Granger's first state habeas case, *Ex parte Granger I*.   These findings are relevant to the issues of exhaustion and ineffective assistance of counsel.   The state habeas court found:

---

[6]   In Granger's sentencing trial, two of the three special issues under Texas law were submitted:  (1) whether there is a probability that the defendant constitutes a continuing threat to society; and (2) whether, considering all of the evidence, there are sufficient mitigating circumstances to warrant life without parole rather than death.   TEX. CODE CRIM. PROC., art. 37.071(2)(b)(1)–(2), (e)(1).

FINDINGS OF FACT

1. [Granger] was convicted of capital murder in Cause No. 13-16388. The jury affirmatively answered the first Special Issue on further danger and negatively answered the second Special Issue on mitigation. Following the Jury's answers to the Special Issues, the Trial Court assessed punishment of death by lethal injection. [Granger]'s conviction was affirmed on direct appeal by the Texas Court of Criminal Appeals.

2. There are no controverted previously unresolved factual issues material to the legality of [Granger]'s conviction and sentence.

3. [Granger] alleges in Ground One of his Application, that trial counsel were ineffective for failing to present mitigating evidence in the nature of a social history and failed to develop a readily available mitigation narrative via the presentation of expert testimony.

FINDINGS:

[Granger] asserts a comprehensive litany of social history issues he claims should have but were not presented to the jury. The Court finds that while [Granger], in hindsight perhaps, expanded on the details of [Granger]'s social history, in fact, trial counsel did present evidence of [Granger]'s social history on each point raised by [Granger]. [Granger] fails to point out that trial counsel presented evidence from a qualified forensic psychiatrist (among other evidence) relative to [Granger]'s competency, paranoia, poor coping mechanisms, problems with impulse control, internalized anger, the fact that [Granger] believed he was a victim of lies, and his overall frustration with his life. The Court finds that trial counsel presented evidence of the following:

A. Evidence of domestic abuse suffered by [Granger]'s mother and observed by the jury.

B. Evidence regarding the unsolved murder of [Granger]'s sister and its effect on [Granger].

C. Evidence regarding [Granger]'s child custody situation over a period of years.

D. Evidence of abuse suffered by [Granger]'s mother.

E. Evidence regarding the impact of [Granger]'s daughter's sexual abuse allegations against him.

F. Psychiatric evidence from Dr. Edward Gripon regarding competency, paranoia, poor coping mechanisms, problems with impulse control, [Granger]'s internalized anger, the fact that he felt he was the victim of lies, his frustration with life, as well as his ability to control his behavior.

G. This Court further finds that Samantha's sexual assault allegations against [Granger] and his brother were not only discussed during trial, but were the

catalyst for the events prompting a capital murder indictment stemming from a retaliation for those allegations.

[Granger] alleges trial counsel to be ineffective for failing to develop a trial narrative emphasizing his social history via Norma Villanueva, a defense mitigation specialist. The Court finds that mitigation evidence of the same nature proposed by Norma Villanueva was, in fact, presented; and that, based upon the affidavits of trial counsel, a sufficient strategic reason existed not to call Norma Villanueva as a witness.

4.  Ground Two of the Application alleges ineffective assistance of counsel for failure to present an expert to explain the impact of [Granger]'s social history.

FINDINGS:

This argument is essentially the same as that claimed in Ground One regarding expert testimony, albeit in more detail.  Expert testimony is not necessarily of benefit to the trier of fact, especially as in this case wherein trial counsel, through lay witnesses, presented social history/mitigation evidence including, but not limited to, the following:

A.  Evidence regarding [Granger], Ulysses Granger, and Vallire Ozene (Granger)'s [respective social histories].

B.  Evidence of [Granger]'s lack of relationship with his father.

C.  Evidence of the breakup of [Granger]'s parents.

D.  Evidence of abuse directed toward [Granger]'s mother.

E.  Evidence of [Granger]'s mother's absence[s] during times when she shipped out as a merchant seaman.

F.  Evidence of subsequent relationships between [Granger]'s mother and another man named Davis Ross ("Ross").

G.  Evidence of a subsequent relationship between [Granger]'s mother and Raymond Ozene ("Ozene").

H.  Evidence that [Granger]'s mother moved the family several times during his formative years and its effect upon him.

I.  Evidence that [Granger]'s sister, Samantha, was taken by a pimp when [Granger] was in elementary school, and the impact that her absence had upon him.

J.  Evidence that [Granger]'s sister, Samantha, ultimately returned to the family as a different person.

K.  Evidence that [Granger]'s sister, Samantha, was ultimately murdered by someone who broke into her apartment and shot her several times, and the impact that had upon [Granger].

L.  Evidence that [Granger] had been in multiple schools, failed two grades and dropped out of school in the ninth grade.

M.  Evidence regarding child custody battles with his ex-wife.

N.  Evidence that he suffered from a degenerative disc disease and its effect on his ability to work.

O.  Evidence regarding his daughter, Samantha's, allegations that he sexually abused her and its effect on him.

Further, trial counsels' Affidavits attached to the State's Response that developments during trial and the presentation of the same evidence through law [sic] witnesses dictated against, or at least made unnecessary and unwarranted, the calling of an expert witness on social history/mitigation.

5.  Ground Three of the Application alleges trial counsel to be ineffective for failing to investigate and present Samantha Jackson's journal, not only rebutting the aggravation evidence but also containing mitigation evidence.

FINDINGS:
[Granger]'s daughter, Samantha Jackson, composed a crudely hand-written diary earlier in her life.  She indicates therein she loved her father.

Based upon the Affidavits attached to the Writ, trial counsel extensively interviewed Rife Kimler, trial counsel in the underlying sexual assault case against Samantha. Kimler relayed the contents of the diary.  Most importantly, trial counsel cross-examined Samantha about the diary.  She testified she was too young at the time to remember its contents.

6. Ground Four alleges trial counsel was ineffective for failure to object to the State's calling [Granger] a "murdering son of a bitch" in the presence of the jury, as well as other inappropriate comments.

FINDINGS:
The Court finds that [Granger] testified on his own behalf.  The Record supports his demeanor, and the jury was able to observe that demeanor.  [Granger]'s conduct at trial is relevant.  The Court finds that during [Granger]'s cross examination, he began to ask the prosecutor questions and invited a response.

Specifically, the Court finds that [Granger] invited the response. The Court finds that although the prosecutor's comments were, perhaps, not a model of decorum, given the demeanor of [Granger] all during the trial the prosecutor's comments were harmless.

The Court further finds that, based upon trial counsel's Affidavit attached to the State's Response, sufficient reason existed not to object to the comments.

The Court further finds that all facts necessary to develop this Ground are contained in the Record on appeal. The Court further finds that [Granger] did not raise this Ground on direct appeal.

7. Ground Five alleges trial counsel to be ineffective for failure to object to specific portions of the State's closing argument on punishment.

FINDINGS:

[Granger] asserts several alleged inflammatory comments made by the prosecutor during closing argument. [Granger] objected to some of the comments and did not object to others. [Granger] raised the issue of the Prosecutor's comments on appeal based on objections made and via fundamental error, grounded on the cumulative effect of the Prosecutor's alleged improper comments.

[Granger], by this Application, raises additional allegations of improper prosecutorial comment, to which no objection was made. The Court finds that all the facts necessary to develop this Ground are contained in the Record on appeal and could have been raised, but were not, on direct appeal.

The Court further finds that, given the facts of the case and the demeanor of [Granger] at trial, the Prosecutor's comments were harmless.

8. Ground Six alleges that [Granger] was denied due process to an impartial jury based upon a claim that Juror Rivera committed misconduct by automatically voting for the death penalty.

FINDINGS:

Lynn Rivera was a juror in the case. She voted for guilt, answered Special Issue No. One, "Yes," and Special Issue No. Two, "No." [Granger] alleges Juror Rivera committed misconduct by automatically voting for the death penalty, based upon her Affidavit attached to the Application. Specifically, she declared, "I do remember deciding to vote for death at the same time I decided to vote for guilt."

Rivera provided a subsequent Affidavit attached to the State's Response stating, "When I said that I decided to vote for the death penalty at the same time I decided to vote for guilt, what I meant was that I felt the death penalty was appropriate for the crime. I did not mean that I was not willing to listen to the punishment evidence or mitigating circumstances. As a matter of fact, I specifically remember during Voir Dire being asked if I knew what mitigating circumstances meant, and I told them I did.

The Prosecutor described it for me to make sure I understood.  I did listen during the punishment phase, and what I heard convinced me to vote for the death penalty."

The Court finds that the juror's Affidavit does not assert:  1) whether any outside influence was improperly brought to bear upon the juror, or 2) rebuttal of a claim that a juror is not qualified to serve.  The Court further finds that the Affidavit does assert matters occurring during the jury's deliberations and the effect of "anything" on the juror's mind or emotions or mental processes influencing her assent to the verdict. The vote of the jury was unanimous on Special Issues One and Two."

9.   [Granger] alleges in Ground Seven that his rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution were violated when the Court was prohibited from instructing the jury that a vote by one juror would result in a life sentence.

FINDINGS:
At the conclusion of the punishment phase of trial, the jury was instructed to answer the applicable Special Issues mandated by TEX. CODE CRIM. PROC., art. 37.071.

10.  [Granger] alleges in Ground Eight that Granger's death sentence was arbitrarily and capriciously assigned on the jury's answer to an unconstitutionally vague first issue.

FINDINGS:
At the conclusion of the punishment phase of trial, the jury was instructed to answer the applicable Special Issues as mandated by TEX. CODE CRIM. PROC., art. 37.071.

11.  [Granger] alleges in Ground Nine that his death sentence is unconstitutional because it was assigned on Texas' alleged arbitrary system of administering the death penalty.

FINDINGS:
There is no evidence that [Granger]'s death sentence was the result of an arbitrary application of the law by the prosecutors or the courts, or that it was based upon [Granger]'s race or ethnicity.

12.  [Granger] alleges in Ground Ten that his death sentence should be vacated because the punishment phase jury instruction restricted the evidence that the jury could determine was mitigating.

FINDINGS:
At the conclusion of the punishment phase of trial, the jury was instructed to answer the statutorily required instructions mandated by TEX. CODE CRIM. PROC., art. 37.071.

## CONCLUSIONS OF LAW

1. Grounds One through Five of the Application allege, in various manners, trial counsel provided ineffective assistance of counsel, violating his United States Constitutional Sixth Amendment rights. Texas has established a process for post-conviction equitable habeas corpus relief under Texas Code of Criminal Procedure 11.07, *et seq.* The Applicable case law is *Strickland v. Washington*, 466 U.S. 688 (1984); *Jackson v. State*, 845 S.W.2d 954 (Tex. Crim. App. 1998). The Defendant must show by a preponderance of the evidence that trial counsel's performance fell below an objective standard of reasonableness and that, but for counsel's errors, a different result would have occurred. Reasonably effective assistance does not mean error-free counsel or whose performance is gaged [sic] from hindsight. *Bridge v. State*, 726 S.W.2d 558, 571 (Tex. Crim. App. 1986); *Ingham v. State*, 679 S.W.2d 503, 509 (Tex. Crim. App. 1984); *McFarland v. State*, 845 S.W.2d 824, 843 (Tex. Crim. App. 1992). Isolated instances of failure to object do not constitute ineffective assistance of counsel. *Johnson v. State*, 629 S.W.2d 731 (Tex. Crim. App. 1981); *McFarland v. State*, 928 S.W.2d 482, 500 (Tex. Crim. App. 1996). An exception to this general rule exists where the potential reasons(s) to object are not apparent from the record and further hearing is necessary to consider facts, circumstances and rationale behind counsel's actions at that juncture of trial. In other words, when the record is insufficient. *See Thompson v. State*, 9 S.W.3d 808 (Tex. Crim. App. 1999); *Robinson v. State*, 16 S.W.3d 808 (Tex. Crim. App. 2000). Trial strategy will be reviewed by appellate courts only if the record demonstrates that the action was without any plausible basis. *Ex parte Ewing*, 570 S.W.2d 941 (Tex. Crim. App. 1978).

   When reviewing a claim of ineffective assistance of Counsel, an appellate court's judicial scrutiny of counsel's performance must be highly deferential. *Strickland*, 446 U.S. at 689; *Busby v. State*, 990 S.W.2d 263, 268 (Tex. Crim. App. 1999).

   The fact that another attorney might have pursued a different strategy will not support a finding of ineffectiveness of counsel. *Passmore v. State*, 617 S.W.2d 682, 686 (Tex. Crim. App. 1981); *Ex parte Kunkle*, 852 S.W.2d 499, 505 (Tex. Crim. App. 1993).

   Moreover, the competency of representation is not to be judged by hindsight or by facts unknown at the time of trial. *Strickland*, 446 U.S. at 689. Counsel's performance is measured against the law in effect at the time of trial; a claim of ineffective assistance of counsel cannot be based on unsettled law. *Vaughn v. State*, 931 S.W.2d 564, 567 (Tex. Crim. App. 1996).

2. [Granger] has not shown by a preponderance of the evidence that trial counsel was ineffective under Ground One. Counsel presented mitigating evidence and was not ineffective for failing to produce a mitigation expert. Trial counsel's failure to call an expert had a plausible basis. Ground One is denied.

3.  [Granger] has not shown by a preponderance of the evidence that trial counsel was ineffective in Ground Two for failing to call an expert witness to testify about the impact of [Granger]'s social history. Trial counsel's failure to call an expert had a plausible basis.[7]

4.  [Granger] has waived Ground No. Four by failing to raise it on direct appeal. [Granger] has failed to demonstrate by a preponderance of the evidence that trial counsel was ineffective [and] that the prosecutor's comments, if improper, were harmless, given the record as a whole. A plausible basis existed for trial counsel's failure to object.

5.  This Court finds that, in Ground Five, [Granger] is attempting to raise an issue that could have been raised and addressed on appeal and is thus not cognizable via this application. "The Great Writ should not be used in matters that should have been raised on appeal." *Ex parte Townsend*, 137 S.W.3d 79 (Tex. Crim. App. 2004) citing *Ex parte Banks*, 769 S.W.2d 539, 540 (Tex. Crim. App. 1989). The writ of habeas corpus should not be used in matters that should have been raised on direct appeal, and thus, even a constitutional claim is forfeited if the applicant for writ of habeas corpus had the opportunity to raise the issue on direct appeal. *Ex parte Gardner*, 959 S.W.2d 189, 191 (Tex. Crim. App. 1996) (if a defendant could have raised a claim on direct appeal, he may not raise the claim in habeas proceedings). This is because the writ of habeas corpus is an extraordinary remedy that is available only when there is no other adequate remedy at law. *Ex parte Townsend*, 137 S.W.3d at 81 (citing *Ex parte Drake*, 883 S.W.2d 213, 215 (Tex. Crim. App. 1994)). [Granger] has not met his burden of establishing that trial counsels['] performance fell below an objective standard of reasonableness, that their performance was deficient, that failure to object to the prosecutor's closing arguments not raised on appeal prejudiced his defense, or that making said objections would have changed the outcome of the trial.

This Court finds that [Granger]'s Fifth Ground is without merit and should be denied.

6.  [Granger]'s allegations under Ground Six are not cognizable as being in violation of Texas Rules of Evidence 606(b). [Granger] has failed to establish, by a preponderance of the evidence, that a different result would have occurred but for the Affidavit. Texas Code of Criminal Procedure Art. 37.071, Sec. 2(d)(2) requires the vote of only ten jurors against the death penalty. [Granger]'s affidavit from Juror Rivera is incomplete. The subsequent Affidavit taken as a whole demonstrates that Juror Rivera was able to follow the law and considered mitigating evidence.

7.  The Court of Criminal Appeals has repeatedly held, and this Court finds, that the Texas death penalty scheme is constitutional. *Saldano v. State*, 232 S.W.3d 77

---

[7]   The trial court did not issue a Conclusion of Law regarding Ground Three (Samantha's diary).

(Tex. Crim. App. 2007) (declining to revisit previous holdings of constitutionality of Texas death penalty scheme under the United States and Texas Constitutions).

This Court finds that in Ground Seven, [Granger] is attempting to raise an issue that could have been raised and addressed on appeal and is thus not cognizable via this application. "The Great Writ should not be used in matters that should have been raised on appeal." *Ex parte Townsend*, 137 S.W.3d 79 (Tex. Crim. App. 2004), citing *Ex parte Banks*, 769 S.W.2d 539, 540 (Tex. Crim. App. 1989). The writ of habeas corpus should not be used in matters that should have been raised on direct appeal, and thus, even a constitutional claim is forfeited if the applicant for writ of habeas corpus had the opportunity to raise the issue on direct appeal. *Ex parte Gardner*, 959 S.W.2d 189, 191 (Tex. Crim. App. 1996) (if a defendant could have raised a claim on direct appeal, he may not raise the claim in habeas proceedings). This is because the writ of habeas corpus is an extraordinary remedy that is available only when there is no other adequate remedy at law. *Ex parte Townsend*, 137 S.W.3d at 81 (citing *Ex parte Drake*, 883 S.W.2d 213, 215 (Tex. Crim. App. 1994)).

This Court further finds that [Granger]'s Seventh Ground is without merit and should be denied.

8. The Court of Criminal Appeals has repeatedly held, and this Court finds that the Texas death penalty scheme is constitutional. *Saldano v. State*, 232 S.W.3d 77, (Tex. Crim. App. 2007) (declining to revisit previous holdings of constitutionality of Texas death penalty scheme under the United States and Texas Constitutions). The Texas Court of Criminal Appeals has consistently and repeatedly held, and this Court finds that "deliberately," "criminal acts of violence," and "continuing threat to society" require no special definitions and that TEX. CODE CRIM. PROC., art. 37.071 is not unconstitutional for lack of such definitions. *Goss v. State*, 826 S.W.2d 162 (Tex. Crim. App. 1992) (holding that trial court's refusal to define criminal acts of violence and continuing threat to society poses no constitutional problems); *Earhart v. State*, 823 S.W.2d 607 (Tex. Crim. App. 1991) (holding that "deliberately," "criminal acts of violence," and "continuing threat to society" require no special definitions); *Boyd v. State*, 811 S.W.2d 105 (Tex. Crim. App. 1991) (holding that Article 37.071 is not unconstitutionally vague for lack of statutory definitions of "deliberately" and "criminal acts of violence").

This Court finds that in Ground Eight, [Granger] is attempting to raise an issue that could have been raised and addressed on appeal and is thus not cognizable via this application. "The Great Writ should not be used in matters that should have been raised on appeal." *Ex parte Townsend*, 137 S.W.3d 79 (Tex. Crim. App. 2004) citing *Ex parte Banks*, 769 S.W.2d 539, 540 (Tex. Crim. App. 1989). The writ of habeas corpus should not be used in matters that should have been raised on direct appeal, and thus, even a constitutional claim is forfeited if the applicant for writ of habeas corpus had the opportunity to raise the issue on direct appeal. *Ex parte Gardner*, 959 S.W.2d 189,191 Tex. Crim. App. 1996) (if a defendant could have raised a claim on direct appeal, he may

not raise the claim in habeas proceedings). This is because the writ of habeas corpus is an extraordinary remedy that is available only when there is no other adequate remedy at law. *Ex parte Townsend*, 137 S.W.3d at 81 (citing *Ex parte Drake*, 883 S.W.2d 213, 215 (Tex. Crim. App.1994).

This Court finds that [Granger]'s Eighth Ground is without merit and should be denied.

9. The Court of Criminal Appeals has repeatedly held, and this Court finds that the Texas Death penalty scheme is constitutional. *Saldano v. State*, 232 S.W.3d 77, (Tex. Crim. App. 2007) (declining to revisit previous holdings of constitutionality of Texas death penalty scheme under the United States and Texas Constitutions). Prosecutorial discretion does not render the death penalty unconstitutional. *Cantu v. State*, 842 S.W.2d 667 (Tex. Crim. App. 1992), *cert. denied*, 509 U.S. 926 (1993).

This Court finds that in Ground Nine, [Granger] is attempting to raise an issue that could have been raised and addressed on appeal and is thus not cognizable via this application. "The Great Writ should not be used in matters that should have been raised on appeal." *Ex parte Townsend*, 137 S.W.3d 79 (Tex. Crim. App. 2004) citing *Ex parte Banks*, 769 S.W.2d 539, 540 (Tex. Crim. App. 1989). The writ of habeas corpus should not be used in matters that should have been raised on direct appeal, and thus, even a constitutional claim is forfeited if the applicant for writ of habeas corpus had the opportunity to raise the issue on direct appeal. *Ex parte Gardner*, 959 S.W.2d 189, 191 (Tex. Crim. App. 1996) (if a defendant could have raised a claim on direct appeal, he may not raise the claim in habeas proceedings). This is because the writ of habeas corpus is an extraordinary remedy that is available only when there is no other adequate remedy at law. *Ex parte Townsend*, 137 S.W.3d at 81 (citing *Ex parte Drake*, 883 S.W.2d 213, 215 (Tex. Crim. App. 1994)). This Court concludes that [Granger]'s 9th ground (claim) is without merit and should be denied.

10. The Court of Criminal Appeals has repeatedly held, and this Court finds that the Texas death penalty scheme is constitutional. *Saldano v. State*, 232 S.W.3d 77 (Tex. Crim. App. 2007) (declining to revisit previous holdings of constitutionality of Texas death penalty scheme under the United States and Texas Constitutions). The jury was properly provided the proper instructions and asked to answer the statutorily mandated issues as mandated by TEX. CODE CRIM. PROC., art. 37.071.

Texas law requires the court to instruct the jury that it shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness. TEX. CODE CRIM. PROC., art. 37.071, Sec. 2(f)(4). The special issues and instructions given to the jury in the punishment phase of trial were in accordance with the mandates of TEX. CODE CRIM. PROC., art. 37.071.

The Texas Court of Criminal Appeals has previously rejected the argument that TEX. CODE CRIM. PROC., art. 27.071 unconstitutionally narrows a jury's discretion to consider

as mitigating only those factors concerning moral blameworthiness. *Shannon v. State*, 942 S.W.2d 591 (Tex. Crim. App. 1996); *Colella v. State*, 915 S.W.2d 834 (Tex. Crim. App. 1995).

This Court finds that in Ground Ten, [Granger] is attempting to raise an issue that could have been raised and addressed on appeal and is thus not cognizable via this application. "The Great Writ should not be used in matters that should have been raised on appeal." *Ex parte Townsend*, 137 S.W.3d 79 (Tex. Crim. App. 2004) (citing *Ex parte Banks*, 769 S.W.2d 539, 540 (Tex. Crim. App. 1989)). The writ of habeas corpus should not be used in matters that should have been raised on direct appeal, and thus, even a constitutional claim is forfeited if the applicant for writ of habeas corpus had the opportunity to raise the issue on direct appeal. *Ex parte Gardner*, 959 S.W.2d 189, 191 (Tex. Crim. App. 1996) (holding that if a defendant could have raised a claim on direct appeal, he may not raise the claim in habeas proceedings). This is because the writ of habeas corpus is an extraordinary remedy that is available only when there is no other adequate remedy at law. *Ex parte Townsend*, 137 S.W.3d at 81 (citing *Ex parte Drake*, 883 S.W.2d 213, 215 (Tex. Crim. App. 1994)).

This Court concludes that [Granger]'s Tenth Ground is without merit and should be denied.

(#50-15, pp. 189–206, 332); SHCR-01.Supp. 329, 186–203.

The TCCA subsequently denied the application for a writ of habeas corpus "based upon the trial court's findings and conclusions that we have adopted, our own review of the record, and our independent findings and conclusions, we deny relief." *Ex parte Granger I*, 2017 WL 3379285, at *5. (SHCR 2).

As discussed more fully below, this court must defer to the state court's findings and conclusions, as instructed in 28 U.S.C. § 2254(d), and presume the state court's factual findings to be correct unless the petitioner rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). State court decisions must be given the benefit of the doubt. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks and citation omitted).

V.     Standard of Review

A.     Section 2254 Standards

"The federal habeas statute, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), imposes important limitations on the power of federal courts to overturn the judgments of state courts in criminal cases." *Shoop v. Hill*, 139 S. Ct. 504, 506 (2019).  In addition to overcoming procedural hurdles, a state prisoner must meet exacting substantive standards to obtain habeas corpus relief.  A federal court may not grant habeas corpus relief with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The standard under Section 2254(d) is highly deferential and difficult to meet.  *Pinholster*, 563 U.S. at 181.  It "reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring)).  State courts are presumed to know and follow the law, *Woods v. Donald*, 575 U.S. 312, 316 (2015), and Section 2254(d) "demands that state-court decisions be given the benefit of the doubt." *Pinholster*, 563 U.S. at 181 (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)).

The statute therefore "restricts the power of federal courts to grant writs of habeas corpus based on claims that were 'adjudicated on the merits' by a state court." *Shinn v. Kayer*, 141 S.

Ct. 517, 520 (2020) (per curiam) (citation omitted).   "When a state court has applied clearly established federal law to reasonably determined facts in the process of adjudicating a claim on the merits, a federal habeas court may not disturb the state court's decision unless its error lies 'beyond any possibility for fairminded disagreement.'"   *Id.* (quoting *Richter*, 562 U.S. at 103).

Further, "[u]nder § 2254(d)," the reasonableness of the state court decision—not whether it is correct—"is 'the only question that matters.'"   *Id.* at 526 (quoting *Richter*, 562 U.S. at 102); *accord Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was *incorrect* but whether that determination was *unreasonable*—a substantially higher threshold."); *Sanchez v. Davis*, 936 F.3d 300, 305 (5th Cir. 2019) ("[T]his is habeas, not a direct appeal, so our focus is narrowed.  We ask not whether the state court denial of relief was *incorrect*, but whether it was *unreasonable*—whether its decision was 'so lacking in justification' as to remove 'any possibility for fairminded disagreement.'" (citation omitted)), *cert. denied*, 140 S. Ct. 2529 (2020); *Hughes v. Vannoy*, 7 F.4th 380, 387 (5th Cir. 2021) ("A merely incorrect state court decision is not sufficient to constitute an unreasonable application of federal law . . . .  Instead, the state court decision must be 'so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" (footnotes omitted)).

A state court adjudication on direct appeal is due the same deference under Section 2254(d) as an adjudication in a state post-conviction proceeding.  *See, e.g., Dowthitt v. Johnson*, 230 F.3d 733, 756–57 (5th Cir. 2000) (a finding made by the TCCA on direct appeal is an "issue . . . adjudicated on the merits in state proceedings," to be "examine[d] . . . with the deference demanded by AEDPA" under 28 U.S.C. § 2254(d)), *cert. denied*, 532 U.S. 915 (2001).  Nothing

"in AEDPA or [the Supreme] Court's precedents permit[s] reduced deference to merits decisions of lower state courts." *Shinn*, 141 S. Ct. at 524 n.2 (citing 28 U.S.C. § 2254).

Starting with Section 2254(d)(1), a state court decision is "'contrary to' clearly established federal law if it relies on legal rules that directly conflict with prior holdings of the Supreme Court or if it reaches a different conclusion than the Supreme Court on materially indistinguishable facts." *Busby v. Dretke*, 359 F.3d 708, 713 (5th Cir.), *cert. denied*, 541 U.S. 1087 (2004); *see Lopez v. Smith*, 574 U.S. 1, 2 (2014) (per curiam) ("We have emphasized, time and time again, that the [AEDPA] prohibits the federal courts of appeals from relying on their own precedent to conclude that a particular constitutional principle is 'clearly established.'" (citation omitted)). In *Will v. Lumpkin*, the Fifth Circuit explained:

> A state court unreasonably applies clearly established Supreme Court precedent when it improperly identifies the governing legal principle, unreasonably extends (or refuses to extend) a legal principle to a new context, or when it gets the principle right but 'applies it unreasonably to the facts of a particular prisoner's case.'

978 F.3d 933, 940 (5th Cir. 2020) (quoting *Williams v. Taylor*, 529 U.S. 362, 407–08 (2000)) (citation omitted), *cert. denied*, 142 S. Ct. 579 (2021). "But the Supreme Court has only clearly established precedent if it has 'broken sufficient legal ground to establish an asked-for constitutional principle.'" *Id*. (quoting *Taylor*, 529 U.S. at 380–82) (citations omitted).

As noted above, "[f]or purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an *incorrect* application of federal law. . . . A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Richter*, 562 U.S. at 101 (citations and internal quotation marks omitted).

Under § 2254(d), a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must

> ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court.

*Id*. at 102; *see Evans v. Davis*, 875 F.3d 210, 216 (5th Cir. 2017) (recognizing that Section 2254(d) tasks courts "with considering not only the arguments and theories the state habeas court actually relied upon to reach its ultimate decision but also all the arguments and theories it could have relied upon" (citation omitted)), *cert. denied*, 139 S. Ct. 78 (2018).

The Supreme Court has further explained that "[e]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations."  *Richter*, 562 U.S. at 101 (internal quotation marks omitted).  "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable."  *Id*. at 102.

The Supreme Court has clarified that, "[i]f this standard is difficult to meet, that is because it was meant to be."  *Id*.  "As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings," but "[i]t preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents," and "[i]t goes no further." *Id*.  Thus,

> [a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Id*. at 103; *accord Burt v. Titlow*, 571 U.S. 12, 20 (2013) ("We will not lightly conclude that a State's criminal justice system has experienced the extreme malfunction for which federal habeas relief is the remedy.").

As to Section 2254(d)(2)'s reference to "an unreasonable determination of the facts," the Supreme Court made clear that "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301, 293 (2010). Rather, federal habeas relief is precluded where the state court's factual determination is reasonably debatable. *Id.* Under this standard,

> it is not enough to show that a state court's decision was incorrect or erroneous. Rather, a petitioner must show that the decision was objectively unreasonable, a substantially higher threshold requiring the petitioner to show that a reasonable factfinder *must* conclude that the state court's determination of the facts was unreasonable.

*Batchelor v. Cain*, 682 F.3d 400, 405 (5th Cir. 2012) (brackets and internal quotation marks omitted).

The court must presume that a state court's factual determinations are correct and can find those factual findings unreasonable only where the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Gardner v. Johnson*, 247 F.3d 551, 560 (5th Cir. 2001). This presumption applies not only to explicit findings of fact but also "to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001), *cert. denied*, 537 U.S. 883 (2002); *see Ford v. Davis*, 910 F.3d 232, 234–35 (5th Cir. 2018) (Section 2254(e)(1) "'deference extends not only to express findings of fact, but to the implicit findings of the state court.' As long as there is 'some indication of the legal basis for the state court's denial of relief,' the district court may infer the state court's factual findings even if they were not expressly made." (footnotes omitted)).

Moreover, even if the state court errs in its factual findings, mere error is not enough—the state court's decision must be "*based* on an unreasonable factual determination. In other words,

[habeas relief is not warranted where] even if the [state court] had gotten [the disputed] factual determination right, its conclusion wouldn't have changed." *Will*, 978 F.3d at 942.  Further, "determining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning." *Richter*, 562 U.S. at 98; *see Pondexter v. Dretke*, 346 F.3d 142, 148 (5th Cir. 2003) ("[A] federal habeas court is authorized by Section 2254(d) to review only a state court's 'decision,' and not the written opinion explaining that decision" (quoting *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc) (per curiam))), *cert. denied*, 541 U.S. 1045 (2004); *Evans*, 875 F.3d at 216 n.4 (even where "[t]he state habeas court's analysis [is] far from thorough," a federal court "may not review [that] decision *de novo* simply because [it finds the state court's] written opinion 'unsatisfactory'" (quoting *Neal*, 286 F.3d at 246)); *see also Hughes*, 7 F.4th at 387 (observing that a federal habeas court also "must 'carefully consider all the reasons and evidence supporting the state court's decision'" and that a decision that "does not explain its reasoning does not affect [federal habeas] review," as federal courts "are required to 'determine what arguments or theories could have supported the state court's determination' and examine '*each* ground supporting the state court decision'" (footnotes omitted)).

B.     Ineffective Assistance Claims under *Strickland*

Granger contends his trial counsel provided ineffective assistance of counsel in eleven out of his twenty federal habeas claims, in violation of *Strickland v. Washington*, 466 U.S. 668 (1984).  *Strickland* provides a two-pronged standard, and the petitioner bears the burden of proving both prongs.  466 U.S. at 687.

Under the first prong, the petitioner "must show that counsel's performance was deficient." *Id*.  To establish deficient performance, he "must show that counsel's representation fell below

an objective standard of reasonableness," with reasonableness judged under professional norms prevailing at the time counsel rendered assistance. *Id.* at 688. The *Strickland* court explained:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight.

*Id.* at 689 (citations omitted). "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (internal quotation marks omitted).

Under the second prong, the petitioner must show that his attorney's deficient performance resulted in prejudice. *Id.* at 687. To satisfy the prejudice prong, the habeas petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. An ineffective assistance of counsel claim fails if a petitioner cannot satisfy either the deficient performance or prejudice prong; a court need not evaluate both if he makes an insufficient showing as to either. *Id.* at 697.

The Supreme Court discussed the difficulties associated with proving ineffective assistance of counsel claims as follows:

> "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky,* 559 U.S. 356, 371 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland,* 466 U.S. at 689–90. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one.

> Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. . . . The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland,* 466 U.S. at 690.

*Richter*, 562 U.S. at 105.  In a separate opinion issued on the same day as *Richter*, the Court reiterated that the "question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from the best practices or most common custom." *Premo v. Moore*, 562 U.S. 115, 122 (2011) (citing *Strickland*, 466 U.S. at 690).

In the context of Section 2254(d), the deference due to counsel's representation must be considered in tandem with the deference that must be accorded to state court decisions, which has been referred to as "doubly" deferential.  *Richter*, 562 U.S. at 105.  "When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Id.*

C.     Exhaustion of State Remedies and Procedural Default

After this case was stayed at Granger's request, he filed a 127-page second-in-time or successive state habeas application raising twelve (12) multi-faceted claims for relief.  SCHR-02 at 4-147.  Eleven of the twelve claims were ineffective assistance of counsel claims.  The TCCA dismissed the successive application as an abuse of the writ.  *Ex parte Granger II*, 2020 WL 915434, at *1.  Here, Granger raises those same twelve (12), procedurally defaulted, multi-faceted claims for relief in his amended federal petition.  The resolution of Granger's amended petition concerns complex procedural issues involving exhaustion of state remedies, procedural default, and whether Granger can overcome the procedural default via *Martinez v. Ryan,* 566 U.S. 1 (2012) and *Trevino v. Thaler*, 569 U.S. 413 (2013).

State prisoners bringing federal habeas petitions are required to exhaust their state remedies before proceeding to federal court unless "there is an absence of available State corrective process" or "circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1). In order to exhaust properly, a state prisoner must "fairly present[]" all of his claims to the state court. *Picard v. Connor*, 404 U.S. 270, 275 (1971). In Texas, all claims must be presented to and decided on the merits by the TCCA. *Richardson v. Procunier*, 762 F.2d 429, 432 (5th Cir. 1985).

In *Coleman v. Thompson*, 501 U.S. 722 (1991), the Supreme Court announced the procedural default doctrine as a necessary corollary to the exhaustion requirement. The Court explained the doctrine as follows:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Id.* at 750. As a result of *Coleman*, unexhausted claims that would now be procedurally defaulted in state court are ordinarily dismissed as procedurally barred. *Fearance v. Scott*, 56 F.3d 633, 642 (5th Cir.), *cert. denied*, 515 U.S. 1153 (1995); *see Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001). This includes unexhausted claims that would be barred by Texas's abuse-of-the-writ rules. *Fearance*, 56 F.3d at 642.

This procedural bar may be overcome by demonstrating either cause and prejudice for the default or that a fundamental miscarriage of justice would result from the court's refusal to consider the claim. *Fearance*, 56 F.3d at 637, 642 (citing *Coleman*, 501 U.S. at 750–51). Dismissals pursuant to abuse of writ principles have regularly been upheld as a "valid state procedural bar foreclosing federal habeas review." *Moore v. Quarterman*, 534 F.3d 454, 463 (5th

Cir. 2008); *Hughes v. Quarterman*, 530 F.3d 336, 342 (5th Cir. 2008), *cert. denied*, 556 U.S. 1239 (2009); *Coleman v. Quarterman*, 456 F.3d 537, 542 (5th Cir. 2006), *cert. denied*, 549 U.S. 1343 (2007).

D.      Application of *Martinez* and *Trevino* Standards

Granger argues that his eleven (11) claims of ineffective assistance of counsel are excused from procedural default in light of *Martinez* and *Trevino*.  *See Martinez*, 566 U.S. at 14; *see also Trevino*, 569 U.S. at 416.[8]

In *Martinez*, the Supreme Court held:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance of counsel at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

566 U.S. at 17.

*Martinez* creates a narrow exception to the procedural bar doctrine.  The exception "treats ineffective assistance by a prisoner's state post conviction counsel as cause to overcome the default of a single claim."  *Davila v. Davis*, 137 S. Ct. 2058, 2062 (2017).  A federal habeas petitioner relying on *Martinez* to show ineffective representation by state habeas counsel must meet three elements before the court can consider the underlying defaulted *Strickland* claim.  First, the petitioner must show that "his claim of ineffective assistance of counsel at trial is substantial—*i.e.*, has some merit—."  *Cantu v. Davis*, 665 F. App'x 384, 386 (5th Cir. 2016), *cert. denied*, 137 S.

---

[8]      The Supreme Court extended *Martinez* to Texas in *Trevino*.  Although Texas does not preclude appellants from raising ineffective assistance of trial counsel claims on direct appeal, the Court held that the rule in *Martinez* applies because "the Texas procedural system—as a matter of its structure, design, and operation—does not offer most defendants a meaningful opportunity to present a claim of ineffective assistance of trial counsel on direct appeal."  *Trevino*, 569 U.S. at 428.  The Court left it to the lower courts to determine on remand whether Trevino's claim of ineffective assistance of counsel was substantial and whether his initial state habeas attorney was ineffective.  *Id.* at 429.

Ct. 2285 (2017); *see Allen v. Stephens*, 805 F.3d 617, 626 (5th Cir. 2015), *abrogated on other grounds by Ayestas v. Davis*, 138 S. Ct. 1080 (2018).

Second, the petitioner must show that "habeas counsel was ineffective" for not raising the underlying *Strickland* claim. *Garza v. Stephens*, 738 F.3d 669, 676 (5th Cir. 2013), *cert. denied*, 573 U.S. 949 (2014). In reviewing this issue, the federal habeas court applies *Strickland* to "indulge a strong presumption that [habeas] counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Federal habeas courts recognize that habeas counsel "who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Vasquez v. Stephens*, 597 F. App'x 775, 780 (5th Cir.) (quoting *Smith v. Robbins*, 528 U.S. 259, 288 (2000)), *cert. denied*, 577 U.S. 830 (2015). To prove ineffective assistance, the petitioner must demonstrate that "a particular nonfrivolous issue was clearly stronger than issues that counsel did present." *Vasquez*, 597 F. App'x at 780 (quoting *Robbins*, 528 U.S. at 288).

Third, even after showing cause flowing from habeas counsel's representation, the petitioner must demonstrate actual prejudice. *Canales v. Stephens*, 765 F.3d 551, 571 (5th Cir. 2014); *see Martinez*, 566 U.S. at 18 (remanding for an assessment of actual prejudice). The Fifth Circuit has held that, even after showing cause under *Martinez*, a petitioner must show actual prejudice by "establish[ing] not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Hernandez v. Stephens*, 537 F. App'x 531, 542 (5th Cir. 2013), *cert. denied*, 572 U.S. 1036 (2014); *see United States v. Frady*, 456 U.S. 152, 170 (1982).

At a minimum, actual prejudice under *Martinez* requires the petitioner to show a reasonable probability that he would have been granted state habeas relief had his habeas counsel's

performance not been deficient.  *Soliz v. Davis*, 750 F. App'x 282, 290 (5th Cir. 2018), *cert. denied*, 139 S. Ct. 1447 (2019); *Mamou v. Davis*, 742 F. App'x 820, 828 (5th Cir. 2018), *cert. denied*, 139 S. Ct. 1171 (2019); *Barbee v. Davis*, 660 F. App'x 293, 314 (5th Cir. 2016); *Newbury v. Stephens*, 756 F.3d 850, 872 (5th Cir. 2014), *cert. denied*, 574 U.S. 1144 (2015). "Conversely, the petitioner's failure to establish the deficiency of either attorney precludes a finding of cause and prejudice." *Sells v. Stephens*, 536 F. App'x 483, 492 (5th Cir. 2013), *cert. denied*, 572 U.S. 1044 (2014).

Granger may proceed to federal habeas review of an unexhausted and procedurally barred claim only if he can satisfy the requirements of *Martinez* and *Trevino*. The question before the court is whether Granger made the requisite showing under *Martinez* and *Trevino* as to each of his applicable, procedurally defaulted, ineffective assistance of counsel claims.

Granger presents new evidence with his amended petition to argue that his trial counsel and state habeas counsel were ineffective. Based on the arguments presented by Granger, he focuses on whether trial counsel discharged their respective duties to uncover and present mitigating evidence and whether state habeas counsel's alleged failure to raise ineffective assistance of trial counsel claims in Granger's first state application for a writ of habeas corpus (*Granger I*) overcomes the default. Granger's new evidence presented in *Granger II* was not reviewed by the TCCA because *Granger II* was dismissed for abuse of the writ. Granger has also attached new evidence to his federal habeas petition that was not attached to his second state habeas application in *Granger II*. This new evidence attached to his amended federal petition has not been presented to or reviewed by the TCCA.

Recently, the Supreme Court decided *Shinn v. Ramirez*, 142 S. Ct. 1718 (2022), which narrowed *Martinez*'s scope. In *Ramirez*, the Court held "that, under § 2254(e)(2), a federal

habeas court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record based on ineffective assistance of state post conviction counsel." *Id.* at 1734. Instead, "a federal court may order an evidentiary hearing or otherwise expand the state-court record only if the prisoner can satisfy § 2254(e)(2)'s stringent requirements." *Id.* at 1735.

Under Section 2254(e)(2), where the petitioner has "failed to develop the factual basis of a claim in state court proceedings, a federal [habeas] court may hold an evidentiary hearing on the claim only if the claim relies on (1) a 'new' and 'previously unavailable' 'rule of constitutional law' made retroactively applicable by [the Supreme] Court, or (2) 'a factual predicate that could not have been previously discovered through the exercise of due diligence.'" *Ramirez*, 142 S. Ct. at 1734 (quoting §§ 2254(e)(2)(A)(i), (ii)). The petitioner must then "show that further fact finding would demonstrate, 'by clear and convincing evidence,' that 'no reasonable fact finder' would have convicted him of the crime charged." *Id.* (quoting § 2254(e)(2)(B)). Granger fails to show specifically that his new evidence comports with the requirements of Section 2254(e)(2), as required by *Ramirez*.[9]

E.    New Evidence under Section 2254(d)(1)

The "AEDPA also restricts the ability of a federal habeas court to develop and consider new evidence." *Shoop v. Twyford*, 142 S. Ct. 2037, 2043 (2022). "Review of factual determinations under § 2254(d)(2) is expressly limited to 'the evidence presented in the State court

---

[9]    In seeming contrast to the holding in *Ramirez* and *Cole v. Lumpkin*, No. 21-70011, 2022 WL 3710723 (5th Cir. Aug. 26, 2022), regarding new evidence presented in a procedurally defaulted IATC claim, the Fifth Circuit in *Mullis v. Lumpkin*, 47 F.4th 380, 393–95 (5th Cir. 2022) acknowledged the applicability of *Ramirez*'s holding to Mullis's new evidence regarding his IATC claims but still granted COA to the questions of (1) whether Mullis's state habeas counsel rendered inadequate assistance by conceding that Mullis was competent to waive review of his claims on state habeas review; (2) whether the court could reach that conclusion based on evidence consistent with the holding in *Ramirez*; and (3) if Mullis's state habeas counsel rendered inadequate assistance, whether the inadequate assistance was a cause external to Mullis. Here, Mullis's and Granger's fact patterns are distinguishable from each other in that Mullis repeatedly waived his right to appellate and habeas review of his IATC mitigation claims because of mental illness issues.

proceeding.'" *Id.* at 2043–44. "[R]eview under § 2254(d)(1) is [also] limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 563 U.S. at 181. As such, "evidence later introduced in federal court is irrelevant." *Id.* at 184. Only in certain, narrow circumstances may a habeas petitioner present evidence that was not part of the state-court record. *Shoop*, 142 S. Ct. at 2044. "Thus, although state prisoners may occasionally submit new evidence in federal court, [the] 'AEDPA's statutory scheme is designed to strongly discourage them from doing so." *Id.* (quoting *Pinholster*, 563 U.S. at 186).

"[I]f § 2254(e)(2) applies and the [petitioner] cannot meet the statute's standards for admitting new merits evidence, it serves no purpose to develop such evidence just to assess cause and prejudice." *Id.* at 2046 (citing *Ramirez*, 142 S. Ct. at 1738 ("[W]hen a federal habeas court . . . admits or reviews new evidence for any purpose, it may not consider that evidence on the merits of a negligent prisoner's defaulted claim unless the exceptions in § 2254(e)(2) are satisfied.")).

Granger proffers new evidence and argument in support of his various unexhausted, procedurally defaulted claims. He also presents new evidence in support of his exhausted claims. The court will determine for each claim whether this new evidence may be considered within the applicable statutory and case law framework.

VI.     Discussion and Analysis

A.     Claim One (IATC):  Trial counsels' conflicting loyalties actually affected their performance at both phases of trial, and the cumulative effect of their deficient performance prejudiced the defense at both phases of trial, depriving Granger of his Sixth Amendment rights.

Granger's first ineffective assistance of trial counsel ("IATC" or "IAC") claim speculates that his trial defense team, Makin, Cribbs, and Joel Vasquez ("Vasquez"), were conflicted because

the shooting of Sebolt occurred in front of the Jefferson County Courthouse where they, other attorneys, or other persons they knew sometimes practiced or worked.  In addition, Granger speculates that Makin was conflicted because Makin's daughter worked in the Clerk's Office in the courthouse.  He does not offer any facts or statements from counsel, however, that establish any such conflict existed regarding their loyalties.  *Bradford v. Whitley*, 953 F.2d 1008, 1012 (5th Cir.) (holding that mere speculation and conjecture cannot establish the prejudice prong of *Strickland* and conclusory allegations are not sufficient to obtain habeas relief),  *cert. denied*, 506 U.S. 829 (1992); *Koch v. Puckett*, 907 F.2d 524, 530 (5th Cir. 1990) (same).

The Director contends that Granger's claim is procedurally barred and that he fails to excuse the default of his claim under *Martinez*.  (#53 at 39–53).  The Director further asserts that Granger's new evidence cannot be considered.  He states, in the alternative, that Granger's claim is without merit and should be denied.  (#53 at 39).

Granger contends his trial attorneys suffered from a conflict of self-interest.  *See Beets v. Scott*, 65 F.3d 1258, 1278 (5th Cir. 1995) (explaining the difference between conflict of interest in the multiple representation context and the conflict of self-interest context, and the standards applicable to each), *cert. denied*, 517 U.S. 1252 (1996).[10]  Under *Beets*, a defendant claiming that his attorney has a conflict of interest must show a reasonable probability that the conflict "prejudiced the defense, undermining the reliability of the proceeding."  *Beets*, 65 F.3d at 1273.  Other than his unadorned statement, Granger does not provide any facts or statements that

---

[10]      Here, Granger is not asserting that there was a conflict of interest because counsel were representing multiple clients in the same proceeding.  *See Beets*, 65 F.3d at 1266.  The Fifth Circuit held in *Beets* that *Cuyler v. Sullivan*, 446 U.S. 335 (1980), applies only when counsel is representing multiple clients in the same proceeding.  *Beets*, 65 F.3d at 1266 ("Neither *Cuyler* nor its progeny strayed beyond the ethical problems of multiple representation.  One cannot read *Cuyler* to analyze conflicts of interests in a context broader than that of multiple client representation.").

reasonably show that any of his trial counsel suffered from a conflict of loyalty or self-interest. Taking Granger's rationale to its logical conclusion, no attorney who had practiced in the Jefferson County courthouse would have been able to represent him because they, too, would have a conflict of self-interest.

In all other contexts besides multiple representation conflicts, the Fifth Circuit explained that the *Strickland* framework applies. *Beets*, 65 F.3d at 1260 ("*Strickland* more appropriately gauges an attorney's conflict of interest that springs not from multiple client representation but from a conflict between the attorney's personal interest and that of his client."). *Strickland* applies in the instant case. Contrary to Granger's claims of self-interest or disloyalty, "*Strickland* . . . calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." *See Richter*, 562 U.S. at 110. Granger's conclusory statements of disloyalty or self-interest are not sufficient to establish a *per se* claim for ineffective assistance of counsel. He must establish that both deficient performance and prejudice exist. *Strickland*, 466 U.S. at 687.

Granger's first IAC claim is essentially a cumulative error claim. The thirteen issues below are similar or the same as Granger's Claims 2–8, 11–12, and 16. As a result of his defense team's alleged conflict of self-interest, Granger asserts that his defense team:

> (1)  retained an investigator whose son was one of the State's witnesses, and who, as the recently retired Chief of the Beaumont Police, was the former boss of many of the other witnesses;
>
> (2)  secured the appointment of a psychiatrist who already served as the court's competency expert and had formed the opinion that Granger was not psychotic and could control his behavior;
>
> (3)  allowed the seating of two jurors who were victims of childhood sexual abuse and/or hostage-taking and a third juror who had been close to an elderly woman who was murdered;

43

(4)  did not object when the prosecution selected a jury of eleven white jurors and one black juror who could vote for death;

(5)  called witnesses who gave extremely harmful testimony, sometimes elicited by the defense on direct examination;

(6)  presented a ballistics expert who was the only witness to opine that the bullets that killed the victim, Sebolt, came from the location from which their client was firing, contradicting Granger's testimony;

(7)  elicited testimony from seven different witnesses that the "felony" for which Granger was on trial at the time of the shooting was the sexual assault of his daughter;

(8)  failed to object to the State's admission of certain prior bad acts and impeachment evidence on cross-examination despite having won pretrial motions precluding the same;

(9)  during the punishment phase, the defense team curtailed the mitigation specialist's investigation, ignored the psychologist's "advice" that Granger had brain damage, and relied on Granger to describe his background and functioning;

(10)  failed to reveal testing of Granger's brain damage to the psychiatrist so that the psychiatrist would reassess his opinions of Granger;

(11)  failed to prepare the psychiatrist to testify during the punishment phase and failed to learn his opinions regarding future dangerousness of Granger;

(12)  called punishment phase witnesses, including the pastor, who gave dramatically damaging testimony regarding Granger; and

(13)  during closing argument, neither defense counsel explicitly asked the jury to impose a life sentence.

As a threshold matter, the court must determine whether this issue was exhausted or procedurally defaulted.  As discussed above, a federal court may not grant habeas relief unless it appears that the applicant has exhausted the available remedies in the state courts.  *See* 28 U.S.C. § 2254(b)(1)(A); *Richter*, 562 U.S. at 103.  When a petitioner fails to raise a claim properly in state court, he "has deprived the state courts of an opportunity to address those claims in the first instance."  *Coleman*, 501 U.S. at 732.  Accordingly, preventing review of claims decided on state

law grounds "ensures that the States' interest in correcting their own mistakes is respected in all federal habeas cases." *Id*. Federal review is precluded "whether the state law ground is substantive or procedural." *Id*. at 729.

A state-law procedural bar is adequate to preclude federal consideration if it is "firmly established and regularly followed." *Lee v. Kemna*, 534 U.S. 362, 885 (2002) (quoting *James v. Kentucky*, 466 U.S. 341, 348 (1984)). The discretionary nature of such a bar does not make it any less "adequate" for a "discretionary rule can be 'firmly established' and 'regularly followed'—even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others." *Beard v. Kindler*, 558 U.S. 53, 60–61 (2009) (citation omitted). Those situations where a state-law ground is found inadequate are but a "small category of cases." *Kemna*, 534 U.S. at 381.

Here, Granger requested a stay to return to state court and fully exhaust this claim. (#22). This court recognized the claim was unexhausted when it granted Granger's request. (#34). Granger presented this claim with its thirteen subparts in his subsequent state habeas application, but the TCCA dismissed the subsequent application as an abuse of the writ without reaching the merits. *Ex parte Granger II*, 2020 WL 915434, at *1. A federal claim is procedurally defaulted and barred from federal habeas review when a state court's rejection of it rests on "an independent and adequate state procedural rule." *Coleman*, 501 U.S. at 750. The Texas abuse-of-the-writ bar is adequate, *see Hughes*, 530 F.3d at 342 ("This court has held that, since 1994, the Texas abuse of the writ doctrine has been consistently applied as a procedural bar."), and independent of federal law. *See Balentine v. Thaler*, 626 F.3d 842, 854–57 (5th Cir. 2010) (holding that a "silent[]" dismissal of a mitigation-ineffectiveness claim pursuant to the abuse-of-the-writ statute

was independent of federal law), *cert. denied*, 564 U.S. 1006 (2011).  In *Hughes*, the Fifth Circuit further explained:

> No application or interpretation of federal law is required to determine whether a claim has, or could have, been presented in a previous habeas application.  The [TCCA] did not need to consider or decide the merits of [a petitioner's] constitutional claims in reaching its decision to dismiss those claims as an abuse of the writ pursuant to Article 11.071, Section 5.  Furthermore, there is nothing in its perfunctory dismissal of the claims that suggests that it actually considered or ruled on the merits.  Accordingly, its decision was independent of federal law for purposes of application of the procedural default doctrine.

530 F.3d at 342.  The same is true for Granger.  The TCCA's decision was independent of federal law for purposes of application of the procedural default doctrine.  A procedural default on state law grounds prevents federal merits adjudication.

To overcome a default under *Martinez*, as discussed above, a petitioner must demonstrate that the underlying IATC claim "is a substantial one."  *Martinez*, 566 U.S. at 14 (citing *Miller–El v. Cockrell*, 537 U.S. 322 (2003)).  "For a claim to be 'substantial,' a petitioner 'must demonstrate that the claim has some merit.'"  *Reed*, 739 F.3d at 774 (quoting *Martinez*, 566 U.S. at 14).  "Conversely, an 'insubstantial' ineffective assistance claim is one that 'does not have any merit' or that is 'wholly without factual support.'"  *Id*. (quoting *Martinez*, 566 U.S. at 15–16).

Granger's Claim 1, with its thirteen (13) subparts, is barred from federal merits adjudication on state law procedural grounds.  The court notes that Claim 1, with its thirteen (13) subparts, is intertwined with Claims 2–8, 11–12, and 16—also apparently procedurally defaulted ineffective assistance of counsel claims (IAC or IATC).  The court will consider whether each subpart is substantial for *Martinez* purposes in connection with the corresponding claims below.

B.  <u>Claim 2 (IATC):  Trial counsel was ineffective at *voir dire* for failing to challenge ten of the twelve seated jurors as biased or otherwise unqualified to serve</u>.

<u>Claim 1(3):  Trial counsel "allowed the seating of two jurors who [had] been victims of childhood sexual abuse and/or hostage-taking, and a third juror who had been close to an elderly woman who was murdered."</u>

Granger contends that his trial counsel provided ineffective assistance of counsel by failing to challenge ten of the twelve seated jurors as biased or otherwise unqualified to serve.  (#44 at 45–65).  He first raised this claim in his second or successive state habeas application.  SHCR-02 at 38–56.  Granger's state habeas application, however, was dismissed as an abuse of the writ. *Ex parte Granger II*, 2020 WL 915434, at *1.  The Director states that Granger's claim is procedurally barred and not entitled to a merits review of the claim.  (#53 at 53–90).  The Director further argues that even if the claim were not procedurally barred, the claim is without merit.

As the entirety of this claim is procedurally barred by the TCCA's dismissal of his successive state habeas application as an abuse of the writ, Granger must satisfy the requirements of *Martinez/Trevino* to be entitled to a review of its merits.  Granger asserts that trial counsel provided ineffective assistance of counsel during the *voir dire* process.  Granger's Claim 2 is a five-part IATC claim faulting trial counsel for failing to challenge:

(a) jurors Gillas, Rivera, and Beard for having experienced similar violence to that presented [or discussed] in Granger's trial;

(b) juror Shanks for not being life qualified;

(c) juror Korin for her bias against psychological mitigation evidence;

(d) five jurors who were empaneled despite their unknown ability to consider mitigating evidence due to the State's improper definition; *Id*. at 33–49; and

(e) for failing to exhaust peremptory challenges.  *Id*. at 49.

"*Voir dire* plays a critical function in assuring the criminal defendant that his constitutional right to an impartial jury will be honored."  *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) (brackets and citation omitted).  "[N]o hard-and-fast formula dictates the necessary depth or

47

breadth of *voir dire*." *Skilling v. United States*, 561 U.S. 358, 368 (2010). Because every attorney will likely conduct *voir dire* in a different manner, the mere fact that another attorney might have asked different questions will not support a finding of ineffective assistance. *See Garza*, 738 F.3d at 676 ("Moreover, Garza cites no authority, and we have found none, that would require a defense attorney to ask specific questions at *voir dire*."). Rather, a defense attorney's method of *voir dire* is strategic and entitled to substantial deference, and thus "cannot be the basis for a claim of ineffective assistance of counsel unless counsel's tactics are shown to be so ill chosen that it permeates the entire trial with obvious unfairness." *Teague v. Scott*, 60 F.3d 1167, 1172 (5th Cir. 1995) (quotation and citation omitted).

In the context of determining whether the failure to strike an allegedly partial juror constitutes deficient performance, a court must first evaluate whether the juror at issue was actually biased. *Virgil v. Dretke*, 446 F.3d 598, 608–10 (5th Cir. 2006). The bias determination centers on a juror's own indication that he has "such fixed opinions that [he] could not judge impartially [defendant's] guilt." *Patton v. Yount*, 467 U.S. 1025, 1035 (1984); *Virgil*, 446 F.3d at 607 (holding that "the Supreme Court's treatment of the right to an impartial jury is more than a mere backdrop to our analysis; it is the lens through which we must examine counsel's performance in this case") (citation omitted); *see Seigfried v. Greer*, 372 F. App'x 536, 539 (5th Cir.) (per curiam), *cert. denied*, 562 U.S. 1066 (2010). In other words, a court must determine "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instruction and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)). Jurors satisfy the constitutional mandate of impartiality if they can "lay aside [their] impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717, 723 (1961).

Based on the above criteria, the court's review will center on whether any one of the jurors identified by Granger was biased and, if so, whether additional questioning by counsel would have made the juror subject to removal for cause. *See Villanueva v. Stephens*, 555 F. App'x 300, 306 (5th Cir. 2014) (holding that to establish deficient performance, a petitioner "must identify any particular juror [who] was in fact prejudiced and must establish that had counsel's questioning focused on a specific area of bias, the bias would have been found") (citation omitted).

### 1.   Alleged Biases Related to Similar Violent Experiences

Granger asserts that Jurors Gillas, Rivera, and Beard should have been struck for cause because each had experienced, or had known people who had experienced, similar violence to that discussed in Granger's trial. (#44 at 47-52). Each of these jurors unequivocally stated that they could fairly and impartially serve as jurors in Granger's trial, and Granger offers only speculation and skepticism that the jurors' statements should not be believed. Absent a showing of bias, counsel cannot be deficient for failing to challenge each of these three jurors.

### a.   Juror Gillas

During *voir dire*, the State asked Juror Gillas about her questionnaire answer indicating that she had been a victim of a crime, namely that she had been molested by her stepfather. 14 RR 136. Informing Gillas that there may be a similar allegation at trial, the State asked, "If it does come up in this trial, will . . . what occurred with you, will it affect you in any way whatsoever?" *Id*. Gillas responded, "Well, of course, it would affect me." *Id*. The State then asked whether "it would affect [her] decisions as to whether or not to find the defendant guilty or . . . how to answer the questions?" *Id*. Gillas answered that her experience "will certainly have some bearing" because she will have "personal knowledge of how that could affect an individual[.]" *Id*. at 136–37.

49

Crucially, however, when the State asked whether Gillas could "follow her oath and not allow [her] prior . . . life experiences to influence those decisions[,]" Gillas answered that her decision would be "based on the evidence presented." *Id*. at 137.  When asked again whether her "prior life experiences with [her] stepfather [would] cause an emotional response which would make [her] make a decision on guilt or innocence or the answers to the questions based upon [her] emotions and not upon the facts that were presented to" her, she responded, "Not likely." *Id*. at 138.  And when pressed on whether "it would not or it would," she stated that she did not know because "it's really so theoretical at this point." *Id*. at 138–39.

Granger faults counsel for not exploring Gillas's prior experience because it gave her "an extremely personal connection" to what would be the "focus of the defense presentation at the guilt phase and the State's presentation at the penalty phase." (#44 at 48–49).  As evidence of Gillas's actual bias, Granger first points to Gillas's affirmative answers to the State's question of whether her experiences would affect her "in any way whatsoever." (*Id*. at 48).  Nonetheless, given the context of this expansive question, *i.e.*, whether Gillas could completely disassociate herself from her prior life experience, her responses indicating that "of course it would affect her" and that "it would have some bearing" are entirely unremarkable.

The Constitution does not mandate that jurors promise to firewall their life experiences completely before serving. *See Virgil*, 446 F.3d at 609.  "Merely expressing that a life experience shades one's view does *not* equate to bias." *White v. Quarterman*, 275 F. App'x 380, 383 (5th Cir.) (per curiam), *cert. denied*, 555 U.S. 999 (2008).  A defendant is not entitled to "blank slate" jurors without any preconceived notions or opinions. *Virgil*, 446 F.3d at 609.  Applying *Virgil* is outcome determinative:  Gillas was not required to affirm that her life experiences would have *no* effect whatsoever on her deliberations. *White*, 275 F. App'x at 383.  Given the context of the

State's unanchored question, Gillas's answers do not present a legal basis upon which trial counsel could have challenged Gillas for cause.

Granger then complains about Gillas's admission of some uncertainty when the State pushed further.  (#44 at 48–49); 14 RR 138–39.  None of Gillas's answers, however, are unequivocal statements that she could not serve as a fair and impartial juror, nor do they even suggest that her experience would affect her deliberations in *this* trial in anything but a hypothetical sense, as she confirmed immediately after the above exchange.  14 RR 139 (volunteering that "it's really *so theoretical* at this point" (emphasis added)).

Ambiguous statements are a far cry from the types of unequivocal statements necessary to demonstrate bias and, in turn, to obligate counsel to ask more questions or otherwise challenge the juror as biased.  *Compare Virgil*,[11] 446 F.3d at 613 ("[Jurors] unequivocally expressed [that they could not sit] as fair and impartial jurors."), *with Flores v. Davis*, 734 F. App'x 278, 279 (5th Cir. 2018) (per curiam) (holding that statement that veniremember "th[ought] his past experience as a crime victim 'would affect [his] ability to be fair' was an 'ambiguous statement . . . distinguishable from the responses deemed biased in *Virgil*'"), *cert. denied*, 139 S. Ct. 2671 (2019).  In *Torres v. Thaler*, 395 F. App'x 101, 107–08 (5th Cir. 2010), *cert. denied*, 562 U.S. 1230 (2011), the Fifth Circuit found that *Virgil* did not control petitioner's claims of juror bias where, unlike *Virgil*, the juror's "statements on the record during *voir dire* were vague," and "did not expressly indicate prejudice."  The juror merely stated that "he *thought* his experiences would

---

[11]    In *Virgil*, one prospective juror stated that "his relationship with law-enforcement officers would preclude him from serving as an impartial juror," while another stated that he could not be "fair and impartial" to the defendant, in a case involving an assault on an elderly person, because his mother had been mugged.  446 F.3d at 609–10.  The Fifth Circuit held that both jurors were actually biased where they had "unequivocally expressed that they could not sit as fair and impartial jurors."  *Id*. at 613.

affect his impartiality" and he "would 'probably' be more for the State"; however, the juror provided no statement "definitively show[ing] he would not be impartial." In *Seigfried*, 372 F. App'x at 539–40, the Fifth Circuit found no bias where a prospective juror answered: "I honestly am not sure, but I think that I would… I really don't know," to the question of whether she would have a hard time applying the law. Ambiguous testimony is "not unusual on *voir dire* examination." *Patton*, 467 U.S. at 1025.

Similar to the juror in *Seigfried*, even if Gillas's statements could be construed as "hint[ing] at possible bias against [Granger], [Gillas] never explicitly stated that she could not be an impartial juror." 372 F. App'x at 540. Rather, Gillas affirmatively demonstrated her constitutional *impartiality*. After Gillas expressed her difficulty with the theoretical nature of the proceedings at that point, the State then described the process to her, during which she repeatedly and unequivocally stated that she could follow the law. *See, e.g.,* 14 RR 132 (stating she could follow her oath to consider or weigh any testimony or evidence introduced at trial), 14 RR 139–40 (stating she could return a guilt-phase verdict depending on whether the State met its burden), 14 RR 141 (stating she can follow the range of punishment for a lesser-included offense), 14 RR 143 (stating she can follow the law regarding the presumption of innocence and the defendant's right not to testify), 14 RR 145–52 (stating she can answer special issues "depending upon the evidence"). At the conclusion of the State's explanation, Gillas was asked whether she "could serve as a juror on this kind of case," to which she definitively answered, "Yes, I can." *Id*. at 152.

"[I]n cases in which potential jurors have disclosed grounds for possible bias"—which Gillas did in both her questionnaire and her *voir dire* testimony—"but have stated that they could be fair"—which Gillas repeatedly did during *voir dire*—the Fifth Circuit has "held that the

defendant was not denied an impartial jury." *Buckner v. Davis*, 945 F.3d 907, 911 (5th Cir. 2019) (citing *Green v. Quarterman*, 213 F. App'x 279, 281 (5th Cir. 2007)), *cert. denied*, 140 S. Ct. 2832 (2020). Beyond rank speculation, (#44 at 49) (acknowledging Gillas said "she could answer depending on the evidence" but that "she never backed off from the obvious: that the abuse she suffered would affect her as a juror"), Granger offers no argument or evidence suggesting that Gillas's answers were false. *See Patton*, 467 U.S. at 1035 (determining bias centers on a juror's own indication that he has such fixed opinions that he could not be impartial); *see also Green*, 213 F. App'x at 281 ("Concerning actual bias, Green offers no evidence suggesting the jurors' answers were false.").

Granger implies that all sexual assault survivors are biased jurors in any prosecution that involves such evidence, even when the juror has not confirmed such bias. (#44 at 48) ("Counsel had no valid strategic reason to leave a childhood sexual abuse survivor to sit in judgment on a client whose trial would spotlight charges of childhood sexual abuse."). In *Andrews v. Collins*, however, the Fifth Circuit recognized that "'[t]he Supreme Court has never explicitly adopted or rejected the doctrine of implied bias.' Moreover, the Court has not looked favorably upon attempts to impute bias to jurors." 21 F.3d 612, 620 (5th Cir. 1994) (quoting *Tinsley v. Borg*, 895 F.2d 520, 527 (9th Cir. 1990), *cert. denied*, 498 U.S. 1091 (1991)), *cert. denied*, 513 U.S. 1114 (1995). The court will follow *Andrews*.[12]

---

[12] The Fifth Circuit later held the opposite in *Brooks v. Dretke*, 444 F.3d 328, 329 (5th Cir. 2006); however, *Andrews* is controlling. *See Goodwin v. Johnson*, 132 F.3d 162, 175–76 (5th Cir.1997) (noting longstanding rule that no panel may overrule a decision made by a prior panel); *see also Uranga v. Davis*, 893 F.3d 282, 288 (5th Cir. 2018) (acknowledging tension between *Brooks* and *Andrews* but declining to resolve it), *cert. denied*, 139 S. Ct. 1179 (2019). This court declines to create a new rule regarding implied bias—which would be in violation of *Teague v. Lane*, 489 U.S. 288, 316 (1989) (holding that newly recognized rules of criminal procedure do not apply retroactively on collateral review).

On these facts, Granger cannot establish that trial counsel was deficient for failing to challenge Gillas for cause, because he has not identified a meritorious factual basis upon which a challenge for cause would be sustained.  *Cf. Patton*, 467 U.S. at 1036 (holding that juror bias is a question of fact).  Gillas's comments do not constitute a definite expression of an inability to be fair and impartial.  The law does not require counsel to raise meritless legal arguments. *Knowles v. Mirzayance*, 556 U.S. 111, 127 (2009) ("The law does not require counsel to raise every available nonfrivolous defense.  Counsel also is not required to have a tactical reason—above and beyond a reasonable appraisal of a claim's dismal prospects for success—for recommending that a weak claim be dropped altogether."  (internal citations omitted)); *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir.) ("Failure to raise meritless objections is not ineffective lawyering; it is the very opposite."), *cert. denied*, 513 U.S. 966 (1994).

Granger also has not shown counsel to be deficient for not questioning Gillas about her experience or using a peremptory strike against her.  (#44 at 49).  The Fifth Circuit has made clear that an "attorney's actions during *voir dire* are considered to be a matter of trial strategy." *Teague*, 60 F.3d at 1172.  Indeed, a reasonably effective defense attorney could justifiably conclude both that Gillas was not actually biased and, further, that she would be favorable to the defense. *See Cordova v. Johnson*, 993 F. Supp. 473, 530 (W.D. Tex. 1998) ("There is nothing unreasonable or professionally deficient in a defense counsel's informed decision to rely upon his own reading of veniremembers' verbal answers, body language, and overall demeanor during the prosecution's *voir dire* examination." (citing *Romero v. Lynaugh*, 884 F.2d 871, 878 (5th Cir. 1989), *cert. denied*, 494 U.S. 1012 (1990)).

Absent record evidence of Gillas's unequivocal and disqualifying bias toward Granger, counsel was left with strategic decisions, and despite Granger's protestations to the contrary (#44 at 49), there is no absolute rule that an attorney is *always* required to exercise a strike in this circumstance. *See Mass v. Quarterman*, 446 F. Supp. 2d 671, 704 (W.D. Tex. 2006) ("The informed exercise of peremptory challenges involves consideration of myriad factors, including a trial counsel's assessment of the critical factual disputes which the jury must resolve, the likelihood individual veniremembers' life experiences and non-disqualifying biases will cause them to be favorably or unfavorably disposed toward a particular side, and similar factors. . . . By its nature, jury selection is a highly intuitive process."); *cf. Strickland*, 466 U.S. at 689 ("Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions.").

There is no rule that defense counsel "*must* ask questions at all," particularly where, as here, the State ably and thoroughly examined the nature of any alleged bias. *Battaglia v. Stephens*, 621 F. App'x 781, 785 (5th Cir. 2015) (per curiam), *cert. denied*, 577 U.S. 1071 (2016); *Garza*, 738 F.3d at 676 (noting petitioner cited to no authority "that would require a defense attorney to ask specific questions at *voir dire*" and that, where the State asked extensive questions regarding venire's views on the death penalty, courts must "consider the full scope of the questions asked and answers given at *voir dire* to meaningfully evaluate the adequacy of trial counsel's attempts to identify juror bias"). Granger fails to overcome the presumption that counsel's decision not to challenge or strike Gillas fell within the broad range of objectively reasonable professional discretion. *See Strickland*, 466 U.S. at 690.

55

Granger, moreover, fails to establish any prejudice.  Granger invokes *Virgil*, suggesting that the court "must conclude" that Gillas's presence on the jury necessarily rendered the verdict fundamentally "unreliable because of a breakdown in the adversarial process."  (#44 at 47) (quoting *Virgil*, 446 F.3d at 613).  Gillas, however, never unequivocally expressed a belief that she could *not* be fair and impartial.  Granger, therefore, cannot invoke *Virgil*'s "presumption" of unreliability.  *See* 446 F.3d at 612–13; *see also Strickland*, 466 U.S. at 693 ("[N]ot every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding.").  Because *Virgil's* presumption of unreliability does not apply, Granger's effort to demonstrate *Strickland* prejudice falters, as he cites no other competent evidence to support a finding that Gillas's presence on the jury improperly affected the outcome with regard to guilt or punishment.  His mere speculation can never entitle him to relief.  *Bradford*, 953 F.2d at 1012 (holding that mere speculation and conjecture cannot establish the prejudice prong of *Strickland* and conclusory allegations are not sufficient to obtain habeas relief); *Koch*, 907 F.2d at 530 (same).  Thus, Granger's claim regarding Juror Gillas fails even under *de novo* review.

> b.   Juror Rivera

Granger cites two of Juror Rivera's life experiences that he believes create a disqualifying bias against him because they "echoed the kinds of traumas the State sought to establish through the trial testimony."  (#44 at 50).  First, Rivera testified that when she was twelve years old, she and two friends "went hitchhiking."  The three girls were picked up by two men in a vehicle, after which she witnessed one of the men sexually assault one friend in the front seat while Rivera and the other friend were held at gunpoint in the back seat.  15 RR 136.  Rivera was able to escape and was not herself a victim of sexual assault.  *Id*.  Second, Rivera was working as an assistant

manager at Domino's Pizza when she was robbed at gunpoint by a former employee who had recently been fired. *Id*. at 137.

Granger concedes (#44 at 50), however, that Rivera affirmatively and definitively averred that the two experiences would have *no impact* on her deliberations as a juror:

> Q. Okay. All right. Are either one of those events that occurred to you gonna affect you in this—
>
> A. No.
>
> Q.  —particular case one way or the other? Okay.˝

15 RR 137.

> Q. Okay. Anything else . . . that you can think of that would impact your ability . . . to serve in this case?
>
> A. No . . . not that I can think of.

15 RR 137–38.

> Q. [A]ny prior experiences that you've had, whether good or bad, you need to be able to set them aside and make your decision in this case based upon the evidence that you hear from that stand . . . Can you do that, as well?
>
> A. Yes.

15 RR 139.

Rivera's responses to the prosecutor's other questions affirmatively demonstrated her impartiality across a broad range of topics. *See* 15 RR 138–54 (affirming she would follow her oath, can apply the full range of punishment, would recognize a defendant's right not to testify and the presumption of innocence, and would answer the special issues according to the evidence presented). When addressing a different claim related to Juror Rivera on state habeas review, the TCCA found Rivera "was able to render a verdict and answer the special issues according to the

57

law and evidence." *Ex parte Granger I*, 2017 WL 3379285, at *5; *cf. Patton*, 467 U.S. at 1036 (holding that juror bias is a question of fact); *Virgil*, 446 F.3d at 610 n.52 (same).

On this record, Granger has provided the court with neither a factual basis to conclude that Rivera had a disqualifying bias nor a legal basis upon which trial counsel might have challenged Rivera for cause. *See Buckner*, 945 F.3d at 911 ("Texas courts have found that a juror who was a victim of a similar crime but who credibly states he will not be affected by that fact is not biased."). Given this twin failing, trial counsel could not have been deficient, and the claim fails for this reason alone.

Unable to demonstrate bias, Granger cannot show that counsel was deficient for failing to challenge Rivera for cause, to exercise a peremptory strike against her, or to ask her more questions about her life experiences. Consequently, Granger fails the *Strickland* test for prejudice, too. First, *Virgil*'s unreliability presumption is unavailable because Rivera never unequivocally expressed a belief that she could *not* be fair and impartial—rather she unequivocally expressed the opposite. *See Virgil*, 446 F.3d at 613. Second, he cites no other competent evidence to support a finding that Rivera's presence improperly affected the outcome as to guilt or punishment. Third, conclusory assertions about the existence of prejudice can never warrant relief. *Bradford*, 953 F.2d at 1012; *Koch*, 907 F.2d at 530. Hence, Granger's claim regarding Juror Rivera fails on *de novo* review.

c.     Juror Beard

Granger alleges that Juror Beard's "personal and emotional connection to a recently murdered elderly woman should have raised concerns about her ability to be objective as a juror at Mr. Granger's trial for the murder of elderly Minnie Sebolt." (#44 at 50). During *voir dire*,

Granger's counsel asked Beard about her statement in her questionnaire that she was "very interested in a criminal case that involved [her] friend's grandmother being murdered." 10 RR 56. Counsel asked whether that "[w]ould affect [her] in any way[.]" *Id*. Beard began crying and apologized, explaining that the murder had occurred a year and a half previously, but the case had only recently closed. *Id*. at 56–57.

Counsel probed further, noting specifically that the evidence would likely show that Granger's victim was also an elderly lady. *Id*. When asked whether she would be "able to set that completely out of [her] mind where [she] will not consider that if [she is] chosen on this jury," Beard responded, "I think so." *Id*. at 57. She then noted that the murder was done in a "very malicious" manner. *Id*. When asked once again about the effect it might have on her, Beard said that she "think[s] it makes [her] more aware of the court system; but [she does not] think it will affect [her] as far as being one-sided, if that's what [counsel was] asking [her]." *Id*. Counsel explained the necessity for the questions by stating: "you can't hardly put somebody . . . on the jury box that's thinking about something else and relates [it] to this offense, cause you gotta be clearheaded and mind on this offense alone when it takes place." Beard signaled her full understanding. *Id*. at 58. She also affirmed that she understood "the seriousness of this case and where [the defense] was coming from," could give everybody a fair trial, and could listen to all the evidence. *Id*. at 59–60.

As with Juror Rivera, Granger disregards Beard's clear statements that her experiences would not affect her ability to base her verdict on the evidence, instead focusing on the fact that she "broke down crying while [counsel] questioned her about this case[.]" (#44 at 52). Granger argues that this fact, "coupled with her statements that the murder was 'very malicious,' had only

recently closed, and remained 'fairly fresh' in her mind, demonstrated her unfitness as a juror, or at least justified the use of a peremptory challenge." (*Id.*). Nevertheless, Beard's unequivocal statements that her experiences would not cause her to be "one-sided" are dispositive. *See Buckner*, 945 F.3d at 911.

Beard's emotional response about the death of her friend's grandmother does not render her statements about her impartiality untrue. *See id.* at 908 (juror admitting father's conviction for sexually assaulting stepsister "was an 'emotional issue' for him, but he repeatedly stated that he could be fair and impartial"); *see also White*, 275 F. App'x at 383 ("Merely expressing that a life experience shades one's view does *not* equate to bias."). At most, Beard's statements could be considered ambiguous, but again, that does not establish bias. *Flores*, 734 F. App'x at 279; *Seigfried*, 372 F. App'x at 540. Considering that the above exchange occurred during defense counsel's questioning, Granger's complaints that counsel should have asked *more* questions are nothing but a matter of degree, which is not enough to establish a *Strickland* claim. *Cf. Skinner v. Quarterman*, 576 F.3d 214, 220 (5th Cir. 2009) ("[W]e must be particularly wary of arguments that essentially come down to a matter of degrees." (citation omitted)), *cert. denied*, 559 U.S. 975 (2010); *see Battaglia*, 621 F. App'x at 786 ("Battaglia has not pointed to any cases establishing that [a] greater level of specificity in *voir dire* questioning is required in order for counsel not to be constitutionally deficient."); *but cf. Virgil*, 446 F.3d at 604 ("At no point during *voir dire* did counsel attempt to clarify, confirm, or rehabilitate this testimony."). Granger fails to demonstrate any resultant prejudice, given the vast difference between his case and *Virgil* and his mere speculation about any other prejudicial effect. *Bradford*, 953 F.2d at 1012; *Koch*, 907 F.2d at 530.

Granger fails to demonstrate that Jurors Gillas, Rivera, and Beard "had such fixed opinions that they could not judge impartially the guilt of the defendant." *Patton*, 467 U.S. at 1035. The testimony of all three of the prospective jurors generally indicated an ability to consider the evidence and follow the law when making a determination on the defendant's guilt and potential punishment, and none of the three displayed a bias that would "prevent or substantially impair" their performance as jurors, if chosen. Granger thus fails to establish that any of the three jurors who experienced similar violence—Gillas, Rivera, or Beard—were actually biased, and his claim is without merit on *de novo* review and insubstantial for the purposes of *Martinez*. Granger's claims as to Jurors Gillas, Rivera, and Beard are denied.

2.   Alleged Bias Related to Life Qualification

In challenging the fourth of the twelve seated jurors, Granger argues that Juror Shanks was not "life qualified." (#44 at 52–56). Granger opines that, through her belief that "victims deserve the right to . . . live, just like the defendant wants to live," 12 RR 25, Shanks indicated she would automatically vote for the death penalty upon conviction, and "[d]espite thirty-seven pages of *voir dire* questioning," she "never stated clearly that she could vote for life in an appropriate case, and trial counsel never asked her for an answer one way or the other." (#44 at 53). Granger argues this was ineffective because, under Texas law, "a capital juror must be willing to consider imposing a life sentence on the basis of the mitigating evidence even after finding the defendant guilty of capital murder[.]" (*Id*. at 52).

In his briefing, Granger admits that Shanks repeatedly stated that she could consider mitigating evidence. (#44 at 53–54). Importantly, the State directly asked Shanks whether she could answer the special issues, without any automatic answers:

Q. Okay. To qualify as a juror you have to have—right now as you sit there, have no automatic answers to any of the questions or verdict—any of those questions. And can you do that?

A. Yes.

Q. Once you hear the evidence, then you can make those answers; but until you hear the evidence, you cannot answer those questions. Is that correct?

A. Yes.

12 RR 21–22. Moreover, defense counsel returned to Shanks's questionnaire answer regarding why she believed in the death penalty during his *voir dire* of her. In her questionnaire, Shanks stated: "The reason I believe in the death penalty is because those victims deserve the right to live just like the defendant wants to live." 12 RR 25. Counsel stated that he "[knew] what [she] meant here" but asking her to "expound a little bit." *Id*. at 25. With some difficulty explaining herself, Shanks said that she essentially meant that "the victim or victims [were] not here anymore to think about" what they would do the rest of their lives. *Id*. at 25–26. Vasquez—one of Granger's counsel—later asked, "[I]f someone is convicted of a capital murder, they don't get the death penalty just like that (snapping fingers), do they?" *Id*. at 30. Shanks's answer was an unambiguous, "No." *Id*.

Despite Shanks's unequivocal answer, Granger asserts that Shanks could not consider mitigation or would otherwise automatically vote for the death penalty upon Granger's conviction. Granger's assertions are wholly unsupported by the record. Both trial counsel and the State expressly told Shanks that there could be no automatic answers to the special issues, and Shanks expressed her understanding and agreement. 12 RR 18-28. At no point did Shanks indicate that she could not consider mitigating factors and would automatically vote in favor of death. Granger

wholly fails to show any inadequacy in trial counsel's *voir dire*, especially given that counsel expressly asked her about her juror questionnaire answer, or any bias on Shanks's part that would warrant a challenge for cause or peremptory strike. *See Morgan*, 504 U.S. at 729 ("The Constitution, after all, does not dictate a catechism for *voir dire*, but only that the defendant be afforded an impartial jury.").

Granger's "argument that trial counsel should have asked [more or other] specific questions at *voir dire* amounts to a disagreement about trial strategy. However, under *Strickland*, [the court] usually defers to counsel's trial strategy." *Ramirez v. Stephens*, 641 F. App'x 312, 323–24 (5th Cir.) (finding that, although trial counsel did not ask the specific questions regarding life-qualification that Ramirez wishes he had, Ramirez failed to show that counsel's tactic of using the questionnaires for that purpose was "so ill chosen that it permeate[d] the entire trial with obvious unfairness" (quoting *Teague*, 60 F.3d at 1172)), *cert. denied*, 137 S. Ct. 279 (2016); *Battaglia*, 621 F. App'x at 786 (noting petitioner failed to proffer any cases requiring a greater level of specificity in *voir dire* questioning); *Garza*, 738 F.3d at 676 (finding no authority requiring counsel to ask specific questions at *voir dire*). Granger does not demonstrate any deficiency in trial counsels' performance.

Granger also fails to prove prejudice. He speculates that Shanks would automatically answer the special issues in light of her beliefs regarding the death penalty. Granger points to no evidence in the record that Shanks could not consider mitigating factors or would otherwise consider a vote for death automatically upon her finding of Granger's guilt. Absent this showing, there can be no prejudice. Granger does not establish that Shanks was actually biased. His claim

63

is without merit on *de novo* review and is insubstantial for purposes of *Martinez*.  Granger's claim as to Juror Shanks is denied.

### 3. Alleged Bias Related to Psychological Evidence

Turning to his fifth allegation of juror bias, Granger asserts that trial counsel was ineffective for failing to challenge for cause or strike Juror Korin.  (#44 at 56–58).  Granger argues that it is not enough simply to allow the presentation of mitigating evidence; instead, a juror must be able to give weight to such evidence.  (*Id*. at 56) (citing *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246, 260 (2007); *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (*Penry I*)).

Granger alleges that Korin demonstrated an "inability to take psychological evidence into account, stating that psychological and psychiatric testimony 'isn't evidence.'" (#44 at 56, quoting 13 RR 203).  Granger alleges that, though defense counsel "noticed Mariah Korin's troubling views on her juror questionnaire," he "allowed his questioning to be quickly derailed by prosecutor Shettle and did not adequately pursue the issue or move to strike Ms. Korin for cause." (*Id*.).  As with the prior four jurors, Granger fails to demonstrate any bias, deficiency, or prejudice.

During *voir dire*, Korin and defense counsel had the following exchange:

> Q. I see where you answered about the psychiatric and psychological testimony:  It's interesting to know the information but—from a professional, but it isn't evidence.  Why did you write that?
>
> A. (No response).
>
> Q. What is it that makes you think it's not evidence if—if you hear it from the witness stand?
>
> A. Well, it's not like—they weren't inside his head type of thing.  It's not—they can't—I don't know.

> Q.      No, they're not inside his head but it could be—you could hear from
> some experts from the State, from the defense, about psychology or
> psychiatry and they would be—if you hear from them, they're
> deemed experts and the judge decides if that evidence is admissible.

13 RR 203–04.   At that point, the State objected to the use of the phrase "deemed experts,"

arguing that Texas law no longer requires a judge to prejudge whether a given witness is an

"expert" and an expert's credibility is left to the factfinder.   *Id.* at 204.   Counsel then rephrased

his question:

> Q.      If you hear what is considered expert testimony and it's admissible
> evidence and the jurors hear it, it is something you—to be on the
> jury, it is something you *would have to consider*.  You wouldn't have
> to believe all of it.  You wouldn't have to—it's just something *you'd
> have to consider*, all 12 of you.  Can you do that?
>
> A.      Yes.

3 RR 204–05 (emphasis added).   Korin again later confirmed that she could consider the testimony

of *any* witness from whom she would hear.   *Id.* at 207.

As the above exchange makes clear, at no point did Korin state that she could not consider

psychological evidence in mitigation, and Granger's claim therefore fails.   At most, Korin

expressed some skepticism toward psychological evidence, but as the Fifth Circuit made plain in

*Virgil*, giving greater or lesser weight to some testimony is not bias.   446 F.3d at 608–09; *Davis
v. Thaler*, 511 F. App'x 327, 332 (5th Cir. 2013) (per curiam) ("[T]he statements Davis objects

to merely reveal an inclination to give greater weight to certain testimony; they provide no

indication that the jurors harbored any prejudice against the defendant or in favor of the State or

the victim or would otherwise be prevented from impartially determining Davis's guilt or

innocence.").   Indeed, Korin's response that psychiatrists are not "inside" the defendant's head

suggests that she could question such testimony's credibility, not refuse to consider it at all.   *Cf.*

*Virgil*, 446 F.3d at 609 (jurors not required to "come ready to serve with a blank slate, without preconception or understanding of the real world"); *see Jones v. State*, 982 S.W.2d 386, 389 (Tex. Crim. App. 1998) ("We could not have meant that jurors must be completely impartial or free of any trace of skepticism toward any category of witness. Complete impartiality cannot be realized as long as human beings are called upon to be jurors.").

Merely because her expression of doubt was inartful or ineloquent does not mean it that it was biased. As the Supreme Court has noted:

> Prospective jurors represent a cross section of the community, and their education and experience vary widely. Also, unlike witnesses, prospective jurors have had no briefing by lawyers prior to taking the stand. Jurors thus cannot be expected invariably to express themselves carefully or even consistently. Every trial judge understands this, and under our system it is that judge who is best situated to determine competency to serve impartially.

*Patton*, 467 U.S. at 1039. Attorneys, too, understand that jurors may not express themselves well, and it is certainly reasonable that defense counsel did not deem Korin's answer on her questionnaire or on *voir dire* as a pronouncement that she had determined, under the law, that psychological testimony can never be evidence that can be considered in mitigation. Given her unequivocal answer that she *could* consider such expert testimony, 13 RR 205, Granger fails to demonstrate any deficient performance by counsel. In the absence of deficient performance, Granger also fails to show prejudice. *See Virgil*, 446 F.3d at 611 ("Since we do not find counsel's performance with respect to [the jurors who expressed skepticism toward witnesses with prior offenses] to be constitutionally deficient, our inquiry is only whether Virgil's defense was prejudiced by counsel's failure to challenge for cause" actually biased jurors). Granger's claim is without merit on *de novo* review and is insubstantial for purposes of *Martinez*. Relief is denied on Granger's claim as to Juror Korin.

4.     Alleged Bias Related to Mitigating Evidence

Granger next asserts that the impartiality of five jurors—Vanderslice, Junemann, Loser, Hamilton, and O'Neil—are in question because of an allegedly improper definition provided by the State during its *voir dire*.  Granger claims that the five jurors served on his jury without a constitutionally adequate understanding of mitigating evidence.  (#44 at 58–63).  Granger argues that the State "misinformed" the jurors in two primary respects:

> it "narrowly describe[d mitigating] evidence as 'favorable' information about the defendant, rather than acknowledging the full range of information that the jurors must consider" (#44 at 58); and

> it "misled" jurors by stating that they could base their sentencing decision "entirely on the circumstances of the crime." (*id*. at 46).

Granger alleges that trial counsels' failure to object to these alleged misstatements of law "prevented trial counsel from ensuring Mr. Granger would be judged by a life-qualified and unbiased jury."  (*Id*. at 59).  Granger points to the *voir dire* of five jurors—Vanderslice, Junemann, Loser, Hamilton, and O'Neil—as evidence of both the State's misstatements and alleged juror bias.  (*Id*. at 59–63).  Granger, however, fails to show *Strickland* ineffectiveness in any portion of his claim; thus, he fails to show that he is entitled to relief.

a.     Juror Vanderslice

Granger complains that the State "repeatedly mispresented" mitigation as something "favorable" to the defendant and "further obfuscated the meaning of mitigation" by explaining that a bad childhood could be considered both mitigating or aggravating.  (#44 at 59).  Granger's selective parsing of the record does not establish a constitutional violation.

The precise nature of Granger's complaint is unclear.  He explicitly refers to a "bad childhood" as the kind of "full range" mitigation evidence that may not be "favorable" in the

typical sense but must be considered nonetheless.  (*See id.* at 58) (citing *Porter v. McCollum*, 558 U.S. 30, 38 (2009); *Parker v. Dugger*, 498 U.S. 308, 314 (1991); *Penry I*, 492 U.S. at 340; and *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982) to establish that evidence of defendant's abusive, difficult, or turbulent childhood and family history can be mitigating).  He faults the State for allegedly defining mitigation in a way that excludes the type of "double-edged" evidence that may not be on-its-face favorable, and in the same breath acknowledging the State offered examples of, and discussed, that kind of evidence.

The State cited to a bad childhood as an example of mitigation evidence during Vanderslice's individual *voir dire*, 8 RR 147–48, but during general *voir dire*, the State discussed other types of evidence a juror "may hear in the punishment phase of the trial to help you answer" the mitigation question.  7 RR 104–05.  For example, when discussing the insanity defense, the State noted that a juror "may hear evidence of [the defendant's] mental state, [or] whatever kind of mental problems he may or may not have" during punishment.  *Id.* (*see* #44 at 58).  The State also said the jury might "hear evidence of somebody who's not necessarily [intellectually disabled] but may have a low IQ," and some people "may consider that to be mitigating; but other people may think that people with . . . low IQ are really dangerous folks, if they're predisposed to commit crimes."  7 RR 105; (*see* #44 at 58).  The key, the State emphasized, is that "what is a mitigating circumstance to one person is an aggravating circumstance for somebody else."  7 RR 105.

Granger's argument appears to focus on the State's use of the word "favorable."  (*See* #44 at 58–63).  Nonetheless, if a potential juror found certain evidence sufficiently mitigating, that would obviously be favorable to Granger in the most significant sense, resulting in a life sentence

rather than death.  *See*, *e.g.*, 7 RR 99–100 (prosecutor Shettle describing mitigating evidence as "anything you've learned about this criminal defendant . . . that would convince you that he should get life rather than death" and saying "[t]here may be some evidence in his favor").  That is common sense, not an unconstitutional narrowing of the nature of mitigating evidence.  Nothing the prosecution said to Vanderslice limited her ability to consider the full range of potentially mitigating evidence.  Thus, there was nothing to which counsel could object, much less anything that could be used to challenge Vanderslice as a juror.  *See Clark*, 19 F.3d at 966 (failure to raise meritless objection is not deficient).

Moreover, even if the prosecutor's comments narrowed the definition of mitigating evidence, Granger cannot prove prejudice.  The court's jury instructions provided Vanderslice the correct—and Supreme Court endorsed—definition of mitigation.  *See* 29 RR 6–8; *Penry v. Johnson*, 532 U.S. 782, 803 (2001) (*Penry II*) (praising "the brevity and clarity of [Texas's mitigation] instruction"); *Beazley v. Johnson*, 242 F.3d 248, 260 (5th Cir.) (Texas's mitigation instruction encompasses "virtually any mitigating evidence" (brackets omitted)), *cert. denied*, 534 U.S. 945 (2001).  Jurors are "presumed to follow [their] instructions."  *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).

A passing comment during *voir dire*, weeks before punishment deliberations began, would not have undermined Vanderslice's ability to understand and follow the state judge's clear instructions regarding mitigating evidence.  *See Penry II*, 532 U.S. at 801 ("[W]e are skeptical that, by the time their penalty phase deliberations began, the jurors would have remembered the explanations given during *voir dire*, much less taken them as a binding statement of the law."); *Ramey v. Davis*, 314 F. Supp. 3d 785, 813 (S.D. Tex. 2018) ("Even if the prosecution misstated

the law, a great deal of time had passed and much had happened before the jury deliberated Ramey's punishment.  Jurors had a full ability to give effect to his evidence under the mitigation special issue which ameliorated any harm from the prosecutor's misstatement.").  Granger's claim is therefore without merit.

b.    Juror Junemann

Granger complains that the State "never explained [to Junemann] that mitigating evidence does not need to prove someone's value to society in order to serve as mitigation" and "further misled" her by stating that her decision on sentencing could be based "entirely on the circumstances of the offense."  (#44 at 60).

In her juror questionnaire, Junemann indicated that she believed in the death penalty because it "can be warranted if the . . . individual proves to be a threat to society with no potential value to society."  9 RR 67.  Though Junemann emphasized during *voir dire* that her view did not come from any source and was just her opinion, *see id.*, both the State and defense counsel complimented her on this opinion because it *almost* tracked the law.  *See id.* at 68 ("Q.  Strangely enough, it's—almost tracks what the law is."), 87 (saying that the first half of her statement "kind of might deal with that first question" and the second "kind of gets into that Question No. 2 and you kind of wonder, well, why didn't the legislature just say that in those easy terms rather than go through that thing").  Neither of these exchanges occurred during a discussion of the mitigation question specifically, and a juror's general opinion on the death penalty is in no way an indication that she could not faithfully apply the law.  *See, e.g.*, *Ramey*, 314 F. Supp. 3d at 811 (noting that even when juror said he "favored" the death penalty, "he clarified that he only meant that he

70

'believed in it' and his opinion on the death penalty would not affect his ability to consider the evidence").

Contrary to Granger's claim that neither the State nor the defense ever "explained that mitigating evidence does not need to prove someone's value to society in order to serve as mitigation," (#44 at 60), both parties explained the mitigation special issue and Junemann evidenced her understanding of it. *See* 9 RR 81–85 (State's *voir dire* on mitigation), 93–94 (defense's *voir dire*). Indeed, Junemann described mitigation as asking "whether or not the sentence of death can be warranted, including—taking into account . . . the person's background, their history, their moral culpability or moral standings." *Id.* at 81.

Junemann signaled her understanding that there were no automatic answers on this question, *id.*, and that a "yes" answer to the question would result in a life sentence, *id.* at 84. She affirmed that she could answer the question either way depending on the evidence. *Id.* at 85. She stated she could be fair to both parties, *id.*, and that she "wouldn't make a decision without weighing the evidence." *Id.* at 94. "Given the exhaustive questioning by [both sides], [Granger]'s emphasis on one answer misrepresents trial counsel's efforts and mischaracterizes the juror's ability to be impartial." *Ramey*, 314 F. Supp. 3d at 811. That, despite the above, trial counsel did not specifically ask whether Junemann now understood that "her beliefs deviated from the law," (#44 at 60), is not evidence of ineffectiveness. *See Ramey*, 314 F. Supp. 3d at 810 ("Not every attorney will conduct *voir dire* in the same manner. The mere fact that another attorney might have asked different questions will not support a finding of ineffective assistance."). Thus, there was nothing to which trial counsel should have objected or corrected.

Similarly, the State's suggestion that the facts of the crime may be enough to answer the special issues in such a way that a death sentence is imposed is a correct statement of the law. *See Miller v. Johnson*, 200 F.3d 274, 286 (5th Cir.) ("Under Texas law, although a number of factors may be considered in making the determination as to future dangerousness, the facts of the crime alone, if severe enough, can be sufficient to support the affirmative finding to the special issue." (citing *Vuong v. State*, 830 S.W.2d 929, 935 (Tex. Crim. App. 1992)), *cert. denied*, 531 U.S. 849 (2000); *cf. Wong v. Belmontes*, 558 U.S. 15, 27–28 (2009) ("It is hard to imagine expert testimony and *additional* facts about Belmontes' difficult childhood outweighing the facts of McConnell's murder."). The State's suggestion that mitigating evidence might be outweighed by the facts of the crime does not, as Granger seems to assert, suggest that the mitigating evidence is not to be considered. *See* 9 RR 82 (State's discussion of the mitigation special issue with the jury).

Regardless, Granger fails to show any prejudice for the same reasons he failed to show prejudice for juror Vanderslice. Even if there had been some misstatement of the law during *voir dire*, "[t]he comments of the court and counsel during *voir dire* were surely a distant and convoluted memory by the time the jurors began their deliberations on [Granger]'s sentence" several weeks later. *Penry II*, 532 U.S. at 802. Also, the jury is presumed to have followed the trial court's accurate instructions. *Weeks*, 528 U.S. at 234. Granger has not shown *Strickland* error with regard to Juror Junemann.

c.      Juror Loser

With respect to Juror Loser, Granger repeats the same complaint as to Juror Vanderslice—that the State's use of the word "favorable" limited the definition of mitigating

evidence.  (#44 at 60–61).  Granger faults counsel for not objecting to the State's description or
failing to clarify the definition, which "allowed Mr. Loser to answer the questions on an
inaccurate basis."  (*Id*).  This claim fails for the same reasons it fails as to Juror Vanderslice.
Namely, the State's definition is correct, and there was, therefore, nothing to which to object or
to clarify.  The State explained that mitigation requires one to "take a step back and look at the
whole picture."  14 RR 182.  The State also described "mitigating" as something that "lessens"
or "takes away" from "the bad you've heard" or something "that's favorable to the defendant."
*Id*. at 184.

During *voir dire*, trial counsel explained the mitigation question as it "is what [he's] heard
called the mercy question.  One person can decide to save his life."  *Id*. at 192.  Granger's
assertion that Loser made a decision based on anything other than the law he was charged to
follow is pure speculation.  Granger, therefore, fails to show deficient performance.  He also fails
to show prejudice given the amount of time that passed between any alleged incorrect statements
of the law and the jury's ultimate deliberations regarding punishment.  Hence, Granger has not
met his burden under *Strickland*.

### d.   Juror Hamilton

Granger once again complains of the State's use of the words "good" and "favorable"
during Juror Hamilton's *voir dire*.  (#44 at 61).  The State's definition of mitigation, however, did
not preclude the consideration of double-edged evidence.  The State specifically instructed,
"[W]hat you decide is sufficiently good is up to Ms. Hamilton."  8 RR 179.  Defense counsel
expounded that mitigation is "[p]retty much whatever you think [it] is," and it "can be anything."
*Id*. at 187.  Joking that he was giving "wild examples," trial counsel provided:  "Could be he was

a Boy Scout.  Could be bad home life.  Could be good cook.  Could be bad cook. . . . Can mean anything you want it to be."  *Id*.  Granger's wish that defense counsel had asked a specific question in a specific way falls far short of demonstrating *Strickland* deficiency.  Granger also fails to prove prejudice for the reasons stated above.

e.    <u>Juror O'Neil</u>

Granger again complains that the State improperly suggested to Juror O'Neil that the sentence can be entirely determined by the facts of the crime and that the State's use of the word "favorable" was incorrect.  (#44 at 61–62).  The former fails for the reasons stated in the discussion of Juror Junemann, *supra*, and the latter fails for the reasons stated in the discussion of Jurors Vanderslice, Loser, and Hamilton, *supra*.  Because Granger fails to demonstrate *Strickland* deficiency or prejudice, his claim challenging the jurors' impartiality is denied.

5.    <u>Failure to Exhaust Peremptory Strikes</u>

Granger finally alleges that, because the first five jurors discussed above were biased or unqualified in some fashion, counsel was ineffective for exhausting only twelve of his fifteen peremptory strikes.  (#44 at 63).  Granger's sole legal citation to support the proposition that counsel can be ineffective for failing to exhaust peremptory strikes is *Virgil*.  (*Id*.) (citing *Virgil*, 446 F.3d at 610).  *Virgil*, however, stands only for the proposition that "unchallenged statements during *voir dire* that [jurors] could not be 'fair and impartial' obligated Virgil's counsel to use a peremptory or for-cause challenge."  446 F.3d at 610.  As discussed above, Granger has not demonstrated that any of the first five jurors—Gillas, Rivera, Beard, Shanks, or Korin—were biased in any way, and, therefore, counsels' failure to use the remaining three strikes on any of them cannot be ineffective.  The fact that counsel allowed those jurors to serve on the jury *despite*

74

having available strikes is evidence not of ineffectiveness, but of trial strategy. *See Teague,* 60 F.3d at 1172 (an "attorney's actions during *voir dire* are considered to be a matter of trial strategy").

Granger does not demonstrate that a biased juror sat on his jury or that counsels' strategy during *voir dire* was unreasonable. Rather, Granger complains that trial counsel did not conduct *voir dire* in a manner that Granger, in hindsight, would have preferred. "The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (citing *Bell v. Cone*, 535 U.S. 685, 702 (2002)). Granger has not shown that trial counsel provided deficient performance or that actual prejudice resulted from counsels' performance during *voir dire*. Consequently, Granger fails to establish ineffectiveness under *Strickland* in any portion of his Claim 2 or Claim 1(3).[13] The claims lack merit and, because the claims are "insubstantial," the procedural-bar exception under *Martinez* is unavailable. *See Martinez*, 566 U.S. at 14. Granger's Claim 1(3) and Claim 2 are denied on *de novo* review and are insubstantial under *Martinez*. These claims, therefore, are denied.

   C.      Claim 3 (IATC/*Batson*): Trial counsels' failure to raise an equal protection challenge to the prosecutor's racially disproportionate exercise of peremptory challenges deprived Granger of the effective assistance of counsel.

           Claim 1(4): Trial counsel "did not object when the prosecution selected a jury of eleven white jurors and one black juror who could vote for death."

In his third claim for relief, Granger suggests that trial counsel was constitutionally deficient for failing to object to "the prosecutors' discriminatory and disproportionate exercise of their peremptory challenges" purportedly made in violation of *Batson v. Kentucky*, 476 U.S. 79,

---

[13]     Claim 1(3): Trial counsel "allowed the seating of two jurors who been victims of childhood sexual abuse and/or hostage-taking, and a third juror who had been close to an elderly woman who was murdered."

100 (1986).  (#44 at 65).  Granger also asserts that his state habeas counsel was deficient because an ineffective assistance claim pertaining to *Batson* was not raised in his first state habeas application.  (*Id*. at  69).  The Director responds that Granger's claim is procedurally barred and insubstantial for purposes of *Martinez*.  (#53 at 90–100).  In the alternative, the Director states that the claim is without merit.  (*Id*.)

In his five pages of argument regarding the lack of a *Batson* challenge, Granger provides no particular details of his claim other than to assert that prosecutors had a strike rate of 57%, or striking 4 out of 7 black veniremembers, and used 27% (4 out of 15) of their 15 peremptory challenges for black veniremembers.  (#44 at 65).  Granger asserts that he can establish at a hearing that a *Batson* objection would have been successful and that his counsel was therefore ineffective.

### 1.    Granger is Not Entitled to a Hearing

Granger is not entitled to a hearing to establish his underlying *Batson* challenge, as *Shinn v. Ramirez* forecloses this request.  142 S. Ct. at 1735.  If a petitioner was rendered ineffective assistance by state postconviction counsel and, thus, was unable to develop the state court record on a claim of ineffective assistance of trial counsel, a federal habeas court is nevertheless barred from "conduct[ing] an evidentiary hearing or otherwise consider[ing] evidence beyond the state-court record" to review that claim even if the failure to *bring* the claim is excused.  *Id*. at 1734.  Because there is no constitutional right to state postconviction counsel, "a state prisoner is responsible for counsel's negligent failure to develop the state postconviction record."  *Id*. at 1735.  Although a petitioner "often need[s] 'evidence outside the trial record' to support [his] trial-ineffective-assistance claims,"  *id*. at 1737 (citation omitted), he cannot develop that evidence in

federal court if his postconviction counsel did not do so in the state court.  Indeed, "when a federal

habeas court convenes an evidentiary hearing for any purpose, or otherwise admits or reviews new

evidence for any purpose, it may not consider that evidence on the *merits* of a negligent prisoner's

*defaulted claim* unless the exceptions in § 2254(e)(2) are satisfied." *Id.* at 1739 (emphasis added).

The upshot of *Shinn v. Ramirez* is that a federal habeas petitioner can *bring* an otherwise-defaulted

ineffective assistance of trial counsel claim in federal court, but he cannot *develop evidence* in

support of that claim.

Here, Granger did not establish any exception under Section 2254(e)(2) either by showing:

(1) "a 'new' and 'previously unavailable' 'rule of constitutional law' made retroactively applicable

by [the Supreme] Court;" or (2) "a factual predicate that could not have been previously

discovered through the exercise of due diligence." *Shoop*, 142 S. Ct. at 2044 (quoting 28 U.S.C.

§ 2254(e)(2)(A)).  Granger's request for an evidentiary hearing regarding his IATC/*Batson*

challenge is denied.

2.    Granger's Newly Presented Evidence Cannot be Considered

To support his IATC/*Batson* claim, Granger proffers what he says is the state judge's list

of jurors generated on the first day of questioning.  (A0676-81); *see also* (#44 at 65 n.3).  He also

proffers what may be juror cards containing the jurors' personal information, including their race.

(A0682-719).  These items were not a part of the state habeas record below.  Finally, he offers

a chart he compiled, aggregating the race of the questioned jurors as reflected in their juror cards.

(A0675).  For the same reasons as stated above, Granger's failure to make a showing under 28

U.S.C. § 2254(e)(2)(A) bars any consideration of this newly presented evidence.

3.     Granger's Claim is Procedurally Barred

Granger concedes that this claim was presented for the first time in Granger's second-in-time state habeas application, (#44 at 69), which was dismissed as an abuse of the writ.  *Ex parte Granger II*, 2020 WL 915434, at *1.  In the absence of an exception being shown, an independent and adequate state law ground bars federal merits review of this claim.  While Granger raises the specter of *Martinez* (#44 at 69), he fails to demonstrate a miscarriage of justice or the applicability of an exception to his claim.

Granger also fails to satisfy *Martinez* for another reason:  A Texas state habeas applicant must demonstrate *Strickland* prejudice to obtain relief on an IATC-*Batson* claim.  *See Batiste v. State*, 888 S.W.2d 9, 15 (Tex. Crim. App. 1994) ("[W]e hold that the likelihood that failure of counsel to ensure that racial discrimination did not take place in jury selection will render trial unfair is not so great as to justify exempting ineffective counsel claims for lack of a *Batson* objection from *Strickland*'s 'prejudice' prong.").  That is, state habeas counsel must establish prejudice by showing that the seated jurors could not have "render[ed] a fair and impartial verdict in the trial of a minority defendant."  *Id*.

Granger does not make that showing.  Granger fails even to suggest that, as a result of trial counsels' failure to raise a *Batson* challenge, he was forced to accept jurors who were incapable of acting impartially with respect to his race.  (*See generally* #44 at 65–69).  In his Claim 2, *supra*, Granger argues that nearly all of the seated jurors were biased against him but none of the supposed biases had any relationship to Granger's race or the constitutional scope of the supposed *Batson* violation.

Granger cannot establish *Strickland* prejudice with reference *only to* the racial composition of his jury because doing so is a direct violation of *Batson* itself: "Race cannot be a proxy for determining juror bias or competence. A person's race simply is unrelated to his fitness as a juror." *Powers v. Ohio*, 499 U.S. 400, 410 (1991) (internal quotations marks and citations omitted). Indeed, the TCCA has acknowledged the extreme difficulty that state habeas applicants face when attempting to prove *Strickland* prejudice in this circumstance. *See Batiste*, 888 S.W.2d at 16 ("A jury of any racial makeup is presumptively capable of providing the impartial tribunal necessary to ensure proper functioning of the adversarial process.").

While a properly preserved and presented *Batson* claim is treated as structural error on direct appeal, the scope of an IATC-*Batson* claim is limited for good reason.[14] *Cf. Weaver v. Massachusetts*, 137 S. Ct. 1899, 1913 (2017) ("When a structural error is raised in the context of an [IATC] claim, however, finality concerns are far more pronounced."). Granger cannot establish cause under *Martinez* because he fails to suggest a viable legal basis upon which state habeas counsel could have established *Strickland* prejudice under *Batiste*. (*See, e.g.*, #44 at 69) (suggesting only that a fifty-seven percent strike rate "supported a viable *Batson* claim that should have been raised).

---

[14] A structural error is one that "affect[s] the framework within which the trial proceeds," as distinguished from a lapse or flaw that is "simply an error in the trial process itself." *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991). Structural errors "trigger automatic reversal because they undermine the fairness of a criminal proceeding as a whole." *United States v. Davila*, 569 U.S. 597, 611 (2013). Structural errors are those that are "intrinsically harmful" and "affect substantial rights." *Neder v. United States*, 527 U.S. 1, 7 (1999). The Supreme Court has found structural error in "a very limited class of cases." *Johnson v. United States*, 520 U.S. 461, 468 (1997). These errors deprive defendants of "basic protections" without which "a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair." *Rose v. Clark*, 478 U.S. 570, 577–78 (1986) (internal citations omitted). Among this limited class of structural errors are violations of the autonomy of criminal defendants, including the right to reject court appointed counsel, *Faretta v. California*, 422 U.S. 806, 834 (1975); the right to self-representation, *see McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8 (1984); and the right to choice of counsel, *United States v. Gonzalez-Lopez*, 548 U.S. 140, 150 (2006).

Even if *Batiste* were inapplicable and state habeas counsel need show only a likelihood of success on direct appeal, Granger still fails to establish that state habeas counsel was deficient. Indeed, he provides no meaningful basis upon which state habeas counsel could have shown prejudice under even this *lower* legal threshold.

The Supreme Court has made plain that "in considering a *Batson* objection, or in reviewing a ruling claimed to be *Batson* error, all of the circumstances that bear upon the issue of racial animosity must be consulted." *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008) (citing *Miller-El v. Dretke*, 545 U.S. 231, 239 (2005)). For example, in *Miller-El*, the Supreme Court focused on numerous factors in holding that the State violated *Batson*, including: (1) the striking of 91% of qualified African American jurors, 545 U.S. at 241; (2) the consistent disparate questioning of African American and white jurors during *voir dire*, *id*. at 255–63; (3) the exercise of a jury shuffle to ensure that fewer African American jurors were on the panel, *id*. at 253–54; and (4) the district attorney's office's "specific policy of systematically excluding blacks from the jury" derived from a twenty-year-old manual on jury selection, *id*. at 263–66. Granger alleges only one of the several factors generally used to support a successful *Batson* argument on appeal. (*See* #44 at 65–69).

Granger's contention in support of his defaulted IATC claim is that trial counsel had sufficient information to make a prima facie *Batson* allegation based only on the State's strike and exclusion rate of black and Hispanic veniremembers. (*See* #44 at 65–66). Critically, however, Granger fails to establish disparate questioning by the State or to perform a comparative analysis of any kind. (*See id*. at 65–69). Granger effectively admits that he has provided no other relevant

evidence of the prosecutor's racial animus—seeking instead to establish an underlying *Batson* violation at an evidentiary hearing.  (*See id*. at 69).

This admission—that he has not carried his burden to prove purposeful discrimination under *Batson*—is fatal to his effort to invoke *Martinez*.  First, in failing to substantiate his claim of racial animus to *this* court (other than his citation to the *prima facie* data), Granger has provided no arguable basis upon which state habeas counsel could have succeeded in the state courts.  Indeed, if Granger is not presently able to invoke any of the "circumstances that bear upon the issue of racial animosity," *see Snyder*, 552 U.S. at 478, then neither could state habeas counsel.

Second, Granger's reliance on the complete *Batson* framework to substantiate his defaulted IATC claim is problematic because of the unavailability of the *Martinez* exception in Texas postconviction proceedings to overcome defaulted IATC-*Batson* claims.  *See, e.g., Ex parte Preyor*, 537 S.W.3d 1, 3 (Tex. Crim. App. 2017) (Newell, J., concurring) (declining to overrule *Ex parte Graves*, 70 S.W.3d 103, 111 (Tex. Crim. App. 2002), or to incorporate the *Martinez*/*Trevino* exception into Texas habeas procedure).  In sum, Granger wholly fails to demonstrate that state habeas counsel was ineffective for failing to raise this claim.  He fails, moreover, to demonstrate *Strickland* prejudice under *Batiste*.  Even under the lower standard, it is clear that the TCCA would have denied the claim had state habeas counsel raised the defaulted IATC claim citing *only* the State's strike and exclusion rate, as he does here.  In either instance, Granger fails to excuse the procedural default of his claim.  Granger's claim is not substantial for purposes of *Martinez*.

4.      In the Alternative, Granger's Claim is Meritless

Typically, to prove a *Batson* violation, a petitioner must overcome the deference afforded the trial court's assessment of the prosecutor's credibility.  *Snyder*, 552 U.S. at 479.  Here, however, because Granger forfeited a *Batson* claim, the trial court did not analyze the credibility of the prosecutor's race-neutral explanations with reference to the live events in the courtroom. As he must then, Granger presses this claim under *Strickland* as an IATC claim.  To establish deficiency, Granger, therefore, must show that "counsel's representation fell below an objective standard of reasonableness," and must overcome the "strong presumption" that counsel's representation was reasonable.  *Strickland*, 466 U.S. at 688–89.

Here, Granger's reliance on the statistics—derived from the juror cards, etc.—to establish the racial composition of the venire is problematic, as Granger fails to show that this information was part of the state court record in *Ex parte Granger I*.   The court cannot consider this evidence pursuant to Section 2254(e)(2) and *Pinholster*.  Even assuming such evidence accurately represents the makeup of the venire panel, and that Granger's strike- and exclusion-rate calculations are correct, he fails to establish a meritorious *Batson* claim.  *See Linscomb v. State*, 829 S.W.2d 164, 166 (Tex. Crim. App. 1992) (en banc) ("[T]he bare fact of strikes exercised against persons of a certain race does not necessarily reveal the work of a racially prejudiced mind.").

If Granger is correct that African Americans made up about twelve percent of the jury pool, then one would expect there to be about one African American juror on his jury—and there was, (*see* #44 at 52), despite the fact that the State still had a peremptory strike available, 17 RR 58 (State used fourteen out of fifteen strikes).  Granger makes no effort to establish that trial counsel, with their real-time perspective and ability to observe the demeanor of both the

82

prosecutors and veniremembers, were somehow required to object to the State's use of peremptory strikes *on this record*.  This is especially true given that the race-neutral explanations for the State's strikes of nearly all the veniremembers at issue are readily apparent on the record.[15]  For example, veniremember Jackson revealed that, though she believed she could be fair, she did not believe in the death penalty and would hold the State to a higher burden in a capital case than a noncapital case.  10 RR 170–73; *see also* 8 RR 21 (veniremember Houston, a white juror who was also struck by the State, volunteered that the State would "really have to prove it to" her, more than a traffic ticket case).  Veniremember Wafer stated that she would want someone like her on the jury "[t]o prove [her] innocent."  14 RR 76.  The State, moreover, unsuccessfully challenged for cause veniremember Harris after she agreed she "would always vote to save his life."  15 RR 63–64.  The answers provided on the record during *voir dire*, along with the demeanor of the veniremembers, could reasonably have led counsel to believe that a *Batson* challenge was not warranted.

All that Granger is left with, then, is an assertion that defense attorneys are *always* required to make a *Batson* challenge—without regard to their subjective understanding of the prosecutor's motives in making peremptory strikes—whenever a minimally sufficient statistical basis could exist to make the prima facie showing.  (*See* #44 at 68) ("An attorney's failure to make a *Batson* claim, when confronted with a prima facie case of discriminatory exercise of peremptory challenges, is deficient.").  On this point, however, Granger is simply incorrect, as the Supreme Court has reasoned:

---

[15]     Deborah Fury, an African American juror who was qualified to the panel but struck by the State as a potential alternate, 17 RR 57, was not questioned by either party in individual *voir dire*. *Id*. at 42–43. Rather, her juror questionnaire was admitted, and the State indicated that it intended to "rely upon her answers to [the questionnaire] in which to decide how to proceed with . . . jury selection." *Id*. at 43.

> No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.  Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions.

*Strickland*, 466 U.S. at 688–89.

Plainly, a defense attorney is not required to mechanistically launch a *Batson* challenge every time a prosecutor strikes 57% of the African American veniremembers.  (*See* #44 at 65).  Rather, trial counsel—who observed all the non-record interactions between the veniremembers, the attorneys, and the trial court—must be permitted to weigh those non-record factors against the strike rate and to determine whether to assert a *prima facie* challenge.

Finally, Granger fails to establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," meaning "a probability sufficient to undermine confidence in the outcome."  *King v. Davis*, 883 F.3d 577, 586 (5th Cir.) (internal quotations omitted), *cert. denied*, 139 S. Ct. 413 (2018).  "The likelihood of a different result must be substantial, not just conceivable."  *Richter*, 562 U.S. at 112 (citation omitted).  A petitioner cannot satisfy *Strickland*'s second prong with mere speculation and conjecture.  *Bradford*, 953 F.2d at 1012.  Likewise, a petitioner cannot rely on conclusory allegations.  *Koch*, 907 F.2d at 530; *Schlang v. Heard*, 691 F.2d 796, 799 (5th Cir. 1982), *cert. denied*, 461 U.S. 951 (1983).  Here, Granger's fundamental contentions regarding the existence of a *Batson* violation are wholly conclusory and speculative.  Granger's *Batson* challenge under Claim 3 and Claim 1(4) is meritless.  Thus, Granger's Claims 3 and 1(4) are denied.

D.     Claim 4 (IATC):  Trial counsels' employment of the court's competency expert as an expert for the penalty-phase defense deprived Granger of Due Process, and counsels' failure to obtain an independent expert, or to consult with and prepare his appointed expert before presenting his testimony, deprived Granger of the effective assistance of counsel.

Claim 1(2):  Trial counsel "secured the appointment of a psychiatrist who already served as the court's competency expert and had formed the opinion that Granger was not psychotic and could control his behavior."

Granger alleges that the retention of Dr. Gripon as a defense expert was improper because he had previously served as the trial court's competency expert, finding Granger not to be psychotic or delusional.  (#44 at 70).  Granger believes that Dr. Gripon's retention violated his due process rights and rendered his trial counsel ineffective.  (*Id.* at 70–79).  The Director asserts that because Granger failed to present these claims during initial state collateral review (*Granger I*), the claim is procedurally barred, and that it is without merit.  (#53 at 100–11).

Granger concedes that he attempted to pursue this claim in a subsequent state habeas application that was dismissed as an abuse of the writ.  (*See* #44 at 79); *Ex parte Granger II*, 2020 WL 915434, at *1.  As such, Granger's claim is procedurally defaulted.  He argues, however, that cause for the default exists under *Martinez* because state habeas counsel was ineffective for not pursuing this claim.

1.     Granger's New Evidence Cannot be Considered

Granger proffers numerous documents related to Dr. Gripon, including his post-trial declarations, in support of Claim 4 and its subparts:  (1) Dr. Gripon's July 2012 competency report (A0311-17); (2) Dr. Gripon's notes from March 1, 2013, evaluation of Granger (A0318-21); (3) Dr. Gripon's notes from March 23, 2013, evaluation of Granger (A0322-23); (4) Dr. Gripon's May 2018 declaration (A0367-69); (5) subpoena of Dr. Gripon (A0862); (6) Dr.

Gripon's August 2018 declaration (A0949-53); (7) selected statements of Derek VerHagen (A0958) ("I was not aware that he never knew about Dr. Hamza's test results."); and (8) selected statements of Ryan Carlyle Kent (#20-1 at 25, A0966) ("I never met with Dr. Gripon[.]"). Because this evidence was not properly presented to the state court on initial collateral review and Granger has failed to show that he meets the requirements of 28 U.S.C. § 2254(e)(2)(A), the new evidence is barred from consideration by Section 2254(e)(2).

Where a petitioner relies on *Martinez* to excuse a procedural default, "a federal court may not hold an evidentiary hearing—or otherwise consider new evidence—to assess cause and prejudice," *Ramirez*, 142 S. Ct. at 1739, if the petitioner "failed to develop the factual basis of [his] claim in State court proceedings." 28 U.S.C. § 2254(e)(2). If a petitioner fails to develop the factual basis of a claim in his state proceedings, a federal court may allow discovery and admit new evidence in only two situations: (1) "[e]ither the claim must rely on a 'new' and 'previously unavailable' 'rule of constitutional law' made retroactively applicable by [the United States Supreme] Court"; or (2) "it must rely on a 'factual predicate that could not have been previously discovered through the exercise of due diligence.'" *Shoop*, 142 S. Ct. at 2044 (quoting 28 U.S.C. § 2254(e)(2)(A)(i) and (ii)). "And even if a prisoner can satisfy one of those two exceptions, he must also show that the desired evidence would demonstrate, 'by clear and convincing evidence,' that 'no reasonable factfinder' would have convicted him of the charged crime." *Id*. (quoting 28 U.S.C. § 2254(e)(2)(B)).

Here, Granger has not shown that his IATC claim regarding Dr. Gripon relies on a new and previously unavailable rule of constitutional law or that the claim relies on a factual predicate that could not have been previously discovered through the exercise of due diligence. He further

fails to demonstrate that "no reasonable factfinder would have convicted him of the crime charged." *Id.* State habeas counsels' strategy or alleged negligence in not presenting the claim is insufficient to meet the standard stated in *Shoop v. Twyford*. *Id.* (quoting § 2254(e)(2)(A)). Thus, the court may not consider Granger's proffer of new evidence to support his Claim 4 and Claim 1(4).

### 2.   His Claims are Procedurally Barred and Without Merit

Granger concedes that his Claim 4 is procedurally barred. (*See* #44 at 79); *Ex parte Granger II*, 2020 WL 915434, at *1. Granger does not argue the miscarriage-of-justice exception to procedural default; instead, he contends that he can overcome the default under *Martinez* because both his IATC claim, and the related due process claim, are substantial. (*See* #44 at 79).

### a.   Due Process Claim

Granger argues as part of Claim 4 that his due process rights were violated because Dr. Gripon had conflicting loyalties, having previously served as the court's competency expert and found Granger competent to stand trial. (#44 at 73–75). Granger relies primarily on *Ake v. Oklahoma*, 470 U.S. 68 (1985), and *McWilliams v. Dunn*, 137 S. Ct. 1790 (2017), to support this contention. (#44 at 73–75).

Granger's reliance on *Martinez* to overcome the procedural default of his due process claim is misplaced. "*Trevino* permits a Texas prisoner to overcome the failure to raise a substantial ineffective-assistance claim in state court by showing that state habeas counsel was ineffective." *Ayestas*, 138 S. Ct. at 1093–94 (citing *Trevino*, 569 U.S. at 429). *Trevino*, however, does not permit a Texas prisoner to overcome the failure to raise non-IATC claims in state court. *See, e.g.*, *Murphy v. Davis*, 732 F. App'x 249, 256–57 (5th Cir. 2018) ("Under *Martinez* and *Trevino*, the

ineffectiveness of state habeas counsel may excuse a petitioner's procedural default 'of a single claim'—ineffective assistance of trial counsel. *Davila*, 137 S. Ct. at 2062. We are also bound by our past pronouncements that *Martinez* and *Trevino* apply 'only' to ineffective assistance of trial counsel claims."); *see, e.g.*, *Speer v. Stephens*, 781 F.3d 784, 785 (5th Cir. 2015).

The Supreme Court in *Davila* declined to extend *Martinez* and *Trevino* beyond ineffective-assistance-of-trial-counsel-claims, calling the exception "'narrow,' 'highly circumscribed,' and available only in 'limited circumstances.'" 137 S. Ct. at 2065–66. *Martinez* cannot excuse the default of a non-IATC claim. *Davila*, 137 S. Ct. at 2063–64. Granger did not, and cannot, allege a sufficient basis to overcome the procedural bar of his due process claim. Granger's due process claim is procedurally barred and does not warrant federal habeas review.

b.   IAC Claim Regarding Dr. Gripon

Regarding his IAC claim, Granger fails to show that his state habeas counsel were ineffective for failing to raise this claim. The court may not rely upon Granger's new evidence—state habeas counsels' statements (#20-1 at 15-26, A0957, A0966, A0957, A0958)—to determine whether his IAC claim is substantial under *Martinez*. *Shoop*, 142 S. Ct. at 2044. As noted above, Granger fails to demonstrate that he can meet either prong of Section 2254(e)(2(A)(i) or (ii). He does not point to, or discuss, any evidence that was presented to the state court in *Granger I* that demonstrates that this ineffective of assistance of state habeas counsel claim is substantial to overcome the procedural default through *Martinez*. The procedural default of this IAC claim is not excused.

3.     Granger's IATC Claim Regarding Dr. Gripon is also Meritless

Granger also claims that his trial counsel were ineffective for deciding to call, but failing to prepare, Dr. Gripon as a witness.  (#44 at 75–79).  "The selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]'" contemplated by *Strickland*.  *Hinton v. Alabama,* 571 U.S. 263, 275 (2014) (citation omitted); *see Dowthitt*, 230 F.3d at 748 (counsel is not required to "canvass[] the field to find a more favorable defense expert").  In any event, Granger's specific complaints about Dr. Gripon lack merit.

First, Granger contends that counsel did not properly "learn and apply the relevant law" because they did not ensure that Granger received the "*defense* expert assistance" to which he was constitutionally entitled.  (#44 at 75–76).  This claim reiterates Granger's due process claim through the IATC lens.  Trial counsel, in fact, retained *two* mental health experts, and they specifically cited to *Ake* when seeking Dr. Gripon's appointment.  (*See* 11-1 at 178, A0171).  Granger is retrospectively challenging trial counsels' strategic decisions.

Second, Granger argues that counsels' decision to use "an expert whose independence was compromised" by his prior opinions was unreasonable.  (#44 at 76).  In other words, Granger now believes that Dr. Gripon's conclusions that "Granger was not only competent but free of delusions and hallucinations, and able to control his behavior" were not favorable to him, *see id.*, and he uses his disagreement with those conclusions as evidence of Dr. Gripon's allegedly conflicting loyalties.  Granger, however, is not constitutionally entitled to a favorable expert who agrees with his own preferred conclusions.  *See Ake*, 470 U.S. at 83 (defendant does not have "a constitutional right to choose a psychiatrist of his personal liking"); *Coble v. Cockrell*, 80 F. App'x 301, 310 (5th Cir. 2003) ("The fact that [one expert's] testimony was not as favorable as Coble would have

liked does not render [his] performance incompetent."); *Ex parte Jimenez*, 364 S.W.3d 866, 877 (Tex. Crim. App. 2012) ("Nor is a defendant entitled to choose an expert of his own personal liking or one who will agree with his defense theory.  A defendant does not have a due-process right to "'shop' for experts—at government expense—until he unearths a person who supports his theory of the case." (quoting *Taylor v. State*, 939 S.W.2d 148, 152 (Tex. Crim. App. 1996))); *De Freece v. State*, 848 S.W.2d 150, 159 (Tex. Crim. App. 1993) (en banc) ("We recognize that the accused is not entitled to a psychiatrist of his choice, or even to one who believes the accused was insane at the time of the offense.  *Ake* makes this much clear.  But even a psychiatrist who ultimately believes the accused was sane can prove invaluable[.]").

Trial counsels' decision to retain Dr. Gripon was undoubtedly strategic.  Contrary to Granger's assertion that counsel were ignorant of the doctor's opinions, (#44 at 76), trial counsel were well aware of Dr. Gripon's competency evaluation and clearly chose him as an expert to deliver similar testimony—explaining the psychology underlying Granger's violent behavior, while, at the same time, concluding that he can ultimately control himself—an important component of future dangerousness.  *See* 27 RR 20–21 (Dr. Gripon testifying that Granger makes a lot of threats, but does not have a history of aggression prior to the instant offense and can control himself when he chooses to); 29 RR 18, 22 (defense closing arguments asking whether all Granger's words of "hate, ranting, rage, anger" are enough to kill someone and pointing out to the jury that other than the instant offense, Granger had not committed other acts of violence).

Granger's primary complaint about Dr. Gripon appears to be that he was predisposed not to diagnose Granger as psychotic or brain damaged.  As discussed further below, counsel strategically sought to avoid portraying Granger as mentally ill.  *See* 29 RR 18 ("He's not insane.

90

He's not mentally ill—I mean, you've heard the doctors[.]").  In this regard, Dr. Gripon's competency report, and his subsequent punishment phase testimony, perfectly served their strategy.  Further still, Dr. Gripon possessed the imprimatur of neutrality, given his prior role in the case.  *See, e.g.*, 27 RR 14–16 (counsel immediately establishing that Dr. Gripon had first met Granger as the court's competency expert and asking whether his opinion has changed).

Even if Granger believes that trial counsel should have used Dr. Gripon in a different manner, or not used him at all, it is clear that counsels' "overall performance indicates active and capable advocacy."  *See Richter*, 562 U.S. at 111; *see also Coble v. Quarterman*, 496 F.3d 430, 436–37 (5th Cir. 2007) (holding that a "desire to have a specific defense theory presented does not amount to ineffective assistance on federal habeas review").  In sum, Dr. Gripon was not conflicted, and counsels' decision to retain him was strategic, not deficient.

Third, Granger asserts that trial counsel were ineffective for failing to prepare Dr. Gripon properly to testify.  (#44 at 76–77).  He complains primarily that counsel did not provide Dr. Gripon with Dr. Mike Hamza's ("Hamza") psychological testing report or the mitigation specialist's social history report.  (*Id.*).  In fact, trial counsel made a strategic decision *not* to call Dr. Hamza or the mitigation specialist.  Counsels' strategy was to show that while Granger certainly suffered from personality disorders, he was not mentally ill and could exercise restraint in order to dispel a finding of future dangerousness.

During closing argument, counsel specifically referenced Dr. Gripon's testimony in arguing that the jury had heard from "the doctors" that Granger was not insane, not mentally ill, "but he's an individual not like us, not like you, not like me. . . . He should be locked up and handled by professionals, people with training."  29 RR 18.  Counsel called Dr. Gripon primarily

to rebut the State's future dangerousness evidence; that strategy's failure does not make it deficient.

Finally, Granger fails to show prejudice resulting from any of the alleged deficiencies. As explained below, Granger's proposed alternate mitigation strategy focusing on his alleged brain damage would have been double-edged, at best. *See Wiggins v. Smith,* 539 U.S. 510, 535 (2003) (indicating that the "double edge" of a defendant's history has been "found to justify limited investigations in other cases"); *Kitchens v. Johnson,* 190 F.3d 698, 702–03 (5th Cir. 1999) (finding counsel's decision not to investigate mitigating evidence of child abuse, alcoholism, and mental illness was sound strategy where evidence was "double-edged" in nature). Given the brutal nature of the primary offense and the significant aggravating evidence presented by the State, there is not a reasonable probability that highlighting Granger's brain damage would have affected the jury's answers on the special issues. Ultimately, counsels' strategy was certainly not an error "so serious as to deprive [Granger] of a fair trial, a trial whose result is reliable." *Strickland,* 466 U.S. at 687. Therefore, Granger's Claims 4 and 1(4) are denied.

> E.  Claim 5 (IATC):  Trial counsel were ineffective for hiring as their lead investigator the father of a witness for the prosecution.
>
> Claim 1(1):  Trial counsel "retained an investigator whose son was one of the State's witnesses, and who, as the recently retired Chief of the Beaumont Police, was the former boss of many of the other witnesses."

Granger next alleges that trial counsel were ineffective for hiring Frank Coffin, Jr., ("Coffin") as their lead fact investigator when he suffered conflicted loyalties on several alleged bases. (#44 at 79–84). The Director contends that Granger's claim is procedurally barred and that he fails to demonstrate any exception to the procedural bar. (#53 at 111–20). The Director

further contends that the court cannot reach the merits of this procedurally barred IATC claim, and, in the alternative, Granger's claim is meritless.  (*Id*.).

Granger asserts that trial counsel were ineffective because their fact investigator, Coffin, was:  (1) the father of one of the State's forty-three (43) witnesses (Coffin, III) who testified at Granger's trial (*see* 1 RR 24–27); and (2) a former City of Beaumont Police Chief.  Coffin had retired six months before the March 14, 2012, shooting of Sebolt.

Granger claims that state habeas counsel were ineffective because they were aware of the familial "relationship between defense investigator Coffin and Detective Coffin, III" and "had no strategic reason for not raising this claim."  (#44 at 84, citing #20-1 at 18, 29 (A0959, A0970)).  Granger concedes that he attempted to pursue this claim in his second state habeas application that was dismissed as an abuse of the writ.  (*See* #44 at 83–84); *Ex parte Granger II*, 2020 WL 915434, at *1.  As such, Granger's claim is procedurally defaulted.  He argues, however, that cause for the default exists under *Martinez*/*Trevino* because state habeas counsel were ineffective for not pursuing this claim.  He insists that state habeas counsels' ineffectiveness excuses any procedural default. (#44 at 84, citing *Trevino*, 569 U.S. at 429).

    1.    <u>Granger's Claim is Procedurally Barred, and his Newly Presented Evidence Cannot be Considered</u>

    a.    <u>Granger's New Evidence Cannot be Considered</u>

As explained above, a federal habeas court may admit new evidence in only two situations: (1) "[e]ither the claim must rely on a 'new' and 'previously unavailable' 'rule of constitutional law' made retroactively applicable by [the United States Supreme] Court"; or  (2) "it must rely on a 'factual predicate that could not have been previously discovered through the exercise of due

diligence.'" *Shoop*, 142 S. Ct. at 2044 (quoting 28 U.S.C. § 2254(e)(2)(A)); *see Ramirez*, 142 S. Ct. at 1739.  Granger has not made any showing that either situation applies here.

As a result, the court cannot consider the following evidence upon which Granger relies to support his claim:  (1) Coffin's website, see (#44 at 80); (2) Detective Coffin, III's March 15, 2012, police report (A0820-21); (3) a September 6, 2012, receipt of items given to investigator Coffin (A0871); (4) notes from an October 25, 2012, interview with Granger (A0873); (5) notes from interviews with Granger, Ulysses, and Kassandra Valadez ("Valadez") (A0875-78); (6) an invoice from February 5, 2013 (A0879-84); (7) notes from March 20, 2013, interview with Darron and Derrick Hayes (A0904-05); (8) March 26, 2013, email regarding defense witness list (A0906-08); (9) cover letters from counsel to Drs. Hamza and Gripon; (10) all of the documents presented in Volume 4 of Granger's appendix, under the subheading "Counsel File Materials," (*see* #11-1, at 6); and (11) state habeas counsels' statements (A0959, A0970).[16]  Because the new evidence was not properly presented to the state court on initial collateral review and Granger has failed to show that he meets the requirements in Section 2254(e)(2)(A)(i),(ii), the new evidence is barred from consideration by Section 2254(e)(2).  *Ramirez*, 142 S. Ct. at 1739.

b.  <u>IAC Claim Regarding Investigator Coffin</u>

Granger fails to show that his state habeas counsel were ineffective for failing to raise this IAC claim.  The court may not rely upon Granger's new evidence; *see supra*, to determine whether his IAC claim is substantial under *Martinez*.  *Shoop*, 142 S. Ct. at 2044.  Granger does not point to, or discuss, any evidence in the state habeas record that makes this claim substantial

---

[16]   The Director also correctly points out that none of the new evidence is properly authenticated and would be excluded from review because of admissibility issues under the Federal Rules of Evidence.  The court, however, will not reach this issue as Granger's new evidence is excluded from consideration due to his failure to meet the requirements of Section 2254(e)(2)(A)(i),(ii).

for purposes of *Martinez*. *Martinez* does not benefit Granger. The procedural default of this IAC claim is not excused.

2.    Granger's IATC Claim Regarding Investigator Coffin is also Meritless

Citing primarily to cases regarding only an attorney's alleged conflict of interest, Granger argues that counsels' decision to hire Coffin as their mitigation fact investigator was deficient. (#44 at 80) (citing to *Beets*, 65 F.3d at 126; *United States v. Vasquez*, 298 F.3d 354, 360 (5th Cir.), *cert. denied*, 537 U.S. 1024 (2002); and *United States v. Carpenter*, 769 F.2d 258, 263 (5th Cir. 1985)). Granger specifically alleges that Coffin was conflicted on two bases: (1) his son was a witness for the State (#44 at 79–84); and (2) less than six months before the March 12, 2013, incident at the courthouse, Coffin retired from the Beaumont Police Department ("BPD"), where he was the Chief of Police (*id*. at 80). Granger argues that, whether due to "laziness, inability to perceive how their agent's loyalty deviated from their client's interest, or some other basic deficiency," counsels' failure to retain an investigator "who was not related, by both blood and profession, to a key State's witness" was deficient. (*Id*.). Relying on little more than speculation or strategic decisions with which he disagrees, Granger asserts that Coffin's retention prejudiced him. (#44 at 80–83). Granger fails to satisfy either prong of *Strickland* ineffectiveness.

First, Granger alleges only hypothetical, not actual, conflicts of interest. Granger argues that Coffin was conflicted because he investigated both phases of trial "*presumably* knowing that his son was a key component of the opposing investigation who believed that Petitioner was a dangerous character and *doubtless* wanted to see Petitioner convicted and punished—in direct contravention of Frank Coffin, Jr.'s and trial counsels' ethically and constitutionally required interests." (*Id*. at 80) (emphasis added). Granger's language alone, e.g., "presumably" and "doubtless," reveals that any conflict is purely hypothetical, and he points to no evidence

establishing that Coffin in fact:  (1) knew his son would be a witness before he testified, (2) was aware of the level of his son's involvement in the investigation, or (3) believed that his son "doubtless" wanted to see Granger convicted and punished.

Granger instead attempts to prove a conflict by relying on a daisy-chain of unsupported assertions.  He points to a two-page supplemental report submitted by Detective Coffin, III, the day after the shooting, which he alleges was turned over to trial counsel during discovery.  (*See* #44 at 81) (citing A0820–21).  This two-page supplemental report, however, may not be considered in light of Section 2254(e)(2).  Granger then points to an unauthenticated, typed receipt of items "handed to Frank Coffin in office today" that included a "Notebook titled 'State's discovery'" (A0871), which Granger alleges "presumably contained [Coffin's] son's report," (#44 at 82).  Again, this receipt and notebook may not be considered pursuant to Section 2254(e)(2).  Granger does not present any evidence that Coffin was aware that his son was going to testify in Granger's trial or that it had any impact on the work that Coffin performed as a fact investigator.

Granger's basic premise that Detective Coffin, III, was a "key component" of the State's case is entirely unsupported.  Coffin, III, was one of forty-three witnesses presented by the State at the guilt/innocence phase, at least twenty of whom were law enforcement.  *See* 1 RR  24–27.  Out of the 557 pages of testimony presented by the State, Coffin, III's, testimony took up *ten* pages *total*.  20 RR 182–92.  Because Coffin, III, arrived at the scene only shortly before Granger was taken into custody, *see* 20 RR 183, he testified primarily as a fact witness to statements Granger made while in custody at the hospital, *see* 20 RR 185–91—testimony that was largely cumulative of other witnesses' testimony.  *Compare* 20 RR 186 (Coffin, III, stating that he overheard Granger tell a nurse that if they were going to treat him like a killer, he would act like a killer), *with* 20 RR 176 (Sergeant Michael Custer testifying to the same).

It is difficult to see how Coffin, III's, minimal contribution to the State's case would somehow lead his father to possess such an animus against Granger that he could not effectively investigate Granger's case, much less that trial counsel unreasonably chose Coffin as their investigator.  *Cf. Beets*, 65 F.3d at 1277 ("Because [counsel]'s potential testimony for Beets was cumulative, he was not a necessary witness for her defense and did not face a substantial advocate/witness conflict.  [Counsel]'s failure to withdraw and testify was not professionally unreasonable under *Strickland*."); *see Koste v. Dormire*, 345 F.3d 974, 983 (8th Cir. 2003) ("Koste failed to allege, much less show, that [counsel]'s trial preparation or legal advice was deficient in any specific way or that any deficiency in her performance was causally connected to the alleged conflict of interest arising out of his ineffective assistance claim against [prior counsel]."), *cert. denied*, 541 U.S. 1011 (2004); *Carpenter*, 769 F.2d at 263 ("[I]n this appeal Carpenter fails to allege any strategy which defense counsel used or failed to use because [the man in whose trial Carpenter was convicted of committing perjury] had agreed to pay the legal fees. . . . There is nothing in the record to indicate that defense counsel had [the same man's] interest in mind.").

The same is true of Granger's hypothetical conflict with respect to Coffin's law enforcement ties.  Granger objects that Coffin was a recently retired Chief of Police, had "supervised and worked side by side with many of the State's other law enforcement witnesses," and had been involved with sex crimes investigations, including supervising the "very unit that would have investigated the sex crimes [Granger]'s daughter accused him of committing."  (#44 at 80, 83).  By Granger's logic, counsel would be *per se* ineffective anytime they hired a former local law enforcement officer, but no such rule exists.  In fact, defense counsel might reasonably

determine, as a matter of trial strategy, that Coffin's background would benefit their mitigation investigation and, thus, ultimately benefit Granger.

Regardless, Granger offers no evidence showing that Coffin was affected either negatively *or* favorably by his ties to the law enforcement community. Coffin's resume shows that he implemented and supervised the Special Crimes Unit from 1972 to 1993, almost *twenty* years before Granger committed the instant offense. *See Frank C. Coffin, Jr. Resume*, https://www.frankcoffininvestigations.com/s/Resume-FrankCoffin.docx (last visited Oct. 26, 2020).[17] Granger points to no evidence supporting his insinuation that Coffin was somehow directly involved in any sex crimes investigation against Granger. Thus, he can demonstrate no deficiency in trial counsels' decision to retain Coffin.

Granger's assertions of prejudice are even more speculative. Though he cursorily alleges that Coffin's proffered conflict "prejudiced [Granger] at both guilt" and punishment, he does not specifically allege how counsels' guilt-phase investigation or presentation was deficient due to any conflict. *See Koste*, 345 F.3d at 983; *Vasquez*, 298 F.3d at 360 ("Vasquez does not specify, however, how counsel was ineffective at the deferred adjudication proceeding, nor does he state how the alleged ineffectiveness affected the outcome of the proceeding."); *United States v. Hernandez*, 333 F.3d 1168, 1175 (10th Cir.) ("Defendant does not . . . argue that [the defense investigator] failed to pursue a particular line of investigation, or that he suppressed potentially exculpatory evidence, or anything of the kind. He merely states, without support, that

---

[17]    Rule 201 of the Federal Rules of Evidence provides that a court may take judicial notice of an "adjudicative fact" if the fact is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to resources whose accuracy cannot be questioned." FED. R. EVID. 201; *accord Taylor v. Charter Med. Corp.*, 162 F.3d 827, 829 (5th Cir. 1998); *see also O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007) ("It is not uncommon for courts to take judicial notice of factual information found on the world wide web.").

'[statements] disparaging [Defendant] could only have the effect of undermining his case and prejudicing him.'"), *cert. denied*, 540 U.S. 992 (2003). Granger's "conclusory allegations respecting counsels' ineffectiveness are insufficient to show that he was prejudiced by his counsels' representation of him [at trial] or that a conflict actually existed." *Vasquez*, 298 F.3d at 360.

Granger's allegations as to prejudice at the punishment phase are similarly conclusory. Granger alleges, without support, that he was prejudiced because "a different mitigation case would have been developed and presented had the *de facto* mitigation specialist not been closely related to, and *presumably* influenced by, his strong ties to the State's law enforcement witnesses, including his son." (#44 at 83) (emphasis added).

Granger claims, in essence, that trial counsel should have known—when they retained Coffin as a fact investigator at the beginning of the criminal case in 2012—that the prosecutor would call Coffin, III, as a witness for the trial in April 2013. Counsel are faulted for not being clairvoyant. "Clairvoyance is not a required attribute of effective representation." *United States v. Fields*, 565 F.3d 290, 294 (5th Cir.) (citation omitted), *cert. denied*, 558 U.S. 914 (2009).

In sum, Granger relies on nothing more than speculation to show that he was prejudiced by counsels' choice of investigator. Granger's mere disagreement with trial counsels' strategic decisions during the punishment phase is not sufficient to establish prejudice. This is especially true given the totality of the evidence presented at this stage of the proceedings. There is not a reasonable probability that any alleged deficiency would have affected the jury's answers on the special issues. Granger's Claim 5 and Claim 1(4) are without merit on *de novo* review and are not substantial under *Martinez*. Claims 5 and 1(4) are denied.

F.    Claim 6 (IATC):  Trial counsels' failure to investigate, prepare, and present readily available, powerful mental health evidence deprived Granger of the effective assistance of counsel.

Claim 7 (IATC):  Trial counsel failed to investigate, develop, and present compelling mitigating evidence of Granger's background.

Claim 1(9):  "[D]uring the punishment phase, the defense team curtailed the mitigation specialist's investigation, ignored the psychologist's "advice" that Granger had brain damage, and relied on Granger to describe his background and functioning."

Claim 1(10):  Trial counsel "failed to reveal testing of Granger's brain damage to the psychiatrist so that psychiatrist would assess his opinions of Granger."

Claim 1(11):  Trial counsel "failed to prepare the psychiatrist to testify during the punishment phase and failed to learn his opinions regarding future dangerousness of Granger."

Granger contends that trial counsel were ineffective because they failed adequately to investigate, develop, and present mitigating evidence at the punishment phase of trial.  (#44 at 84–104).  He specifically complains that trial counsel failed to investigate and present three areas of mitigating evidence:

(1)    Granger allegedly suffers from diffuse organic brain damage (#44 at 87–89);

(2)    Granger is a mentally ill trauma survivor with Schizoaffective Disorder, Bipolar Type (#44 at 89–91); and

(3)    Granger had a more thorough and sympathetic life history that could have been presented through their mitigation specialist, Norma Villanueva ("Villanueva"), and other lay witnesses (#44 at 93–104).

Granger concedes that Claim 6—focusing more on mitigating mental health evidence—is procedurally defaulted.  (#44 at 91).  Granger states that he attempted to exhaust the claim in his second habeas petition, which was rejected as an abuse of the writ.  *Ex parte Granger II*, 2020 WL 915434, at *1.  He argues, however, that cause for the default exists under *Martinez*/*Trevino*

because state habeas counsel were ineffective for not pursuing this claim, which he contends is substantial.  (#44 at 91, citing *Trevino*, 569 U.S. at 429).

Granger acknowledges that Claim 7—which focuses on background mitigation evidence, including mental health evidence—was presented to the TCCA in *Granger I*.  (#44 at 103–04); *see Ex parte Granger I*, 2017 WL 3379285, at *4 (holding Granger failed to demonstrate *Strickland* violations for his claims that "counsel were constitutionally ineffective for failing to [] investigate and present readily available mitigating evidence" and failing to "present an expert to explain the impact of [Granger]'s social history").  The TCCA ruled that trial counsel were not ineffective for failing to present social history evidence, including the testimony of the mitigation specialist, Villanueva, because "mitigation evidence of the same nature proposed by Norma Villanueva was, in fact, presented [by trial counsel]."  (#44 at 103) (citing #50-15 at 332).

The Director argues that Granger's current Claims 6 and 7 are essentially a single claim that was raised and rejected on the merits in *Granger I*.  (#53 at 121).  The Director contends that Granger must show that the state court's rejection of his claim was unreasonable, but he failed to do so on the record before the state court when it adjudicated his case.  (#53 at 120–159).  The Director further asserts that Granger's new evidence and argument, which Granger now seeks to characterize as a separate claim, is barred from consideration under *Pinholster*.  (#53 at 121).  In addition, he asserts that the new evidence and arguments fail to demonstrate constitutional ineffectiveness in counsels' mitigation investigation and presentation.  (*Id*.).  The Director maintains that Granger's Claim 6 and 7 should be denied.

    1. <u>Granger Argues that His Mental Health Claim is Unexhausted</u>

Granger argues that his mental health claim is unexhausted and thus should be reviewed under *Martinez/Trevino*.  Even if the court were to consider Granger's IAC-mitigation claim to

be two separate claims, with the mental health component being unexhausted and thus procedurally defaulted, Granger fails to provide any analysis under Section 2254(e)(2) to evaluate whether his new evidence can be considered. Specifically, Granger has not shown that his IAC claim regarding mental health mitigation evidence is based on a new and previously unavailable rule of constitutional law or that the claim relies on a factual predicate that could not have been previously discovered through the exercise of due diligence. State habeas counsels' trial strategy or alleged negligence in not presenting the claim is not sufficient to meet the standard stated in *Shoop v. Twyford*, 142 S. Ct. at 2044 (quoting 28 U.S.C. § 2254(e)(2)(A)). Accordingly, for the reasons already explained above, none of the new evidence offered by Granger in support of this claim can be considered by the court.[18] *Ramirez*, 142 S. Ct. at 1739.

### 2. The Director Argues that Granger's Mental Health Claim was Adjudicated by the State Court

In his first state habeas application, Granger alleged that his trial counsel were ineffective for failing to present "readily available mitigating evidence." *Ex parte Granger I*, 2017 WL 3379285, at *4. Granger faulted counsel for failing to investigate and present:

(1)    information about his parents' lives before his birth, SHCR-01.Supp.2 at 39;

(2)    the domestic violence his mother, Vallire, suffered at the hands of his father, Ulysses Granger, Sr. ("Granger, Sr."), and his stepfather, Ross, *id.* at 39–42;

(3)    his dysfunctional family life resulting from the overprotectiveness of his mother, *id.* at 42–45;

---

[18]    Granger's new evidence in support of this claim consists of: statements or reports from Stacie Brown ("Brown") (A0266-310); Dr. Gripon (A0367-69–May 2018), (A0949-53–August 2018); Dr. Hamza (A0378-84–May 2018), (A0954-55–October 2018); and Vallire (A1014-20). Although Granger obtained state habeas affidavits from the following witnesses, he has attached new declarations—not presented to the state habeas court—from: Villanueva, Sewell, Monika Foster ("Foster"), Bartholomew, Christina Evans ("Evans"), Debby Granger ("Debby"), and Ulysses. *See* Villanueva's declaration dated May 2018 (A0372-76), all others dated August and October 2018 (A0983-1020). He also relies on new reports from Dr. Daniel A. Martell ("Martell") (A0227-48), and Dr. Richard Dudley ("Dr. Dudley") (A0249-65), and he offers Dr. Hamza's report, which was created at trial but not proffered to the state habeas court (A0324-45). Finally, he proffers Villanueva's billing records (A0889-93).

(4)     the unsolved murder of his older sister, Samantha Granger,[19] *id.* at 45–48;

(5)     Granger's good relationship with his children, Samantha and Bartholomew, *id.* at 48–49;

(6)     the toll the sexual assault allegations took on his family, *id.* at 50–52; and

(7)     the decline in Granger's mental health leading up to the shooting, *id.* at 52–53.

The record supports the Director's argument that Granger's mental health status was raised before the state habeas court in Granger's first state writ application.  *See Ex parte Granger I* (#50-15 at 190–91); *Ex parte Granger I*, 2017 WL 3379285, at *4–5.  As the TCCA ruled upon the IAC claim regarding mitigation evidence, including mental health, Granger cannot proceed under *Martinez* because the claim is exhausted.  *Martinez* applies only to unexhausted IATC claims.

Here, Granger alleges that the above issues should have been presented in the trial court through lay witnesses and through an expert, Dr. Kevin Cokley.  *See id.* at 39–62.  Granger's argument reflects his disagreement with how trial counsel presented the evidence of the domestic violence suffered by Granger's mother, his unstable upbringing, the poor parenting he received, his poor performance in school, his sister's murder, and family mental illness.  (*See* #44 at 93–98).

In rejecting this claim, the TCCA, adopting most of the trial court's findings and conclusions, held that Granger failed to meet his burden under *Strickland*.  *Ex parte Granger I*, 2017 WL 3379285, at *4–5.  It found that trial counsels' investigation was constitutionally adequate.  Granger's trial team consisted of three attorneys, Cribbs, Makin, and Vasquez, fact investigator Coffin, mitigation specialist Villanueva, and her assistant, Valadez.  SHCR-01.Supp.2

---

[19]     Granger's sister is referred to as "Samantha Granger."  Granger's daughter, Samantha Jackson, is referred to as "Samantha" only.

at 32; CR at 13 (appointment of Makin); 1 CR.Supp.2 at 45 (appointment of Vasquez); (A0157) (appointment of Villanueva); (A0161) (appointment of Coffin).  Moreover, Granger retained *four* experts to assist with his defense:  medical expert Kathy Snyder (A0162–68); pathologist Dr. Grossberg (A0169); psychiatrist Dr. Gripon (A0175); and neuro-psychologist, Dr. Hamza (A0180).

With this team of experts, counsel "conducted a thorough investigation of Granger's life and situation," including "fully investigat[ing] all family members and evaluat[ing] all information."  SHCR-01.Supp.2 at 176, 180–81.  Villanueva interviewed and investigated numerous witnesses, producing a seventy-three-page report of her findings and proposed mitigation themes.  2 SHCR-01 at 196–269.  Additionally, Coffin "personally talked with numerous family members and knowledgeable parties."  *Id*. at 177; *see also* 3 SHCR-01 at 275 (Granger's ex-girlfriend stating that *two* investigators spoke with her prior to Granger's trial); 2 SHCR-01 at 193 (Villanueva reporting that Makin told her Coffin was already investigating Granger's intellectual deficits).

Based on counsels' "evaluation of the stories, emotions[,] and believability" of the witnesses investigated, counsel formulated a strategy that focused on Granger's nonviolent past and minimal future dangerousness—choosing to present Dr. Gripon solely as a future dangerousness expert to establish that, though Granger may have mental health issues, he has the ability to control his behavior.  *See also* 27 RR 17 (Dr. Gripon noting that Granger had no significant criminal record before the March 2012 shooting).

To that end, trial counsel presented nine witnesses on Granger's behalf, including Granger himself.  *See* 27 RR 9–112; 28 RR 8–67.  Two of those were Granger's fellow inmates who testified that Granger was not violent in prison; therefore, he could be controlled if sentenced to

life in prison.  *See* 27 RR 68–71; 27 RR 79–80.  In line with their theme of Granger's being "all

talk" but no action, counsel presented Dr. Gripon to rebut the State's future dangerousness case,

which focused primarily on the sexual assault allegations against Granger as well as the often

graphic and vulgar language Granger used against jail officials as well as with his family.  For

example, Dr. Gripon noted that Granger's references to the apocalypse or Armageddon during his

recorded phone calls cannot possibly be taken as an indication of his future danger since he has

no power to bring about such things while in prison.  *See* 27 RR 21; *see also* 29 RR 16 (counsel

arguing that he could have brought doctors to explain the phone calls, but common sense tells the

jury that Granger never really received a call from Casey Anthony and that he is not really a

soldier or an avenging angel).  Counsel thus attempted to impart to the jury that, even at Granger's

"worst" in jail, he was not actually dangerous.  *See, e.g.*, 29 RR 17 (arguing that Granger's words

of hate were all-inclusive, but are just words, not action, and that was not even Granger being on

"good" behavior while awaiting trial).

And while counsel was mindful of Granger's life history and potential mental health issues,

*see* 2 SHCR-01 at 196–269 (Villanueva's mitigation report), it is clear they wanted to steer the

jury away from any implication that Granger would be unable to control his actions in prison.

Counsel was careful to elicit Dr. Gripon's conclusions that, despite potentially having intermittent

explosive disorder, Granger could control himself if he chose to.  *See id.* (calling Dr. Gripon

because he arrived at such conclusions when he was the "neutral" court-appointed competency

expert); *see also* 27 RR 19, 21, 30–31 (Dr. Gripon testifying that his opinion on Granger's

competency was that, though he was a paranoid individual with a lot of internalized anger, he

could control himself).  Counsel highlighted Dr. Gripon's opinions in closing argument that

Granger was not mentally ill or psychotic.  *See* 29 RR 18 ("He's not insane. He's not mentally

ill—I mean, you've heard the doctors[.]"); *see also* 27 RR 16, 19 (Dr. Gripon testifying that he's "never found evidence of psychosis" in Granger and that Granger's paranoia is not a mental illness).

Trial counsel presented Granger's social history and background "through lay witnesses and a mental health expert." SHCR-01.Supp.2 177, 179, 182. Contrary to Granger's allegation that the *only* mitigation testimony came through Granger himself, (*see* #44 at 93, 103), Dr. Gripon testified to Granger's mental health and lack of coping mechanisms. *See, e.g.*, 27 RR 19–20, 27. His cousin, his father, and his mother, all testified about Granger as a child and about the family dynamics. *See* 27 RR 49–52, 55–63, 97–112. Pastor James McAbee ("McAbee") testified about his ministrations to Granger in prison. 27 RR 33–43. Trial counsel also played hours of recorded jailhouse conversations between Granger and his family, *see* 27 RR 121–27; 28 RR 5–7, and admitted hundreds of pages of Granger's school records, workers' compensation records, and medical records, *see* Defense Exhibits 3–11. In all, counsel presented evidence of: (1) domestic abuse suffered by Granger's mother; (2) Samantha Granger's unsolved murder and its effect on Granger; (3) Granger's child custody situation over a period of years; (4) the impact of the sexual abuse allegations against Granger; (5) psychiatric evidence regarding competency and paranoia; (6) Granger's poor coping mechanisms; (7) his problems with impulse control; (8) Granger's internalized anger; (9) his insistence that he felt he was the victim of lies; (10) his frustration with life; and (11) his ability to control his behavior. SHCR-01.Supp.2 at 187–88.

The state court also found that counsel additionally presented evidence of: his parents and lack of relationship with his father; the breakup of Granger's parents; his mother's absence when she was shipped out as a merchant seaman; his mother's subsequent relationships with Ross and Ozene; the effect that the many moves the family made during Granger's formative years had on

him; his sister's life as a prostitute and the effect of her absence on Granger; his sister's murder by someone who broke into her apartment and shot her several times; the numerous schools Granger had attended in childhood, as well as the fact that he failed two grades and dropped out in ninth grade; the custody battle between Granger and his ex-wife Claudia; and the degenerative disc disease he suffered and its impact on his ability to work.  SHCR-01.Supp.2 at 188–90.

The findings of fact by the state court are entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1) that Granger fails to overcome with clear and convincing evidence.  *See Reed*, 739 F.3d at 768 (deferring to the TCCA's findings of fact on an actual innocence question under state law in finding that petitioner failed to prove actual innocence under federal law).  Thus, whether Granger's claim is considered adjudicated—and reviewed under 28 U.S.C. § 2254(d)(1)—or partially procedurally defaulted—and reviewed in light of the presumed-correct fact-findings of the state court under 28 U.S.C. § 2254(e)(1)—Granger's claim fails.

Given the above, the state habeas court reasonably found that, "while [Granger], in hindsight perhaps, expanded on the details of [his] social history, in fact, trial counsel *did* present evidence of [his] social history" on each issue Granger faulted trial counsel for not presenting.  SHCR-01.Supp.2 at 187.  Given that the evidence Granger faults trial counsel for not presenting was also cumulative of that presented at trial, counsel could not have been deficient for failing to present it through either lay witnesses or an expert like Villanueva.  *See id.* at 188 (finding that "evidence of the same nature proposed by Norma Villanueva was, in fact, presented"); *see also United States v. Fields*, 761 F.3d 443, 458 (5th Cir. 2014) ("[O]ur review of the evidence presented at trial, when compared to the additional evidence Fields claims his counsel should have discovered, convinces us that reasonable jurists would not disagree with the district court's determination that the new evidence is not materially different from that presented at trial.  Rather,

it offers more detail about each category of mitigation evidence, but duplicates the evidence already presented."), *cert. denied*, 576 U.S. 1004 (2015).  To the extent that trial counsel did not proceed in exactly the manner Granger now says they should have, such matters of degree are squarely not grounds for ineffective assistance of counsel.  *See Dowthitt*, 230 F.3d at 743 ("We must be particularly wary of argument[s] [that] essentially come[ ] down to a matter of degrees. Did counsel investigate enough?  Did counsel present enough mitigating evidence?  Those questions are even less susceptible to judicial second-guessing.").

Granger admits that "Villanueva developed much of the above mitigation,"  (#44 at 85), but argues that she did not develop all of it because counsel curtailed the investigation and unreasonably "cast aside" powerful mitigating evidence by not consulting with her before choosing not to call her.  (#44 at 99–100).  The record, however, belies these assertions.  First, Villanueva admits that throughout her investigation, she emailed her work product, including interview memos and the emerging mitigation themes, *"as it was completed."*  2 SHCR-01 at 191.  Counsel acknowledged receipt of such work product and gave her positive feedback about it.  *See id.* (Villanueva saying that she "occasionally received email replies saying things like 'good work'"). Thus, even assuming that Villanueva did not send her final report to trial counsel until the night before the punishment phase of trial began, counsel were kept abreast of Villanueva's investigation as it developed and so had ample time to consider the evidence and the themes she proposed. Granger's attempts to cast doubt on counsels' strategic decisions by insinuating that they simply did not have time to make them are unavailing.  (*See* #44 at 100) (complaining that counsel never talked to Villanueva and did not "have time" to read her report and incorporate it into their mitigation presentation).

Second, Villanueva admits that counsel discussed the possibility of her testifying on Granger's behalf, that it was a "constant topic" within the team throughout her investigation, and that on the day of the guilty verdict she was instructed to prepare to travel to Galveston to testify. 2 SHCR-01 at 193. Despite Villanueva's purported confusion about why she was not ultimately called, *see id.* at 193—and despite Granger's assertions that there was no strategic reason not to call her (*see* #44 at 100)—the record makes clear what occurred. Villanueva was told "[o]n the afternoon of the day before Mr. Granger's death sentence was handed down" that she would no longer be needed to testify, 2 SHCR-01 at 193, *i.e.*, the same afternoon that Granger testified against counsels' advice, 28 RR 8. During his testimony, Granger had numerous outbursts and clashes with the prosecutor. *See, e.g.*, 28 RR 60–62 (calling the trial a "mockery of justice" and using other profanity to impugn the integrity of the trial). It was thus "based on the situation that had developed at trial," at least in part, that counsel decided not to call Villanueva. *See* SHCR-01.Supp.2 at 176 (counsel "felt that in evaluating the evidence and developments during trial, a decision to not call Ms. Villanueva was best"), SHCR-01.Supp.2 at 180 (stating that "Granger's behavior up to his courtroom outburst was exemplary"), *id.* at 181.

The state court found that "developments during trial and the presentation of the same evidence through la[y] witnesses dictated against, or at least made unnecessary and unwarranted, the calling of an expert witness on social history/mitigation." *Id.* at 190. Therefore, counsel reasonably chose not to call an expert to testify as to Granger's life story after he had inappropriate outbursts while testifying against counsels' advice. *See id.* at 196; *see also Schriro*, 550 U.S. at 476–77 (finding that where the defendant interferes with counsel's attempts to present a case in mitigation, he cannot later claim ineffective assistance); *cf. Strickland*, 466 U.S. at 691 ("[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be

fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.").

Counsel could not be deficient for electing not to call a mitigation expert to testify when such "[e]xpert testimony is not necessarily of benefit to the trier of fact[.]" SHCR-01.Supp.2 at 188. Furthermore, it is not clear that the proposed testimony set forth in Villanueva's declaration would be admissible at trial, given that it is comprised almost entirely of hearsay. "Generally speaking, an expert is not permitted to testify as to hearsay information acquired during said expert's investigation that forms the basis for the experts' opinions and conclusions." *Sells v. Thaler*, No. SA-08-CA-465-OG, 2012 WL 2562666, at *63 (W.D. Tex. June 28, 2012) (citing *United States v. Mejia*, 545 F.3d 179, 194–96 (2d Cir. 2008)); *see also Allison v. Ayers*, No. CV 92-06404 CAS, 2008 WL 5274580, at *2 (C.D. Cal. Dec. 17, 2008) (finding that social history mitigation expert's "declaration and anticipated testimony are not admissible for the truth of the facts they contain regarding petitioner's background and character").

Even assuming that Villanueva's testimony would be admissible, the added value of expert testimony that merely summarized other witnesses' experiences and testimony is minimal, "especially as in this case wherein trial counsel, through lay witnesses, presented social history/mitigation evidence" that was largely duplicative of Villanueva's declaration. *See* SHCR-01.Supp.2 at 188. Villanueva's "conclusions," which are essentially what she called her mitigation "themes," *see* 2 SHCR-01 at 192, are simply not the kind that require expert testimony—the jury did not need expert testimony to understand that Granger's sister's murder had a great impact on his family or that the domestic violence suffered by Granger's mother affected him. *Cf. Belmontes*, 558 U.S. at 24 ("But the body of mitigating evidence the Ninth Circuit

would have required [counsel] to present was neither complex nor technical.  It required only that the jury make logical connections of the kind a layperson is well equipped to make.").

The jury "could use its common sense or own sense of mercy" to arrive at those conclusions.  *See id.*  Thus, counsel reasonably decided that a social history expert was not warranted, and counsels' "[e]valuation of all known facts, Mr. Granger's statements[,] and the veracity of all parties were factors considered in this decision."  SHCR-01.Supp.2 at 177.  Instead, social history "evidence was presented through lay witnesses and a mental health expert."  *Id.*; *see also* 29 RR 20 (counsel noting that part of Granger's problem is the environment in which he was raised, including the many schools he attended, his dropping out of school, and his mother who was not "super mama" as he believed).  The state court reasonably concluded that trial counsels' "failure to call an expert witness had a plausible basis," and Granger had demonstrated no deficiency.  *Id.* at 196; *see id.* at 188 (finding "sufficient strategic reason existed not to call Villanueva as a witness").

Granger has not demonstrated that he was prejudiced by any alleged failure to investigate mitigating evidence.  *See Ex parte Granger I*, 2017 WL 3379285, at *4.  To assess the likelihood of a different result, reviewing courts "reweigh the evidence in aggravation against the totality of available mitigating evidence."  *Wiggins*, 539 U.S. at 534.  Here, the aggravating evidence, especially Granger's repeated statements that he did not regret shooting at his daughter or running over her in a truck and that it was not his gun that killed Sebolt, is powerful.  The jury, moreover, witnessed Granger's outbursts on the stand, in which he insulted the State, the court, and even the jury, demonstrating his inability (or lack of desire) to control himself.  *See* 28 RR 60–62.  Granger was so unruly and uncontrollable during the State's closing arguments he had to be removed from the courtroom.  29 RR 33.  Whatever additional sympathy more minute detail of his life history

may have garnered, (*see, e.g.*, #44 at 102) (citing to Vallire requiring seventeen stitches after a beating by Granger, Sr., and still having scars on her face from such abuse, that Granger threw himself in front of his mother when Ross pulled a gun on her, that Granger, Sr., attempted to run Vallire off the road once when she tried to leave him), the state court appropriately concluded it was likely outweighed by the totality of the aggravating evidence, combined with the jury's in-court observations of Granger, at trial.

Further, given that much of the evidence Granger faults counsel for failing to investigate and present was in fact presented to the jury, the omission of any additional testimony regarding such evidence is not prejudicial. *Belmontes*, 558 U.S. at 22 (holding that adding cumulative evidence to "what was already there would have made little difference"); *Parr v. Quarterman*, 472 F.3d 245, 258 (5th Cir. 2006), *cert. denied*, 551 U.S. 1133 (2007). This is doubly so when some of that testimony, such as that contained in Villanueva's declaration, may not even have been admissible. *See Neal*, 286 F.3d at 242 (refusing to consider hearsay testimony for purposes of *Strickland* prejudice); *Clark v. Thaler*, 673 F.3d 410, 423 (5th Cir.) (considering hearsay as "a factor relevant to the quality of the mitigating evidence" for purposes of *Strickland* prejudice), *cert. denied*, 568 U.S. 850 (2012).

This case is readily distinguishable from *Wiggins*, upon which Granger relies. In *Wiggins*, defense counsel offered no mitigating evidence at trial in spite of the compelling evidence of physical and sexual abuse that was available. 539 U.S. at 516–17. Further, Wiggins's counsel reviewed only a Pre-Sentence Investigation report and records from the Department of Social Services, and the Court concluded that defense counsel were unreasonable to cease investigation after learning that Wiggins had an alcoholic mother and problems in foster care. *Id.* at 518, 522–24. In contrast to the situations in *Wiggins*, Granger's defense team thoroughly investigated

his background and developed and presented a compelling mitigation defense, comprised of the type of evidence now proposed. While this later-discovered evidence might provide more detail about Granger's childhood, it does not change the original mitigation case as drastically as in *Wiggins*, 539 U.S. at 516–17, 525–26, 534–36.

Finally, it is even more unlikely that counsels' alleged failure to present such mitigating evidence was prejudicial when Granger testified and asked for the death penalty. *See* 28 RR 13 (Granger acknowledging counsels' reluctance to ask him whether he would prefer life or death), 28 RR 45 (stating that he would rather die than live life in prison), 28 RR 52 (stating that he wants the death penalty and admitting that he previously told the court to "give [him] death"); *cf. Schriro*, 550 U.S. at 475–80 (denying relief when defendant testified that no mitigating circumstances existed, instructed his attorney not to present any, and told the sentencing court to "bring [the death penalty] right on"); *see Luna v. Lumpkin*, 832 F. App'x 849, 853 (5th Cir. 2020) (holding that several factors distinguish Luna's case from others where there was prejudice from counsels' failure to present mitigating evidence of mental illness and childhood trauma, with the most obvious one being Luna's own testimony that he could not be rehabilitated, that the death penalty was appropriate, and that no mitigating evidence existed), *cert. denied*, 142 S. Ct. 718 (2021).

Granger makes little effort to challenge the state court's determinations based on the record before the court, instead offering new evidence to support his claim. *See, e.g.*, #44 at 104 (the pervasive history of mental illness in Granger's family was not discussed). As explained below, however, this argument and the evidence supporting it cannot be considered and, in any event, do not undermine the reasonableness of the state court's ruling. Granger's remaining argument that the state court's verbatim adoption of the State's proposed findings of fact and conclusions of law

was unreasonable and, therefore, not entitled to deference (*see id*. at 103), is similarly unavailing. *See Green v. Thaler*, 699 F.3d 404, 416 (5th Cir. 2012); *Valdez*, 274 F.3d at 946. Thus, Granger fails to demonstrate that the state court's decision was unreasonable, and his claim should be denied.

"Mitigating evidence that illustrates a defendant's character or personal history embodies a constitutionally important role in the process of individualized sentencing, and in the ultimate determination of whether the death penalty is an appropriate punishment." *Riley v. Cockrell*, 339 F.3d 308, 316 (5th Cir. 2003) (citing *Moore v. Johnson*, 194 F.3d 586, 612 (5th Cir. 1999)). Accordingly, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. The Supreme Court has observed that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91. Thus, a particular decision not to investigate further "must be directly assessed for reasonableness in all the circumstances," and a heavy measure of deference is given to counsel's strategic decisions. *Id.* at 691.

The question of the effectiveness of pretrial investigation is one of degree; it is not subject to precise measurement. *Id.* at 680; *Dowthitt*, 230 F.3d at 743. "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." *Wiggins*, 539 U.S. at 533. "[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005). Courts should "conduct an objective review of [counsel's] performance, measured for 'reasonableness under prevailing professional

norms,'" which must include a "context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" *Wiggins*, 539 U.S. at 523 (citation omitted); *see Gray v. Lucas*, 677 F.2d 1086, 1094 (5th Cir. 1982) ("[C]ounsel's decision to pursue one course rather than another is not to be judged by hindsight."), *cert. denied*, 461 U.S. 910 (1983).

The fact that a particular strategy may prove to be unsuccessful does not by itself establish ineffective assistance. *Gray*, 677 F.2d at 1094. Rather, a "conscious and informed decision on trial tactics and strategy is not a permissible basis for a claim of ineffective assistance of counsel unless the strategy was so poor that it robbed the defendant of any opportunity to get a fair trial." *Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002) (internal quotation marks and citation omitted), *abrogated on other grounds by Tennard v. Dretke*, 542 U.S. 274 (2004).

### 3.   Granger's New Evidence and Argument are Barred by *Pinholster*

Granger now seeks to raise the same claim he raised on state habeas review—challenging counsels' mitigation investigation and presentation—but with new evidence not presented to the state court when it adjudicated the claim. Specifically, Granger did not proffer the following new evidence to the state court: declarations from Brown (A0266–310); Dr. Gripon (A0367-69–May 2018), (A0949-53–August 2018); Dr. Hamza (A0378-84–May 2018), (A0954-55–October 2018); and Vallire (A1014–20). Though he obtained state habeas affidavits from each of the following, he has also attached new declarations from: Villanueva, Sewell, Foster, Bartholomew, Evans, Debby, and Ulysses. *See* Villanueva's declaration dated May 2018 (A0372–76), all others dated August and October 2018 (A0983–1020). He also relies on new reports from Dr. Martell (A0227–48), and Dr. Dudley (A0249–65), and he offers Dr. Hamza's report, which was created at trial but not proffered in state court (A0324–45). Finally, he proffers Villanueva's billing records (A0889–93).

Granger does not address any of the new evidence he offers in support of his argument regarding his life history.  (*See generally* #44 at 79–90).  With respect to the mental health evidence, he argues that state habeas counsel was ineffective.  (*See* #44 at 93–104).  *Martinez*, however, does not apply to claims that were adjudicated in state court.  *See Escamilla v. Stephens*, 749 F.3d 380, 395 (5th Cir. 2014); *Brown v. Thaler*, 684 F.3d 482, 489 n.4 (5th Cir. 2012), *cert. denied*, 568 U.S. 1164 (2013).  Instead, those claims are subject to the limitations of Section 2254(d) and *Pinholster*.  *Escamilla*, 749 F.3d at 395.

> Th[e] backward-looking language [of § 2254(d)] requires an examination of the state-court decision at the time it was made.  It follows that the record under review is limited to the record in existence at the same time; *i.e.*, the record before the state court. . . . Our cases emphasize that review under § 2254(d)(1) focuses on what a state court knew and did.

*Pinholster*, 563 U.S. at 182.  To this end, Granger cannot prove that the state court unreasonably adjudicated exhausted claims with arguments and evidence that were not presented to the state court.  *Id.*; *see Robertson v. Davis*, 715 F. App'x 387, 392 (5th Cir. 2017) (new assertions raised to show that the state court's adjudication was unreasonable were barred from consideration by *Pinholster*).

Granger may contend that his claim is qualitatively "new" because Drs. Martell and Dudley diagnosed him with mental health issues and challenged Dr. Gripon's testimony regarding intermittent explosive disorder, whereas his state habeas arguments more generally related to Granger's background.  Granger, however, cannot evade the deference afforded to the state court's legal determinations that counsels' decision to focus on Granger's future dangerousness and to present the social history information that they did was reasonable trial strategy.  *Cf. Nelson v. Davis*, 952 F.3d 651, 660–61 (5th Cir. 2020) (holding that if Nelson's federal IATC-Mental Health claim is the same as the IATC claim he raised in state court, which "[n]otably . . . lacked

any claim of severe [Post-Traumatic Stress Disorder] that he now emphasizes in his federal petition," but which the district court nevertheless considered exhausted, no reasonable jurist would debate the state court's denial of the claim). Thus, Granger cannot convert his unsuccessful state habeas claim into a new unexhausted claim by supplementing it with the reports of new experts. *Cf. id.* at 661 ("Recognizing the substantial limitations on our review of an exhausted claim, Nelson argues that his IATC-Mental Health claim is unexhausted because it is not the same as the ineffectiveness claim he brought on state habeas.").

The Fifth Circuit, moreover, has disapproved of similar efforts. For example, the petitioner in *Lewis v. Thaler* asserted that he had fundamentally altered his claim with new evidence and because his claim was thus unexhausted, the federal court could consider evidence not presented to the state court. 701 F.3d 783, 790 (5th Cir. 2012), *cert. denied*, 569 U.S. 910 (2013). Rejecting this argument, the Fifth Circuit explained "that the exhaustion requirement of § 2254(b) is a reinforcement of, rather than an escape hatch from, the rule that a federal habeas court's review is limited to the state court record." *Id.* Similarly, in *Clark*, the court applied this principle to a claim challenging trial counsel's punishment investigation and presentation, holding that a federal court could not consider new affidavits from trial counsel and a private investigator even though they alleged the non-presentation of entirely new witnesses.[20] *See* 673 F.3d at 420.

---

[20]     Granger also cites to *Andrus v. Texas*, 140 S. Ct. 1875 (2020) (per curiam). (#44 at 76, 85). Because the state court adjudicated his claim prior to *Andrus*, *Andrus* cannot be used to show that the state court's decision was unreasonable. *Cf. Shoop*, 139 S. Ct. at 507–09 (per curiam) (criticizing a federal court for relying on *Moore v. Texas*, 581 U.S. 1 (2017), to assess the reasonableness of a state court's pre-*Moore* adjudication of an intellectual disability claim under § 2254(d)). Even so, *Andrus* is distinguishable: Granger's counsel did not "abandon[ ] [his] investigation of [Granger's] background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Andrus*, 140 S. Ct. at 1882 (quoting *Wiggins*, 539 U.S. at 524). Nor did he "'ignore[ ] pertinent avenues for investigation of which he should have been aware,' and indeed was aware." *Id.* (quoting *Porter*, 558 U.S. at 40). Andrus's counsel "performed virtually no investigation, either of the few witnesses he called during the case in mitigation, or of the many circumstances in Andrus' life that could have served as powerful mitigating evidence." *Id.* at 1883. Here, Granger's counsel had extensive familiarity with Granger's background based on the thorough investigations of his mental health expert, his mitigation expert, and his fact investigator. Any limitations on his investigation were due not to willful disregard, *see id.*, but to clear strategic choice.

Here, Granger cannot avoid the AEDPA's deferential standard by doing exactly what *Pinholster* prohibited—adding new evidence. *Id.*

The TCCA's merits rejection of Granger's IATC mitigation claim was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Granger's state habeas corpus proceeding.  Under AEDPA, Granger's claims—Claims 6, 7, and 1(8–10)—do not entitle him to federal habeas corpus relief.

> G.    Claim 8 (IATC):  Granger was denied his Sixth Amendment right to effective assistance of counsel at the penalty phase of trial as a result of counsels' failure to adequately investigate and prepare witnesses and through presentation of overtly harmful evidence.
>
> Claim 1(5):  "Trial counsel called witnesses who gave extremely harmful testimony, sometimes elicited by the defense on direct examination."
>
> Claim 1(12):  "[M]ost of the punishment phase witnesses the defense team called, including the pastor, gave dramatically damaging testimony regarding Granger."
>
> Claim 1(13):  "[D]uring closing argument, neither defense counsel explicitly asked the jury to impose life."

Granger asserts that his counsel provided ineffective assistance during the punishment-phase representation.  He specifically alleges that counsel failed adequately to investigate and prepare the witnesses who were called, which led to the presentation of overtly harmful evidence. (#44 at 104–116).  Granger lodges three primary complaints:

> (1)    counsel did not object to the State's introduction of extraneous acts through three jail-guard witnesses (*id.* at 105–07);
>
> (2)    counsel presented harmful evidence because of their inadequate preparation of five of the nine witnesses they presented (*id.* at 107–13); and
>
> (3)    counsels' closing arguments were inept (*id.* at 113–15).

Granger also asserts that these alleged actions violate his right to fair and reliable sentencing under the Eighth and Fourteenth Amendments. (*Id.* at 105, 107).

The Director contends that Granger's IATC claims for failure to prepare witnesses adequately are procedurally barred, or, in the alternative, the claims lack merit. (#53 at 159–180). He also states that *Martinez* does not apply to Granger's Eighth and Fourteenth Amendment claims; thus, they are procedurally barred and not entitled to a merits review.

1.     <u>Granger's Claims are Procedurally Barred, and his Newly Presented Evidence Cannot be Considered</u>

Granger admits that he presented these claims in a second state habeas application that was dismissed as an abuse of the writ. (*See* #44 at 116); *Ex parte Granger II*, 2020 WL 915434, at *1. He concedes these claims are procedurally defaulted but asserts that the default is excused. Granger fails to provide any analysis under Section 2254(e)(2) to evaluate whether the evidence in support of that argument can be considered by the court.

a.     <u>Granger's New Evidence Cannot be Considered</u>

Granger attaches the 2018 statements of Sewell (A0986), Bartholomew (A0997-98), and McAbee (A0976-78) to show that his attorneys failed to properly prepare these witnesses to testify on his behalf. (#20-1). None of these declarations or statements was presented to the state court in *Granger I*.

Where a petitioner relies on *Martinez* to excuse a procedural default, a federal court may not consider new evidence to assess cause and prejudice, if the petitioner "failed to develop the factual basis of [his] claim in state court proceedings." *Ramirez*, 142 S. Ct. at 1739; 28 U.S.C. § 2254(e)(2). A federal court may admit new evidence in only two situations: (1) "[e]ither the claim must rely on a 'new' and 'previously unavailable' 'rule of constitutional law' made retroactively applicable by [the United States Supreme] Court"; or (2) "it must rely on a 'factual

predicate that could not have been previously discovered through the exercise of due diligence.'" *Shoop*, 142 S. Ct. at 2044 (quoting 28 U.S.C. § 2254(e)(2)(A)).

Granger does not assert that he may present the above evidence because of a new law or rule that is retroactively applicable or that his claims asserting a failure to prepare defense witnesses adequately could not have been discovered through due diligence. *Id.* Granger's new evidence is barred by 28 U.S.C. § 2254(e)(2)(A), and the court may not consider it.

### b.   The Eighth and Fourteenth Amendment Claims

Granger argues that his counsels' performance during the punishment phase violates his Sixth Amendment rights, "as well as his Eighth and Fourteenth Amendment rights to a fair and reliable sentencing proceeding." (#44 at 105).  Granger concedes that these claims were not presented to the state court in *Granger I* and were dismissed as an abuse of the writ in *Granger II*. (#44 at 116).  He asserts that the procedural bar is excused under *Martinez*. (*Id.*) (citing *Trevino*, 569 U.S. at 429).

*Martinez* does not apply to Granger's Eighth and Fourteenth Amendment claims. *Martinez* can only excuse the default of ineffective-assistance-of-counsel claims. *See Davila*, 137 S. Ct. at 2063.  Granger cannot overcome the procedural bar for his Eighth and Fourteenth Amendment claims here.  The Eighth and Fourteenth Amendment claims are denied as procedurally barred.

### 2.   IAC Regarding Eighth and Fourteenth Amendment Claims

To the extent Granger is asserting that his state habeas counsel were ineffective for failing to raise either an Eighth or a Fourteenth Amendment claim regarding "fair and reliable sentencing proceedings," that claim is procedurally barred as noted above.  *Martinez* does not excuse the default; thus, Granger cannot show prejudice as required by the *Strickland* test.

3.     The State's Introduction of Extraneous Acts

Granger alleges that counsel were ineffective for not objecting to the State's introduction of extraneous acts, despite counsels' strategy to exclude such acts. (#44 at 105–07).  Granger specifically complains about the testimony of three jail guards—Craig Turner ("Turner"), Leday, and Gutierrez—who worked at the Jefferson County Sheriff's Office while Granger was awaiting trial. (*Id.*).  Granger alleges that each of these witnesses testified, without notice, and without objection, to Granger's behavior in jail. (*Id.*).  He argues that the failure to object resulted in the admission of bad acts that had been excluded before trial and that such deficient performance by counsel prejudiced his defense. (*Id.* at 107).

Granger's assertion that evidence of bad acts had been excluded prior to trial is incorrect. (*See* #44 at 104–05, 107).  Granger filed a pretrial motion seeking to discover evidence of extraneous or unadjudicated acts that the State intended to offer at either phase of trial.  *See* 3 CR.Supp.2 at 447–49.  A review of the motion indicates that counsel did not seek to *exclude* evidence of bad acts if timely notice was not provided.  Rather, counsels' motion was directed primarily at the impact of insufficient notice on their ability to investigate and the possible need for a continuance to investigate such acts.  *Id.* at 448.  In granting the discovery motion, *id.* at 447, the trial court did not rule that such acts would be excluded if not timely noticed, *see* 5 RR 40.  Granger, therefore, cannot rely on an exclusion theory for either deficiency or prejudice.

Counsel, furthermore, is not required to make frivolous objections. *Green v. Johnson*, 160 F.3d 1029, 1037 (5th Cir. 1998), *cert. denied*, 525 U.S. 1174 (1999); *McCoy v. Lynaugh*, 874 F.2d 954, 963 (5th Cir. 1989).  Assuming that the complained-of testimony in fact amounts to "bad acts,"[21] it is not clear from the state record that timely notice was not provided.  When

---

[21]     Some of the testimony about which Granger complains are simply opinions. (*See, e.g.*, #44 at 106) (citing Turner's affirmative response to the State asking whether Granger "was 'a risk to other guards and inmates in the jail'").  Other testimony did not introduce evidence of a bad act at all. (*See, e.g.*, *id.*) (citing Leday's

discussing the motion at a pretrial conference, the State acknowledged that they were already "in the process of complying with" the discovery requirements.  5 RR 40; *see also* 5 RR 34 (State acknowledging that they will comply with TEX. R. EVID. 404(b)).  The record further reflects that counsel were well aware of Granger's misbehavior in pretrial detention:  Dr. Hamza's report explicitly refers to an offense report from the Jefferson County Detention Center in which it was alleged that Granger was "being violent and threatening officers."  (A0332).  During defense counsels' cross-examination of Gutierrez, counsel referred to two incidents involving Granger, the first of which "was about some blankets" that was not referred to during direct examination.  *See* 26 RR 51.  Granger therefore fails to establish that counsel would have had a meritorious objection on notice grounds to any of the complained-of testimony.

Granger's complaint that counsel should have objected to Gutierrez's testimony regarding his risk of escape is also unavailing.  When Gutierrez began to testify that an unknown inmate "was talking about Mr. Granger trying to plan an escape[,]" the State quickly interrupted him.  26 RR 49–50 ("Mr. Shettle:  Stop him.  Hold on a minute. . . . Can we have just a moment, your Honor?").  The State then changed course, instead asking Gutierrez if he, at any point, considered Granger to be an escape risk.  *Id.* at 50.  Gutierrez responded that he did "[e]ver since [Granger] came into the facility."  *Id.*  The State's curing of its own witness's testimony left no basis or purpose for counsel to object.  A jailer's opinion as to whether he considered an inmate to be an escape risk is appropriate and admissible lay witness testimony.  *See Fierro v. State*, 706 S.W.2d 310, 317 (Tex. Crim. App. 1986) ("[W]e have previously held that a properly qualified lay witness could state an opinion concerning the probability that a capital murder defendant would

---

response, "I've read some reports, yes," to the State's asking whether he was "aware of any other instances with inmate Granger and other deputies"); 26 RR 32 (defense counsel asking if Granger had merely "called people bad names" and if Turner was "aware of other incidents," to which Turner responded that he had "heard of other incidents; yes, sir").

continue to commit criminal acts of violence."). To be sure, contrary to Granger's assertions, (#44 at 106), whether Granger was an escape risk is certainly a relevant consideration with regard to the future dangerousness inquiry. *See, e.g., Gribble v. Johnson*, No. 98-40927, 1999 WL 800203, at *11 (5th Cir. 1999) (per curiam) ("[T]he possibilities of escape or some other release from prison are legitimate concerns in determining the future dangerousness of a defendant." (quoting *Gribble v. State*, No. AP-71,485, slip op. at 14 (Tex. Crim. App. Feb. 1, 1995) (unpublished))), *cert. denied*, 528 U.S. 1173 (2000). Thus, Granger fails to establish deficiency by counsel.

Moreover, even assuming deficiency, Granger cannot establish prejudice. Granger argues that counsels' actions "resulted in the admission of bad acts that the court had excluded before trial." (#44 at 107). As discussed above, the trial court did *not* exclude any bad acts prior to trial; as a consequence, Granger's conclusory assertion of prejudice fails. Granger cannot establish prejudice for another reason: even if all the complained-of testimony *were* excluded, it would not have made a different result reasonably probable given the horrific nature of his crime, the video evidence, his own testimony and behavior in the courtroom, and his lack of remorse. Granger is not entitled to habeas relief on this claim.

4.    Counsels' Preparation of Witnesses

Granger attacks trial counsels' direct examination of nearly all of his punishment phase witnesses. Granger alleges that counsel inadequately prepared the witnesses to testify. (#44 at 107–113) (complaining about the testimony of McAbee, Granger, Sr., Jeffrey Sias ("Sias"), Jonathan Gonzales ("Gonzales"), and Vallire). Granger alleges that, as a result of their lack of preparation, counsel either elicited, or allowed the State to elicit without objection, harmful

information, which "unwittingly aided the State's case in aggravation." (*Id.* at 107) (citing *Andrus*, 140 S. Ct. at 1882–83).

a.    <u>McAbee</u>

Granger argues that McAbee, whom he characterizes as his "most harmful penalty-phase witness[ ]," (*id.* at 108), gave "devastating" testimony when he testified that: (1) Granger was "not at all remorseful about what happened to Claudia and Samantha"; (2) McAbee, who was known as the "pistol packing pastor," would have shot at Granger if he had been at the courthouse the day of the shooting; (3) he believed in the death penalty; and (4) he could "probably side with putting Mr. Granger to death." (*Id.* at 108). Granger alleges that had counsel investigated McAbee, he would not have presented him. *(Id.)*.

Granger relies on a declaration provided by McAbee to support his argument. (A0977–78). The court may not rely on McAbee's declaration, as Granger fails to show that this new evidence meets either prong of 28 U.S.C. § 2254(e)(2)(A)(i) or (ii). *Shoop*, 142 S. Ct. at 2044.

Regarding McAbee's actual testimony at trial, Granger overstates McAbee's testimony. First, Granger's argument that "[t]he only helpful testimony" McAbee provided "was his recollection that [Granger] felt bad about Sebolt's death" is misleading. (#44 at 108). McAbee testified that he met Granger through his weekly ministrations at the jail, that Granger accepted prayer, and that they talked about scripture together. 27 RR 36–37, 40. Consistent with a guilt-phase theory that sought to decrease Granger's culpability for the crime, McAbee testified that Granger "felt lied on" and that "caused him to get to that capacity." *See* 27 RR 38. McAbee further testified that Granger expressed remorse about what happened to Sebolt, asked him to contact Sebolt's family because he "hated" what happened to her, and thought the family had

124

grounds for a wrongful death lawsuit against Jefferson County. *Id.* at 38–41. While McAbee affirmed Granger's lack of remorse towards Claudia and Samantha, *see id.* at 38, 40–41, that was consistent with Granger's testimony at both phases of the trial and served to bolster his credibility that he was admitting to the bad actions he took, but not to the ones he felt he did not take. *See* 23 RR 38–39 (admitting to shooting Samantha but denying shooting Sebolt), 66 (same), 69 (admitting to running over Samantha with the truck).

Although McAbee testified that he personally believed in the death penalty, 27 RR 44, he did not testify, as Granger asserts, that he "could probably side with putting Mr. Granger to death." (#44 at 108). Instead, he indicated only that, if he was in the position to make such a decision, he would be able to impose it if the evidence supported it—just as any other juror sitting on the jury was qualified to do. *See* 27 RR 43–44 (stating that he would not make a decision as to whether Granger should be put to death, since that job belongs to the jury, and "if [he] was sitting in that jury and listening to it for the first time," he would be able to impose the death penalty because he believes in it, but he is not there to make that decision because he is not a juror). This is simply a common sense answer, and the same thing that all jurors had to agree to in order to sit on the jury. The same applies to McAbee's statement that he would have defended Samantha had he been at the courthouse that day. (#44 at 108).

Ultimately, counsel was faced with an impossible situation—they had a client who adamantly denied killing the victim but who was honest, likely to his detriment, about wanting to shoot and kill his ex-wife and daughter and who, therefore, felt no remorse either for a crime he said he did not commit or for a crime he thought was justified. Added to that, half of his immediate family, *e.g.*, his ex-wives and his daughter, *accused* him of sexual assault; both of his brothers had themselves been accused of sexual assault; and his son and mother vigorously

defended him.  Indeed, when Granger insisted on testifying against his counsels' advice, counsel were left taking the bad with the good—for every good piece of evidence they could squeeze out of a witness, *e.g.*, that Granger accepted prayer and had found faith in jail, there would inevitably be bad evidence, *e.g.*, that Granger was not remorseful about what happened to Claudia and Samantha.  In other words, Granger engages in the type of second-guessing of trial counsels' strategy that is impermissible to establish a *Strickland* violation.  "[T]he presentation of witnesses is generally a matter of trial strategy," *Woodfox v. Cain*, 609 F.3d 774, 793 (5th Cir. 2010), and "there is a strong presumption that [trial counsel acted] for tactical reasons rather than through sheer neglect." *Yarborough*, 540 U.S. at 8.  Granger fails to prove that no reasonable counsel would have presented McAbee.

Moreover, Granger does not demonstrate any resultant prejudice.  He offers no evidence that counsel would not have called McAbee knowing the full extent of his eventual testimony.  In addition, most of the complained-of testimony was cumulative to that presented at trial in other respects.  Indeed, even if counsel were deficient for eliciting testimony from McAbee about Granger's lack of remorse toward Claudia and Samantha, Granger certainly cannot show prejudice when he repeatedly made such statements to the jury.  Regardless, given the horrendous nature of the primary offense and the significant aggravating evidence presented by the State, *supra*, there is not a reasonable probability that it would have affected the jury's answers on the special issues.  Ultimately, counsels' strategy was not an error "so serious as to deprive [Granger] of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687.  Granger is not entitled to habeas relief on this claim.

b. <u>Granger, Sr.</u>

Granger next asserts that counsel "did not meet with Petitioner's father, Granger, Sr., at all before presenting him as a witness," and counsels' "lack of preparation was apparent." (#44 at 109). He analogizes his case to *Andrus*, where counsel "met with the defendant's mother for the first time when he subpoenaed her and [with] his father for the first time when he arrived in court to testify." (*Id.*) (citing *Andrus*, 140 S. Ct. at 1882). Granger, however, offers no evidence that counsel never previously met with Granger's father. Thus, his reliance on *Andrus* is misplaced.

Granger is also incorrect to aver that Granger, Sr., had "absolutely nothing helpful to say, except that he did not want his son, whom he had not seen in a very long time, to be put to death." (#44 at 109). The fact that Granger had not seen his father in a long time and that his father was not generally present in Granger's life is precisely the type of mitigating life history that Granger faults trial counsel for *not* presenting. Granger, Sr., also testified about the murder of Granger's sister in 1987, 27 RR 55, 58; that he and Granger's mother divorced when Granger was very young, *id.* at 56; that he did not see his kids very much because they moved a lot and he was not able to find them, *id.* at 56–57, 61–62; and that he knew what Granger did was wrong, but he did not think that putting him to death was going to solve it, *id.* at 61–62.

Granger argues that Granger, Sr., nevertheless provided "hurtful" testimony: (1) Granger told him in the middle of trial that the shooting happened because "he just couldn't control his self anymore"; (2) "Vallire took the children and hid them from him for years, just as [Granger] was alleged to have done to Claudia"; and (3) Claudia had called Granger, Sr., a few years earlier looking for Granger and the kids. (#44 at 95). The first statement was again consistent with Granger's testimony at both phases of trial and is therefore cumulative. The second statement,

if true, is as mitigating as it is aggravating, as it shows a cycle of neglect or abuse in his family history.  Finally, the third statement is untrue:  Granger, Sr., testified that Claudia called "want[ing] to know about Bartholomew" but that he did not know what she wanted because he "wouldn't let her ask [him]."  27 RR 63.  Granger, Sr., then clarified that she had asked where Granger was, and he told her that he had last heard that Granger was in Houston.  *Id.* at 64.  Granger, Sr., did not testify that Claudia asked about the children.  Granger fails to prove deficiency, and he fails to present any argument as to how he was prejudiced.  In light of the overwhelming evidence against Granger, there is no reasonable likelihood that these snippets of testimony by his father negatively impacted the outcome of the case.  Granger fails to meet his burden under *Strickland*.  This claim does not warrant habeas relief.

### c.      Fellow Inmates Sias and Gonzales

Granger next alleges that counsel presented fellow inmates Sias and Gonzales in a "hopeful" attempt "to confirm the abuse [Granger] experienced in prison," but that their failure to prepare these witnesses led to very little helpful testimony and, in Sias's case, "devastating cross-examination" testimony.  (#44 at 109).  Like his prior claims, Granger alleges that his counsels' investigation and preparation of these witnesses was as inadequate as that in *Andrus* because they "barely met, let alone prepared, the witnesses [they] presented[.]"  (*Id.*).

Granger believes that trial counsel "did not meet with inmate Gonzales before presenting him as a witness," (*id.*) (citing to 27 RR 65), and they were "equally unprepared to present the testimony" of inmate Sias, (*id.* at 96).  While counsel elicited testimony that he and Gonzales had never met, *see* 27 RR 65, that was done strategically to bolster the inmate's credibility, *i.e.*, possibly to show that counsel had not influenced his testimony.  *See Feldman v. Thaler*, 695 F.3d 372, 380 (5th Cir. 2012) (noting that a court reviewing counsel's strategic choices is required to

"not simply to give [counsel] the benefit of the doubt . . . but to affirmatively entertain the range of possible reasons [he] may have had for proceeding as [he] did." (quoting *Pinholster*, 563 U.S. at 196)), *cert. denied*, 568 U.S. 1233 (2013).

This does not mean, however, as Granger alleges, that "[c]ounsel asked questions without knowing how Gonzales would answer" or that he was unprepared to question either witness. (*See* #44 at 109–10). Whether *counsel* formally met the witness is irrelevant. In addition to his trial counsel, Granger's trial team consisted of mitigation specialist Villanueva, and her assistant, Valadez, and investigator Coffin. With this trial team, counsel "conducted a thorough investigation of Granger's life and situation," including "fully investigat[ing] all family members and evaluat[ing] all information." SHCR-01.Supp.2 at 176, 180–81. Villanueva interviewed and investigated numerous witnesses, producing a seventy-three-page report of her findings and proposed mitigation themes. 2 SHCR-01 at 196–269. Additionally, Coffin "personally talked with numerous family members and knowledgeable parties." *Id.* at 177; *see also* 3 SHCR-01 at 275.

"[N]either *Strickland* nor any other authority has ever concluded that utilizing a court-appointed investigator to interview witnesses amounts to the ineffective assistance of counsel." *See King v. Cockrell*, 2002 WL 432450, at *3 (5th Cir.), *cert. denied*, 536 U.S. 989 (2002); *Lord v. Wood*, 184 F.3d 1083, 1095 n.8 (9th Cir. 1999) ("Counsel is not obligated to interview every witness personally in order to be adjudged to have performed effectively."). "A defense attorney is not required to investigate the facts of a case *personally*. Counsel may delegate the investigation to a private investigator." *Callahan v. State*, 24 S.W.3d 483, 486 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd). As the Ninth Circuit has stated, "A claim for failure to interview a witness may sound impressive in the abstract, but it cannot establish ineffective

assistance when the person's account is otherwise fairly known to defense counsel." *Eggleston v. United States*, 798 F.2d 374, 376 (9th Cir. 1986) (quoting *United States v. Decoster*, 624 F.2d 196, 209 (D.C. Cir. 1976)).

Granger's situation is wholly unlike *Andrus*, where Andrus's counsel admitted that he was "barely acquainted with the witnesses who testified during the case in mitigation." 140 S. Ct. at 1882. In *Andrus*, "[c]ounsel acknowledged that the first time he met Andrus's mother was when she was subpoenaed to testify, and the first time he met Andrus's biological father was when he showed up at the courthouse to take the stand." *Id.* "Counsel also admitted that he did not get in touch with the third witness (Dr. Roache) until just before *voir dire*, and became aware of the final witness (Martins) only partway through trial." *Id.* "In short, counsel performed virtually no investigation, either of the few witnesses he called during the case in mitigation, or of the many circumstances in Andrus's life that could have served as powerful mitigating evidence." *Id.* at 1883. By contrast, Granger's counsel conducted a more-than-adequate investigation in general, and, through his investigator and mitigation experts, was quite familiar with Sias and Gonzales, specifically.

Further, Granger's allegations that neither witness provided "much helpful testimony" are inaccurate. Supporting counsels' lack-of-future-danger strategy, Gonzales testified that, in the approximately eight months he had known Granger, he had never observed him getting into physical fights, despite the fact that other inmates "messed with him." 27 RR 66–69. Gonzales also testified that he never saw Granger assault a guard, even though he had heard that guards assaulted Granger. *Id.* at 70. Underscoring Dr. Gripon's earlier testimony that Granger was a lot of "hot air" but no action, Gonzales admitted that Granger would curse at people, but he never threw a punch or resisted them, *see* 27 RR 71. Gonzales also supported counsels' strategy to

130

confirm that Granger was being mistreated in jail. *See* 27 RR 72 (guards made fun of Granger), 73 (guards treated him badly), 73 (guards would not want to give Granger his medications or would just skip them), and 74 (Granger was treated differently from the ordinary prisoner). While Gonzales testified that Granger denied killing anybody, this was again consistent with, and cumulative of, Granger's similar, repeated denials. Granger cannot show any deficiency or prejudice with respect to Gonzales.

The same assessment pertains to Sias. Like Gonzales, Sias confirmed that Granger was being mistreated in jail. *See* 27 RR 79 (testifying that officer told Granger to "shut the fuck up" when he asked about his medication). Sias also testified that he never saw Granger strike the staff. *Id.* at 80. While it is clear that counsel believed, based on Coffin's interview of him, that Sias would be a *more* favorable witness for Granger, it appears that counsel was faced with a witness who simply decided to be less forthcoming on the stand than during his interview. *See, e.g., id.* at 80 (counsel asking Sias if there were other incidents where Granger had issues with guards regarding food, and Sias curtly responding, "No, not to my knowledge; no sir."), 83 (counsel asking whether "Granger had problems with trustees depriving him of food," and Sias again denying personal knowledge of such facts). "Here, counsel's decision to call [Sias] was an informed, strategic choice that simply backfired." *Murphy v. Davis*, 737 F. App'x 693, 704–05 (5th Cir.) (finding fact that defense future dangerousness expert "buckled under cross-examination does not show that calling him was strategically unreasonable"), *cert. denied*, 139 S. Ct. 568 (2018).

This applies with equal force to Sias's testimony regarding Granger's alleged admission to molesting his daughter. (*See* #44 at 110–11). Sias was apparently identified by Granger as being *helpful* to him, and no reasonable counsel would expect that, where his client has

vehemently denied any sexual misconduct, he would then point counsel toward a witness to whom he had confessed such conduct. Thus, while it may be true that counsel had not asked Sias whether Granger had ever admitted to sexual misconduct, it does not undermine the reasonableness of counsels' investigation that he did not anticipate that a witness identified by his client as helpful would have inculpatory information about the same client. The fact that Sias's testimony surprised counsel because he did not volunteer such information prior to trial does not mean counsel were strategically unreasonable in their decision to call him. *See Richter*, 562 U.S. at 86 ("Just as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities."); *see also Murphy*, 737 F. App'x at 704–05.

Regardless, "the impact of [Sias's testimony] is not measurably more damaging than the facts already before the jury." *Id.* at 705. Indeed, the evidence of Granger's future dangerousness was substantial and significant. The State presented *several* witnesses, including Granger's daughter, to testify in graphic detail about the molestation that had occurred. *See* 26 RR 86–125. Notably, Granger's ex-wife had already testified about the shower incident that Sias mentioned. *See id.* at 124. The impact of Sias's testimony was also minimized by defense counsel's impeachment of him: defense counsel highlighted that Sias had never mentioned this information to anyone before and undermined Sias's credibility by getting him to admit that he supposedly overheard this statement when Granger was "just talking about it" out loud, to Sias, without seeing him, from three cells down. 27 RR 92–93. Granger fails to demonstrate that Sias's testimony had a reasonable probability of changing the jury's mind regarding his future dangerousness, given all the other evidence supporting such a finding.

Granger summarily proffers a litany of other ways counsels' actions with regard to Sias were allegedly ineffective or prejudiced him. (#44 at 111). All are based on the notion that, because the State purportedly did not provide notice of its intention to admit Granger's statement, the statement was inadmissible. (*Id.*). Granger is incorrect—Granger's motions referred only to custodial statements made during interrogation or at the behest of other "state actors," including jailhouse snitches. *See* 1 CR.Supp.2 at137–41; 3 CR.Supp.2 at 459–61 (citing *Jackson v. Denno*, 378 U.S. 368 (1964)); *see also* 5 RR 41 (referring to a number of oral statements made by Granger); 20 RR 106–08 (defense counsel agreeing that Granger's inculpatory statements during hostage situation were noncustodial). Thus, neither of the motions apply to the situation at bar—a fellow inmate, called by the defense, who testified that Granger spontaneously admitted to the misconduct of sexual assault. Moreover, even if the motions applied, the trial court did not grant either one. 5 RR 13–14, 41. Granger is mistaken that his counsel violated a court order preventing certain testimony from being admitted into the record. He is further mistaken that the State was required to provide notice of Granger's jailhouse statement. Granger cannot show deficient performance on the part of his trial counsel on the basis of the two motions. Granger fails to show that he is entitled to habeas relief on this claim.

d.    Vallire

Granger finally alleges that counsel were inadequate in their preparation of Granger's mother, Vallire. (#44 at 111–113). Granger alleges not only that Vallire "act[ed] inappropriately on the stand" by blowing kisses and winking at Granger, but "her testimony was more damaging and offensive than it was helpful." (*Id.* at 111). Citing almost exclusively to Vallire's answers during the State's cross-examination, he characterizes Vallire's testimony as having "expressed no remorse for the harm her son had caused, little sympathy for the victims, and absolutely no

133

respect for the jury's guilt-phase verdict." (*Id.* at 112).  Granger alleges that, had counsel

prepared Vallire to testify, "[t]hey would have prepared Ms. Ozene to respond to these questions

in a way that would not alienate and offend the jury" or would have decided not to call such a

"devastatingly damaging witness" at all. (*Id.* at 113).

Granger, however, offers no evidence in support of his assertions—that trial counsel would

not have called Vallire at all, that the jury was offended, or that counsel could have done anything

to keep Vallire from behaving "inappropriately" on the stand.  *See Richter*, 562 U.S. at 110

(counsel cannot be faulted for "failing to prepare for what appear to be remote possibilities").

Granger's assertions on these issues are conclusory and should be denied.  *Miller*, 200 F.3d at

282.  Moreover, Vallire's testimony was helpful.  She expressed her shock at finding out about

Granger's involvement in the shooting, 27 RR 97; expressed empathy and sadness for Sebolt's

family, based on her experience of having her own daughter murdered, *id.* at 98; bolstered

Granger's testimony that he was driven to that point by Claudia's manipulations of Samantha, *id.*

at 99–100; testified that Claudia and her brother beat her and put her in a coma for more than four

days, *id.* at 100; testified that her heart nevertheless dropped when she heard Samantha had been

shot, *id.* at 101; opined that Granger "wasn't in his right mind" when he shot at people because

"he wouldn't do that," *id.* at 102; expressed that the family had been feeling under pressure for

over four years preceding the offense, *id.*; and stated that she never foresaw this coming, *id.* at

103.

There is nothing to indicate that any additional preparation would have changed Vallire's

testimony or made counsel decide not to call her.  *See Murphy*, 737 F. App'x at 704–05.  Indeed,

most of her testimony during cross-examination was simply cumulative of Granger's testimony:

that he did not kill Sebolt, that the police did, and that the family did not like Claudia for using

Samantha against them.  (*See* #44 at 112) (citing to 27 RR 103, 108–09, 101); *see also* 28 RR 56 (Granger saying the police killed Sebolt).  Granger misconstrues Vallire's testimony regarding her support of Granger—she was not "attempt[ing] to justify her son's actions," (#44 at 112), when she said she "stand[s] behind what he did," *see* 27 RR 106.  She merely meant that "he is [her] son," and while she does not "excuse him for what he did," she was going to be there for him. *Id.* at 107.  Whether such support was typical, it is far from "devastating" for the jury to hear that a mother still loves her son even if he has been convicted of a heinous act.  *See also* 27 RR 103 (his mother stating that she "love[s her] son" and was "supporting him 150 percent").  Thus, even if Granger could show any deficiency in counsels' decision to call his mother, he fails to show any prejudice, especially in light of the overwhelming aggravating evidence regarding the crime. Granger is not entitled to habeas relief on this claim.

5.  IAC of State Habeas Counsel

In addition to attacking his trial counsel for their investigation and preparation of witnesses presented at the punishment phase of the trial, Granger maintains that his state habeas counsel were ineffective for failing to raise his inadequate investigation and preparation of witness claims on state habeas review.  (#44 at 116).  Granger contends that state habeas counsel "identified claims contesting trial counsels' failure to conduct adequate investigation and preparation of lay witnesses, Sias and Gonzale[s]" (#44 at 116); however, state habeas counsel did not raise the claim in their state habeas briefing.  Granger concedes that a claim for failure to prepare Sias and Gonzales adequately for trial was not raised in *Granger I* and was dismissed as an abuse of the writ in *Granger II*.  (*Id.*).

Insofar as Granger argues his state habeas corpus counsel should have raised an ineffective assistance of trial counsel claim regarding the inadequate investigation and preparation of lay

witnesses, Sias and Gonzales, Granger fails to present any argument or evidence that:  (1) his underlying ineffective assistance of trial counsel claim is substantial, (2) his habeas counsel was ineffective for failing to present the claim, and (3) he suffered actual prejudice.  *Beatty v. Stephens*, 759 F.3d 455, 465-66 (5th Cir. 2014) ("To succeed in establishing cause under *Trevino* and *Martinez*, the petitioner must show:  (1) that his claim of ineffective assistance of counsel at trial is 'substantial' (*i.e.*, 'has some merit'); and (2) that his habeas counsel was ineffective for failing to present those claims in his first state habeas application."), *cert. denied*, 575 U.S. 1011 (2015); *Hernandez*, 537 F. App'x at 542 (holding that an inmate must show actual prejudice by "establish[ing] not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.").

Courts recognize that habeas counsel "who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal."  *Vasquez*, 597 F. App'x at 780 (quoting *Robbins*, 528 U.S. at 288).  In order to show ineffective assistance, the petitioner must demonstrate that "a particular nonfrivolous issue was clearly stronger than issues that counsel did present."  *Id.*  Granger does not provide any showing that his failure to investigate and prepare lay witnesses claim was clearly stronger than the issues that were presented in *Granger I*.  The court must give deference to state habeas counsels' strategy as to which issues to present to the state habeas court.  *Harrington*, 562 U.S. at 105 ("Even under *de novo* review," a court would be "most deferential" to such strategic choices, because "unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge.").  Granger's failure to provide analysis on this issue negates his claim.

136

Additionally, in Section G.4.c., *supra*, the court addresses Granger's claim that his trial counsel were ineffective for failing to prepare Sias and Gonzales adequately.  Granger failed to establish that his claim was substantial.  Moreover, Granger failed to present any argument or evidence that he suffered actual prejudice by his state habeas counsels' decision not to include the investigation and preparation of lay witnesses claim in his state habeas briefing.  Granger's ineffective assistance of state habeas counsel claim is denied.

### 6.    Counsels' Punishment-Phase Closing Arguments

Granger next claims that his trial counsel provided ineffective assistance in presenting closing argument.  He contends that counsel unreasonably "painted an unsympathetic picture of [Granger]" by "emphasizing how eyewitnesses rightfully wanted to kill him, characterizing his conversations from prison as bigoted, vulgar, and profane, and belittling and dehumanizing their client."  (#44 at 113–15).  Granger argues that counsel "did very little to present the case that he was worthy of life, rather than death[,]" and in fact, they never "directly asked the jury to spare their client's life."  (*Id.*).  Granger argues that trial counsels' tactics—dehumanizing their client—violated ethical rules and deprived him of competent counsel.  (*Id.* at 115).

When examining counsel's closing argument to determine whether it was proper, the court must consider the closing argument in its entirety.  *Riley*, 339 F.3d at 317.  Here, the record clearly refutes Granger's allegation, as trial counsel explicitly and emphatically asked the jury to impose a life sentence on Granger.  *See*, *e.g.*, 29 RR 18 (Makin arguing that Granger is not insane or mentally ill, but "he's an individual not like us, not like you, not like me," and he should therefore "be removed from normal society" and "locked up and handled by professionals, people with training"), 29 RR 21 (Cribbs discussing the story of Cain and Abel and how God could have

137

killed Cain, but instead he chose "to banish him away from the people," and "that's what we're

gonna ask you to do"). In his final plea to the jury, Cribbs argued:

> I'm gonna ask if you will vote life, life without parole, life in the penitentiary under,
> as James said, under proper supervision. He hadn't committed an act of violence
> other than this one thing. Now, he is not a truthful person, I can tell you that, 'cause
> it's obvious from the stand . . . . But we're still gonna ask you vote to give this young
> man life in the penitentiary, even though he doesn't want it, because he does not want
> to serve a life sentence in the penitentiary. He wants you to vote death, and I'm gonna
> ask not to vote death. Consider him, consider his family, his upbringing, his
> education, and you've heard it all. But when you're finished and you go in there and
> make this deliberation, you vote to give this man life in the penitentiary, life without
> parole. He'll never be with his family. He'll be controlled completely for the rest of
> his life.

29 RR 22. Granger's allegation that counsel never argued that Granger was worthy of life is

inaccurate. Granger cannot show deficiency or prejudice by counsels' making the very argument

for life that he says they should have made. *Cf. Fields*, 761 F.3d at 456 ("Thus, while Fields

contends that his trial counsel should have found and presented precisely this type of [mitigation]

evidence, the record reflects that his trial counsel did so.").

Granger fails to show that his counsels' argument—considered in its entirety—was

improper. His mere disagreement with counsels' tactic—to embrace the vulgar and profane

language Granger and his family used but to highlight that such language did not translate into

violent action—is not sufficient to establish ineffectiveness. *See Richter*, 562 U.S. at 110

("*Strickland*, however, calls for an inquiry into the objective reasonableness of counsel's

performance, not counsel's subjective state of mind."). He cites no case law supporting his

argument that counsels' closing argument strategy was in any way improper. (#44 at 115).

Instead he cites the American Bar Association ("ABA") Guidelines and three cases that are largely

irrelevant to the factual bases of his claim. (*Id.*) (citing *Buck v. Davis*, 580 U.S. 100 (2017);

*Rickman v. Bell*, 131 F.3d 1150 (6th Cir. 1997), *cert. denied*, 523 U.S. 1133 (1998); and *United States v. Swanson*, 943 F.2d 1070 (9th Cir. 1991)).

The Supreme Court has soundly rejected the notion that the ABA's guidelines are an "inexorable command with which all capital defense counsel must fully comply" to be constitutionally effective. *Bobby v. Van Hook*, 558 U.S. 4, 17 (2009) (per curiam) (internal quotation marks omitted). In any event, *Buck* has nothing to do with counsels' closing argument, *see* 580 U.S. at 104 (IATC claim for defense expert who offered his opinion that defendant "was statistically more likely to act violently because he is black"); *Rickman,* 131 F.3d at 1156, is a claim of counsel abandonment under *United States v. Cronic*, 466 U.S. 648 (1984); and *Swanson* deals with an attorney who conceded in his guilt-phase closing argument "that there was no reasonable doubt regarding the only factual issues in dispute," 943 F.3d at 1072. In short, Granger offers no legal support for his claim that counsel was ineffective in their punishment-phase closing arguments, and his claim is conclusory at best. This claim is denied.

    H.    <u>Claim 9 (IATC): Trial counsels' failure to investigate and present Samantha Jackson's diary or other available documentary evidence, to rebut her claim that her father sexually mistreated her, deprived Granger of the effective assistance of counsel at the penalty phase</u>.

Granger complains that trial counsel was ineffective for failing to locate or present Samantha's physical diary as rebuttal evidence to the State's future dangerousness case. (#44 at 116–24). Samantha's diary did not contain any entries of sexual abuse or mistreatment of Samantha by Granger. Although the physical diary was not present at trial, the contents of the diary were presented through multiple witnesses. Despite the contents being presented, Granger maintains that his counsel were ineffective for not locating the physical diary.

The state court record shows that Granger raised this IAC claim regarding the location of Samantha's physical diary in *Granger I*.  SHCR-01.Supp.2 at 190, 194–202, 329.  The TCCA found that Granger's counsel were not ineffective in failing to find the physical diary.  *Ex parte Granger I*, 2017 WL 3379285, at *4.  This claim is exhausted and is not procedurally barred.

The Director contends that Granger fails to demonstrate that, on the record before it, the state court's rejection of his IAC claim was unreasonable, and his claim should be denied.  (#53 at 181–88).  The Director further asserts that Granger's new evidence and argument are barred by *Pinholster*.  (*Id.* at 181–83).

### 1.  Granger's Newly-Presented Evidence is Barred by *Pinholster*

In support of his claim regarding ineffective assistance of counsel as it pertains to Samantha's physical diary, Granger proffers new evidence that was not presented to the state court.  Specifically, he submits:  (1) a declaration from his state habeas counsel Derek VerHagen ("VerHagen") (A0365–66); (2) a declaration from Kimler, Granger's defense attorney in his sexual assault trial (A0377); (3) excerpts from the third volume of the reporter's record from Granger's sexual assault trial (A0722–43); (4) the State's exhibits from Granger's sexual assault trial (A0744–68); and (5) a March 23, 2012, offense report from the Jefferson County Sheriff's Office (A0835).

Relying on the newly-presented declaration from state habeas counsel, Granger improperly attempts to show that the state court's adjudication of this IAC claim was unreasonable.  (*See, e.g.*, #44 at 124) (relying on newly-presented declaration to argue that state habeas counsel could have presented testimony to undermine the state court's factual findings regarding trial counsel).  Granger argues that his new evidence demonstrates that the state court's decision rested on an unreasonable determination of the facts.  (*See* #44 at 124) (citing 28 U.S.C. § 2254(d)(2)).

140

*Pinholster,* however, prohibits using evidence introduced for the first time in federal court to undermine the reasonableness of the state court's adjudication. *See Pinholster*, 563 U.S. at 181 (federal habeas review "is limited to the record that was before the state court that adjudicated the claim on the merits"); *Smith v. Cain*, 708 F.3d 628, 638 (5th Cir.) (permitting an evidentiary hearing only after "the court determined that the state courts had violated clearly established law . . . based solely on the state court record"), *cert. denied*, 571 U.S. 855 (2013); *Blue v. Thaler*, 665 F.3d 647, 656 (5th Cir. 2011) ("*Pinholster* prohibits a federal court from using evidence that is introduced for the first time at a federal-court evidentiary hearing as the basis for concluding that a state court's adjudication is not entitled to deference under [28 U.S.C.] § 2254(d)."), *cert. denied*, 568 U.S. 828 (2012). "Section 2254(d)(2) identifies the record to be used in reviewing a state court's decision by requiring that a federal court consider 'the facts in light of the evidence presented in the State court proceeding.'" *Wardrip v. Lumpkin*, 976 F.3d 467, 473 (5th Cir. 2020). Thus, whether Granger is proceeding under Section 2254(d)(1) or (d)(2), he is prohibited from using this new evidence to undermine the state court's adjudication.

Granger also proffers new argument in addition to his new evidence. He contends that his counsel were ineffective for not securing the diary and "other evidence" because counsel could have impeached Samantha's credibility "with records" that would have shown "that her allegations against Mr. Granger's brother [Lyndon] were also false." (#44 at 117). In his first state habeas application, *Granger I*, Granger does not discuss or describe any "records" that demonstrated that the sexual abuse allegations against Lyndon were false. *See* 1 SHCR-01 at 72–80. Granger does not cite any records in his federal petition or discuss the allegations against his brother, making it difficult to determine whether such argument or records were presented to the state court. Aside from being inadequately briefed and conclusory, Granger is prohibited from using this new

141

argument to undermine the state court's adjudication.  *See Pinholster*, 563 U.S. at 181; *see also Robertson*, 715 F. App'x at 392.  Moreover, the argument has not been fairly presented to the highest state court and is thus unexhausted.  *Bagwell v. Dretke*, 372 F.3d 748, 754 (5th Cir.) (holding that where petitioner advances in federal court an argument based on a legal theory distinct from that relied upon in the state court, he fails to satisfy the exhaustion requirement), *cert. denied*, 543 U.S. 989 (2004).  Even if Granger's new argument were a new, defaulted claim, it is not substantial for purposes of *Martinez*.  Granger's attempts to circumvent the state court's adjudication is denied.

### 2.   The State Court's Adjudication was Reasonable

Granger alleges that, though counsels' strategy appeared to be attacking the credibility of Samantha's sexual assault allegations against Granger, they failed to locate or present the physical diary she kept during the years she claimed the sexual assault(s) occurred.  (#44 at 116–24).  Granger argues that counsel could have used the diary to impeach Samantha with her own contemporaneous statements or to provide mitigating evidence of Granger's positive relationship with his daughter.  (*Id.* at 117).

Granger contends that counsel "knew about the diary's existence and importance throughout the pretrial preparation period."  (*Id.*)  In their affidavits before the state court (*Granger I*), trial counsel described their investigative efforts.  They stated that neither Granger nor the trial judge had the diary or otherwise knew where the diary was, despite Granger's prior defense attorney Kimler's insistence that the court had a copy of it.  SHCR-01.Supp.2 at 177, 182.  Counsel searched the court file and were unable to locate it.  *Id.*  They then extensively interviewed Kimler as to the diary's contents.  *Id.*  As found by the state court, Kimler in fact

related the contents of the diary to counsel. *Ex parte Granger I*, 2017 WL 3379285, at *4. Nothing demonstrates that counsel were unreasonable in their efforts to locate the diary.

More importantly, counsel cannot be deficient because they actually did the very thing Granger now says he wishes trial counsel had done: they used the contents of the diary to impeach the credibility of Samantha's assertions and to establish that a good relationship existed between her and her father as mitigation evidence. The contents of the diary were elicited through testimony at trial. Contrary to Granger's argument that counsel "had to rely *solely* on testimony by Mr. Granger and his family" to implement the above strategy, (#44 at 119), trial counsel used multiple witnesses to bring out such evidence. For example, during Kimler's guilt-phase testimony, counsel elicited much of the evidence at issue: that the diary was helpful to, and in fact exculpatory for, Granger, 23 RR 175–76; that Kimler intended to use it to cross-examine Samantha at the sexual abuse trial on the day the shooting occurred, *id.* at 176; that there was nothing in the diary about the allegations she was making at the sexual abuse trial, *id.* at 182; and that, in it, she stated, "My dad had been both a father and a mother to me and I love him very much," *id.* (*See* #44 at 120–21) (diary did not suggest that Granger sexually abused his daughter and described Granger as her "Mother and Dad and . . . Friend"). Additionally, Sewell, a friend of Samantha's, testified that she had read the diary and that, while it said that Samantha hated her mom and was being teased at school, the only thing she said about Granger was that she loved him. 23 RR 125–26. Sewell also confirmed that she never witnessed any inappropriate behavior between Granger and Samantha. *Id.* at 126. Granger's mother, Vallire, also testified that the diary said nothing bad about Granger and only said that Samantha loved her father. *Id.* at 131. Granger himself confirmed that the diary said a lot of good things about him. *Id.* at 20.

143

Though much of this evidence was not repeated during the punishment phase, the jury was undoubtedly free to consider it.  *See* 29 RR 5 (instructing jury that it is "necessary now for you to determine from *all* the evidence in this case" the answers to the special issues (emphasis added)); *see Pinholster*, 563 U.S. at 198 ("Here, the same jury heard both the guilt and penalty phases and was instructed to consider all the evidence presented." (citing to *Woodford*, 537 U.S. at 25, for proposition that state habeas court in that case "had correctly considered mitigating evidence introduced during the guilt phase")).  Thus, the idea that Granger was a good father to Samantha, certainly one whom she loved very much and considered "both a mother and father" was appropriately before the jury as mitigating evidence.  Given that the evidence Granger faults trial counsel for not presenting through the actual diary was, in fact, presented, the state court reasonably held that counsel were not deficient and that Granger had failed to show any resultant prejudice.  *Ex parte Granger I*, 2017 WL 3379285, at *4; *see Pinholster*, 563 U.S. at 200–01 (finding no reasonable probability of a different result, in part, because "[t]he 'new' evidence largely duplicated the mitigation evidence at trial"); *Fields*, 761 F.3d at 456 (counsel cannot be deficient for finding and presenting the exact type of evidence petitioner claims he should have).

Granger attempts to show the unreasonableness of the state court's opinion in two, largely procedural, ways.  First, he argues that the state court never resolved "key contested factual questions" about whether counsel knew where the diary was, making the state court's decision unreasonable under § 2254(d)(2).  (#44 at 122–24).  Second, he argues that, because the state trial court issued no conclusion of law on this claim, there was no merits adjudication to which to defer.  (*Id.* at 124).  He argues these reasons entitle him to *de novo* review.  Granger is mistaken on both counts.

As to his first argument, the Fifth Circuit has held that a state court's decision that "there were no material, controverted facts still to be resolved" is "a legal conclusion, not a 'determination of the facts in light of the evidence presented in the State court proceeding,' as meant by [§] 2254(d)(2)." *Wardrip*, 976 F.3d at 476. Thus, Granger's attempt to argue that "the state *habeas* court did not know enough facts to be reaching a decision on the claim" has been squarely rejected by the Fifth Circuit as an inappropriate attack under 28 U.S.C. § 2254(d)(2). As to his second argument, Granger is incorrect that the TCCA "made no legal findings of its own[.]" (#44 at 123). The TCCA noted that the state trial court had entered no conclusion of law with respect to this claim, *Ex parte Granger I*, 2017 WL 3379285, at *3, but then expressly held that Granger had failed to meet his burdens under *Strickland*, *id.* at *4. The TCCA, moreover, denied Granger's application "[b]ased upon the trial court's findings and conclusions that we have adopted, *[its] own review of the record*, and [its] independent findings and conclusions." *Id.* at *5 (emphasis added). Even if the TCCA had not explicitly held that Granger failed to meet his burdens under *Strickland*, its opinion would still be entitled to deference under § 2254(d)(1). *See Richter*, 562 U.S. at 102; *see also Langley v. Prince*, 890 F.3d 504, 515 (5th Cir. 2018) ("[U]nder our circuit's interpretation of the 'unreasonable application' clause, we review only the reasonableness of the state court's 'ultimate legal conclusion,' as distinct from the thoroughness or quality of its written opinion.").

Granger fails to demonstrate that the state court's fact findings were unreasonable. Granger's primary argument that the state court did not resolve the "disputed" issue of whether counsel knew where the diary was located is irrelevant, (#44 at 124), given that the state court made no findings regarding counsels' knowledge of the diary's location, instead focusing on the fact that counsel interviewed Kimler about the diary and learned of its contents through him. *Ex*

*parte Granger I*, 2017 WL 3379285, at *4.  Thus, Granger's attempt to establish this "dispute," largely using *Pinholster*-barred evidence to show that counsel never talked to Kimler and could have easily found the diary in the State's files, does not undermine the state court's decision.  (*See, e.g.*, #44 at 124) (citing to Kimler's declaration, executed five years after trial, for assertion that counsel never asked him about the diary).  Whether counsel could have located the diary itself is effectively rendered moot when considering, as discussed above, that the contents of the diary were elicited at trial.  In short, even considering Granger's *Pinholster*-barred evidence, he fails to demonstrate that the state court's decision was unreasonable.  Habeas relief is not warranted on this claim.

I.   <u>Claim 10 (IATC):  Granger's right to due process was infringed by improper prosecutorial argument at penalty phase summation, and his right to the effective assistance of counsel was infringed by the failure of trial counsel to object.</u>

Granger challenges the State's punishment-phase closing argument as improper.  (#44 at 125–27).  Granger specifically cites to five instances of allegedly improper argument made by the prosecutors:

(1)   [I]f you read more of the Bible, there's also, 'Eye for an eye,' 29 RR 25;

(2)   Proverbs 21:15 says:  When justice is done, it brings joy to the righteous and terror to the evildoers, 29 RR 30;

(3)   I suspect you've made up your minds as of last week, and everything that happened this week just confirmed your opinion, 29 RR 25;

(4)   He is a very angry, evil man.  And when he doesn't get his way, when he loses control—he's gonna hurt somebody, 29 RR 39; and

(5)   My God, don't you understand that his whole family's that way?  It's horrible.  It's like a—it's like a cancer.  It's scary, 29 RR 40.

(#44 at 125–26).  Granger alleges that these comments violated his due process rights, and that his trial counsel was ineffective for failing to object to them.  (*Id.* at 125–26).

146

The Director responds that the state court reasonably rejected Granger's IATC claim premised on counsels' failure to object to the State's punishment-phase closing argument. (#53 at 188–202). The Director also asserts that Granger fails to demonstrate that the state court's decision was unreasonable based on the record before it. The Director points out that Granger's new argument cannot be considered, as it is barred by *Pinholster*. The Director further contends that Granger's independent due process claim is procedurally barred and that he fails to establish any exception to the default. (*Id.*). The Director urges that Granger's claim be denied.

1.       Granger's Due Process Claim is Procedurally Barred

Granger raised his due process claim predicated on improper closing argument in his second-in-time state habeas application that was dismissed by the TCCA as an abuse of the writ. *See* SHCR-02 at 115–17; *Ex parte Granger II*, 2020 WL 915434, at *1. Granger cannot overcome the default because *Martinez* does not apply to the default of a non-IATC claim, and he does not argue otherwise. *See Davila*, 137 S. Ct. at 2063. The due process claim is denied as procedurally barred, and the court may not reach the merits of the claim.

2.       The State Court Reasonably Rejected Granger's IATC Claim

a.       Granger's New Arguments are Barred by *Pinholster*

Granger admits that state habeas counsel raised an IATC claim that "included some . . . but not others" of the instances of allegedly improper argument that he now raises. (#44 at 126). Of the five prosecutorial arguments Granger relies on in his federal petition, he arguably raised only two of them in his state case: (1) a reference to the Biblical passage about an eye for an eye, 29 RR 25; and (3) a reference pertaining to the jury making up its mind based on the evidence presented, 29 RR 25. Granger now points to three *additional* instances—Numbers 2, 4, and 5 above—to which he alleges counsel should have objected, and at least one additional argument as

147

to why the arguments were improper.  These three additional instances were not raised in the state court below.

Because this claim was adjudicated, the state court's conclusion that Granger failed to meet his burdens under *Strickland* is entitled to deference by this court.  *See Ex parte Granger I,* 2017 WL 3379285, at *4.  Granger's attempt to rely on *Martinez* to excuse the non-presentation of his new arguments is unavailing because *Martinez* does not apply to adjudicated claims.  Instead, Granger's "new" arguments are barred by *Pinholster*.  *See id.*; *see also Robertson*, 715 F. App'x at 392 (new record-based assertions raised in federal court to show that the state court's adjudication was unreasonable were barred by *Pinholster*); *cf. Lewis*, 701 F.3d at 790 (exhaustion is not an escape hatch from § 2254(d)).

b.        The State Court Reasonably Denied Granger's Claim

Granger fails to demonstrate that counsel was unreasonable for not objecting to the State's closing argument.  Initially, with respect to the two exhausted instances of which he complains, (*see* #44 at 125) (citing to 29 RR 25 for "eye for an eye" and jury pre-judgment at guilt comments), Granger is responsible for any failure by trial counsel to object.  *Cf. Schriro*, 550 U.S. at 476–77 (petitioner's behavior from trial—interrupting repeatedly when counsel tried to proffer mitigating evidence and refusing to allow counsel to proffer employment evidence—demonstrates petitioner would have undermined presentation of any mitigating evidence; "because of his established recalcitrance, [petitioner] could not demonstrate" *Strickland* prejudice if granted a hearing).

In their state-court affidavits, trial counsel asserted, and the record supports, that they did not object during the State's closing because they were being distracted by Granger.  SHCR-01.Supp.2 at 178, 183.  As early as the first comment about which Granger complains—regarding

148

the "eye for an eye" statement—Granger began audibly laughing during the State's argument. *See* 29 RR 25 ("I'd submit to you that Granger is worse than Cain and if you read more of the Bible, there's also, 'Eye for an eye.'  THE DEFENDANT:  (Laughing)."). Granger continued to interrupt the State's argument many times, including interjecting his disagreement with the State's characterization of him as a molester and "display[ing] to the jury a legal pad with the word 'Death' written on it." *See Ex parte Granger I*, 2017 WL 3379285, at *3; *see also* 29 RR 27 (laughing), 28 (laughing and parroting the State's argument), 29 ("Huh-uh."), 32 ("I'm no molest[e]r."), 33 (calling prosecutor a liar), 42 (court stating it admitted into the record legal pad with word "death" on it).

"After he interrupted the State's argument several times and disregarded the trial judge's admonitions to remain quiet, [Granger] was removed from the courtroom and taken to a holding cell, where he stayed for the rest of the argument." *Ex parte Granger I*, 2017 WL 3379285, at *3; *see* 29 RR 33–34. Granger's removal did not put an end to the distractions, however, as he continued to make noises from the holding cell that were loud enough to be reflected on the record. *See Ex parte Granger I*, 2017 WL 3379285, at *3 ("While the prosecutor continued his argument, [Granger] made loud noises from the holding cell that were audible inside the courtroom and prompted a response from courtroom bailiffs."); *see also* 29 RR 37. Granger must bear responsibility for distracting counsel from their responsibilities. *See Carpenter v. Vaughn*, 296 F.3d 138, 150 (3d Cir. 2002) (finding no deficiency in counsel's failure to object because counsel stated that defendant "was talking to him and distracted him when the testimony in question came in").

Even aside from Granger's distracting behavior, he fails to establish that his counsels' lack of objection was deficient because he does not show that any objection would have had merit. *See*

*Ries v. Quarterman*, 522 F.3d 517, 530 (5th Cir.) ("In order to show that counsel was deficient for failing to object under the first prong of *Strickland*, the objection must have merit." (citing *Turner v. Quarterman*, 481 F.3d 292, 298 (5th Cir.), *cert. denied*, 551 U.S. 1193 (2007))), *cert. denied*, 555 U.S. 990 (2008). Under federal due process, "[i]t 'is not enough that the prosecutors' remarks were undesirable or even universally condemned.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Darden v. Wainwright*, 699 F.2d 1031, 1036 (11th Cir. 1983)). Rather, "[t]he relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.* (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). Granger's burden here is two-fold: he "must not only show [1] improper jury argument rising to the level of a constitutional impairment of a fundamentally fair trial, but he must also show [2] that his trial counsel was constitutionally ineffective in failing to object to the argument[.]" *Adams v. Quarterman*, 324 F. App'x 340, 353 (5th Cir. 2009) (quoting *Bridge v. Lynaugh*, 838 F.2d 770, 774 (5th Cir. 1988)). The latter is subject to *Strickland*'s presumption of competence, but "the nature of [Granger]'s particular argument here requires him to overcome a substantial barrier to relief: 'A decision not to object to a closing argument is a matter of trial strategy.'" *Id.* (quoting *Drew v. Collins*, 964 F.2d 411, 423 (5th Cir. 1992), *cert. denied*, 509 U.S. 925 (1993)).

Granger does not overcome the state court's determination that trial counsel was not deficient for failing to object. SHCR-01.Supp.2 at 197. With respect to an "eye for an eye," Granger minimizes the fact that trial counsel, during their closing argument, referenced the Bible and the first murderer in biblical history—Cain killing Abel. (*See* #44 at 125 n.10) (attempting to distinguish trial counsel's invocation of the Bible from the State's); *see also* 29 RR 21–22.

Counsel specifically implored the jury that, like God with Cain, they should not kill Granger but instead banish him from his people and his family. 29 RR 21–22. The prosecutor's biblical references, therefore, were invited by the defense counsels' closing argument and were a fair response to the defensive argument. *See* 29 RR 25 ("And Mr. Cribbs cited the Bible and . . . perhaps Cain wasn't executed because Cain had remorse. I'd submit to you that Granger is worse than Cain and if you read more of the Bible, there's also, 'Eye for an eye.'"). Such responsive comments are not improper under state or federal law. *See Ries*, 522 F.3d at 530 n.7 ("[W]e cannot conclude that the statements so infected the trial with unfairness as to make the resulting conviction a denial of due process, particularly where, . . . the prosecutor's comments were to some extent invited by defense counsel's summation." (citing *Darden*, 477 U.S. at 182)); *Freeman v. State*, 340 S.W.3d 717, 727 (Tex. Crim. App. 2011) (proper jury argument falls into four categories, one of which is a response to argument of opposing counsel); *see also Hathorn v. State*, 848 S.W.2d 101, 117 (Tex. Crim. App. 1992) (comment that defendant "knows he deserves [the death penalty]" invited by defendant and an answer to his opening statement). Thus, a conscious decision not to object to these comments was strategically reasonable under the circumstances.

Granger cites to *Sandoval v. Calderon*, 241 F.3d 765 (9th Cir. 2000), for the proposition that arguments based upon scripture are "clearly" improper. (#44 at 111). While *Sandoval* cites to several other courts, 241 F.3d at 777, it does not reference any Fifth Circuit opinion, and Granger has not cited any authority in this circuit to support that argument. He also ignores that the question is not merely whether the State's comments were improper, but whether they had substantial and injurious effect on his trial and whether trial counsel was deficient for failing to object to them. *See Adams*, 324 F. App'x at 353.

Regardless, the comments deemed improper in *Sandoval* are distinguishable from those made here.  In *Sandoval*, the defense used the phrases "'playing God' and 'an eye for an eye' in the context of a secular argument against vengeance" but "did not invoke religious authority to support the result he advocated." 241 F.3d at 778.  The state, by contrast, argued to the jury that "God sanctioned the death penalty for people like Sandoval who were evil and have defied the authority of the State," "that by sentencing Sandoval to death, the jury would be 'doing what God says,'" and that "destroying his mortal body might be the only way to save Sandoval's eternal soul." *Id.* at 776.  The Ninth Circuit found these comments improper and, given defense counsel's primarily secular argument, "not merely a fair response to comments in defense counsel's closing argument." *Id.* at 777.  Indeed, the state's argument "was strong medicine" with a clear message that actually prejudiced Sandoval's defense:  "those who have opposed the ordinance of God should fear the sword-bearing state, whose task, as an avenging minister of God, is to bring wrath upon those who, like Sandoval, practice evil." *Id.* at 778.  Here, the comments made by the State were direct responses to defense counsels' suggestion that the jury follow God's punishment and banish, but not kill, Granger, and the comments did not suggest that the Bible dictated imposition of the death penalty like those in *Sandoval* did.  *See Ward v. Dretke*, 420 F.3d 479, 497 (5th Cir. 2005) (finding counsel deficient for not challenging State's "suggesti[ons] that Ward's embrace of faith dictated that he be judged by Biblical standards"), *cert. denied*, 547 U.S. 1040 (2006).  Granger fails to demonstrate that, under these circumstances, the state court was unreasonable in holding that counsel was not deficient.  *See* SCHR-01.Supp.2 at 197; *Strickland*, 466 U.S. at 688.

Furthermore, Granger does not show that the state court's determination of no prejudice was unreasonable.  *Strickland*, 466 U.S. at 694; *see Richter*, 562 U.S. at 112 (The "likelihood of

a different result must be substantial, not just conceivable."). Because trial counsel invoked a biblical reference in support of mercy, efforts to limit the prosecution's reply argument could have been viewed unfavorably by the jury and undermined the defensive efforts to invoke biblical mercy. Given Granger's disruptive behavior during closing arguments, the jury likely already viewed Granger with disfavor. Any action counsel took to limit the state's closing argument would have had little or no positive impact in this situation. CR.Supp.3 at 6 (showing jury had reached verdict by 12:29 p.m. the day closing arguments were presented); *see Ward*, 420 F.3d at 499–500 (state habeas court holding that no prejudice resulted from failure to object to improper comment, "given the severity and number of the offenses and the strength of the evidence" against petitioner, was not objectively unreasonable); *cf. Schriro*, 550 U.S. at 476–77 (because of petitioner's "established recalcitrance, [petitioner] could not demonstrate" *Strickland* prejudice).

Granger also fails to demonstrate the unreasonableness of the state court's rejection of his complaint regarding the State's suggestion of the jury's predetermination of punishment. (*See* #44 at 125) ("I suspect you've made up your minds as of last week, and everything that happened this week just confirmed your opinion." (citing 29 RR 25)). Aside from the responsibility Granger bears for distracting counsel right before the contested comment, *see* 29 RR 25, Granger fails to demonstrate that such comment was improper. He argues that the comment "affirmed for the jury the unconstitutional idea that automatically imposing the death penalty upon a finding of guilt is proper" and that it "improperly interfered with [Granger]'s right to a separate penalty phase where mitigating evidence could be considered." (#44 at 125) (citing *Gregg v. Georgia*, 428 U.S. 153 (1976); TEX. CODE CRIM. PROC. ANN. art. 37.071).

On this point, Granger distorts the record. The prosecutor made the complained-of statement on Tuesday, May 7, 2013. 29 RR 1. On Monday, May 6, 2013, the only witness the

jury heard from was Granger.  *See* 28 RR 3.  Thus, when the State said "everything that happened this week," it was referring to the jury's having heard Granger's testimony, in which he had several outbursts on the stand and directed profanities at the State, the court, and the jury.  *See* 28 RR 61–62.  Moreover, the prior week, or what the State contemporaneously referred to as "last week," 29 RR 25, the jury heard three full days of punishment evidence, including the entirety of the State's case-in-chief and nearly all the defense's case.  *See* 1 RR 28–31 (State's punishment case began Wednesday, May 1, 2013, and defense presented all witnesses except Granger on Friday, May 2, 2013).  With the above context, the State's argument is clear:  "I suspect you've made up your minds as of last week [when you heard all of the State's punishment case and almost all of the defense's mitigation case], and everything that happened this week [namely, Granger's obscene outburst on the stand] just confirmed your opinion."  There is nothing remotely inappropriate in this argument, much less anything approaching the level of a constitutional impairment of a fundamentally fair trial, and any objection would have been futile.

Granger fails to demonstrate any deficiency or prejudice from this event.  Granger falls far short of establishing that the state court's rejection of his claim was unreasonable, and he is therefore not entitled to habeas relief.

### 3.    Granger's New Arguments also Fail

Even considering Granger's new arguments, he fails to demonstrate the unreasonableness of the state court's adjudication.  With respect to the State's reference to Proverbs, (*see* #44 at 111) (citing 25 RR 30), Granger does not demonstrate any ineffectiveness for the same reasons listed above:  counsel was being distracted by Granger's repeated interjections, for which Granger must bear the blame, *see* SHCR-01.Supp.2 at 178; 29 RR 29, 32; and the State's argument was yet another direct response to counsels' own invocation of the Bible, 29 RR 30 ("[Defense

154

counsel] cited and used and misrepresented the word of God for his own purposes; but Proverbs 21:15 says: When justice is done, it brings joy to the righteous and terror to the evildoers."). *See Ries*, 522 F.3d at 530 n.7 (citing *Darden*, 477 U.S. at 182); *Freeman*, 340 S.W.3d at 727. Thus, the state court's conclusion that counsel was constitutionally effective was reasonable.

The State's reference to Granger as an "angry, evil man" and to Granger and his family as a "cancer" (#44 at 125) occurred after Granger was removed from the courtroom. Granger's removal, however, along with the fact that he had been displaying the word "Death" to the jury during the State's argument as observed first-hand by the jury, provided support for the argument that Granger was "a very angry, evil man. And when he doesn't get his way, when he loses control—he's gonna hurt somebody." 29 RR 39. Considering that Granger displayed no remorse for Sebolt's death, repeatedly denied killing her, had an angry outburst while testifying in his own defense the day before, *see* 28 RR 61–63, and then had to be forcibly removed from the courtroom during argument, 29 RR 33, the State's argument could also be seen as both a summation of, and a reasonable deduction from, the evidence and Granger's behavior while on trial for capital murder. *See, e.g.*, 29 RR 39 ("The only reason he hadn't done [violent acts] in the courtroom is 'cause we've got these good bailiffs (indicating), and you've seen it yourselves. He is a very angry, evil man."); *Freeman*, 340 S.W.3d at 727 (proper jury argument falls into four categories: (1) a summary of the evidence; (2) *a reasonable deduction from the evidence*; (3) a response to argument of opposing counsel; and (4) a plea for law enforcement); *see also Hathorn*, 848 S.W.2d at 117. To the extent that such comment was nevertheless improper, it was limited and did not render the trial fundamentally unfair. Counsels' decision not to object at this late stage, after their client had been removed for such disrespectful behavior, was reasonable. Granger fails to demonstrate that the state court's adjudication was unreasonable.

155

Finally, the State's "cancer" comment was made in the following context:

> What have you heard that reduces this man's moral blameworthiness? That's what Question No. 2's all about. What have you heard?
>
> The facts of the crime? The fact that he's a child molester? The fact that he's a murderer? The fact that he's a kidnapper? The fact that he commits aggravated assault?
>
> The fact that he is—calls himself Mr. Hyde?
>
> What did you hear in those audiotapes, those telephone calls that was mitigation, that reduced his moral blameworthiness, that he grew up in a family that caused him to be that way?
>
> My God, don't you understand that his whole family's that way? It's horrible. It's like a—it's like a cancer. It's scary.
>
> But they—they can be controlled by you—at least this man can.

29 RR 40.

The jury listened to hours of "profanity-laced telephone calls" between Granger and his family in which Granger "expressed threats, hatred, and a lack of remorse regarding virtually everyone associated with his sexual assault trial—especially Samantha and her mother—as well as hatred toward many other groups." *Ex parte Granger I*, 2017 WL 3379285, at *2. His mother also used extremely vulgar language during those phone calls. 27 RR 112–13. Both mother and son furthermore behaved inappropriately while on the stand—the former winked at and blew kisses to her son, *see* 27 RR 103, 113, and the latter, mockingly, to the prosecutor after he behaved disrespectfully during cross-examination, 28 RR 61–63 ("Aw, what's wrong, Ed? Did I piss you off? Did I get you upset, baby? (Laughing). You don't like hearing the truth, man?").

Given the testimony about Granger's family and life history, coupled with the jury's observations of said family in the courtroom, it was certainly reasonable for the State to suggest that the family evidence was far more aggravating than mitigating. *See Pinholster*, 563 U.S. at

201 (incorrigibility of a defendant's family is "by no means clearly mitigating," as the jury might conclude that the defendant "was simply beyond rehabilitation").  The State's analogy to cancer—a disease that can spread, is "scary," 29 RR 40, and sometimes terminal—to sum up the effect Granger's family history has on his future dangerousness may be dramatic, but not necessarily improper, argument.  Moreover, assuming the argument was objectionable, counsel could have reasonably decided not to draw further attention to the misbehavior the jury had witnessed of their client and client's mother by objecting.  *See Drew*, 964 F.2d at 411 (decision not to object is a matter of trial strategy); *Vasquez v. Thaler*, 505 F. App'x 319, 330 (5th Cir.) (finding district court's conclusion that trial counsel was not deficient for not objecting where counsel "could have reasonably concluded that an objection would draw additional attention to the prosecutor's remarks about Vasquez's dangerousness" was not debatable), *cert. denied*, 571 U.S. 832 (2013).  Granger fails to show that the state court's determination that counsel was not deficient was unreasonable.

Granger also fails to prove prejudice.  "[B]ecause the objection[s were] of questionable merit, [Granger] has not shown a reasonable probability that the objection[s] would have been sustained."  *Ries*, 522 F.3d at 531.  None of the three new arguments establish a reasonable probability of a different result when viewed in light of the extensive aggravating evidence, including the jury's observations of Granger's inability to control himself despite the seriousness of a capital murder trial.  Thus, even if this court could consider Granger's new arguments, he fails to demonstrate ineffectiveness and, consequently, cannot establish that the state court's rejection of his claim was unreasonable.  Granger has not shown that habeas relief is warranted on this claim.

J.      <u>Claim 11 (IATC):  Granger was denied his Sixth Amendment rights to effective assistance of counsel and a fair trial as a result of trial counsels' failure to investigate, prepare, and present a coherent guilt-phase defense; counsels' introduction of overtly harmful evidence; and counsels' failure to object to irrelevant and overly prejudicial evidence and argument</u>.

In Claim 11, Granger raises several IATC allegations regarding the guilt phase of his trial.

Granger complains that:

(1)      Trial counsel introduced evidence concerning the underlying nature and circumstances of the offense for which Granger was being tried when the shooting occurred—the sexual abuse of his daughter, Samantha. (#44 at 129–31).

(2)      Trial counsel introduced—through *Granger's* testimony—extraneous acts irrelevant to guilt or innocence. (*Id.* at 131–33).

(3)      Trial counsel failed to object to improper cross-examination about phone calls Granger made from jail while awaiting trial. (*Id.* at 133–34).

(4)      Trial counsel inadequately prepared Granger's brother, Lyndon, for his testimony. (*Id.* at 134–35).

(5)      Trial counsel failed to object to the prosecutor's closing argument. (*Id.* at 136–38).

Combining these alleged deficiencies, Granger reasons that the jury would be biased against him after hearing prejudicial and irrelevant evidence, that the jury would not have had reasonable doubt as to who shot Sebolt, and the jury would not have heard the prosecutors' argument that would not have been made but for counsels' opening the door to it. (*Id.* at 124–25).

The Director responds that the claims are procedurally barred, and the default is not excused under *Martinez*.  In the alternative, the Director asserts that Granger's claims have no merit. (#53 at 202–22).

1.      <u>Granger's Claims and New Evidence are Barred</u>

Granger admits that he did not raise his guilt-innocence ineffective-assistance claims in his initial state habeas application. (#44 at 139).  He further admits that he raised these claims in a

second state application, which was dismissed by the TCCA as an abuse of the writ in *Ex parte Granger II*. (*Id*. at 140). He asserts that the procedural default of his claims is excused by *Martinez*. Granger fails to show that his state habeas counsel, however, were ineffective for failing to raise these meritless, and therefore insubstantial, claims. *Mirzayance*, 556 U.S. at 127. *Martinez*, therefore, does not benefit Granger.

Moreover, Granger's new evidence (*see* #44 at 121) (citing to purported letter sent to defense counsel from prosecutor with State's witness list (A0816–19)), is barred by § 2254(e)(2). The letter is also unauthenticated, and is not competent evidence that can be considered.

    2.   <u>Alternatively, these Claims are Without Merit</u>

        a.   <u>Counsel Cannot be Blamed for Granger's Exercise of his Right to Testify, but Even if They Could, Counsel Employed a Reasonable Strategy regarding Granger's Sexual Assault Trial and No Prejudice Resulted</u>

Granger faults his counsel for introducing the fact that he was on trial for the sexual assault of his daughter when Sebolt was shot and killed. (#44 at 129). Granger argues that the prosecutors did not introduce evidence about the sexual assault charges Granger faced at the time of the shooting. (*Id*.). He errs in this assertion, as on direct examination with one of Granger's hostages and before the defense presented its case, prosecutors elicited that Granger said that "he had been accused of raping his daughter." 20 RR 141.

Granger points to his own testimony on direct examination by his counsel and that of the witnesses he called in his defense to show that the sexual assault charges were discussed during that testimony. (*Id*. at 129–30). He claims that evidence of the sexual assault charge was irrelevant because it did nothing to negate his guilt of capital murder and was prejudicial because

it engendered sympathy for Samantha, biased the jury against him, and allowed the prosecution to argue that his defense was "Samantha Jackson needed killing." (*Id*. at 130) (citing 24 RR 53).

Granger cannot blame counsel for his choice to testify, but even if he could, he fails to prove deficient conduct or prejudice. The record makes clear that Granger foisted a strategy upon counsel by testifying about the charges he faced at the time of the shooting—Granger's theory was that he was not retaliating against Claudia for her status as a witness, but that he had finally snapped after years of domestic disagreement with her over their children, leading to false charges of sexual assault.[22] For example, on cross-examination of one of Granger's hostages, counsel elicited testimony that Granger had said that his daughter "framed" him with sexual assault charges. 20 RR 148. The same witness also testified that he believed that Granger was "pretty irrational," "upset," and "scared" when he entered the business, he "ranted and raved" while in the establishment, and he "would get mad" at whoever he was talking to on the phone. 20 RR 148–49.

When Granger testified—a decision constitutionally left to him under the Fifth Amendment—he discussed his tumultuous and strained relationship with Claudia. 23 RR 8–22. When the prosecution objected on relevance grounds, counsel made the strategy clear—"[I]t goes to the state of mind of my client. This is a long relationship, and every matter is very important as to his state of mind in March of 2012." 23 RR 18. Granger then described his state of mind, speaking of being persecuted with false claims of sexual assault masterminded by Claudia, of how angry that made him feel, and of how it resulted in a fugue-type state during the shooting. 23 RR 26, 35–37; *see* 23 RR 67 ("I told you it was like I was on cruise control or something. It's like I wasn't even there. I didn't have no control."); 23 RR 101 (Lyndon, Granger's brother,

---

[22]  Additionally, Granger challenged the State's evidence that he shot Sebolt, presenting expert testimony that the medical examiner had erroneously determined the direction of the bullet that fatally injured Sebolt.

describing Granger as "irate" on a phone call likely placed during the hostage taking); 23 RR 133 (Vallire, Granger's mother, saying the day before the shooting that Granger "was out of his mind").

His other witnesses bolstered the evidence of the mounting stress Granger suffered. Lyndon testified that Samantha told authorities in a neighboring county that Lyndon sexually assaulted her, but he was not arrested.  23 RR 99.  She made the same allegations against Granger's other brother, Ulysses, resulting in an indictment that was dismissed because he was captaining an offshore ship at the time of the supposed sexual assault.  23 RR 99–100, 194. Granger's son testified that he saw nothing improper between Samantha and Granger and his uncles, nor did she ever make an outcry to him.  23 RR 112.  The same was true of Sewell, who also stated that Samantha was gullible and easily influenced by others.  23 RR 125–26.  Case in point:  before Samantha went to live with Claudia, she revealed in her diary that she "hated her mom," but "love[d]" her dad.  23 RR 125–26.  Granger's prior attorney, Kimler, also thought that the diary was exculpatory, confirming that Samantha thought Granger was a good father.  23 RR 176, 182.  Granger's mother, Vallire, with whom Granger and Samantha lived for a time, also did not see any sexually assaultive behavior or hear any outcry.  23 RR 130.  She also confirmed that Claudia had a "vendetta" against her because Claudia felt like Vallire "took her kids from her bosom," so Claudia got Samantha to lie about being sexually assaulted by the Granger brothers. 23 RR 131.  These false allegations had "destroyed [her] and [her] children" and the "whole family [had] been suffering" as a result.  23 RR 131, 133.

Before closing, trial counsel requested that the jury be offered the lesser included offense of murder, an offense not requiring a showing of retaliation, but the request was denied.  24 RR 5; *see* TEX. PENAL CODE § 19.02(b).  During closing, trial counsel admitted that Granger "[m]ight

be guilty of murder," an offense not before the jury, but not capital murder.  24 RR 25.  Trial counsel also pointed to the fact that, while Granger admitted to shooting a weapon, he did not "remember when he shot, who he shot, or where he shot," bolstering Granger's claim that he "lost it" during the shooting.  24 RR 26.

Counsel were obviously attacking the aggravator of retaliation, providing a reason for the shooting other than Claudia's status as a witness.  Directly affecting the reasonableness of this defense theory is Granger's role in presenting it.   Namely, Granger exercised his Fifth Amendment right to testify and described what he thought were false charges leveled against him. Indeed, during the punishment phase of trial, Granger testified against counsels' advice, explaining that he continued "to want to try the sexual assault case" "because it has a lot of relevance to this case because that was the main reason why I went berserk, 'cause I thought I was being wrongfully convicted."  28 RR 13–14.  Thus, Granger effectively seeks "to avoid conviction on the ground that his lawyer did exactly what he asked him to do.  That argument answers itself." *United States v. Masat*, 896 F.2d 88, 92 (5th Cir. 1990).  This is because "a defendant's Sixth Amendment rights are his alone, and . . . trial counsel, while held to a standard of 'reasonable effectiveness,' is still only an *assistant* to the defendant and not the master of the defense."  *Id*. (quoting *Mulligan v. Kemp*, 771 F.2d 1436, 1441 (11th Cir. 1985), *cert. denied*, 480 U.S. 911 (1987)).

Here, Granger directed his defense by testifying to his belief that he "went berserk, 'cause I thought I was being wrongfully convicted," and his attorneys cannot be faulted for Granger's actions.  *Cf. Faretta*, 422 U.S. at 819–20 ("The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails.  The counsel provision [of the Sixth Amendment] supplements this design.  It speaks of the 'assistance' of counsel, and an assistant,

however expert, is still an assistant."). Granger's testimony about the "false charges" against him required his counsel to follow this as a trial theme, including exploring the allegations and evidence regarding the conflict with Claudia and the sexual abuse or sexual assault charges against him. Counsels' strategy in adopting Granger's grievance was reasonable in light of counsels' hope to negate the retaliation element of the capital murder charge.

In fact, in other cases, habeas petitioners have attempted to do precisely what counsel did in this case or have faulted their attorneys for failing to do so. For example, in *Russell v. Lumpkin*, the petitioner challenged the sufficiency of the evidence on the issue of retaliation, arguing that the killing was borne of infidelity rather than the victim's status as an informant against him. 827 F. App'x 378, 386–89 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 2636 (2021). As another example, in *Gardner v. Davis*, a petitioner complained that his attorneys did not present a psychological defense tending to show that the killing was in reaction to abandonment by his estranged wife, not because she was a prospective witness against him. 779 F. App'x 187, 189–90 (5th Cir. 2019), *cert. denied*, 140 S. Ct. 842 (2020). In *Ward v. Stephens*, trial counsel argued that the petitioner's "childhood and family caused a delusional mental state toward the City of Commerce that precluded the required intent for capital murder—retaliation," negating the state's theory of retaliation against a public servant. 777 F.3d 250, 260 (5th Cir.), *cert. denied*, 577 U.S. 844 (2015), *abrogated on other grounds by Ayestas*, 138 S. Ct. at 1080.

These cases establish that it is reasonable trial strategy to attack the aggravator present here—retaliation—by providing another reason for the killing other than the victim's membership in a protected class, e.g., witness, informant, or public servant. While Granger may criticize this defensive tactic, it does not prove counsels' strategic choice was deficient. *See Strickland*, 466 U.S. at 689 ("There are countless ways to provide effective assistance in any given case. Even

the best criminal defense attorneys would not defend a particular client in the same way."). Thus, Granger fails to prove substandard attorney performance.

Granger also fails to prove prejudice. As discussed above, the State brought out the fact Granger was accused of sexually assaulting his daughter before the defense addressed that topic. 20 RR 148. Accordingly, the additional testimony brought out in the defense's case in chief is cumulative and, therefore, non-prejudicial. *See Pinholster*, 563 U.S. at 200–01 (finding no prejudice, in part, because "[t]he 'new' evidence largely duplicated the mitigation evidence at trial"). Moreover, this testimony in no way undermined Granger's claim that he did not shoot Sebolt. (#44 at 130, 138). Granger's non-retaliation defense and alternative shooter defense ran parallel, and the former did nothing to undermine the latter.

This defensive strategy (#44 at 130) could not have prejudiced the jury against Granger any more than the video of him shooting and running over his own daughter, regardless of the charges he faced. Furthermore, the jury knew that Granger was on trial for a felony, that Samantha was the victim, and that her mother testified adversely to Granger. 18 RR 29–30. As such, the jury knew that Granger had allegedly done something felonious to his daughter, the specification of which did not add much to the already unflattering portrait of Granger brought out as a function of the capital murder charges against him.

Finally, to the extent the State was able to argue that Granger thought "Samantha Jackson needed killing" because of this defense strategy (#44 at 130), that fault falls upon Granger and his decision to testify and is not something about which he can complain. S*ee Schriro*, 550 U.S. at 478 ("[I]t was not objectively unreasonable for that court to conclude that a defendant who refused to allow the presentation of any mitigating evidence could not establish *Strickland* prejudice."); *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000) ("[A] defendant who explicitly tells his attorney

not to file an appeal plainly cannot later complain that, by following his instructions, his counsel performed deficiently."). Granger chose to testify, as was his right, and clearly wanted to air his false charge grievances. Even if he could escape this invited error, Granger fails to prove that he would not have been convicted absent this strategy. The evidence shows that Granger killed Sebolt while trying to kill Claudia for testifying against him—the shooting is on videotape.[23] Granger is not entitled to habeas relief on this claim.

b.    <u>Trial Counsels' Preparation of Granger for his Testimony was not Inadequate or Prejudicial</u>

Granger claims that his trial attorneys ineffectively prepared him for his testimony because he testified regarding "inadmissible bad acts," such as his rap persona, his tumultuous relationship with Claudia, and the sexual assault charges he faced at the time of the shooting.[24] (#44 at 131–33). He contends that had he not so testified, then the State could not have cross-examined him about his rap lyrics or discussed them at closing, nor could it have brought up the sexual assault charges at closing. (*Id*. at 132–33, 139). Granger does not prove deficiency or prejudice.

This subpart is a repeat of the prior claim—Granger complains of trial counsels' representation despite having knowingly and voluntarily exercised his right to testify in his defense. He effectively argues that more preparation could have reined him in (*id*. at 131), but that assertion is conclusory, *see Miller*, 200 F.3d at 282, and the record demonstrates to the contrary, *see, e.g.*, 28 RR 61–62 ("This is not a fucking court. This is a lynching of another nigger. . . . Aw, what's wrong, Ed? Did I piss you off? Did I get you upset, baby? You don't

---

[23]    The videotape also shows Granger's attempts to kill Samantha and Richard. Granger was indicted for causing the death of Sebolt while intending to cause the death of Claudia in retaliation for her testifying against him. (#48-3 at 6, at CR.Supp.2 at 2).

[24]    Granger claims that he was the "first witness in the case to inform the jury that he was facing sexual assault charges against his daughter at the time of the shooting." (#44 at 131). As noted above, Granger is mistaken.

like hearing the truth, man?").  As explained above, Granger was the master of his defense and he testified about the sexual assault charges and volatile relationship with Claudia because that was the defense he wanted to assert.  He cannot establish prejudice arising from his own choices.  *Id*.

As for Granger's rap persona, trial counsel did not introduce any bad acts.  Granger, in explaining how Samantha suffered brain damage from smoke inhalation, testified that he was not home when a fire started there but was instead at a rap show.  23 RR 11–12.  Trial counsel then asked Granger questions to clarify what rap was, that he and his brother were rappers, and that he had a rap persona.  23 RR 12.  Being a rapper and having a rap persona are not bad acts, so counsel did not introduce any improper evidence.  Granger's real complaint, then, is that the State cross-examined Granger about his rap lyrics and used his rap persona in closing against him.

Counsel reasonably introduced Granger's rap name (Mr. Hyde) to soften the blow of the State's cross-examination.   "The general rule is that[,] if a defendant exercises his right to testify[,] he is subject to the same rules governing examination as any other witness," and "[i]n Texas, the scope of cross-examination is wide open."  *Felder v. State*, 848 S.W.2d 85, 99 (Tex. Crim. App. 1992), *cert. denied*, 510 U.S. 829 (1993).  The State clearly knew about Granger's rapping, including a song entitled "Helloween," which Granger described as his "delivering death and destruction" instead of candy.  23 RR 56.  While Granger claims that such is not relevant, he is incorrect.  Cross-examination using these lyrics was relevant to rebut Granger's testimony that the shooting was an unintentional or accidental action stemming from extreme pressure.  *See, e.g.*, 23 RR 57 ("Q. I asked you about the lyrics to your song.  And the fact that the people that come to your door you murder.  Isn't that right?"); TEX. R. EVID. 404(b)(2) ("This evidence may be admissible for another purpose, such as proving . . . intent . . . or lack of accident.").  Given the State's knowledge, and Texas's open scope of cross-examination, the State's use of this material

on cross-examination was not dependent on whether it was raised in Granger's direct examination. Counsel could reasonably decide that it was better for the defense to bring up Granger's rap alter-ego so that the State was not the first to do so. Later, when examining Lyndon, trial counsel made the point that rap music should not be taken literally, uses a lot of slang, and is a popular form of music. 23 RR 92. Again, there was nothing objectively deficient about counsels' approach.

Even if counsel could be faulted for introducing Granger's rap name, there is no reasonable probability of a different result without that evidence. The evidence against Granger was overwhelming—he was videotaped committing the offense, and he admitted to shooting Samantha. A few questions about rap lyrics and a brief discussion of his rap persona in closing argument did not tip the scales in the State's favor, especially where trial counsel introduced evidence that such lyrics should not be interpreted literally. Granger is not entitled to habeas relief on this claim.

c.      Trial Counsels' Lack of Objections did not Constitute Deficient Performance or Result in Prejudice

Granger next faults trial counsel for not objecting to cross-examination using recorded jailhouse phone calls between Granger and various family members. (#44 at 133–34). He complains this was outside the scope of direct examination, irrelevant, and highly prejudicial. (*Id.* at 133). Counsel should have objected, Granger claims, because there was a motion *in limine* covering the jailhouse phone calls and the State did not give advance notice "as to which statements they intended to use to impeach" Granger. (*Id.* at 134). The trial court did not, however, grant a motion *in limine* concerning the recorded telephone calls and, in Texas, cross-examination is not limited in scope by direct examination. Because neither of Granger's assertions to the contrary is correct, they cannot be the basis of deficient performance.

Trial counsel filed two motions concerning Granger's out-of-court statements.  Neither was a motion *in limine* to suppress any statements from the phone calls, and neither was granted by the trial court.  3 CR.Supp.2 at 459–61; 5 RR 41; 3 CR.Supp.2 at 465–66; 5 RR 42.  Simply put, there was no *in limine* ruling upon which trial counsel could have predicated an objection during Granger's cross-examination, so it cannot be the foundation of Granger's complaint of deficient performance.

As discussed above, "[i]n Texas, the scope of cross-examination is wide open." *Felder*, 848 S.W.2d at 99.  "[T]he State [is] not confined in its cross-examination to matters elicited on the direct examination of the defendant." *Brumfield v. State*, 445 S.W.2d 732, 736 (Tex. Crim. App. 1969).  Thus, any argument of deficient performance based on an objection regarding the scope of cross-examination falters under Texas law, as no such limitation exists.  Accordingly, trial counsel cannot be faulted for having failed to lodge such an objection.

Granger complains that counsel should have objected to the relevance of the prosecutor's cross-examination of him regarding the recorded jailhouse phone calls, his rap lyrics and persona, and his pretrial detention behavior.  His counsel cannot be criticized for not raising a frivolous objection to the cross-examination questions.  As discussed above, Granger denied any intent to retaliate against Claudia or that the shooting was intentional.  Cross-examination of Granger about whether Claudia, in Granger's words, was a "Babylonian whore[]" who needed her "throat cut" goes to establish that the shooting was intentional and not a mistake. *See* TEX. R. EVID. 404(b)(2).  The "war of Armageddon"[25] cross-examination similarly addressed whether this was a planned shooting, something Granger repeatedly denied. *Id.* ("This evidence may be admissible for

---

[25] Lyndon explained that this rap song reference was about various wars and country destabilizations around the world—"Our country's heading for Armageddon." 23 RR 92–93.  If Granger's cross-examination on this point were improper, the contextualization diminished the harm, if any.

another purpose, such as proving . . . plan."). In other words, it went to rebutting Granger's I-don't-know-how-I-ended-up-at-the-Beaumont-courthouse-with-a-gun defense. 23 RR 32, 52. ("I don't remember bringing [the gun]."). The final comments, in context, show that Granger engages in retaliatory behavior: The "start[ing] shit" comment concerned inmates supposedly throwing urine and feces in Granger's face, and the "break their necks" comment concerned guards supposedly cutting his arm. Stated differently, these statements tended to show that Granger engaged in retaliatory behavior when he was wronged, which goes again to proving intent and absence of mistake. Given that Granger's words were used for permissible purposes, he cannot show that trial counsel were deficient for not objecting to the State's cross-examination.

Granger also fails to prove prejudice. To the extent that the above instances of cross-examination were used for the improper purpose of proving a character of violence, Granger's *words* pale in comparison to his *actions*. In his jailhouse phone calls, Granger admitted without evincing remorse to shooting his daughter repeatedly and then running over her with his truck when it appeared he had not finished the job of killing her. These few statements, which Granger said were largely made in anger, 23 RR 50 ("Listen, I just had feces thrown in my face; and if I did say that, it was out of anger."), do not even come close to outweighing his actions toward Richards, Claudia, Samantha, and nearby bystanders. As such, Granger fails to prove prejudice. He is not entitled to habeas relief on this claim.

> d.   Counsel did not Inadequately Investigate or Prepare Lyndon Granger

Granger claims his attorneys failed adequately to prepare and investigate his brother, Lyndon. (#44 at 134–35). He complains of Lyndon's testimony about the sexual assault charges and the cross-examination Lyndon faced about allegedly telling a fellow inmate, R. J. Jackson,

that he [Lyndon] sexually assaulted Samantha.  (*Id*. at 135).  Granger asserts that trial counsel should have objected to the latter because the State did not disclose R. J. Jackson as a witness it intended to call.  (*Id*.).  Once more, Granger does not demonstrate deficient performance or resultant prejudice.

For the third time, Granger complains of a defense that was clearly of his making—taking the stand in his own defense and blaming the shooting on the deleterious effects of being wrongfully accused by Samantha and Claudia.  Once he exercised his right to testify in this manner, it was perfectly permissible—if not commanded by Granger—to support his chosen defensive theory.  That is exactly what Lyndon's testimony did, explaining that Samantha claimed he sexually assaulted her but that Harris County authorities did not file charges against him and dismissed the charges against his brother, Ulysses, after Ulysses proved he had an alibi.  23 RR 98–100.  This obviously advanced Granger's line of defense—if the sexual assault charges were indeed false, as Harris County authorities apparently concluded, then an innocent man was being railroaded, a stressor that could cause anyone to break.  The fact the strategy failed does not make counsels' efforts deficient, and nothing about Lyndon's direct examination was more harmful to Granger than the other overwhelming evidence against him.  Yet again, Granger cannot claim deficient performance or prejudice for a defensive tack that he introduced via his right to testify in his own defense.

Concerning the cross-examination of Lyndon, that too is a direct consequence of Granger's strategic choice to present the false-charges defense.  Once Lyndon denied sexually assaulting Samantha, it was fair to challenge whether that was true.  Secondarily, it was also permissible to challenge Lyndon's credibility through a prior inconsistent statement.  Both were achieved by asking whether Lyndon confessed to another inmate that he sexually assaulted Samantha.  The

question asked of Lyndon followed the Texas Rules of Evidence foundational requirements to question a witness about his own prior inconsistent statement—the State revealed the (1) contents of the statement (admitting to sexual assault), (2) the time and place it occurred (first jail incarceration), and (3) to whom it was uttered (R. J. Jackson). 23 RR 104; Tex. R. Evid. 613(a)(1). The cross-examination was entirely proper and relevant in light of Granger's chosen defense strategy.

Moreover, Granger cannot prove deficient conduct by counsel for failing to object to a lack of notice when the trial court *denied* his request for witness lists. 5 RR 33. The fact that the prosecutor provided a witness list does not somehow turn a gratuitous action into a judicial command. Additionally, the State was not required to call Jackson to testify or to identify him as a potential witness simply to question Lyndon about his own statement. In fact, calling Jackson to provide extrinsic evidence of Lyndon's alleged statement would not have been permissible under the Texas Rules of Evidence until after Lyndon denied making the statement. Tex. R. Evid. 613(a)(4). The State chose not to do that here, despite Lyndon's denial. Again, a lack of notice was no basis for an objection, and counsel cannot be faulted for failing to lodge one.

Irrespective of performance, Granger fails to demonstrate prejudice. Once again, he cannot complain about any backlash produced by the strategy he implemented by exercising his constitutional right to testify. Further, any poor reaction produced by Lyndon's testimony was cumulative of Granger's testimony wherein he discussed Samantha's sexual assault allegations against him. *See Pinholster*, 563 U.S. at 200–01. Granger offers no evidence about what further investigation into R. J. Jackson would have yielded, so he has nothing to suggest a different result, let alone by a reasonable probability. *See Gregory v. Thaler*, 601 F.3d 347, 352 (5th Cir.) ("An applicant 'who alleges a failure to investigate on the part of his counsel must allege with specificity

what the investigation would have revealed and how it would have altered the outcome of trial.'" (quoting *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989))), *cert. denied*, 562 U.S. 911 (2010).   Moreover, the complained-of cross-examination made only Lyndon look bad, not Granger.   Finally, trial counsel minimized any damage by pointing out in closing argument that the State failed to call R. J. Jackson to disprove Lyndon's denial.   24 RR 19.   Given all these circumstances, Granger does not prove a reasonable probability of a different result.   Granger has not shown that he is entitled to habeas corpus relief.

e.   Trial Counsels' Performance during the State's Closing Argument was Constitutionally Sound

Granger's final subpart of Claim 11 focuses on trial counsels' treatment of the prosecution's closing statement.   (#44 at 136–38).   Granger specifically complains that trial counsel did not object to the prosecutor's closing statements that Granger was "incapable" of empathy, that he bragged about the killing, that he is "the personification of the evil that we deal with in the criminal justice system," that he "has more than the guts of a skydiver to come in here and lie to your faces," and that he is "disgusting."   (*Id*. at 136) (citing 24 RR 31, 34, 49, 55, 56). He also seemingly complains about descriptions of Granger as "evil" despite counsels' objections. (*Id*.) (citing 24 RR 49).   Granger further asserts that the prosecution argued for conviction based on anger, lack of remorse, outrage of the crime, empathy for the victim, fear of his release, and protection of society.   (*Id*. at 137) (citing 24 RR 31–32, 50–52, 58).   He admits, however, that counsel objected to the statements about anger and fear of release.   (*Id*.).

Granger cannot complain of the instances where counsel objected to the State's closing argument—that he was evil, that the jury should be angry, and that he could walk free if found not guilty.   *See* 24 RR 49, 50–52; *see also Fields*, 761 F.3d at 456 ("Thus, while Fields contends that

his trial counsel should have found and presented precisely this type of evidence, the record reflects that his trial counsel did so."). He offers nothing more about what counsel could have done and therefore he proves no deficiency on those points.

Other instances of argument about which Granger complains were clearly proper. Concerning the bragging comment, the prosecution's argument must be contextualized:

> And he goes in - - he goes with the story, "I don't remember."
>
> Hah, laughable. He's bragging about it before, he's bragging about it after. And, then at trial he comes up with this extra memory that, "Oh, yeah, she pleaded, 'I'll tell the truth now, Daddy.'"
>
> He never mentioned that before. He's still focused on that. He's still got anger.

24 RR 34. The record reveals that the State was discussing Granger's braggadocious statements to challenge his credibility vis-a-vis whether he remembered the shooting. "A prosecutor is allowed to argue that the witnesses for the defense are not worthy of belief." *Satterwhite v. State*, 858 S.W.2d 412, 425 (Tex. Crim. App.), *cert. denied*, 510 U.S. 970 (1993). Given this law, there was no basis upon which trial counsel could have lodged an objection to this argument. The same is true for the skydiver comment, which also was just a challenge to Granger's credibility.

Concerning the lack of remorse and empathy, Granger testified that he was sorry for shooting and running over Samantha, and that he was sorry "if [he] killed . . . Sebolt." 23 RR 34, 55. In his jailhouse phone calls to family, however, he made comments that the jury could construe as bragging "about killing people in Beaumont." 23 RR 64. Thus, "there was evidence presented at trial that, immediately following the murder[], [Granger] made comments that indicated his lack of remorse." *Coble*, 496 F.3d at 438. This argument, therefore, was fair game for the prosecution in two ways: (1) to rebut Granger's testimony of remorse and (2) to question whether he was telling the truth. In other words, it was a summation of evidence and a challenge

to credibility.  *See id.* (denying improper argument claim because there was evidence that petitioner lacked remorse); *Satterwhite*, 858 S.W.2d at 425.  Trial counsel cannot be faulted for failing to lodge a frivolous objection to this argument.

Finally, the argument about protecting "the good folks of Jefferson County" was a proper plea for law enforcement.  It is almost verbatim to the closing made in *Anderson v. State*, where the prosecution argued, "Now the question here is whether[,] . . . after all the evidence that you have heard, whether or not the rights of the law abiding citizens of Dallas County are going to be protected."  486 S.W.2d 569, 572 (Tex. Crim. App. 1972).  The TCCA found that such "argument was more in the form of a plea for law enforcement than an improper appeal to community prejudice."  *Id.*; *see Ridyolph v. State*, 545 S.W.2d 784, 790 (Tex. Crim. App. 1977) (holding that call to "protect our policemen" was proper plea for law enforcement); *Myers v. State*, 468 S.W.2d 847, 848–49 (Tex. Crim. App. 1971) (holding that argument for protection of women in a sexual assault case was not reversible error).  It was not deficient for trial counsel not to object where no basis existed.

It is also clear that trial counsel were paying attention to closing argument and objected when they thought appropriate.  24 RR 49, 50–52 (counsel objecting to prosecutor:  calling Granger an "evil creature," misstating definition of transferred intent, and personal attacks on Granger).  "When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect."  *Gentry*, 540 U.S. at 8.  To the extent that any of the complained-of arguments were improper, trial counsels' lack of objection is easily justified by not wanting to "draw additional attention to the prosecutor's remarks."  *Vasquez*, 505 F. App'x at 330.  Obviously, the "[failure to raise meritless objections

174

is not ineffective lawyering; it is the very opposite." *Clark*, 19 F.3d at 966.  Deficient performance is not found on this record.

Assuming, however, that trial counsels' failure to object was deficient, there is no prejudice.  "[T]he overwhelming evidence of [a petitioner's] guilt" can outweigh any harm caused by improper closing remarks.  *Pondexter v. Quarterman*, 537 F.3d 511, 525 (5th Cir. 2008), *cert. denied*, 555 U.S. 1219 (2009).  Curative or jury instructions can also minimize any harm.  *See Hughes*, 530 F.3d at 347.  Here, the evidence of the crime was video-recorded and numerous witnesses identified Granger as the shooter, which he admitted in his testimony (though denying he shot Sebolt).  Further, both the defense and State acknowledged that closing argument is not evidence, 24 RR 18, 29, and the jurors were instructed to engage in a "careful and impartial consideration of all the evidence" and could "not refer to nor discuss any matters not in evidence."  CR.Supp.3 at 3.  Moreover, assuming some improper argument, it was not pronounced or sustained, with the bulk focusing on evidence of guilt and rebutting Granger's argument.  There is no reasonable probability that Granger would have been found not guilty but for the supposedly improper closing arguments.  Granger fails to establish that he is entitled to habeas relief on this claim.

K.  Claim 12 (IATC):  Granger was denied effective assistance of counsel and a fair trial and sentencing as a result of counsels' handling of the ballistic evidence, including presentation of harmful expert testimony and failure to object to the State's presentation of false testimony and overstated closing argument.

Claim 1(6):  Trial counsel "presented a ballistics expert who was the only witness to opine that the bullets that killed the victim, Ms. Sebolt, came from the location their client was firing from, contradicting Granger's testimony."

Granger asserts that his trial counsel mishandled the guilt-phase ballistics evidence and testimony.  (#44 at 140–48).  Granger's claim is comprised primarily of three multi-faceted parts:

(1)      counsel failed to highlight helpful ballistics evidence and instead elicited harmful evidence from the State's witnesses (*id*. at 144–45);

(2)      counsel failed to prepare their ballistics expert, Dr. Grossberg, to testify, resulting in the introduction of evidence contrary to their purported strategy (*id*. at 145–46); and

(3)      counsel failed to object to the State's overstatement of the ballistics evidence during closing argument (*id*. at 146–47).

Granger also claims that the State presented "exaggerated and false argument on an important and contested guilt-phase issue—the origin of the bullets found near the body." (*Id*. at 148). He asserts that the State's presentation of the "false evidence" violated his rights under *Napue v. Illinois*, 360 U.S. 264, 269 (1959).

The Director contends that Granger's claims related to the ballistics evidence and testimony are procedurally barred; and in the alternative, the claims are without merit. (#53 at 222–36).

1.      These Claims are Procedurally Barred, and the New Evidence Cannot Be Considered

Granger admits that he attempted to pursue these claims in a subsequent state habeas application that was dismissed as an abuse of the writ. (#44 at 148; *Ex parte Granger II*, 2020 WL 915434, at *1). His claims are therefore procedurally barred. Granger offers no cause to excuse his defaulted false testimony and "fair trial and sentencing"[26] claims, and none is apparent from the record. *Martinez* does not excuse the default of a non-IATC claim. *Davila*, 137 S. Ct. at 2063. Accordingly, Granger's false testimony and "fair trial and sentencing" claims are denied as procedurally barred.

Regarding his IATC claim, he argues that he can overcome the default under *Martinez* because state habeas counsel had no strategic reason for failing to present his meritorious IATC

_____

[26]      His "fair trial and sentencing" claim is presumably a Sixth Amendment claim.

claim.  (#44 at 147–48).  Granger fails to provide any analysis under Section 2254(e)(2) to evaluate whether the evidence in support of this claim can be considered.

Granger presents new evidence in support of his IATC claims regarding the ballistics evidence and/or testimony.  Where a petitioner relies on *Martinez* to excuse a procedural default, a federal court may not consider new evidence to assess cause and prejudice if the petitioner "failed to develop the factual basis of [his] claim in state court proceedings." *Ramirez*, 142 S. Ct. at 1739; 28 U.S.C. § 2254(e)(2).  Granger presents:  (1) Dr. Grossberg's May 2018 declaration (A0363–64); (2) T.D. Spikes's March 2012 Beaumont Police Department Report (A0822–24); (3) Coffin, III's, March 15, 2012, Beaumont Police Department Report (A0825–26); (4) a February 1, 2013, Letter to defense counsel from prosecutor Shettle regarding discovery (A0847–61); (5) a Jefferson County List of Recovered Evidence (A0863–67); and (6) a Jefferson County Lab Submission Form (A0868–70).[27]

Granger fails to make any showing that his IATC ballistics claims rely on a new and previously unavailable rule of constitutional law or that the claims rely on a factual predicate that could not have been previously discovered through the exercise of due diligence.  State habeas counsels' trial strategy or alleged negligence in not presenting the claim is not sufficient to meet the standard stated in *Shoop*, 142 S. Ct. at 2044 (quoting 28 U.S.C. § 2254(e)(2)(A)).  The court may not consider Granger's proffer of new evidence to support Claim 12.

Regarding his claim that state habeas counsel was ineffective for failing to raise these claims in *Ex parte Granger I*, state habeas counsel Jeremy Schepers ("Schepers") belies Granger's claim of ineffective assistance of counsel.  State habeas counsel Schepers—whose investigation was

---

[27]    The Director notes that aside from Dr. Grossberg's declaration, the new evidence is unauthenticated—none of the alleged discovery documents are accompanied with a business records affidavit or otherwise self-authenticated.

expressly "limited to investigating the circumstances surrounding the shooting and attempting to determine if the fatal bullets could have come from the direction of the courthouse,"—"reviewed testimony and reports relating to the analysis of bullets, jackets, and fragments collected at the crime scene" and even "hired a ballistics expert, Edard Love, to analyze the ballistics evidence[.]" (A0972). Schepers was especially "interested in determining the accuracy of the State's evidence . . . and if there was any way bullets could have been fired from the courthouse, rather than the street, where Mr. Granger was located." *Id*.

The fact that state habeas counsel *specifically* hired an expert to contest the location from which the bullets were shot and yet *did not raise* any claim based on the ballistics evidence in the first state habeas application is quite telling. The decision not to include a challenge to the ballistic evidence in the state habeas proceedings is clearly a strategic decision—and is effectively a concession that the claim had no merit. *See, e.g.*, (A0972) (stating that "*[a]ny* discrepancies between Mr. Baldwin's testimony and report or between his report and the State's argument[] would be potentially viable claims that should have been litigated" but that he did not raise (emphasis added)). State habeas counsel need not and should not raise every nonfrivolous claim. *Vasquez*, 597 F. App'x at 780. Likewise, state habeas counsel should not raise a claim that is unsupported by the record. Granger fails to demonstrate that state habeas counsel were ineffective, as required to overcome the procedural default of the underlying IATC claim through *Martinez*. *Martinez* does not benefit Granger. The procedural default of this IATC claim is not excused. Thus, Granger is not entitled to habeas relief on this claim.

2.      Alternatively, the Claims Lack Merit

a.      Granger's False Testimony Claim is Conclusory and Without Merit

In a tacked-on *Napue* claim, Granger alleges that the State knowingly presented "exaggerated and false argument" as to the "origins of the bullets found near" Sebolt's body. (#44 at 148) (citing *Napue*, 360 U.S. at 269).  Due process is violated at trial when the prosecution knowingly presents false evidence or fails to correct such evidence when it is offered.  *See Giglio v. United States*, 405 U.S. 150, 153–54 (1972); *Napue*, 360 U.S. at 269.  To establish such a claim, a petitioner must demonstrate "(1) the testimony was actually false, (2) the state knew it was false, and (3) the testimony was material."  *Canales*, 765 F.3d at 573 (quoting *Pyles v. Johnson*, 136 F.3d 986, 996 (5th Cir.), *cert. denied*, 524 U.S. 933 (1998)).  "[T]estimony is material if 'there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'"  *Id.* (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)).

Through the lens of an IATC claim, Granger complains of various supposed falsities, but he does not direct the court to exactly which testimony he believes was false under *Napue*, much less demonstrate than any such testimony was actually false.  He also does not point to anything that proves the State *knowingly* presented false evidence.  In addition, Granger fails to show that the allegedly false evidence was material.  His claim is conclusory.  *See Miller*, 200 F.3d at 282.

Granger further complains about the State's "presentation of exaggerated and false *argument*," as opposed to testimony.  (*See* #44 at 148) (emphasis added); *see also id.* at 132–33 (IATC claim for failing to object to prosecutor's overstatement during closing argument).  Jury argument, however, is not evidence; therefore, it cannot be the foundation of a false testimony claim.  *See Cary v. State*, 507 S.W.3d 761, 766 (Tex. Crim. App. 2016) (noting that, in sufficiency-of-the-evidence analysis, "the arguments of the parties are of no consequence because

179

arguments are not evidence" (citing *Hutch v. State*, 922 S.W.2d 166, 173 (Tex. Crim. App. 1996) (plurality opinion) ("It is axiomatic that jury arguments are not evidence."))); *cf. Boyde v. California*, 494 U.S. 370, 384 (1990) ("But arguments of counsel generally carry less weight with a jury than do instructions from the court.  The former are usually billed in advance to the jury as matters of argument, not evidence, and are likely viewed as the statements of advocates . . . ." (internal citations omitted)).  Granger fails to demonstrate any falsity or that any alleged falsity is material to his conviction.  Hence, Granger fails to demonstrate that he is entitled to habeas relief on this claim.

b.    Granger's IATC Claim Lacks Merit

Granger asserts that trial counsel mishandled the ballistics evidence.  He contends trial counsels' handling of the ballistics evidence undermined his defense—"that the State had failed to prove that the bullets [Granger] fired killed Ms. Sebolt." (#44 at 144).  Granger claims that counsel should have:

(1)    highlighted the physical evidence showing several unidentified bullet fragments were located near the entrance to the courthouse (*id*. at 144);

(2)    corrected the State's ballistics expert's inaccurate testimony regarding the identification of bullet fragments 17B and 17C (*id*. at 144–45);

(3)    elicited testimony from the State's pathologist, Dr. Lisa Funte ("Dr. Funte"), that indicated the fatal bullets must have come from the direction of the courthouse based on the entrance wounds on Sebolt's body (*id*. at 145);

(4)    better prepared Dr. Grossberg for her testimony (*id*. at 145–46); and

(5)    objected to the State's overstatement of the ballistics evidence during closing argument (*id*. at 146–47).

180

Granger argues that he was prejudiced by counsels' alleged deficiencies because, but for such deficiencies, "the jury would have had reasonable doubt as to the origin of the bullets that killed Ms. Sebolt." (*Id*. at 147).

Granger's prejudice argument boils down to one basic premise: that the linchpin of the State's guilt theory was the place *from where* the bullets were shot and, in turn, that the *direction* of the bullets identified Granger as the killer. The State's theory of Granger's culpability, however, did not rely upon the location from which the bullets were shot or their direction, but rather that Granger was the only individual who had been firing a weapon at the time Sebolt fell to the ground. Granger complains that Dr. Funte, the State's forensic pathologist, "did not provide any testimony about where the bullets that caused Ms. Sebolt's injuries came from." (#44 at 142). He also asserts that the State did *not* present any evidence, either through Dr. Funte or in the remainder of the State's case-in-chief, that because the bullets entered the front of Sebolt's body, the bullet must have come from the direction of the courthouse. (*Id*. at 145). In an attempt to demonstrate some malfeasance or weakness in the State's case (*see id*.), Granger disregards the weight of the evidence and testimony which shows that Granger was the only person who had discharged a weapon up to the point that Sebolt fell to the ground and began to bleed out. The prosecution summed it up best:

> So, what do [the defense] bring you as their defenses? What does Bartholomew Granger bring as his defense to this courtroom? That the cops shot her? You really think that plays? Do you really think that plays?
>
> There is not one, not one iota, not one microbit of proof that anybody shot their weapon until—other than that man right here (indicating), until *after he was back in his truck*. And by that time the evidence proves without any doubt, without any doubt that Minnie Sebolt *was already lying, dying in a pool of her own blood*.

24 RR 51 (emphasis added); *see* 24 RR 35 ("*Not a single witness* did they even ask saw a police officer shooting towards Minnie Sebolt. *Not a single witness* said they shot at the time of Minnie Sebolt. The video doesn't support that at all." (emphasis added)). The record reflects the following testimony:

• Anderson, who was parked directly behind Granger's truck, testified that no police had begun firing at the point that he witnessed two women fall down in front of the courthouse door. 19 RR 12, 19–20, 35. Anderson repeated: "At no time was there any possibility that [Granger] was in a position for any [officers] to fire in that direction." *Id*. at 35.

• Deputy Barker testified that he was inside the courthouse when he noticed that "[s]ome ladies fell at the front door" and "immediately saw a man running *away* from them" before he ran out of the front of the courthouse. 19 RR 41–42. Barker never fired his duty weapon. *Id*. at 51. Importantly, the individuals standing at the front of the courthouse "went down" *before* any of the officers fired their weapons. *Id*. at 52–53. And while there was "friendly fire," it occurred long after the individuals had fallen. *Id*. at 56.

• Deputy Hayes testified that he was behind the security table in the courthouse when he heard the glass shatter, and as he came around the table toward the front door, he noticed several people fall, but he didn't know they were hit until he exited through the front door and saw blood pooling underneath a lady, just seconds after the glass shattered. 19 RR 61, 66. Hayes testified that the first time anybody in law enforcement shot at Granger was after Granger had returned to his truck. *Id*. at 69. Importantly, Hayes emphasized that by the time the officers shot, Sebolt was already bleeding. *Id*. at 70.

• Michael Kirkpatrick ("Kirkpatrick") confirmed that the video taken of the courthouse showed that, by the time Deputies Barker and Hayes exited the courthouse, Sebolt was already down. 18 RR 145–46.

• Officers Jonathan McCauley ("McCauley"), Poole, and Hamilton testified that they did not shoot their weapons at Granger until he was in the truck driving away. 19 RR 130, 144, 160.

• Attorney Soileau saw Granger shooting toward the courthouse and heard glass breaking, when he noticed a woman lying prone and nonresponsive in the courthouse doorway. 19 RR 29–31. He did not hear shots coming from the police officers until after this occurred. 19 RR 33, 42.

In short, no amount of objecting to the evidence about the *trajectory* of the bullets that killed Sebolt would have made a different result reasonably probable given the overwhelming evidence

that, *temporally*, the only bullets that could have fatally pierced her femoral vein were Granger's. *See Richter*, 562 U.S. at 112 ("likelihood of a different result must be substantial, not just conceivable").

Trial counsel presented Dr. Grossberg, whose entire purpose was to establish reasonable doubt as to the State's ballistics evidence based on the trajectory of the entrance and exit wounds. *See* 23 RR 155–56 (Makin eliciting testimony during Dr. Grossberg's *voir dire* that her opinion "affects the trajectory path—the path of the bullet"). Trial counsel revealed this strategy in his closing argument, in which, after he summarized the chaos and confusion surrounding the shooting, the immediacy of the police department's response, and the allegedly limited ballistics testing, 24 RR 17–20, he highlighted the inconsistency in the testimony provided by the two pathologists:

> Well, neither [of the two experts] could tell us which bullet or bullet fragment is the one that hit the femoral vein; or no ballistic[s] person could tell us that.
>
> Where did it come from? From which direction? From which weapon? What were the entry and exit wounds? You'd think there would be some agreement.
>
> You have Dr. Funte, who examined the body in her laboratory, you know, where the lighting is all perfect and it's the body and it's the time she needed and the instruments and procedure and she took pictures and everything and she reached a decision, you know, saying, "This is the entry, and this is the exit."
>
> And then we had Dr. Grossberg, who examined pictures and the video and came up with kind of a different conclusion on things, you know. So, which was the entry; and which was the exit?
>
> Even Dr. Grossberg said, "Well, it was a close call. You know, I'm not saying she was wrong. But if Dr. Funte was right, from the way [Sebolt] was standing, Miss Sebolt *had to be shot from inside the courthouse*."
>
> You know, that's kind of important, I think.
>
> You decide what's beyond a reasonable doubt.

24 RR 20–21 (emphasis added).  Counsel summed up the defense case:

> We believe, ladies and gentlemen, the Government has failed to prove to you beyond a reasonable doubt that Mr. Granger fired the bullet or bullets that hit Miss Sebolt and brought about her death.  And the biggest thing, again, is the contradictory testimony of the forensic pathologists.  You know, they're both experts.  They know what they're doing.

*Id*. at 22.  Given the above testimony, most of what Granger complains about now would clearly be cumulative of that presented at trial, and cumulative evidence does not prove prejudice.  *See Pinholster*, 563 U.S. at 200–01.  Even if Granger could establish that trial counsel were ineffective, he could not establish prejudice in light of the evidence establishing that Sebolt was shot and bleeding out before anyone—other than Granger—had fired a weapon.

### c.   Failing to Highlight Evidence

Granger first argues that trial counsel missed an opportunity to bolster their defense when they failed to elicit testimony from Baldwin, the State's ballistics expert, that there were four unidentified bullet fragments located near the entrance of the courthouse.  (#44 at 144).  Granger, however, fails to prove deficient performance.  While counsel did not ask about the specific items about which Granger now wishes he had (*see id*.) (identifying item numbers 16A, 17B, and 17C from Baldwin's report (A0844–45), counsel elicited the substance of Granger's complaint:  that not all of the collected bullet fragments had been linked to Granger's gun.  *See* 21 RR 95 ("Q. But there were some things you were unable to identify, correct?  A.  Yes, sir.  Q.  Okay.  And that's—when you say, 'lacks individual, as well as class characteristics and was unsuitable for comparison,' that simply means you just couldn't tell?  A.  That's correct, sir.").  Granger's complaint comes down to a matter of degree, which is not enough to establish deficient performance.  *Skinner*, 576 F.3d at 220.

Moreover, trial counsel could have reasonably chosen not to ask questions about specific items because the State's retort could have been highly damaging. Of the ten total bullet components found near the revolving doors where Sebolt's body lay, six bullets were identified as having been fired from Granger's gun, and four were unsuitable for comparison at all. That is, every *identifiable* bullet component found near Sebolt's body was linked to Granger's gun. Reasonable counsel could certainly decide to avoid drawing any further attention to that damaging evidence. *Cf. Strickland*, 466 U.S. at 668 (holding counsel's defense was the result of reasonable professional judgment, even without the presumption of competence, where counsel restricted testimony on defendant's character to ensure that contrary character and psychological evidence would not come in).Providing little explanation (*see #44 at 130*), Granger cites to what may be an inventory list from the Jefferson County Regional Crime Laboratory ("JCRCL"). *See* (A0863–70).[28] Granger next alleges that counsel should have corrected Baldwin's allegedly false testimony "that bullet jacket fragments identified as 17B and 17C were fired from [Granger]'s Beretta[.]" (#44 at 144). Granger, however, is mistaken as to Baldwin's testimony. When the

---

[28]   In that list, ten items were identified as having been recovered at or near the courthouse revolving doors. *See* (A0865)—(item numbers A62 through A65 identified as bullet components inside courthouse), *id.*—(items AB, AD, and AG identified as bullet components near base of revolving door or near newspaper stands), (A0868)—(Lab Exhibit Number 52, labeled by the Jefferson County Sheriff's Office as "front of courthouse pole"); *see also* 21 RR 42–44 (bullet fragment in Lab Exhibit Number 52 was "found at the base of the revolving door in a pole right in front of where Sebolt was found"). The JCRCL then analyzed those items and assigned the following exhibit numbers: item numbers A62 through A65 were renumbered as exhibits 49.001 through 49.004, *see* (A0855–56); items AB, AD, and AG were renumbered as exhibits 21.002 through 21.003, *see* (A0849); and Lab Exhibit Number 52, which was comprised of three fragments and one lead core, remained exhibit 52, *see* (A0859). These materials were then submitted to Baldwin for analysis, and he renumbered the items yet again. Under Baldwin's numbering, JCRCL exhibit numbers 49.001 through 49.004 became item numbers 16A through 16D, *see* (A0843); exhibit numbers 21.002 through 21.003 became item numbers 11B through11D, *see* (A0841–42); and exhibit number 52 became item numbers 17A through 17C, *see* (A0843). Baldwin concluded that items 16A, 16C, 17B, and 17C were unsuitable for comparison and could not be identified. *See* (A0844–45). All the others, including one of the components recovered near the courthouse dedication sign and one from "front of courthouse pole" (*see* #44 at 144), were identified as having been shot from Granger's Beretta. *See* (A0843)—(items 11B, 11C, and 11D identified as having been fired from Item 10, the Beretta model CX4); (A0844)—(items 16A, 16D,and 17A identified as having been fired from Item 10); 21 RR 32–34 (witness identifying State's Exhibit 73, a Beretta CX-4 Storm rifle, as the gun used by Granger).

State asked if Baldwin had "test[ed] all three of th[e] bullet fragments" in Items 17A, 17B, and 17C, Baldwin clearly stated, "With respect to 17A, sir— . . . —that was a jacket fragment that I was able to make a determination of; and that was identified, in my opinion, as having been fired" from Granger's gun.  21 RR 90–91.  Baldwin made no such statements and drew no such conclusions with respect to 17B and 17C.  Baldwin did not testify inaccurately, and trial counsel had no testimony to correct.  Granger fails to prove deficiency on this point.

Having his efforts to show deficiency with respect to Baldwin's testimony prove unavailing, Granger next faults counsels' performance with respect to the two pathologists:  Drs. Funte and Grossberg.  (#44 at 145).  Granger argues that counsel should have elicited testimony from Dr. Funte that established that the bullets must have come from the direction of the courthouse, but instead counsel "inexplicably" presented harmful testimony from Dr. Grossberg that the gunshots entered the back of Sebolt's body, and, therefore, the bullets came from the street where Granger was standing.  (*Id*.)  Granger's insinuation that counsel should have attempted to elicit *affirmative* evidence showing the bullets came from the courthouse, and, therefore the bullets "very well could have come from a police officer's firearm" (*id*. at 145), is merely a disagreement with trial counsels' strategy.  Trial counsel presented Dr. Grossberg to challenge and raise questions with regard to the State's case, *i.e.*, to create reasonable doubt—not to establish affirmatively anything about the trajectory from which the fatal bullet was fired.  Merely because Granger now wishes counsel had taken a more aggressive tack does not mean that counsels' strategy was unreasonable.  *See Richter*, 562 U.S. at 109 ("To support a defense argument that the prosecution has not proved its case[,] it sometimes is better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates.").  It does not mean that counsel were deficient for failing to achieve their goals in the exact manner that Granger

retrospectively desires.  *See id*. at 106 ("Rare are the situations in which the 'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach.").  Granger fails to show any deficient performance.  This claim is denied.

### d.   Failing to Prepare Dr. Grossberg

Granger next alleges various inadequacies in trial counsels' preparation of Dr. Grossberg. (#44 at 145–46).  First, he alleges that counsel did not spend enough time speaking, meeting with, or guiding Dr. Grossberg ahead of her testimony.  (*Id*. at 145) (pointing to Dr. Grossberg's declaration stating that she spoke with counsel on the phone once for twenty minutes and then only again just before she took the stand).  Counsel presumably hires an expert to perform expert analysis competently, independently, and without influence from counsel.  If Dr. Grossberg felt she needed to speak with counsel more, counsel were certainly entitled to rely on her to make such a request.  *See Murphy v. Davis*, 901 F.3d 578, 592 (5th Cir. 2018), *cert. denied,* 139 S. Ct. 1263 (2019).  Dr. Grossberg, however, gave no such indication.  Indeed, Dr. Grossberg was clearly aware of her purpose:  "To consult regarding the death of Minnie Sebolt . . . regarding cause and manner of death." 23 RR 153; *see* (A0363) ("[Makin] asked me to focus on the autopsy report and the medical examiner's findings.").  She had also either reviewed or completed "[w]ell over a thousand" autopsies in her career.  *Id*. at 159.  She ran a consulting business "for attorneys on death cases."  *Id*.  Given her familiarity with these cases, speaking over the phone for twenty minutes for testimony that comprised a total of twenty-seven pages seems eminently reasonable.  Certainly, Dr. Grossberg did not express anywhere in her declaration that speaking to counsel for a longer period of time would have assisted her in her evaluation or changed her testimony.  There is no deficiency in counsels' performance on this point.

Second, Granger alleges that counsel were deficient for not advising Dr. Grossberg that, pursuant to a pretrial order, she was not required to share her opinions with the State prior to her testimony.  (#44 at 145–46).  Granger further alleges that counsel were even more deficient—if that were possible—by *authorizing* Dr. Grossberg to share her opinions with the State.  (*Id*. at 146).

Granger is mistaken in interpreting the state court's pretrial ruling.  The defense filed a "Motion for Production of Impeachment Evidence" in which they requested only that the State disclose all expert data and opinions ahead of time.  CR.Supp.2 at 408–11.  The motion made no mention of defense experts.  Regardless, the trial court granted the motion only in part, ordering the parties to instruct their experts to bring their underlying data with them to trial.  *See* 5 RR 35–39.  The order contained no rulings as to expert opinions, and even if it did, that such opinions were not *required* to be shared does not mean the experts were *prohibited* from sharing them.  There was nothing improper, much less deficient, in giving Dr. Grossberg permission to speak with the State.

Third, Dr. Grossberg avers that her notes reflect that she, like Dr. Funte, had concluded that both entrance wounds were on the front of Sebolt's body, with exits through the back.  *See* (A0363); *see also* 21 RR 19–20 (Dr. Funte testifying entrance wounds on front of legs).  At trial, however, Dr. Grossberg testified that she disagreed with Dr. Funte's conclusion as to the fatal wound, in particular, that the entrance and exit were reversed.  23 RR 164.  Granger attributes this mistake to counsels' inadequate preparation.  (#44 at 146).  That is pure speculation, and Granger's true complaint is actually one about the ineffectiveness of counsels' *expert*.  Granger, however, "has no constitutional guarantee of effective assistance of experts."  *See Earp v. Cullen*, 623 F.3d 1065, 1077 (9th Cir. 2010) ("An expert's failure to diagnose a mental condition does

188

not constitute ineffective assistance of *counsel*[.]"), *cert. denied*, 563 U.S. 1037 (2011).  Granger fails to show deficiency, and he is not entitled to relief on this claim.

e.      Failing to Object to the State's Summation

Granger complains that his trial counsel was ineffective for failing to object to the prosecutors' closing argument.  Granger argues that the following statement during the State's closing argument was inaccurate:

> The ballistics nail'em.  Every single slug that was found in the courthouse, the one behind Minnie, the one inside that pole in front of Minnie, the one by the newspaper, the one inside the courthouse that went through the shattered windows, all those match this gun (displaying), State's 73, which witness after witness said they saw him holding and firing, which when the police arrested him they took off of him, which that ballistics expert that he referred to said matched those slugs.

(#44 at 132) (citing 24 RR 33).  Granger focuses only on the opening clause of the prosecutor's argument, "Every single slug that was found in the courthouse."  He argues this clause was inaccurate because four bullet fragments found in or near the courthouse were not traced to any weapon.  *Id*.  The prosecutor, however, immediately narrowed his reference to "every single slug that was found in the courthouse" to the four specific bullets he mentioned.  Granger does not claim that any of the specific matches identified by the prosecutor were inaccurate—indeed they were not.  While the original clause of that argument, taken out of context, could be misleading, the prosecutor promptly corrected it, and the brief misstatement was not flagrant or pervasive.  *Darden*, 699 F.2d at 1036 ("The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'").

Moreover, even if the prosecutor's statement could be construed as misleading, counsel could still have reasonably chosen to avoid drawing attention to the fact that every bullet fragment that could be *identified* had been connected to Granger's gun.  *See id*.; *see also Lambert v. McBride*, 365 F.3d 557, 564 (7th Cir.) ("[W]e must note that there may very well be strategic

189

reasons for counsel not to object during closing arguments. Counsel may have been trying to avoid calling attention to the statements and thus giving them more force."), *cert. denied*, 543 U.S. 1027 (2004). Given that Granger had repeatedly denied shooting toward the courthouse at all, the risk of highlighting the ballistics evidence was certainly great enough for reasonably strategic counsel to decide silence was prudent. Granger fails to demonstrate deficient conduct in these circumstances. Granger is not entitled to relief on this claim.

     L.    <u>Claim 13 (IATC): Granger's right to due process was infringed when the prosecutor called him a "Murdering Son of a Bitch" during Guilt-Phase cross-examination, and his right to the effective assistance of counsel was infringed by the failure of trial counsel to object or seek a mistrial</u>.

During the State's guilt-phase cross-examination of Granger, he asked prosecutor Shettle why "people automatically assume that [he is] lying" and why his word was not good enough. 23 RR 40. In response to Granger's question, Shettle answered, "Because you're a murdering son of a bitch. That's why." *Id*. The judge then admonished the State "not to use that kind of language." *Id*. Granger complains that, despite the court's intervention, counsel should have objected or sought a mistrial to preserve error. (#44 at 135–38). Granger also argues that his due process rights were violated by Shettle's "emotion-fueled" outburst. *Id*. The Director contends that the latter claim is procedurally barred, and that the former claim was reasonably rejected by the state court. (#53 at 237–41).

     1.    <u>The Due Process Claim is Barred and, in the Alternative, Meritless</u>

Granger raised his due process claim predicated on prosecutor Shettle's comment on direct appeal. *Granger*, 2015 WL 1875907, at *3. The TCCA held the record did not show a contemporaneous objection, and Granger, therefore, had failed to preserve the claim for review. *Id*. (citing TEX. R. APP. P. 33.1(a)). This procedural rule has been repeatedly upheld as adequate and independent. *Scheanette v. Quarterman*, 482 F.3d 815, 823 (5th Cir. 2007); *Turner*, 481

F.3d at 301; *Parr*, 472 F.3d at 253; *Amos v. Scott*, 61 F.3d 333, 345 (5th Cir.), *cert. denied*, 516 U.S. 1005 (1995).  Because the denial of this claim was based upon an adequate and independent state procedural rule, and because Granger failed to allege cause or prejudice relating to his default, the claim is barred.

In any event, his due process complaint lacks merit.  To show reversible prosecutorial error, the State's allegedly improper argument must infect the trial with unfairness.  *See Darden*, 477 U.S. at 181.  This requires the petitioner to "show a reasonable probability 'that but for these remarks' the result would have been different."  *Nichols v. Scott*, 69 F.3d 1255, 1278 (5th Cir. 1995), *cert. denied*, 518 U.S. 1022 (1996).  Though the state court did not adjudicate Granger's due process claim on the merits, the state court's fact findings on his adjudicated IATC claim are entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1), which Granger fails to rebut with clear and convincing evidence.  *See Austin v. Davis*, 876 F.3d 757, 778 (5th Cir. 2017) ("Section 2254(e)(1) limits our review of state-court fact findings, even if no claims were presented on direct appeal or state habeas."), *cert. denied*, 138 S. Ct. 2631 (2018); *Murphy*, 901 F.3d at 594–95 (finding that, where the TCCA dismissed Murphy's state habeas application as an abuse-of-the-writ "[b]ased on the trial court's findings," even the trial court's *alternative* merits findings were entitled to deference under § 2254(e)(1)).  Granger fails to show that prosecutor Shettle's comment rose to the level of reversible error.

For example, in *Darden*, the prosecutor referred to the defendant as an "animal," argued that the defendant should not be allowed out of prison unless on a leash, and wished that the defendant's face had been "blown away with a shotgun."  477 U.S. at 180 nn.11 & 12.  The Court found that, though such comments were undoubtedly improper, "it 'is not enough that the prosecutors' remarks were undesirable or even universally condemned.'"  *Id*. at 181 (quoting

*Darden*, 699 F.2d at 1036).  They must render his trial fundamentally unfair.  *Id*.  If the comments in *Darden* did not deprive the petitioner of a fair trial, Granger being called "a murdering son of a bitch" does not either.

Here, the state habeas court specifically found that Granger invited the response when he "began to ask the prosecutor questions" and insisted that he answer.  SHCR-01.Supp.2 at 191; *see Granger*, 2015 WL 1875907, at *3.  The *Darden* Court explained that "the idea of 'invited response' is used not to excuse improper comments, but to determine their effect on the trial as a whole."  477 U.S. at 182 (citing *United States v. Young*, 470 U.S. 1, 13 (1985)); *see Ries*, 522 F.3d at 530 n.7 (citing *Darden*, 477 U.S. at 182)).  As in *Darden*, "[t]he weight of the evidence against [Granger] was heavy; hence, the 'overwhelming eyewitness and circumstantial evidence to support a finding of guilt on all charges' reduced the likelihood that the jury's decision was influenced by argument."  477 U.S. at 182 (internal citations omitted).  There is no unfairness here.[29]  Granger fails to show that he is entitled to habeas relief on this claim.

### 2.  The State Court's Adjudication of Granger's IATC Claim was Reasonable

Granger fails to demonstrate that the state court's rejection of his claim was unreasonable.  *See* SHCR-01.Supp.2 at 196; *Ex parte Granger II*, 2017 WL 3379285, at *4.  Indeed, a decision not to object is a matter of trial strategy, *Drew*, 964 F.2d at 423, counsel had such strategy here.  In their affidavits submitted to the state habeas court, counsel noted that the decision of whether to object is one made in microseconds.  SHCR-01.Supp.2 at 183.  Counsel recalled the complained-of incident, however, and believed that allowing the State to attack Granger personally

---

[29]  Granger cites several cases to show that the State's comment was improper. (#44 at 149–50) (citing *Berger v. United States*, 295 U.S. 78 (1935); *United States v. Diaz-Carrion*, 915 F.2d 951 (5th Cir. 1990); *United States v. Murray*, 888 F.2d 24 (5th Cir. 1989)).  These cases, however, were decided on direct review of federal criminal prosecutions, and the Fifth Circuit has reminded federal habeas courts to be wary of imposing the same standards on state and federal prosecutors.  *See Ries*, 522 F.3d at 530 (quoting *Kirkpatrick v. Blackburn*, 777 F.2d 272, 281 (5th Cir. 1985), *cert. denied*, 476 U.S. 1178 (1986)).

could garner consideration in Granger's favor. *Id*. In fact, prosecutor Shettle was immediately admonished by the trial court "not [to] use that kind of language," 23 RR 40, further solidifying counsels' belief that perhaps the State's emotional response would ingratiate Granger to the jury. The state habeas court found that there was "sufficient reason . . . not to object to the comments." SHCR-01.Supp.2 at 191; *see id*. at 196 ("A plausible basis existed for trial counsel's failure to object."). Given that Granger fails to show that the comment was fundamentally unfair, he does not show deficient performance in failing to object. *See Ries*, 522 F.3d at 530 (objection must have merit).

Granger also fails to show the state court's determination of no prejudice was unreasonable. As discussed above, the state court found that Granger invited the response. SHCR-01.Supp.2 at 191. By the time Shettle gave the complained-of answer, Granger had asked him two other questions. *See* 23 RR 39 ("A. Well that's the only answer I have. How is it convenient?"), 40 ("You say it's really convenient for me?"). Shettle did not answer Granger's question until Granger insisted. *Id*. at 40 ("[Granger]: Why is it that people automatically assume that I'm lying? Why . . . isn't my word good enough? [Shettle]: You want me to answer that question? [Granger]: Yeah, answer it.").

Where the client invited an arguably objectionable response, it is not reasonably probable that trial counsels' objection would have made any difference in the outcome of the proceeding. *See* SHCR-01.Supp.2 at 196 (holding Granger failed to demonstrate prejudice where "prosecutor's comments, if improper, were harmless, given the record as a whole"); *see also Schriro*, 550 U.S. at 476–77 (because of petitioner's "established recalcitrance, [petitioner] could not demonstrate" *Strickland* prejudice). This is especially true when considering Granger's increasingly hostile, combative, and belligerent behavior during the remainder of his cross-examination. *See, e.g.*, 23

RR 42 (Granger admonished by the court to answer just the question asked), 23 RR 44 (Granger fighting with the court as to whether he was answering the question asked).  "Although the prosecutor's comments were, perhaps, not a model of decorum, given the demeanor of [Granger] all during the trial[,] the prosecutor's comments were harmless."  SHCR-01.Supp.2 at 191.

Moreover, Granger cannot show prejudice given the considerable evidence establishing his guilt.  Namely, the State established that Granger was the only person firing a weapon before Sebolt was on the ground and the first law enforcement officer responded.  Granger fails to show that the state court unreasonably determined that he could not demonstrate prejudice.  SHCR-01.Supp.2 at 196.  This claim is denied.

> M.   Claim 14 (*Atkins* and IATC):  Because Granger's brain damage and psychosis—defects beyond his control—are morally indistinguishable from intellectual disability, he is categorically ineligible for the death penalty, and his counsel were ineffective for failing to make that claim.

Granger claims that his evidence of brain damage and psychosis are morally indistinguishable from intellectual disability, and, thus, he is categorically ineligible for the death penalty under *Atkins v. Virginia*, 536 U.S. 304 (2002).[30]  (#44 at 152–56).  In a canned argument, with no application to him personally, Granger asserts that the court should declare him "ineligible for the death penalty because his conditions undermine his moral culpability, and because his conditions originated in his biology, not his choice."  (#44 at 156).  Even though the title of this claim asserts that Granger is raising an IATC claim, it contains no argument that any counsel was ineffective for failing to raise this argument in the state courts below.  (#44 at 152–56).

In response, the Director contends that Granger never presented this claim for state court review; and it is, therefore, unexhausted and procedurally defaulted.  In the alternative, the

---

[30]   Granger's evidence of brain damage and psychosis is new evidence that was not presented to the state habeas court and Granger failed to show that any of the necessary elements of 28 U.S. U.S.C. § 2254(e)(2)(A) applied.  *See* court's analysis of Claims 6 and 7 above discussing Granger's new mental health evidence.

Director asserts the claim is without merit.  (#53 at 242–44).   The Director also notes that—despite the title of this claim—Granger fails to raise an argument regarding ineffective assistance of counsel in the body of his argument.  Granger "does not specify which counsel—trial or appellate—and he makes no other reference to counsel in the body of his briefing.  A passing reference to ineffective assistance of unspecified counsel is insufficient to raise a claim."  (#53 at 242 n.58).  The Director argues that the claim is thus forfeited.

Granger did not present his functional–*Atkins* claim in either his direct appeal or his initial state habeas application.  *See Granger*, 2015 WL 1875907, at *3–7; 1 SHCR-01 at 3–6.  Despite requesting and a receiving a stay to return to state court from this court (*see* #34), Granger did not raise an *Atkins* claim in *Ex parte Granger II*, either.  59 SHCR-02 at 11–14.  Granger has not fairly presented his *Atkins* claim to the state courts for review.  *See Parr*, 472 F.3d at 252 (exhaustion is met "when the substance of the federal habeas claim has been fairly presented to the highest state court" (quoting *Smith v. Dretke*, 422 F.3d 269, 275 (5th Cir. 2005))).

Given Texas's restriction on subsequent writ applications, the TCCA would find the claim procedurally barred under its abuse-of-the-writ doctrine if he returned to the state habeas court yet again, and the claim is therefore procedurally defaulted.  *See Coleman*, 501 U.S. at 735 n.1; *Woodfox*, 609 F.3d at 793 ("If a prisoner fails to exhaust state remedies and the court to which the prisoner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred . . . 'federal courts are barred from reviewing those claims.'" (quoting *Sones v. Hargett*, 61 F.3d 410, 416 (5th Cir. 1995)); Tex. Code of Crim. Proc., art. 11.071 § 5.

Granger does not argue any exception to the procedural default of his claim, nor can he for the reasons stated above—namely, this functional–*Atkins* claim does not meet the miscarriage-of-

justice exception, and *Martinez* does not apply to non-IATC claims.  This claim is procedurally barred, and the default is not excused.  This claim is denied.

As Granger did not present an argument that his counsels' performance was deficient under *Strickland* for failing to present an *Atkins* claim, any ineffective of assistance claim is waived and foreclosed from federal habeas review.  Any IAC claim in this context is denied.

N.    Claim 15:  Granger's death sentence is inconsistent with the evolving standards of decency that mark the progress of a maturing society.

Granger asserts that his death sentence is unconstitutional under the Eighth and Fourteenth Amendments[31] because capital punishment defies evolving standards of decency, operates arbitrarily, fails to serve any valid penological purpose, and inflicts torture.  (#44 at 156–58). Granger raises a generic argument that the death penalty is unconstitutional under evolving standards of decency and that his prolonged stay on Texas's death row is also unconstitutional. (#44 at 156–58).  In response, the Director contends that Granger's claim is procedurally defaulted and without merit.  (#53 at 244–47).

1.    Granger's Eighth Amendment Claim is Procedurally Defaulted

Granger asserts that this claim was "substantially raised" in a pretrial motion but denied by the trial court and not raised on direct appeal.  (#44 at 158).  The claim, according to Granger, was then once again "substantially raised" in his state habeas application, but the TCCA barred it "because habeas is not a substitute for matters which should have been raised on direct appeal."

---

[31]    In addition to making an Eighth Amendment challenge—the only law supporting an evolving standards of decency claim—he asserts, without citation or briefing, the following bases for this claim:  the Fifth, Sixth, and Fourteenth Amendments, "decisional law and other mandatory rules," and international law.  (#44 at 156).  Simply stating possible legal foundations, without argument or supporting case law, is inadequate briefing, so the "claims" founded upon them are forfeited.  *See United States v. Stalnaker*, 571 F.3d 428, 439–40 (5th Cir. 2009) (finding claims forfeited when appellant merely provided "a laundry list of grievances," but did "not fully explain them and often [did] not cite the record or relevant law").  In addition to being waived, arguments under the Fifth, Sixth, Fourteenth Amendments, etc., are procedurally barred for not having been raised in state court.

*Id*. (quoting *Ex parte Granger I*, 2017 WL 3379285, at *4).  Granger argues the state procedural bar is inadequate to render the claim procedurally defaulted.  *Id*.  He is mistaken.

First, the pretrial motion upon which Granger relies claimed that "capital jurors are not making sentencing decisions consistent with state and federal constitutional mandates."  2 CR.Supp.2 at 265.  Not once did this motion mention "evolving standards of decency," but rather it focused on supposed flaws in the sentencing process.  2 CR.Supp.2 at 198–267.  This pretrial motion is not similar to Granger's current claim.  Second, while Granger asserts that his Eighth Amendment claim was raised in his state habeas application, he does not cite to the record.  The only identifying information Granger provides is that the supposed state court analogue was barred for not having been raised on direct appeal.  The four claims barred under that ground in state court—Claims 7, 8, 9, and 10—also do not assert that evolving standards of decency render the death penalty unconstitutional.  1 SHCR-01 at 98–124.  The closest he comes is in Claim 9, and that claim is much like Granger's pretrial complaint—that death sentences are being arbitrarily imposed.  1 SHCR-01 at 109–19.  Again, that is not an evolving-standards-of-decency claim under the Eighth Amendment.  As such, Granger failed to present this claim in state court.

As previously discussed, the failure to present a claim in state court results in procedural default.  *See, e.g.*, *Sones*, 61 F.3d at 416 (noting that "when 'it is obvious that the unexhausted claim would be procedurally barred in state court, we will forego the needless 'judicial ping-pong' and hold the claim procedurally barred from habeas review'" (quoting *Steele v. Young*, 11 F.3d 1518, 1524 (10th Cir. 1993))).  Such is the case here.  Granger does not assert that he can overcome the default, which he cannot.  This claim is denied.

2.    Granger's Eighth Amendment Claim Lacks Merit

The AEDPA greatly limits the ability of this court to grant federal habeas corpus relief when a state court has acted in a manner consistent with clearly established federal law, as set forth by the Supreme Court.  The Court recently reaffirmed the constitutional vitality of capital punishment.  *See Bucklew v. Precythe*, 139 S. Ct. 1112, 1122 (2019) ("The Constitution allows capital punishment.").  Because the Court has never declared the death penalty unconstitutional *per se*, the application of the death sentence to Granger's conviction is wholly consistent with clearly established federal law and does not furnish a basis for federal habeas corpus relief.  The death penalty, as assessed in Granger's case, is constitutional.  Granger's claim, moreover, violates *Teague*.  *See Luna v. Davis*, No. SA-15-CA-451-XR, 2018 WL 4568667, at *36 (W.D. Tex. Sept. 24, 2018).

Granger also argues that his extended time on death row renders his sentence unconstitutional.  Such allegations are often referred to as *Lackey* claims.  *See Lackey v. Texas*, 514 U.S. 1045, 1045 (1995) (Stevens, J., respecting denial of certiorari).  Such claims also fail under *Teague*.  *See White v. Johnson*, 79 F.3d 432, 437–38 (5th Cir. 1996).  They fail on their merits, too.  *See ShisInday v. Quarterman*, 511 F.3d 514, 526 (5th Cir. 2007) (citing *Felder v. Johnson*, 180 F.3d 206, 215 (5th Cir.) (rejecting argument that executing petitioner after 20 years on death row was unconstitutional and stating that the claim bordered on being legally frivolous), *cert. denied*, 528 U.S. 1067 (1999)), *cert. denied*, 555 U.S. 815 (2008).  Binding precedent requires denial of the claim.  Granger has not shown that he is entitled to habeas corpus relief on this claim.

O.      Claim 16:  The presentation of evidence of "extraneous" conduct violates the Fifth, Sixth, Eighth, and Fourteenth Amendments.

Granger contends that the presentation of extraneous offense evidence at the punishment phase violated his Fifth Amendment right to a presumption of innocence, his Sixth Amendment jury trial guarantee, and his Eighth and Fourteenth Amendment rights to reliable sentencing.  (#44 at 159–61).  Granger also asserts that trial counsel failed to object to the prosecutor's reference in closing argument to prior bad acts or to the instructions given to the jury on these bases, which allowed the jury to consider such acts without finding beyond a reasonable doubt, that Granger committed them.  (*Id*. at 160).

The Director points out that Granger never presented these claims for state court review. The claims, therefore, are unexhausted and procedurally defaulted.  (#53 at 247–51).  The claims also fail on *de novo* review and should be denied.  (*Id*.).

1.      These Claims are Unexhausted and Procedurally Defaulted

Granger admits that these claims were not raised on direct appeal or initial collateral review.  (#44 at 160).  Granger contends that he "attempted to pursue th[ese] claim[s]" in his subsequent application; however, his second time state writ application was denied as an abuse of the writ.[32]  *See* SHCR-02 at 11–14; *Ex parte Granger II*.  He further asserts that "state habeas counsels' ineffectiveness in not challenging trial counsels' ineffective performance in *voir dire*[33]

---

[32]     Granger raised the failure to object to the State's closing argument claim that he now presents as Claim 10. *Cf*. (#44 at 125-127) *with* SHCR-02 at 115–17.  He also raised two death-penalty challenges which correspond to his federal claims 19 and 20.  *Cf*. (#44 at 171–78) *with* SHCR-02 at 139–27.  None of these claims, however, are predicated on a failure to impose a beyond-reasonable-doubt standard on extraneous offenses introduced at a capital sentencing proceeding.

[33]     The court presumes that Granger did not intend to reference "*voir dire*" at this point in his argument.

excuses any default, alone and in combination with other instances of their deficiency set forth in this petition." (#44 at 161).

Granger's Fifth, Sixth, Eighth, and Fourteenth Amendment claims are procedurally defaulted for failure to exhaust them in state court. *See Ex parte Granger II*. Granger's perfunctory reference to *Martinez* does not save him, as *Martinez* does not apply to non-IATC claims, so his Fifth, Sixth, Eighth, and Fourteenth Amendment claims are barred and cannot be reviewed by the court. *Martinez,* furthermore, does not save his IATC claim because, as explained below, it is entirely meritless and insubstantial.

### 2.   In the Alternative, this Claim is Meritless

Circuit precedent is clear: "[T]he admission of unadjudicated offenses in the sentencing phase of a capital trial does not violate the [E]ighth and [F]ourteenth amendments." *Williams v. Lynaugh,* 814 F.2d 205, 208 (5th Cir.) ("Evidence of these unadjudicated crimes is clearly relevant to the jury's task of determining whether there is a probability that [the defendant] would continue to commit acts of violence as required by [the] special [issues]."), *cert. denied*, 484 U.S. 935 (1987); *see Brown v. Dretke,* 419 F.3d 365, 376 (5th Cir. 2005) ("[T]here is no constitutional prohibition on the introduction at a trial's punishment phase of evidence showing that the defendant has engaged in extraneous, unadjudicated, criminal conduct."), *cert. denied*, 564 U.S. 1217 (2006). Neither the Fifth Circuit nor the Supreme Court has held that the State must prove unadjudicated offenses beyond a reasonable doubt before they may be used at sentencing. *See Brown*, 419 F.3d at 376–77; *Harris v. Johnson,* 81 F.3d 535, 541 (5th Cir.), *cert. denied*, 517 U.S. 1227 (1996). Therefore, Eighth Amendment or due process challenges to the admission of

unadjudicated extraneous offenses during sentencing are *Teague*-barred. *Brown,* 419 F.3d at 376–77; *Beazley,* 242 F.2d at 262.

Granger does not address this authority, instead relying on *Ring v. Arizona,* 536 U.S. 584 (2002). (*See* #44 at 159–60). *Ring* holds that death-eligibility factors are the functional equivalent of elements of the greater offense and must therefore be found by the jury beyond a reasonable doubt. 536 U.S. at 589. *Ring* is inapplicable here. In Texas, the "aggravating factors"—which are sufficient to increase the maximum possible punishment a defendant can receive to "death"—are established when the jury finds a defendant guilty of capital murder. TEX. PENAL CODE §§ 12.31(a) (a defendant found guilty of a capital felony can be punished by life imprisonment or death), 19.03(a)–(b) (enumerating ten specific circumstances which constitute a capital felony). The concerns addressed in *Ring* are disposed of under Texas law at the guilt phase of the trial. *See Adams v. Thaler,* 421 F. App'x 332, 334–35 (5th Cir.) (citing *Granados v. Quarterman,* 455 F.3d 529, 536 (5th Cir. 2006) ("In sum, the state was required to prove beyond a reasonable doubt every finding prerequisite to exposing Granados to the maximum penalty of death.")), *cert. denied*, 565 U.S. 942 (2011).

Granger cites no case law extending *Ring* to the extraneous-offense context, and his request that *Ring* be extended notwithstanding the absence of precedent is barred by *Teague*. *See Jackson v. Dretke*, 181 F. App'x 400, 410 (5th Cir.) (finding claim that trial court should have instructed capital sentencing jury that unadjudicated extraneous offenses needed to be proven beyond a reasonable doubt to be barred by *Teague*), *cert. denied*, 549 U.S. 1016 (2006). Because Granger provides no legal support for his argument, his claim is waived. *See id*. at 411 (finding waiver where petitioner cited no authority for claim that admission of unadjudicated extraneous offense

evidence violates Eighth and Fourteenth Amendments); *see also Summers v. Dretke,* 431 F.3d 861, 870 (5th Cir. (2005), *cert. denied,* 549 U.S. 840 (2006).

Because any objection or motion by trial counsel based on these theories would be futile, Granger cannot demonstrate any deficiency in trial counsels' performance. *See Ries,* 52 F.3d at 530 (holding that counsel is not ineffective for failing to object because proposed objection was of questionable merit, and petitioner had not shown reasonable probability of objection being sustained); *Nixon v. Epps,* 405 F.3d 318, 328 (5th Cir.) (no deficient performance under *Strickland* where objection would have been fruitless), *cert. denied,* 546 U.S. 1016 (2005). Moreover, as Granger acknowledges, counsel tried to preclude the admission of unadjudicated extraneous offense evidence based on *Ring,* but the trial court denied it. *See* 3 CR.Supp.2 at 437–44; 5 RR 40.

Unlike Granger, counsel recognized that his request was "not the current state of the law" and would in effect "be making new law." 5 RR 40. Further, objecting during closing argument would only call attention to the evidence, and counsel was reasonable not to do so. *See Nixon,* 405 F.3d at 328 ("If anything, counsel's decision not to object, and thereby highlight the prosecution's arguments to the jury, was a prudent trial decision."). Thus, Granger cannot demonstrate deficient performance or prejudice because any objection would have been unavailing. Claim 16 fails on *de novo* review. Granger is not entitled to habeas relief based on this claim.

P.   <u>Claim 17: The jury's determination of Special Issue One lacked the guided discretion required by the Eighth and Fourteenth Amendments, because the terms of the question are vague and undefined, and the use of "probability" undermines the State's burden of proof.</u>

Granger argues that the future dangerousness special issue is unconstitutionally vague because it fails to define the terms "probability," "criminal acts of violence," and "continuing

threat to society." (#44 at 161–62). Granger complains that, without a definition of these terms, the issue fails to narrow the class of death-eligible defendants, while the use of the word "probability" undermines the State's burden of proof. (*Id.*).

The Director responds that Granger's challenge to the future dangerousness special issue is procedurally barred. He also contends that this claim is barred by an independent and adequate state-law ground and that the claim fails on the merits. (#53 at 251–53).

### 1.   This Claim is Procedurally Barred

Granger raised his challenge to the future dangerousness special issue for the first time on state habeas review. The TCCA held that the claim was procedurally barred "because habeas is not a substitute for matters which should have been raised on direct appeal." *Ex parte Granger,* 2017 WL 3379285, at *4. Relying on a single dissenting state court opinion, Granger contends that the TCCA's ruling is neither firmly established nor consistently followed and thus does not bar federal habeas review. (*See* #44 at 158, 162) (citing *Ex parte Carter,* 521 S.W.3d 344, 359–60 (Tex. Crim. App. 2017) (Alcala, J., dissenting)).

The Fifth Circuit, however, has repeatedly upheld the adequacy of this state procedural bar. *See, e.g.*, *Dorsey v. Quarterman,* 494 F.3d 527, 532 (5th Cir. 2007), *cert. denied*, 552 U.S. 1232 (2008); *Aguilar v. Dretke*, 428 F.3d 526, 535 (5th Cir. 2005), *cert. denied*, 547 U.S. 1136 (2006); *see also Scheanette,* 482 F.3d at 827–28 (court upholding procedural bar on challenge to use of "probability" (citing *Busby,* 359 F.3d at 718–19). Granger's claim is barred, and he makes no effort to demonstrate any exception to the procedural bar. Granger is not entitled to habeas corpus relief on this claim.

2.    In the Alternative, the State Court Reasonably Rejected the Claim

Granger's claim also fails on the merits.  The state court alternatively found that the TCCA has consistently and repeatedly:  upheld the constitutionality of the Texas death penalty scheme; held that the terms "deliberately," "criminal acts of violence," and "continuing threat to society" require no special definitions; and held that Tex. Code of Crim. Proc., art. 37.071, is not unconstitutional for lack of definition.  SHCR-01.Supp.2 at 198–99 (collecting cases).

Federal courts, too, have repeatedly rejected similar challenges to Texas's future dangerousness special issue.  *See Johnson v. Texas,* 509 U.S. 350, 373 (1993); *Franklin v. Lynaugh*, 487 U.S. 164, 171 (1988); *Jurek v. Texas*, 428 U.S. 262 (1976); *Pulley v. Harris*, 465 U.S. 37, 50 n.10 (1984); *see also Sprouse v. Stephens,* 748 F.3d 609, 622–23 (5th Cir.) (denying COA on constitutional-vagueness challenge to "probability," "criminal acts of violence," and "continuing threat to society" as not running afoul of Supreme Court precedent), *cert. denied*, 574 U.S. 993 (2014); *Scheanette,* 482 F.3d at 827–28 (denying COA on claim that failure to define "probability" dilutes states burden of proof); *Turner,* 481 F.3d at 299; *Leal v. Dretke,* 428 F.3d 543, 553 (5th Cir. 2005), *cert. denied*, 547 U.S. 1073 (2006).

The Fifth Circuit also has specifically rejected Granger's allegation that the use of "probability" violates *Ring*.  (*See* #44 at 161–62).  In *Turner*, the court explained that capital juries make two determinations:  (1) eligibility for the death penalty; and (2) selection of the penalty.  481 F.3d at 299; *see Tuilaepa v. California,* 512 U.S. 967, 971 (1994).  As to eligibility for the death penalty, the jury must find an aggravating circumstance, which cannot be "unconstitutionally vague."  *Turner,* 481 F.3d at 299 (citing *Tuilaepa*, 512 U.S. at 972).  As to the selection of the penalty, "the jury must be allowed to make 'an individualized determination'

and . . . may even be given 'unbridled discretion in determining whether the death penalty may be imposed.'" *Id.* (citing *Tuilaepa,* 512 U.S. at 972, 979–80).  Given that Texas law requires the eligibility determination to be made at the guilt-innocence phase, *Ring* is not applicable to any discussion of the constitutional requirements of the selection phase.  *Id.* at 300.

Because controlling federal law upholds the constitutionality of the Texas future dangerousness issue, Granger's argument is barred by *Teague.  See Scheanette,* 482 F.3d at 827. Any argument that the state court's adjudication of this claim was unreasonable is plainly contradicted by Supreme Court and Fifth Circuit precedent.  SHCR-01.Supp.2 at 198–99. Granger's Claim 17 is procedurally barred and fails on the merits.

> Q.   <u>Claim 18 (10/12 Rule):  Granger's rights under the Sixth, Eighth, and Fourteenth Amendments were violated because the trial court did not instruct the jury that a vote for life by one juror would result in a life sentence</u>.

In Claim 18, Granger contends that the Texas capital sentencing scheme, facially and as applied, violates the Sixth, Eighth, and Fourteenth Amendments.[34]  (#44 at 162–71).  Usually in the punishment phase of the trial, a jury will answer three special issues under the Texas capital sentencing scheme.  In Granger's punishment-phase trial, however, the jury answered only two questions:  (1) will the defendant be a future danger to society; and (2) do sufficient circumstances mitigate against a death sentence.  *See* TEX. CODE CRIM. PROC., art. 37.071 § 2(b).

The Texas statute requires jurors to answer the future-dangerousness issue first.  *See id.* at § 2(d).  In a provision called the "10-12" or "12-10" Rule, the statute requires instructing the

---

[34]   Under Texas law, up to three special issues are submitted to the jury during the sentencing phase of a capital trial:  (1) whether there is a probability that the defendant constitutes a continuing threat to society; (2) whether the defendant actually caused, intended, or anticipated the death of the deceased; and (3) whether, considering all of the evidence, there are sufficient mitigating circumstances to warrant life without parole rather than death. TEX. CODE CRIM. PROC., art. 37.071 § (2)(b)(1)–(2), (e)(1).  Here, Granger is challenging Special Issue Nos. 1 and 3—future dangerousness and mitigation.

jury that an affirmative answer to the future-dangerousness issue must be unanimous and the jury "may not answer any issue 'no' unless 10 or more jurors agree." *See id.* at § 2(d)(2).  Under the statute, "if the jury returns an affirmative finding" on the future-dangerousness issue, then jurors must consider whether mitigating circumstances provide for a life sentence.  *See id.* at § 2(e)(1). A "no" answer on the mitigation question requires unanimity, but a "yes" answer requires only 10 votes.  *See id.* at § 2(f).  An answer resulting in a death sentence must be unanimous, but an answer that would result in a life sentence requires only ten votes.

Here, Granger argues that the Texas statutory requirement that ten jurors must agree before answering the future dangerousness special issue "no" and that ten jurors must agree before answering the mitigation issue "yes" violates his constitutional rights.  In order to sentence him to death, Granger's jury had to find unanimously that he posed a future danger to society and that the mitigating evidence was insufficient to warrant a life sentence.  If a single juror votes "no" on the future dangerousness special issue, or "yes" on the mitigation special issue, then the defendant receives a life sentence.  TEX. CODE CRIM. PROC., art. 37.071 § 2(g).

Granger claims that the failure to provide instruction on how to proceed if the jury does not agree on a sentence creates an unconstitutional risk of arbitrary and unreliable sentencing and a risk of jury coercion.[35]  (*Id.* at 164) (citing *Mills v. Maryland*, 486 U.S. 367 (1988); *Lockett v. Ohio*, 438 U.S. 586 (1978); *Jenkins v. United States*, 380 U.S. 445, 446 (1965)).  Granger also complains that the requirement that ten jurors must agree on an answer to a special issue before a life sentence may be imposed diminishes a juror's individual sense of responsibility by creating

---

[35]    Texas law specifies that if the jurors are "unable to answer any issue . . . the court shall sentence the defendant to confinement in the institutional division of the Texas Department of Criminal Justice for life imprisonment without parole."  TEX. CODE CRIM. PROC., art. 37.071 § 2(g).  A life sentence results when jurors cannot reach the required number of votes on answers that would result in a death sentence.  Texas law, however, forbids the court or counsel from informing the jury "of the effect of a failure of a jury to agree" on the special issues.  *Id.* § 2(a)(1).

the impression that a single hold-out juror would be insufficient to affect the outcome.  (*Id.* at 164–71) (citing *Caldwell v. Mississippi*, 472 U.S. 320 (1985); *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020)).

The Director responds that Granger's claim is procedurally barred by an independent and adequate state-law ground.  (#53 at 254–57).  In the alternative, the Director states that Granger fails to demonstrate that the state court's rejection of his claim was unreasonable.

1.    The Claim is Procedurally Barred

Granger asserts that trial counsel moved to have the 10/12 rule declared unconstitutional, 2 CR Supp. 344-70, but the motion was denied.  5 RR 31.  Granger's appellate counsel did not challenge the constitutionality of the 10/12 Rule on direct appeal.  State habeas counsel challenged the constitutionality of the rule; however, the TCCA concluded that the claim was "procedurally barred because habeas is not a substitute for matters which should have been raised on direct appeal."  (#44 at 171); *see Ex parte Granger I*, 2017 WL 3379285, at *4.  Despite the dismissal of this claim as procedurally barred by the TCCA, Granger asserts that Texas's rule of disallowing claims in state habeas that could have been raised on direct appeal is neither firmly established nor consistently followed, and, thus, does not bar federal habeas review.  (#44 at 171).

Granger is incorrect regarding the procedural bar.  The Fifth Circuit has repeatedly upheld the adequacy of this bar.  *See, e.g.*, *Dorsey,* 494 F.3d at 532; *Aguilar,* 428 F.3d at 535; *see also Scheanette,* 482 F.3d at 827–28 (court upholding procedural bar on challenge to use of "probability" (citing *Busby,* 359 F.3d at 718–19)).  Granger further fails to demonstrate any exception to the procedural bar.  This claim is barred, and Granger is not entitled to habeas corpus relief on this claim.

2.     Alternatively, the State Court's Adjudication was Reasonable

In *Granger I*, Granger challenged the constitutionality of the 10/12 Rule contending that his rights under the Sixth, Eighth, and Fourteenth Amendments were violated when the state court was prohibited from instructing the jury that a vote by one juror would result in a life sentence. SHCR-01 at 98-104.  The state habeas court made a specific finding and conclusion that Granger's jury was "properly provided the proper instructions and asked to answer the statutorily mandated issues as mandated by Tex. Code Crim. Proc. Art. 37.071," and that Texas's death penalty scheme is constitutional per *Saldano v. State*, 232 S.W.3d 77 (Tex. Crim. App. 2007), *cert. denied*, 552 U.S. 1232 (2008).  SHCR-01.Supp. at 329, 201.  The state court held that Granger's 10/12 claim lacked merit.  SHCR-01.Supp.2 at 198.

Addressing this same type issue, the Supreme Court has held that "the Eighth Amendment does not require that the jurors be instructed as to the consequence of their failure to agree." *Jones v. United States*, 527 U.S. 373, 381 (1999).  In *Jones*, a capital defendant wished to inform the jury that a life sentence without parole would be imposed if it could not reach a punishment verdict.  *Id*. at 380–81.  The Court held:

> [T]he proposed instruction has no bearing on the jury's role in the sentencing process. Rather, it speaks to what happens in the event that the jury is unable to fulfill its role . . . Petitioner's argument . . . appears to be that a death sentence is arbitrary within the meaning of the Eighth Amendment if the jury is not given any bit of information that might possibly influence an individual juror's voting behavior.  That contention has no merit.

*Id*. at 382.

Relying on *Jones*, the Fifth Circuit has repeatedly rejected similar 10/12 Rule challenges. *See Sprouse*, 748 F.3d at 622–23 (holding circuit precedent and *Jones* foreclose COA on whether failure to inform jury of consequences of hold-out juror is constitutional); *Blue*, 665 F.3d at

669–70 (holding "*Jones* insulates the [10/12] Rule from constitutional attack"); *Druery v. Thaler*, 647 F.3d 535, 543–44 (5th Cir. 2011) (acknowledging *Jones* and rejecting argument, under *Caldwell,* 472 U.S. at 320, that failure to inform jurors of consequence of failure to agree relieves them of individual responsibility), *cert. denied*, 565 U.S. 1207 (2012).

The Fifth Circuit has denied the same arguments underlying Granger's challenge to the Texas capital sentencing scheme's requirement of jury unanimity for a verdict favorable to the prosecution but only ten votes for a verdict favorable to the defense on the capital sentencing special issues. *See*, *e.g.*, *Blue*, 665 F.3d at 669–70 (rejecting an Eighth Amendment challenge to the Texas 10/12 rule); *Jacobs v. Scott*, 31 F.3d 1319, 1328–29 (5th Cir. 1994) ("Under the Texas system, all jurors can take into account any mitigating circumstance.  One juror cannot preclude the entire jury from considering a mitigating circumstance."), *cert. denied*, 513 U.S. 1067 (1995).

The cases upon which Granger relies do not undercut these precedents.  The Fifth Circuit has rejected challenges to Texas's 10/12 Rule predicated on *Mills*, *Lockett*, and *Caldwell*.  *See Allen*, 805 F.3d at 631–32 (rejecting argument that sentencing process violated *Mills* because jurors may believe that they do not have the individual ability to prevent death sentence); *Druery*, 647 F.3d at 542–44; *Alexander v. Johnson*, 211 F.3d 895, 897 n.5 (5th Cir. 2000) (expressly rejecting contention that 10/12 Rule prevents jurors from considering mitigating circumstances). Granger's reliance on *Jenkins*, 380 U.S. at 446, is misplaced as *Jenkins* does not address the 10/12 Rule or *Jones*.  Rather, in *Jenkins*, after the jury indicated that they were unable to agree upon a verdict because of insufficient evidence, the judge told the jury, "You have got to reach a decision in this case." 380 U.S. at 446.  In briefing to the Court, the respondent essentially conceded that,

if the Court concluded that the judge's statement was coercive, the judgment should be reversed under "the principle that jurors may not be coerced in surrendering views conscientiously held[.]" *Id*. The Court granted relief, agreeing that the judge's statement did indeed have a coercive effect. *Id*. Such blatant coercion did not occur in this case, and Granger does not address any of the above cited, binding precedent.

Granger cites to *Ramos,* 140 S. Ct. at 1397, for the proposition that the 10/12 Rule unconstitutionally "disempowers the single juror who sails against the wind." (*See* #44 at 168–71). *Ramos*, however, was decided three years after the state court adjudicated Granger's claim. *Cf. Ramos*, 140 S. Ct. at 1390 (decided April 20, 2020), *with Ex parte Granger I*, 2017 WL 3379285 (decided May 17, 2017). *Ramos* cannot be used to demonstrate the unreasonableness of the state court adjudication because it was not clearly established precedent at the time of the adjudication. *See* § 2254(d); *cf. Shoop*, 139 S. Ct. at 507–09 (criticizing a federal court for relying on *Moore*, 137 S. Ct. at 1039, to assess the reasonableness of a state court's pre-*Moore* adjudication of an intellectual disability claim under § 2254(d)). In any event, it does not undermine the state court's decision, as *Ramos* held that "'the Sixth Amendment's right to a jury trial requires a unanimous verdict to support a *conviction*,' not a sentence." *See Ruiz v. Davis*, 819 F. App'x 238, 246 n.9 (5th Cir. 2020) (quoting *Ramos*, 140 S. Ct. at 1397), *cert. denied*, 142 S. Ct. 354 (2021). "*Ramos* is of no moment" to Granger's sentencing challenge. *Id.*

Granger effectively asks the court to adopt a new rule of constitutional criminal procedure, but that request is barred by *Teague*. *See Blue,* 665 F.3d at 670 (to the extent "10/12 Rule" challenge urges adoption of new rule, it is barred under *Teague*); *Hughes v. Dretke,* 412 F.3d 582, 593–94 (5th Cir. 2005) (rejecting Eighth Amendment challenge to "10/12 Rule" as *Teague-*

barred), *cert. denied*, 546 U.S. 1177 (2006); *see also In re Sharp*, 969 F.3d 527, 529 (5th Cir. 2020) ("Even if we further assume that *Ramos* constitutes a 'new rule of constitutional law,' the Supreme Court plainly has not made it retroactive to cases on collateral review."). The state court's rejection of Granger's claim was not objectively unreasonable. SHCR-01.Supp.2 at 198.

The TCCA's rejection of Granger's state habeas challenge to the constitutionality of Texas's 10/12 Rule was neither contrary to, nor involved, an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Granger's trial. Granger is not entitled to habeas corpus relief on this claim.

> R. <u>Claim 19 (Mitigation Special Issue): The trial court's instructions and the prosecutor's arguments limited the jury's ability to give effect to mitigating evidence, in violation of the Eighth and Fourteenth Amendments.</u>
>
> <u>Claim 20 (Definition Claim): The trial court erred in failing to instruct the jury that mitigating circumstances do not need to be proved beyond a reasonable doubt, violating Granger's Eighth and Fourteenth Amendment rights; trial counsel were ineffective for failing to move for a proper instruction or object to the instruction as given.</u>

In Claims 19 and 20, Granger raises two Eighth Amendment challenges to the mitigation special issue: (1) that the statutorily-required definition of mitigating evidence impermissibly limited the jury's consideration of mitigating evidence (#44 at 171–75) (the "definition" claim); and (2) that the absence of a burden-of-proof instruction unconstitutionally limited the jury's ability to consider and give effect to his mitigating evidence (*id.* at 175–77) (the "burden-of-proof" claim). Granger also alleges that trial counsel were ineffective for failing to object on these grounds. (*See id.* at 174–75, 178).

The Director responds that Granger's challenges to the mitigation special issue are procedurally barred. (#53 at 257–63). The Director also argues that the state court reasonably adjudicated these claims. The Director further contends that Granger's definition claim was reasonably rejected by the state court, and the remainder of his claims are meritless on *de novo* review.

### 1. The Claims are Procedurally Barred

Granger admits that he raised the underlying definition claim but did not raise the related IATC claim on initial state habeas review. (#44 at 174–75). Granger's definition claim is also barred because the state habeas court rejected it on an independent and adequate state law ground. *See Ex parte Granger I*, 2017 WL 3379295, at *4.

Further, Granger admits that he did not raise the burden-of-proof claim or attendant IATC claim on initial state habeas review. (*Id*. at 178). He admits that he raised all of the above claims, as presented in the instant petition, in a second state habeas application, which the TCCA rejected as an abuse of the writ without addressing the merits. (*Id*. at 175, 178). These admissions establish procedural default. Granger's only argument for overcoming these defaults is a perfunctory reference to *Martinez*. *Id*. *Martinez*, however, does not excuse defaulted non-IATC claims, and, in any event, because all the claims are meritless, *Martinez* does not benefit him. Granger's claims are procedurally barred.

### 2. Alternatively, Granger's claims were Reasonably Rejected or Meritless

#### a. The State Court Reasonably Rejected the Definition Claim

Granger complains that the definition of mitigation under TEX. CODE OF CRIM. PROC., art. 37.071 § 2(f)(4), impermissibly limited the jury's consideration of his mitigation evidence and effectively instructed the jury to disregard mitigating evidence that was unrelated to his moral

culpability.  (#44 at 171–75).  Granger contends that the jury may have been unable to consider evidence that Granger was kind toward children and had no relationship with his own father, and, as a consequence, the State was able to exploit the definition "to force home the idea that the jury should not consider much of [Granger]'s mitigation case."  (*Id.* at 173.)  The state court's rejection of his claim, *see* SHCR-01.Supp.2 at 203, however, is indisputably correct in light of Supreme Court and Fifth Circuit precedent.  Accordingly, the AEDPA precludes relief.

A review of the mitigation instruction given shows that Granger's capital-sentencing jury was not denied a vehicle for expressing its reasoned, moral response to Granger's mitigating evidence.  The trial court instructed the jury:

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

CR.Supp.3 at 8.  The trial court further instructed that the jury should "consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's blameworthiness." *Id.* at 9.

The Fifth Circuit has repeatedly held that "Texas's definition 'encompasses virtually any mitigating evidence.'"  *Roach v. Quarterman*, 220 F. App'x 270, 277 (5th Cir. 2007) (quoting *Beazley*, 242 F.3d at 260); *see McCoskey v. Thaler*, 478 F. App'x 143, 150 (5th Cir. 2012) ("The capacious definition of 'mitigating evidence' employed in the Texas statute can 'encompass . . . virtually any mitigating evidence.'"), *cert. denied*, 568 U.S. 1093 (2013).  Furthermore, the Supreme Court specifically commended the new statute as a "[a] clearly drafted catchall instruction on mitigating evidence" and a model of "brevity and clarity."  *Penry II*, 532 U.S. at 802–03.

The Fifth Circuit has soundly rejected Granger's specific argument that the definition unconstitutionally limits the categories of evidence that may be considered mitigating.  *See Sprouse*, 748 F.3d at 622; *Blue*, 665 F.3d at 663–68; *Beazley*, 242 F.3d at 259.  In *Blue*, the petitioner raised a similar claim arguing that due to the unconstitutionally narrow definition, a reasonable juror would assume that "moral blameworthiness" relates only to those factors directly related to the commission of the crime, while other socio-economic and psychological reasons for the defendant's behavior—such as evidence of "poor mental health, low IQ, and good conduct while incarcerated"—were effectively beyond the jury's reach.  *Id.* at 665–66.  The Fifth Circuit found this argument to be foreclosed.  *Id.* at 666–67 (relying on *Beazley*).

Further, Granger's arguments to the contrary are barred by *Teague*'s nonretroactivity principles.  Granger thus has not shown that the state court's denial of this claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Supreme Court law or that the decision was based on an unreasonable determination of the facts in light of the evidence presented.  *See* SHCR-01.Supp.2 at 203.  Granger's claim does not merit habeas corpus relief.

b.    <u>Granger's Remaining Claims are Meritless</u>

Granger's IATC claims and his burden-of-proof claim fail on *de novo* review.  In his burden-of-proof claim, Granger argues that the trial court erred by failing to instruct the jury that mitigating circumstances do not need to be proven beyond a reasonable doubt.  (#44 at 175–78).  Granger further argues that the error was effectively compounded by the fact that the jury instructions on guilt, the future dangerousness special issue, and extraneous crimes or bad acts all required beyond-a-reasonable-doubt findings and the jury therefore likely believed that *all findings*, including mitigating circumstances, were required to be made beyond a reasonable doubt.

(*Id*. at 176–77).  Granger speculates that, without this instruction, the jury was unconstitutionally limited in its ability to consider and give effect to his mitigating evidence.  (*Id*. at 177–78) (citing *Penry I*, 492 U.S. at 327–28; *Lockett*, 438 U.S. at 605).

The Supreme Court, however, has specifically rejected the contention that the Eighth Amendment requires the trial court to instruct the jury that mitigating circumstances "need not be proved beyond a reasonable doubt." *Kansas v. Carr*, 577 U.S. 108, 118–22 (2016) (relying on *Buchanan v. Angelone*, 522 U.S. 269 (1998), and *Weeks*, 528 U.S. at 225).  The Court "doubt[ed] whether it is even *possible* to apply a standard of proof to the mitigating-factor determination (the so-called 'selection phase' of a capital-sentencing proceeding)" because it is "largely a judgment call (or perhaps a value call)[.]" *Id*. at 119 (emphasis added).  The Court further found "equally unavailing" an "as applied" argument that suggested that a jury instruction was necessary in a particular case to avoid confusion regarding the burden of proof.  *Id*. at 120–21.  "Ambiguity in capital-sentencing instructions gives rise to constitutional error only if 'there is a *reasonable likelihood* that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence.'" *Carr*, 577 U.S. at 120 (quoting *Boyde,* 494 U.S. at 380).  "A meager 'possibility' of confusion is not enough." *Id*. at 643.

Here, the jury instructions clearly required the State to prove that Granger would be a future danger beyond a reasonable doubt but only required the jury to find that "a" mitigating circumstance existed to warrant life.  CR.Supp.3 at 7–9.  Similar to the language in *Carr*, "a" mitigating circumstance "certainly does not suggest proof beyond a reasonable doubt." 577 U.S. at 121.  The mere juxtaposition between the explicit reasonable-doubt burden in the first special issue and the lack of burden in the second special issue is not enough to "[cause] the jury to

speculate that mitigating circumstances must also be proved beyond a reasonable doubt." *Id*. "The instructions as a whole distinguish clearly between aggravating and mitigating circumstances," and "[t]he reality is that jurors do not 'pars[e] instructions for subtle shades of meaning in the same way that lawyers might.'" *Id*. at 121–22. On these instructions, "no juror would reasonably have speculated that mitigating circumstances must be proved by any particular standard, let alone beyond a reasonable doubt." *Id*. at 122. "Jurors would not have misunderstood these instructions to prevent their consideration of constitutionally relevant evidence." *Id*. Granger does not acknowledge, much less distinguish, *Carr*, which is fatal to his claim.

The Fifth Circuit, furthermore, has consistently held "No Supreme Court or Circuit precedent constitutionally requires that Texas's mitigation special issue be assigned a burden of proof." *Rowell v. Dretke*, 398 F.3d 370, 378 (5th Cir.), *cert. denied*, 546 U.S. 848 (2005); *see Druery*, 647 F.3d at 546–47 (listing cases rejecting argument that failure to instruct jury that State bears burden of proof on the mitigating special issues is unconstitutional). The Fifth Circuit has similarly rejected allegations that the jury received "mixed signals" because no burden of proof is placed on the mitigation special issue. *See Oliver v. Quarterman*, 254 F. App'x 381, 386–87 (5th Cir. 2007) (noting that the Supreme Court has implicitly upheld Texas's current scheme); *Scheanette*, 482 F.3d at 825–27. Granger's speculative arguments, based on a theory that has been rejected by the Supreme Court and the Fifth Circuit, fail to demonstrate that his mitigating evidence could not be given effect through the special issues. Because his argument is directly contrary to existing Supreme Court precedent, his Eighth Amendment claim is also barred by *Teague*.

Granger's tack-on IATC claims are fruitless here because any objections predicated on either the definition or burden-of-proof claims would not have been successful.  He cannot show that counsel was deficient for failing to object on either basis or that he suffered any prejudice.  *See Nixon*, 405 F.3d at 328 (because objection would have been fruitless, there can be no deficient performance under *Strickland*).  The fact that counsel raised *other* meritless issues does not make them deficient for failing to raise *these* meritless issues.  (*See*, *e.g.*, #44 at 178) (arguing counsel raised similar death-penalty-statute challenges).  Granger fails to demonstrate that his counsel were deficient or that he suffered prejudiced as a result of any deficiency.  Hence, Granger is not entitled to habeas corpus relief on Claims 19 and 20.

S.     Granger Does Not Prove Error or Cumulative Error

Throughout his briefing, Granger repeatedly argues that the cumulative effect of the allegedly ineffective representation he received, the prosecutorial errors inflicted, and the trial court errors committed rendered his trial fundamentally unfair.  (See #44 at 42–45 (Claim 1), 64, 78–79, 83, 115, 122, 127, 138, 152, and 178).  As discussed above, however, Granger has proven no constitutional errors, so he has nothing to cumulate.  *See Derden v. McNeel*, 978 F.2d 1453, 1458 (5th Cir. 1992) (en banc) ("[A]ny cumulative error theory must refer only to *errors* committed in the state trial court."), *cert. denied*, 508 U.S. 960 (1993); *Mullen v. Blackburn*, 808 F.2d 1143, 1147 (5th Cir.1987) ("Twenty times zero equals zero.").

Granger argues that even if none of the above allegations independently entitles him to relief, their cumulative prejudicial effect denied him his right to the effective assistance of counsel at both the guilt/innocence and punishment phases of trial.  The Fifth Circuit has made it clear that cumulative-error analysis applies only in "rare instances" where there is constitutional error to

cumulate.  *United States v. Delgado*, 672 F.3d 320, 344 (5th Cir.) (en banc), *cert. denied*, 568 U.S. 978 (2012); *Derden*, 938 F.2d at 609.   "Meritless claims or claims that are not prejudicial cannot be cumulated, regardless of the total number raised."  *Pondexter*, 537 F.3d at 525.

As discussed throughout this memorandum opinion, none of the claims raised by Granger establish that trial counsels' performance was deficient under the *Strickland* analysis.  Even if counsel could be deemed deficient in one or more of the allegations, this court has found no instances where Granger was prejudiced by counsels' allegedly deficient conduct.  Accordingly, there is no prejudicial effect for this court to cumulate.  *United States v. Thomas*, 724 F.3d 632, 648 (5th Cir. 2013) ("[T]here is no precedent supporting the idea that a series of 'errors' that fail to meet the standard of objectively unreasonable can somehow cumulate to meet the high burden set forth in *Strickland.*"), *cert. denied*, 571 U.S. 1176 (2014); *Pondexter*, 537 F.3d at 525 (finding "[m]eritless claims or claims that are not prejudicial cannot be cumulated"); *United States v. Hall*, 455 F.3d 508, 520 (5th Cir. 2006) ("Our clear precedent indicates that ineffective assistance of counsel cannot be created from the accumulation of acceptable decisions and actions"), *cert. denied*, 549 U.S. 1343 (2007).

Granger's cumulative-error claim therefore is not substantial, nor does it warrant federal habeas corpus relief under a *de novo* standard of review.  Granger is not entitled to habeas corpus relief on his cumulative error claim(s).

VII.     Request for Evidentiary Hearing

Granger, in his amended federal habeas petition (#44 at 21–22), asks that he be afforded an evidentiary hearing on his claims.  Under 28 U.S.C. § 2254(e)(2), the court's ability to hold an evidentiary hearing is limited as follows:

If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—

    (A)  the claim relies on—

        (i)  a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

        (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

    (B)  the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

Here, Granger has failed to make the necessary showing under Section 2254(e)(2).  An evidentiary hearing is not warranted in this proceeding.  There are no issues of fact that remain unresolved, and there is no clear and convincing evidence to overcome the presumption of correctness afforded the state court's detailed factual findings.  Accordingly, Granger's request for an evidentiary hearing (#44 at 21–22) is **DENIED**.

## VIII.  Conclusion

The court has carefully considered each of Granger's claims.  The court finds that each of the claims is foreclosed by clear, binding precedent.  This court concludes that under such precedents, Granger failed to make a substantial showing of the denial of a constitutional right.  Granger has not shown that he is entitled to federal habeas corpus relief, and his petition is denied.

## IX.  Certificate of Appealability

"A state prisoner whose petition for a writ of habeas corpus is denied by a federal district court does not enjoy an absolute right to appeal." *Buck*, 580 U.S. at 115.  Instead, under 28

U.S.C. § 2253(c)(1), he must first obtain a certificate of appealability ("COA") from a circuit justice or judge.  *Id.*  Although Granger has not yet filed a notice of appeal, the court may address whether he would be entitled to a certificate of appealability.  *See Alexander*, 211 F.3d at 898 (concluding a district court may *sua sponte* rule on a certificate of appealability because "the district court that denies a petitioner relief is in the best position to determine whether the petitioner has made a substantial showing of a denial of a constitutional right on the issues before the court.  Further briefing and argument on the very issues the court has just ruled on would be repetitious").

A certificate of appealability may issue only if a petitioner has made a substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2).  To make a substantial showing, the petitioner need only show that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El*, 537 U.S. at 327.  The Supreme Court recently emphasized that the COA inquiry "is not coextensive with merits analysis" and "should be decided without 'full consideration of the factual or legal bases adduced in support of the claims.'"  *Buck*, 580 U.S. at 115 (quoting *Miller-El*, 537 U.S. at 336). Moreover, "[w]hen the district court denied relief on procedural grounds, the petitioner seeking a COA must further show that 'jurists of reason would find it debatable whether the district court was correct in its procedural ruling.'"  *Rhoades v. Davis*, 852 F.3d 422, 427 (5th Cir. 2017) (quoting *Gonzalez v. Thaler*, 565 U.S. 134, 140–41 (2012)).

In this case, reasonable jurists could not debate the denial of Granger's Section 2254 grounds for relief on substantive or procedural grounds or find that the issues presented are

adequate to deserve encouragement to proceed further.  Accordingly, the court finds that Granger is not entitled to a certificate of appealability as to his grounds for relief.  It is accordingly

**ORDERED** that the petition for a writ of habeas corpus is **DENIED** and the case is **DISMISSED** with prejudice.  It is further

**ORDERED** that the request for an evidentiary hearing is **DENIED**.  It is further

**ORDERED** that a certificate of appealability is **DENIED**.  It is finally

**ORDERED** that all motions not previously ruled upon are **DENIED**.

SIGNED at Beaumont, Texas, this 24th day of February, 2023.

_____
MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE